# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SARAH FRANCES DRAYTON, *et al.*,

    Plaintiffs,

       v.

MCINTOSH COUNTY, *et al.*,

    Defendants.

Civ. No. 1:15-cv-04274-ODE

## PLAINTIFFS' CONSOLIDATED OPPOSITION TO STATE AND COUNTY DEFENDANTS' MOTIONS TO DISMISS FIRST AMENDED COMPLAINT

/s/ Reed N. Colfax
Reed N. Colfax (admitted *pro hac vice*)
Ryan C. Downer (admitted *pro hac vice*)
Jia M. Cobb (admitted *pro hac vice*)
Jamie L. Crook (admitted *pro hac vice*)
RELMAN, DANE & COLFAX PLLC
1225 19th St., NW, Suite 600
Washington, D.C. 20036
Tel: 202-728-1888
rcolfax@relmanlaw.com
rdowner@relmanlaw.com
jcobb@relmanlaw.com
jcrook@relmanlaw.com

/s/ Robert Jackson
Robert Jackson, Esq.
(GA Bar #387750)
ROBERT B. JACKSON, IV, LLC
260 Peachtree Street, Suite 2200
Atlanta, Georgia 30303
Tel: 404-313-2039
rbj4law@gmail.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

I.  INTRODUCTION.................................................................................1

   A. Factual Background ....................................................................1

   B.  Procedural Overview ................................................................4

II.  LEGAL STANDARD ...........................................................................5

III.  ARGUMENT .......................................................................................5

   A. Plaintiffs' Claims Are Not Barred by the
   Eleventh Amendment ................................................................5

      1.  *Title VI Abrogates Eleventh Amendment Immunity* ...................................6

      2.  *Title II of the ADA Validly Abrogates Eleventh
      Amendment Immunity with Respect to the State's
      Provision of Public Transportation* .............................................9

      3.  *SIHA Is Not Protected by the Eleventh Amendment
      Because It Is Not an Arm of the State* .......................................14

      4.  *Sheriff Jessup Is Not Acting as an Arm of the State
      with Respect to the Budgetary Allocation Function
      at Issue in this Case*....................................................................20

      5.  *The Board of Tax Assessors Is Not Acting as an
      Arm of the State with Respect to the Appraisal
      Functions at Issue in This Case* ................................................24

   B.  The Tax Injunction Act Is Not a Bar to Any of Plaintiffs'
   Claims Because Plaintiffs Do Not Seek to Enjoin,
   Suspend, or Restrain the Collection of State Taxes..................................28

      1.  *The Discriminatory Appraisals Have Injured
      Plaintiffs Beyond the Tax Assessments* ....................................29

i

2.  *The Garbage Removal Charge Is a Fee, not a Tax* ..................................... 31

3.  *Plaintiffs' Allegations Concerning the Appraisals
    and Tax Assessments Will Support Their Housing
    Discrimination Claims* ................................................................... 34

C.  Raccoon Hogg and HELP Org, Inc. Have Standing ................................. 36

D.  Plaintiffs Have Included Sufficient Allegations to
    State Disparate Treatment Claims Under the FHA,
    42 U.S.C. §§ 1981 and 1982, the Equal Protection
    Clause, and Title VI ........................................................................ 40

1.  *The* Arlington Heights *Factors Provide the Evidentiary
    Framework for Proving Plaintiffs' Disparate Treatment
    Claims* ........................................................................................ 41

2.  *The Fact that the Challenged Conduct May Affect
    Some Individuals Outside the Protected Group Does
    Not Undermine Plaintiffs' Disparate Treatment Claims* ......................... 46

3.  *FHA Liability Extends Beyond the Acquisition of Housing* ..................... 48

4.  *Plaintiffs Have Stated a Claim Under the FHA
    42 U.S.C. § 3605* .......................................................................... 54

5.  *Plaintiffs Have Stated Claims Under 42 U.S.C. §§ 1981,
    1982, and 1983, and the Equal Protection Clause* ................................. 55

    (a)  Plaintiffs have alleged sufficient facts to hold the
         County, Defendant Jessup, and Defendant Board of
         Assessors liable for official County policies, customs,
         and practices ................................................................... 55

    (b)  Section 1982 ..................................................................... 58

    (c)  Section 1981 ..................................................................... 59

    (d)  Equal Protection Clause ....................................................... 60

6.  *Plaintiffs Have Stated Claims Under Title VI*............................................... 61

E.  Plaintiffs' Claims Are Timely ...................................................................... 66

F.  Plaintiffs Have Alleged Viable Claims for Injunctive and Declaratory Relief........................................................................ 69

1.  *Plaintiffs Properly Seek Prospective Injunctive Relief Against Defendants* ........................................................... 69

2.   *Plaintiffs Properly Seek Declaratory Relief Against Defendants* .................................................................. 72

IV.    CONCLUSION ............................................................................... 73

# I.    INTRODUCTION

## A. Factual Background

Plaintiffs are African Americans and Gullah-Geechee descendants with familial, historical, and property connections to Sapelo Island, a barrier island off the coast of McIntosh County, Georgia. The Gullah Geechee are descendants of slaves who, following the Civil War, settled in the coastal areas of North Carolina, South Carolina, Georgia, and Florida. First Amended Compl. (Doc. 29) ("FAC") ¶ 164. The federal government, the State of Georgia, and McIntosh County have all recognized the unique culture and history of the Gullah Geechee and the need for protection to ensure the community's continuing viability. *Id.* ¶ 169, 171.

Sapelo Island is home to the nation's largest remaining intact Gullah-Geechee community, although the full-time resident population has dwindled to approximately fifty, from a peak of 900 in the early 1900s. *Id.* ¶¶ 167, 178, 214. The Island's permanent population remains predominantly African-American and Gullah-Geechee. *Id.* ¶ 166. In addition to the full-time population, the Sapelo Island Gullah-Geechee community includes many Plaintiffs and other descendants who were raised on the Island or have other close connections to it but have been forced to make their lives on the mainland for many reasons, including the difficulty in traveling to and from the Island, which makes it

difficult to maintain a job or attend school on the mainland, and the lack of medical, emergency, police, and other services available on the Island. *Id.* ¶¶ 22, 33, 40, 44, 50, 56, 59, 65, 71, 74, 89, 92, 97, 101, 104, 106, 112, 118, 120, 122, 125, 132, 373-374.

Over the course of the twentieth century, Sapelo Island's Gullah-Geechee community was forced out of various Gullah-Geechee settlements located throughout the Island and relocated to Hogg Hummock, a low-lying, swampy enclave on the southern part of the Island. *Id.* ¶¶ 180-190. A majority of those who were displaced to Hogg Hummock were the victims of fraudulent land swaps and other coercive measures implemented by tobacco heir R.J. Reynolds. *Id.* The State of Georgia ultimately obtained title to the overwhelming majority of land on Sapelo Island through a transfer from Reynolds's widow. *Id.* ¶¶ 191-193.

Plaintiffs' land tenure and the very viability of this unique Gullah-Geechee community are under increasing peril due to a combination of factors, including the unequal provision of vital services to Sapelo Island—which makes full-time residence in Hogg Hummock virtually impossible for those with school-age children, who work full-time, or who have medical issues—and the pressures of development that threaten to convert the Island into a vacation community with luxury second homes and resorts. *Id.* ¶¶ 3, 369-374.

Defendants have provided Plaintiffs with unequal housing-related services

while providing better and more of these services to the predominantly white mainland of the County. Examples of such disparities in the provision of services to Sapelo Island include the absence of any emergency medical services on the Island; inadequate fire protection; a lack of police protection, with inadequate response times; inadequate roads that make certain parts of the Island impassible following rain; unequal trash removal services; a failure to provide sufficient, clean water and sewer services; limited and inaccessible ferry service connecting the Island to the mainland; discriminatory application of the County's zoning code; and interference with Plaintiffs' access to ancestral lands and sites. *Id.* ¶¶ 196-199, 213-323.

Defendants have further discriminated against Plaintiffs by dramatically increasing the appraisals of property and homes in Hogg Hummock based on erroneous appraisal procedures. The average increase in Plaintiffs' property values from 2011 to 2012 was five-fold. Plaintiffs could not afford the inflated taxes, and some were forced to sell their property. *Id.* ¶¶ 324-349. While assessing the Island's property owners a disproportionate share of property taxes, the County has provided them almost no benefit from the property taxes they pay. *Id.* ¶ 349.

The County has refused to consider a preferential tax assessment for Hogg Hummock that would freeze tax assessments as being in a historic district. When

the sole African-American commissioner on the McIntosh County Board of Commissioners moved to propose such a preferential tax assessment, a white Commissioner deviated from normal procedure by requiring additional legislative steps, and the proposed legislation was defeated. *Id.* ¶¶ 350-352.

Plaintiffs further allege that Defendants have failed to allocate federal financial assistance to Sapelo Island. Defendants receive funding from various federal sources and spend it disproportionately in favor of mainland residents over Island residents. Over the last decade, the County has received millions of dollars from the federal government and the State for various projects—including water projects, community development, housing, and capital improvements—virtually none of which has been invested on the Island. *Id.* ¶¶ 353-366.

### B. Procedural Overview

Plaintiffs challenge Defendants' conduct under some of the nations' most important civil rights laws: the Fair Housing Act ("FHA"), the Civil Rights Act of 1866, the Equal Protection Clause, Title VI of the Civil Rights Act of 1964 ("Title VI"), and Title II of the Americans with Disabilities Act ("ADA"). Collectively, these laws broadly prohibit discrimination based on, *inter alia*, race, national origin, and disability.

The County Defendants and the State Defendants' renewed motions to

dismiss (Docs. 46, 48) consist of scattershot attacks and lengthy block quotations, with little actual analysis or application of the law to the allegations in the FAC. Defendants have utterly failed to establish that Plaintiffs should not be allowed to proceed to discovery on their well-pleaded discrimination claims. In addition, the FAC is not a shotgun pleading, contrary to the County Defendants' suggestion. Each cause of action is clearly defined in terms of the relief sought, against which Defendants, and the specific factual allegations that support it.

## II.     LEGAL STANDARD

In ruling on a motion to dismiss under Rule 12(b)(6), the court must accept as true all of the factual allegations in the complaint. *Young Apartments, Inc. v. Town of Jupiter*, 529 F.3d 1027, 1037 (11th Cir. 2008). Its review is "limited to the four corners of the complaint." *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009). The court may not consider the merits of the case: a Rule 12(b)(6) motion must be denied if the "factual allegations, when assumed to be true, [are] enough to raise a right to relief above the speculative level." *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1303 (11th Cir. 2008).

## III.     ARGUMENT

### A. Plaintiffs' Claims Are Not Barred by the Eleventh Amendment

Defendants incorrectly argue that some of Plaintiffs' claims are barred by the Eleventh Amendment. Every claim and defendant is properly before the

5

Court.

As set forth below in Part III.A.1, Plaintiffs' claims against the State and the Department of Natural Resources ("DNR")[1] should not be dismissed because Plaintiffs' claims against them proceed under federal statutes that have abrogated the State's immunity from suit.[2]

As set forth below in Part III.A.3-5, the Eleventh Amendment does not bar Plaintiffs' claims against Defendants SIHA, Jessup, or the Board of Tax Assessors ("Board") because these Defendants are not acting as arms of the State with respect to the conduct giving rise to Plaintiffs' claims.[3]

### 1. Title VI Abrogates Eleventh Amendment Immunity

The State argues that its acceptance of federal financial assistance does not waive its sovereign immunity under Title VI. State Defs.' Mem. at 14-16. Many courts disagree.

---

[1] Plaintiffs assert claims against the State pursuant to Title VI and Title II of the ADA and against the DNR pursuant to Title II of the ADA. FAC ¶¶ 443-458.

[2] Defendants correctly concede that claims for injunctive relief against Deal and Williams in their official capacities do not implicate the Eleventh Amendment. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989).

[3] The Court need not determine that these three Defendants are part of the County in order for Plaintiffs' claims to proceed against them. It suffices that they are not parts of the State, even if the Court were ultimately to conclude that they are not part of the County either. *See Ballard v. Chattooga Cnty. Bd. of Assessors*, 615 F. App'x 621, 626 n.3 (11th Cir. 2015) (recognizing the possibility under Georgia law of an entity that is "neither part of the State nor the County").

Eleventh Amendment immunity under Title VI and other federal statutes that prohibit discrimination by recipients of federal financial assistance is explicitly abrogated in 42 U.S.C. § 2000d-7(1)(1). This section "expresses clear intent of Congress to condition grant of federal funds on State's consent to waive its constitutional immunity" from suit under statutes like Title VI. *See, e.g., Clark v. California,* 123 F.3d 1267, 1270 (9th Cir. 1997), *cert. denied, Wilson v. Armstrong*, 524 U.S. 937 (1998); *Bd. of Pub. Educ. for City of Savannah and Cnty. of Chatham v. Georgia*, No. CV 490-101, 1990 WL 608208, at *6 (S.D. Ga. Sept. 24, 1990) (holding that § 2000d-7 specifically abrogated states' immunity from Title VI suits (citing *Gomez v. Ill. State Bd. of Educ.*, 811 F.2d 1030 (7th Cir. 1987))); *Flores v. Arizona*, 48 F. Supp. 2d 937, 940 (D. Ariz. 1999) (similar).

The caselaw cited by the State is not to the contrary, but merely stands for the proposition that not all agencies of a state (or the state itself) are properly considered to have waived sovereign immunity when one agency or department of the state has accepted federal funds. In other words, if a state's department of transportation accepts federal funds, that receipt of funds does not necessarily bring the activities of all of that state's other agencies within the ambit of Title VI. That proposition is not relevant here because Plaintiffs have alleged that the State itself, which is a Defendant here, has received federal funds. FAC ¶¶ 142, 353.

Defendants cite *Lightbourn v. City of El Paso,* 118 F.3d 421 (5th Cir. 1997),

7

where the Fifth Circuit concluded that the receipt of federal funds by the State of Texas did not bring its Secretary of State within the coverage of the Rehabilitation Act because it was established that the Secretary, who was the sole defendant by the time of judgment, did not receive any federal funds. The citation to *Arroyo v. New York State Insurance Department*, No. 91 CIV. 4200, 1995 WL 611326 (S.D.N.Y. Oct. 18, 1995), *aff'd*, 104 F.3d 349 (2d Cir. 1996), is similarly inapplicable. There, the plaintiff argued that she could sue the New York State Insurance Department under the Rehabilitation Act because:

> (1) The State of New York receives some federal funding; (2) the Insurance Department receives funding from the State of New York; (3) therefore, the Insurance Department receives federal funding for purposes of section 504.

*Id.* at *7. The court rejected the argument because the Insurance Department itself did not receive federal funding directly from the federal government or receive federal funding indirectly from the state. *Id.*

The situation here, however, is different. The State itself is a defendant and the State itself is a recipient of federal funds. FAC ¶¶ 142, 153. Accordingly, it is properly concluded that Defendant State of Georgia waived its sovereign immunity under Title VI when it accepted federal funds.

8

### 2. *Title II of the ADA Validly Abrogates Eleventh Amendment Immunity with Respect to the State's Provision of Public Transportation*

A subset of Plaintiffs who are qualified individuals with disabilities have alleged claims against the State Defendants under Title II of the ADA. These Plaintiffs allege that the State Defendants have failed to make the Sapelo Island ferry and the Meridian and Sapelo Island docks and parking lots readily accessible to and usable by them. *See, e.g.*, FAC ¶¶ 411-412; *see also Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001) (noting that the Title II regulations "specifically require that services, programs, and activities be "readily accessible").

The State Defendants argue that the Eleventh Amendment bars these ADA Title II claims because the FAC does not allege that Defendants' actions rise to a constitutional violation. Contrary to Defendants' assertions, however, Plaintiffs need not demonstrate that the State's conduct *actually* violated the Constitution to show that Congress validly abrogated the State's sovereign immunity pursuant to Congress' authority under § 5 of the Fourteenth Amendment. It is clear that "Title II of the ADA validly abrogates sovereign immunity as to . . . classes of state conduct that do not facially violate the Constitution but are prohibited by Title II in order to 'prevent and deter unconstitutional conduct.'" *Toledo v. Sanchez*, 454 F.3d 24, 31 (1st Cir. 2006) (quoting *Tennessee v. Lane*, 541

9

U.S. 509, 541 (2004)). This is so "even if in the process [Congress] prohibits conduct which is not itself unconstitutional and intrudes into the 'legislative spheres of autonomy previously reserved to the States.'" *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997).

To determine whether Congress validly abrogated sovereign immunity as to a class of conduct that does not rise to a constitutional violation, a court must determine whether the measure taken is "congruent and proportional" to the harm. *Id.* The application of Title II against the State is a valid exercise of Congress' § 5 authority because in this context it exhibits "'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" *Lane*, 541 U.S. at 520 (quoting *City of Boerne*, 521 U.S. at 520).

The Eleventh Circuit has enacted a three-step inquiry to determine whether a particular statute satisfies the congruence and proportionality test. That test requires the court to determine: "(1) the constitutional right or rights that Congress sought to enforce when it enacted the ADA, (2) whether there was a history of unconstitutional discrimination to support Congress' determination that prophylactic legislation was necessary; and (3) whether Title II is an appropriate response to this history and pattern of unequal treatment." *Ass'n for Disabled Americans, Inc. v. Florida Int'l Univ.*, 405 F.3d 954, 957 (11th Cir. 2005).

10

Applying this test in the context of public education, the Eleventh Circuit found that Title II abrogates sovereign immunity. *Id*. The court recognized that Title II seeks to enforce "the Fourteenth Amendment's prohibition on irrational disability discrimination," and even though the right to education is not "fundamental," the historical "record supporting Title II *as a whole*," including the documentation of "unconstitutional disability discrimination in the provision of public services," supported abrogation in that context. *Id*. at 957-58 (internal quotation marks omitted) (emphasis in original).[4]

The logic applied in *Disabled Americans* applies with equal force to the context at issue here, public transportation. The operation of public transit implicates the same "right to be free from irrational disability discrimination" as in public education. *Bowers v. NCAA*, 475 F.3d 524, 554 (3d Cir. 2007); *Disabled Americans,* 405 F.3d at 957. And, the history of disability discrimination in the public transportation context unfortunately mirrors the history of disability discrimination in the public education context. *See Disabled Americans*, 405 F.3d at 958 (when passing the ADA, Congress "document[ed] a pattern of unequal treatment in the administration of a wide range of public services, programs and

---

[4] That historical record revealed that "the unequal treatment of disabled persons in the administration of education has a long history, and has persisted despite several legislative efforts to remedy the problem of disability discrimination." *Id*. at 958.

activities").

In studying the need for the ADA, "Congress found that historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674-75 (2001). Congress noted the specific history of "discrimination against individuals with disabilities persists in such critical areas as . . . *transportation*, . . . and *access to public services*," 42 U.S.C. § 12101(a)(2) (emphasis added); *see also* § 12101(a)(3), and "concluded that there was a compelling need for a clear and comprehensive national mandate to eliminate discrimination" in these areas, *PGA Tour*, 532 U.S. at 675. The legislative record makes clear that Congress determined that accessible public transportation was critical to achieving the ADA goal of eliminating barriers that prevent people with disabilities from readily participating in economic, social, and civic activities.

During the passage of Title II, the vital link between adequate transportation and the ability to exercise fundamental rights was repeatedly emphasized. Rep. Luken observed that transportation plays a "crucial role" in our lives and is "the veritable lifeline which enables all persons to enjoy the full economic and social benefits which our country offers. To be denied effective

12

transportation is to be denied the full benefits of employment, public and private services, and other basic opportunities." 136 Cong. Rec. H2421, H2433 (daily ed. May 17, 1990).

The House Committee on Education and Labor stated that transportation is "the linchpin which enables people with disabilities to be integrated and mainstreamed into society." H.R. Rep. No. 101-485(II), 37 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 319. The Committee cited the notion that "[i]t makes little sense to protect an individual from discrimination in employment if, for example, they have less than adequate accessible public transportation services" and referenced "surveys in 45 communities" showing "consistently, inaccessible transportation has been identified the major barrier, second only to discriminatory attitudes." *Id.* Without accessible transportation, people with disabilities are confined to their homes, unable to go to work, attend school, attend religious services, or meaningfully participate in public life. 42 U.S.C. § 12101(a)(3). Fundamental rights such as these have no meaning if the state prevents individuals from getting to where they need to be in order to exercise those rights. *See* S. Rep. 101-16, at 13 (1990).

In response to this history, Congress selected a narrowly tailored but effective solution. Title II's—

prophylactic remedy acts to detect and prevent discrimination

13

against disabled users of public transportation "that could otherwise go undiscovered and unremedied. By prohibiting insubstantial reasons for denying accommodation to the disabled, Title II prevents invidious discrimination and unconstitutional treatment in the actions of state officials exercising discretionary powers" . . . . and protects the] future ability to exercise and participate in the most basic rights and responsibilities of citizenship.

*Disabled Americans,* 405 F.3d at 959.

In this case, the inaccessibility of the Sapelo Island ferry and docks prevents disabled individuals from accessing other basic services, including education and employment. The history of the ADA and Congress' concern of long-standing discrimination against people with disabilities, combined with the inextricable link between accessible transportation and the ability to exercise a host of fundamental rights, brings the ADA's prohibitions against disability discrimination in the context of public transportation well within Congress' § 5 authority. The abrogation of sovereign immunity in the context of the ADA's prohibitions against disability discrimination in public transportation is congruent and proportional.

### 3. *SIHA Is Not Protected by the Eleventh Amendment Because It Is Not an Arm of the State*

SIHA is not an arm of the State and is subject to suit under the FHA; 42 U.S.C. §§ 1981, 1982, and 1983; and the Equal Protection Clause. Contrary to Defendants' suggestion, Plaintiffs do not contend that these laws abrogate

14

Eleventh Amendment immunity; instead, Plaintiffs argue that SIHA is not entitled to invoke such immunity and is subject to suit under the anti-discrimination laws whether or not immunity has been abrogated.

The question of whether a defendant is an arm of the state for purposes of applying Eleventh Amendment immunity depends on "'the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise. . . .'" *Abusaid v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 405 F.3d 1298, 1303 (11th Cir. 2005) (quoting *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003)); *see also Dukes v. Georgia*, 428 F. Supp. 2d 1298, 1318 (N.D. Ga. 2006) ("[W]hether a defendant is an 'arm of the state' must be assessed in light of the particular function in which the defendant was engaged when taking the action out of which liability arose.").

Under federal law, whether an entity is an arm of the state when engaged in a particular function is determined under the following factors: "(1) how state law defines the entity, (2) what degree of control the state maintains over the entity, (3) the source of the entity's source of funding, and (4) who bears financial responsibility for judgments entered against the entity." *Abusaid*, 405 F.3d at

1303.[5] The factors concerning funding and responsibility for satisfying judgments are the "most important" in determining whether a defendant is an arm of the state, because if the state is not "obligated to bear and pay the resulting indebtedness of the enterprise[,] . . . then the Eleventh Amendment's core concern is not implicated." *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 51 (1994); *accord Hines v. Ga. Ports Auth.*, 278 Ga. 631, 634 (2004). An analysis of these factors establishes that SIHA is not an arm of the State in the context of the FAC.

First, SIHA's enabling statute provides that SIHA is "not the State of Georgia or an agency thereof." O.C.G.A. § 12-3-443(b). Accordingly, the first arm-of-the-state factor weighs against finding that SIHA is an arm of the State. When considering a similar statute, which created a bridge building authority, the Georgia Supreme Court concluded that the authority was a "state instrumentality" but was "not the State, nor a part of the State, nor an agency of the State. It is a mere creature of the State, having distinct corporate entity." *McLucas v. State Bridge Bldg. Auth.*, 210 Ga. 1, 6 (1953). This statutory language relating to SIHA distinguishes it from the Jekyll Island-State Park Authority ("Jekyll Island Authority"), which was at issue in *Fouche v. Jekyll Island-State Park Authority*, 713 F.2d 1518 (11th Cir. 1983). The statute establishing the Jekyll Island

---

[5] The third and fourth factors are sometimes joined. *Walker v. Jefferson Cnty. Bd. of Educ.*, 771 F.3d 748, 751-53 (11th Cir. 2014).

Authority lacks any similar language declaring that it is "not the State of Georgia or an agency thereof." O.C.G.A. §§ 12-3-230 through 277.

SIHA's assignment to the DNR "for administrative purposes only," *see id.*, § 12-3-443(c), does not change the analysis. Assignment to a department for administrative purposes—

> means only that the state department through which the authority deals with the state shall be that department to which the authority is assigned. Any authority created by state law shall retain its separate identity as an instrumentality of the state and a public corporation.

*Id.*, § 50-4-3(c).

In addition, the legislature did not confer on SIHA traditional state powers, such as the power to acquire property through condemnation or eminent domain. *Id.*, § 12-3-445(2). In this regard, SIHA stands in stark contrast to the Jekyll Island Authority, to which the legislature has delegated numerous traditional state powers. *Id.*, §§ 12-3-235, 12-3-236, 12-3-236.1.

Second, the State lacks control over SIHA's activities and operations. SIHA has the capacity to sue and be sued in its own name, *id.*, § 12-3-451; to acquire, hold, and dispose of property in its own name, without state approval, *id.*, § 12-3-445; to adopt, modify, and repeal its own bylaws, rules, and regulations, *id.*, § 12-3-445(5), and "[t]o do all things necessary or convenient" to carry out the other powers specified in § 12-3-445. *Id.*, § 12-3-445(8). It furthermore can contract and

17

sue to enforce such contracts, without any limitation on suits to enforce contracts it executes with the State for the acquisition of property. *Id.*, §§ 12-3-443, 445; *cf. Hines*, 278 Ga. at 637.

The fact that two of SIHA's five members are non-state officials with term limits further shows a lack of state control. O.C.G.A. § 12-3-444; *Hines*, 278 Ga. at 636 n.39 (noting less state control where governor's appointments served for fixed terms and not at the governor's pleasure). Unlike the Jekyll Island Authority, SIHA is not subject to any General Assembly oversight committee. *Compare* O.C.G.A. §§ 12-3-440 through 453 (governing SIHA), *with* § 12-3-234 (establishing a legislative oversight committee for the Jekyll Island Authority and requiring the submission to the committee of quarterly summaries of each lease and contract involving an amount in excess of $50,000).

Thus, the "state control" factor also weighs against finding SIHA to be an arm of the state.

Third, SIHA is financially self-sustaining and, as noted above, is not subject to budgetary oversight by the General Assembly. *See, e.g.*, *Hines*, 278 Ga. at 634 (holding that the Georgia Ports Authority was not an arm of the State because, *inter alia*, the Ports Authority raised its own revenue; had authority to borrow money and to acquire property in its own name; and did not have a statutory right to any state funds); *Vierling v. Celebrity Cruises, Inc.*, 339 F.3d 1309,

18

1315 (11th Cir. 2003) (finding that the Florida Ports Authority was not an arm of the State in large part because it was financially self-sufficient); *cf. Fouche*, 713 F.2d at 1520-21 (observing that the Jekyll Island Authority's budget is reviewed by the State's Office of Planning and Budget and is submitted to the General Assembly, that the legislature has limited the uses to which the authority can put the income it generates, and that the Authority's fiscal life was thus "controlled by the state").

Accordingly, the third arm-of-the-state factor, regarding SIHA's funding also weighs against finding SIHA to be an arm of the State.

Fourth, the State is not obligated to pay any indebtedness of SIHA, including debts arising out of litigation against SIHA. *Cf. Tuveson v. Fla. Governor's Council on Indian Affairs, Inc.*, 734 F.2d 730, 734 (11th Cir. 1984) (fact that state would assume responsibility for any judgment against the entity suggested entity was an arm of the state); *Fouche*, 713 F.2d at 1521 ("[B]ecause the Park Authority's budget is submitted to the General Assembly, presumably the state would be responsible for any debts incurred by it that could not be paid out of its revenues."). This factor, which has been described as one of the most important arm-of-the-state analysis factors, *Hess*, 513 U.S. at 51, further establishes that SIHA should not be deemed an arm of the State in this context.

With all four relevant factors weighing against SIHA being an arm of the

19

State, the Court must conclude that Eleventh Amendment immunity does not apply to any of the claims Plaintiffs have brought against SIHA.

### 4. *Sheriff Jessup Is Not Acting as an Arm of the State with Respect to the Budgetary Allocation Function at Issue in this Case*

Defendant Jessup contends that the Eleventh Amendment shields him from suit in his official capacity because "the plaintiffs complain about [his] law enforcement function, *i.e.* providing police services." County Defs.' Mem. (Doc. 46-1) at 28. [6] As the Eleventh Circuit has made clear, however, a sheriff is not always an arm of the state for Eleventh Amendment purposes, and to determine whether the immunity applies, the court must examine whether the sheriff is acting for the state in the particular context at issue. *See Abusaid*, 405 F.3d at 1303 (quoting *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785) (1997)). Courts again use the four-part arm-of-the-state test articulated above, which begins with defining the particular function of the governmental official at issue.

Plaintiffs challenge Defendant Jessup's budgetary and resource allocation decisions with respect to the provision of police services on Sapelo Island, alleging that Defendant Jessup, along with McIntosh County, has made budgeting and resource allocation decisions that prevent the provision of police

---

[6] Defendant Jessup correctly acknowledges that he would not be immune from suit for prospective injunctive relief even if the Court accepted his Eleventh Amendment immunity argument. *See supra* note 2.

services on Sapelo Island, including regular patrols or guaranteed response times, despite his estimate that he could provide such service by reallocating just $50,000 annually (or less than two percent of the total budget that McIntosh County allocates to him). FAC ¶¶ 244, 246. Plaintiffs allege that this failure to provide police protection is part of a "longstanding and ongoing custom or practice" of denying police protection on Sapelo Island while ensuring that this protection is provided on the predominantly white mainland, and that Defendant Jessup has done so with knowledge that Sapelo Island's permanent residents are predominantly African-American. *Id.* ¶¶ 249, 251.

The application of the four-part arm-of-the-state test in the context of Plaintiffs' allegations makes clear that Defendant Jessup is not acting as an arm of the State. The first factor—how state law defines the entity—indicates that Jessup is a county official, not a state officer. *See* Ga. Const. art. IX § 1, ¶ III (a)-(b); *Nichols v. Prather*, 286 Ga. App. 889, 892 (2007) ("[U]nder the plain language of the Georgia Constitution . . ., sheriffs are county officials, not state officers or employees."); *Bd. of Comm'rs of Randolph Cnty. v. Wilson*, 260 Ga. 482, 489 (1990) (referring to sheriff as a "county officer" whose "budget and accounts are subject to the authority of the [county] commission").

The second factor—the degree of control the state exercises with respect to the function at issue—also weighs in favor of finding that Jessup is not an arm of

21

the State. Jessup has provided no authority to show that the budgeting and resource allocation functions are controlled by the State. Instead, he simply relies on *Manders* and other cases involving jail operations and *Lewis v. Wilcox*, No. 3:06-cv-29, 2007 WL 3102189 (M.D. Ga. Oct. 23, 2007), which addresses the use of force in the execution of a traffic stop.

The conduct at issue in *Manders* involved the establishment of a "force policy in the county jail and in training and disciplining their deputies in that regard." *Manders*, 338 F.3d at 1324 n.45. These functions are distinct from the conduct challenged in this lawsuit, and the analysis of the degree of state control over the jail maintenance and use of force functions has no persuasive value for the analysis here. Indeed, a county sheriff's budgeting and resource allocation functions are inherently tied to the source of funding prong, which is the "most important," *Hess*, 513 U.S. at 51, and as set forth next, also weighs in favor of finding that Jessup is not acting as an arm of the State.[7]

---

[7] Courts in this Circuit have found that a variety of sheriff functions are not subject to state control for purposes of the second prong of the arm-of-the-state test. In *Abusaid*, for example, decided shortly after *Manders*, the Eleventh Circuit held that a sheriff was not acting as an arm of the state by enforcing a County ordinance. 405 F.3d at 1303; *see also Kicklighter v. Herrin*, No. CV206-77, 2007 WL 2248089, at *8 (S.D. Ga. July 31, 2007) (holding that the county sheriff was not acting as an arm of the state "for the general law enforcement functions at issue"); *Dukes* 428 F. Supp. 2d at 1321-22 (finding that the state did not exercise

The third and fourth factors—the source of the defendant's funding and the entity responsible for satisfying any adverse judgment—also weigh in favor of finding that Jessup is not acting as an arm of the State with respect to the budgetary and resource allocation conduct at issue in this case. The McIntosh County Board of Commissioners, not the State, provides the funds for Defendant Jessup's salary and for the operation of the Sheriff Department and has authority over his budget and accounts. FAC ¶¶ 155-158. One-quarter of the entire budget for McIntosh County is allocated to Defendant Jessup and the Office of the Sheriff. *Id.* ¶ 244.

Because any budgetary shortfall by the sheriff's office as the result of an adverse judgment "would more directly be met by county funds . . . . [t]o the extent that the state is insulated from paying any adverse judgment against the Sheriff's Office, that entity's autonomy with respect to this 'core concern' of the Eleventh Amendment weighs heavily in favor of denying immunity." *Keene v. Prine*, 477 F. App'x 575, 579-80 (11th Cir. 2012) (citing *Hess*, 513 U.S. at 51; *Abusaid*, 405 F.3d at 1312-13)).

The application of the arm-of-the-state test to Defendant Jessup's conduct demonstrates that he is not acting as an arm of the State and, consequently, the

---

control over the county "sheriff's duty to provide medical necessities to inmates").

Eleventh Amendment does not apply.

Indeed, the allegations in the FAC, if proven, support a conclusion that Defendant Jessup is acting as a final decisionmaker for the County with respect to the budgeting and allocation of resources for the provision of police services on Sapelo Island and the mainland.[8]

### 5. *The Board of Tax Assessors Is Not Acting as an Arm of the State with Respect to the Appraisal Functions at Issue in this Case*

The Board is not an arm of the State with respect to the conduct alleged in the FAC concerning its discriminatory appraisals of real property on Sapelo Island. As an initial matter, the Eleventh Circuit's decision in *Ballard v. Chattooga County Board of Tax Assessors*, 615 F. App'x 621 (11th Cir. 2015), does not establish that a board of tax assessors is always acting as an arm of the state. An entity may be acting as an arm of the state while engaging in one function but not while engaging in another function. *See Dukes*, 428 F. Supp. 2d at 1298. Again, the four-factor arm-of-the-state test described above must be used to determine whether

---

[8] The County and Defendant Jessup attempt to have it both ways, arguing on the one hand that Plaintiffs cannot sue the County for discrimination in the provision of police services because the County has no role in providing police services, *see* County Defs.' Mem. at 46-47, but on the other hand they cannot sue Defendant Jessup because he is immune from suit. The latter fails for the reasons set forth above, and the former is a factual contention that contradicts the well-pleaded allegations in the FAC, which focus not on any law enforcement functions but on the allocation of funding and other resources in a manner that denies any police services on Sapelo Island. *See* FAC ¶¶ 243-251.

the Eleventh Amendment shields the Board from suit with respect to the particular appraisal functions at issue in this case. Applying that test here demonstrates that the Board is not entitled to immunity.

First, Georgia law does not define boards of tax assessors as state entities. To the contrary, the boards are created by counties, which have authority to appoint board members or to choose them by election. O.C.G.A. §§ 48-5-290, 291. The sections of the Official Code of Georgia that address the establishment of the county boards are contained in the Title governing taxation (Title 48) and not in the State Government Title (Title 50). State law intends that the boards will operate independently from the State by precluding board members from simultaneously holding state or county office. *Id.*, § 48-5-292.

Second, the State has ceded substantial control over the boards' operations and appraisal functions to the counties and the boards themselves. If a county chooses to compose its board by election, the county, not the State, has full authority to set board members' term length and compensation, fill vacancies, remove members for cause, and classify board staff under the county civil service system, making them subject to county personnel policies. *Id.*, §§ 48-5-262, 309. A county can further require an independent performance review of the board, and county officials may assign additional tax-related duties to the board, such as receiving homestead exemption applications and tax returns. *Id.*, § 48-5-299.1.

25

The boards have authority to determine which properties are subject to taxation and to set the appraised value of each property. *Id.*, §§ 48-5-297, 299. The boards also have authority to add new properties to the tax digest, and correct errors in the digest, place liens on properties based on their tax assessment, and subpoena witnesses and documents for assessment purposes. *Id.*, §§ 48-5-299, 300, 303, 305. While the State establishes appraisal standards and approves county digests, it is not involved in the board's ground-level analysis or calculations. The State's minimal role in prescribing assessment standards and approving digests does not "transform [the board members] into state officers." *Abusaid*, 405 F.3d at 1309.

The boards' autonomy with respect to their appraisal functions thus distinguishes this case from *Ballard*, which did not involve the board's appraisal functions but instead its functions as an employer, over which the county had no control. *Ballard*, 615 Fed. Appx. at 626-27. In contrast, state law allows boards to operate separately from the State with respect to the tax appraisal functions.

The third factor, the source from which the entity derives its funding, also weighs in favor of finding that the Board is not an arm of the State. Although the Board receives some funding from the State, the County determines Board members' salaries and pays its portion of them from the county treasury. O.C.G.A. § 48-5-294. The County also preapproves and pays for the Board's

26

operating costs, including employment contracts for assistance in tax assessments, appraisals of new property, and reevaluations. *Id.*, § 48-5-298. Thus, the County not only provides the majority of the Board's funding, but it also has a great degree of discretion in the amount of funding to allocate and the purposes for which it can be used. *Cf. Manders*, 338 F.3d at 1323 (state law required county funding).

Because *Ballard* only involved the board's particular function of employing appraisal staff, the court only considered the state-mandated funding of appraisal staff, thus finding that the county merely funded staff as required by the State. *See Ballard*, 615 Fed. Appx. at 627. This case is clearly distinguishable because it involves the Board's broader tax appraisal function. The County primarily funds this function and has broad discretion in doing so. Thus, the third factor strongly suggests that the Board is not acting as an arm of the State.

The fourth factor—which entity bears financial responsibility for judgments against the entity—also weighs heavily in favor of finding that the Board is not an arm of the State. Counties are responsible for paying refunds to taxpayers for property taxes that were based on erroneous or illegal assessments, O.C.G.A. § 48-5-380, and so the counties, not the State, bear financial responsibility for appraisal errors by the county boards. *Cf. Ballard*, 615 F. App'x at 628 (state law was silent on financial responsibility for the employment

27

function at issue and the court inferred the state would share responsibility).

The arm-of-the-state test establishes that, for the purposes of the claims asserted by Plaintiffs, the Board is not operating as an arm of the State and therefore is not entitled to Eleventh Amendment immunity.

### B. The Tax Injunction Act Is Not a Bar to Any of Plaintiffs' Claims Because Plaintiffs Do Not Seek to Enjoin, Suspend, or Restrain the Collection of State Taxes

The County Defendants contend that Plaintiffs' claims addressing disposal fees, appraisals, and "tax issues" are barred by the Tax Injunction Act ("TIA"), which precludes federal courts from "enjoin[ing], suspend[ing] or restrain[ing] the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341.

The County Defendants' TIA argument fails. First, Plaintiffs' claims do not seek a ruling from this Court that would restrain Defendants' collection of taxes or force any Defendant to refund taxes that Plaintiffs have already paid. Second, the garbage removal charge is a fee, not a tax, and thus not subject to the TIA.[9]

---

[9] Plaintiffs do not contend that, and the Court therefore need not decide whether, in some applications Georgia law may fail to provide a "plain, speedy and efficient remedy" for purposes of the statutory TIA exception, an issue the Eleventh Circuit left open in *Amos v. Glynn County Board of Tax Assessors*, 347 F.3d 1249, 1265-66 (11th Cir. 2003), *abrogated other grounds*.

28

Third, the Court may consider Plaintiffs' allegations concerning, *inter alia*, the comparison between the taxes assessed and the services provided on the Island, the discriminatory refusal to consider the preferential tax assessment ordinance, and various procedurally and substantively aberrational actions by the Board as evidence of discrimination.[10]

### 1. The Discriminatory Appraisals Have Injured Plaintiffs Beyond the Tax Assessments

The TIA bars federal jurisdiction over claims that would "reduce the flow of state tax revenue." *Hibbs v. Winn*, 542 U.S. 88, 106 (2004). The Supreme Court has made clear that the TIA applies "only in cases . . . in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes." *Id.* at 107. By contrast, claims that do not "seek to impede [a state's] receipt of tax revenues" do not implicate the TIA. *Id.* at 92. Plaintiffs' claims do not involve the collection of state tax revenue but instead allege that McIntosh County and the Board are responsible for discriminatory property appraisals that have injured Plaintiffs in ways other than their property tax payments.

For example, the FAC alleges that by dramatically increasing the assessed

---

[10] Defendants' TIA argument challenges the Court's subject-matter jurisdiction and should have been brought under Rule 12(b)(1), not 12(b)(6). However, similar standards apply under both rules. *Hayden v. Vance*, No. 2:15-CV-469-WKW, 2016 WL 953055, at *2 (M.D. Ala. Mar. 14, 2016).

values of land in Hogg Hummock, the challenged appraisals have "facilitat[ed] the development of high-priced vacation homes," FAC ¶ 326; "threatened the viability and survival of Hogg Hummock," *id.* ¶ 340; forced some residents to sell their land or have their land sold, *id.*; and "adversely affected property values," with the result of impeding the ability to buy, sell, and obtain financing for real property in Hogg Hummock, *id.* ¶ 346. Plaintiffs do not receive equal services despite their payment of what they challenge as discriminatory property tax payments. *Id.* ¶ 349. As a result, Plaintiffs have suffered threats to their "ability to maintain continuing ownership of properties that have been in their families for generations, threatening the stability and viability of the Hogg Hummock community." *Id.* ¶ 370. The combination of the lack of basic services and the threat of losing land has caused and will continue to cause Plaintiffs significant emotional distress. *Id.* ¶¶ 371-372. These claims do not challenge the amount of *ad valorem* taxes that Plaintiffs have paid or will pay in the future but instead focus on other, collateral consequences of the discriminatory appraisals. For the same reason, there is no *res judicata* or other preclusion bar because the *ad valorem* tax assessments are not at issue in this case.

Plaintiffs' challenge to the effects of the discriminatory appraisals is distinct from a challenge to the tax assessments that flow from those appraisals. The TIA bars only the latter. Here, Plaintiffs do not seek to avoid paying their tax

assessments or to obtain a refund or an order enjoining the future collection of taxes. *Cf. Hibbs*, 542 U.S. at 107 ("[T]his Court has interpreted and applied the TIA only in cases Congress wrote the Act to address, *i.e.*, cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes."). The TIA therefore does not bar these claims, because they do not seek a remedy changing the amount of taxes Plaintiffs paid or will owe. It is immaterial that "the relief they seek may well affect the [tax] revenue that the County raises" as a "secondary economic effect" of the claims because it will not "require the court to enjoin, suspend, or restrain any tax collection." *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty.*, 115 F.3d 1372, 1383 (8th Cir. 1997); *Harvey & Harvey Inc. v. Del. Solid Waste Auth.*, 600 F. Supp. 1369, 1376 (D. Del. 1985) (similar).

## 2. *The Garbage Removal Charge Is a Fee, not a Tax*

The County Defendants contend that the TIA bars Plaintiffs' challenge to the imposition of a $128.40 garbage fee for services that are unequal to those provided to residents on the predominantly white mainland because, according to Defendants, the fee is a tax. County Defs.' Mem. at 39.

The County imposes an annual $128.40 garbage fee on County residents who own real property that has improvements. FAC ¶ 252. Whereas the County provides curbside garbage pickup on the mainland, it does not provide this

31

service in Hogg Hummock. Plaintiffs and other Hogg Hummock residents must load their garbage into their own vehicles and drive it to a remote, filthy, and poorly maintained dumpsite in order to dispose of their trash. *Id.* ¶¶ 252-258. The compactor and surrounding dumpsters, which are provided by the State and the DNR and not the County, are frequently overflowing. The dumpsite lacks safety features such as locks and nighttime lighting. *Id.* ¶ 261.

Federal law determines if a charge is a tax or a fee for purposes of the TIA. *Homewood Vill., LLC v. Unified Gov't of Athens-Clarke Cnty.*, ---F. Supp. 3d---, No. 3:15-cv-23, 2015 WL 5559853, at *2-*3 (M.D. Ga. Sept. 18, 2015). In making this determination, federal courts consider: "(1) Who imposed the assessment? (2) Who pays the assessment? [and] (3) Who benefits from the assessment?" *Id.* at *3 (internal citations omitted). Whereas a "tax is generally a revenue-raising measure . . . that allocates revenue to a general fund and is spent for the benefit of the entire community," a fee "is a payment given in return for a government provided benefit and is tied in some fashion to the payor's use of the service." *Lightwave Techs., L.L.C. v. Escambia Cnty.*, 43 F. Supp. 2d 1311, 1314 (S.D. Ala. 1999) (quoting *Folio v. City of Clarksburg*, 134 F.3d 1211 (4th Cir. 1998)). A "user fee," which "generates only enough revenue to defray the costs of providing the service to which the user fee is attached," is a type of non-tax charge that is not subject to the TIA. *See Kathrein v. City of Evanston*, 636 F.3d 906, 911 (7th Cir.

32

2011).

Applying these considerations here, it is clear that the garbage removal service charge is a user fee and not a tax. The County imposes the charge only against property owners of improved real property, who are thus the direct beneficiaries of the service. The charge is therefore similar to the stormwater runoff charge that the court in *Homewood* concluded was a fee and not a tax, in part because it was assessed only against "citizens who own property that collects stormwater runoff." 2015 WL 5559853, at *3; *Hard-Ing Builders, LLC v. City of Phenix*, No. 3:07-cv-1069, 2008 WL 2230034, at *3 (M.D. Ala. May 27, 2008) (sewer tap charge was a fee because "it related to the inspection and maintenance of the new sewer lines" benefitting people seeking building permits, not "for a more general purpose").

Nothing similar to the factual considerations that drove the court's analysis in *Antosh v. City of College Park*, 341 F. Supp. 2d 565 (D. Md. 2004), a non-binding district court decision from another Circuit on which the County Defendants rely, is present here.[11] Further, the Court may not consider

---

[11] The County Defendants mistakenly rely on Section 34-04 of the McIntosh County Code of Ordinances, which does not address residential garbage removal. Section 34-94 authorizes the assessment of "disposal fees at the landfill" and does not on its face apply to residential garbage removal. Plaintiffs could find no other provision in the county code governing garbage removal fees.

Defendants' factual assertions about "the collection of receptacles by a third-party contractor," the comparative accessibility of Sapelo Island, or the contention that "the collection and disposal of waste for Sapelo is the same for all residents." County Defs.' Mem. at 40. Those assertions are outside of and contradictory to the pleadings and cannot be considered on a motion to dismiss. *See Hard-Ing*, 2008 WL 2230034, at *3 n.1 (holding that if additional facts were developed in discovery the court would revisit its TIA determination).

### 3.   *Plaintiffs' Allegations Concerning the Appraisals and Tax Assessments Will Support Their Housing Discrimination Claims*

The County's decisions relating to tax assessments on Sapelo Island as compared to on the mainland, and its refusal to submit for further legislative action a proposed ordinance that would have allowed for preferential assessments for historic properties in Hogg Hummock, reveals a continuation of the historic disregard for the survival of the Hogg Hummock community, despite its status as a nationally recognized historical and cultural resource that should be preserved. Thus, the allegations in Paragraphs 324-352 of the FAC, if proven, will support Plaintiffs' disparate treatments claims under the FHA, 42 U.S.C. §§ 1981-1983, the Equal Protection Clause, and Title VI.

For example, Plaintiffs will support their claims regarding the discriminatory provision of services with evidence showing that the services on

34

the Island are non-existent or objectively inadequate, but Island residents and property owners pay more for such services than other residents and property owners in the County. *See, e.g.*, *Williams v. City of Dothan*, 745 F.2d 1406, 1414-15 (11th Cir. 1984) (TIA did not bar equal protection challenge to disparities between city's expenditures of tax revenues in predominantly white area and expenditures in predominantly black area). Anomalies surrounding the increase of tax assessments on the Island, *see* FAC ¶¶ 331-344, provide evidence of the County's discriminatory intent toward the Island's predominantly African-American residents and property owners. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (substantive and procedural irregularities support showing of disparate treatment); *see also infra* Part III.D.1.

Finally, the fact that the County refused to consider the adoption of a historical property preferential assessment that would have provided tax relief to Island taxpayers, pursuant to O.C.G.A. § 48-58-7.3, constitutes an independent governmental action that is not barred by the TIA. When Commissioner Jordan circulated the proposed historical property preferential assessment ordinance, Commissioner Spratt required a motion and a second in order for the County Attorney to draft a resolution that would have allowed the legislation to be considered. Even the County Attorney noted that this is not normal procedure for the Commission's consideration of new legislation. This departure from

35

procedure led to the proposed legislation being defeated on the spot, without being allowed to go through the full legislative process. FAC ¶¶ 350-352. *See Arlington Heights*, 429 U.S. at 268 ("The legislative . . . history may be highly relevant . . . ."); *Greater New Orleans Fair Hous. Action Ctr. v. Saint Bernard Parish*, 641 F. Supp. 2d 563, 571-73 (E.D. La. 2009) ("*GNOFHAC*") (considering procedural history surrounding adoption of ordinance alleged to discriminate based on race).

### C.  Raccoon Hogg and HELP.Org Have Standing

The FAC allegations establish the standing of the two Organizational Plaintiffs—Raccoon Hogg and HELP.Org—under the FHA and ADA Title II.

Standing under the FHA is as broad as is permitted by Article III of the Constitution and does not require the plaintiff to be within a protected class or undertake an affirmative act to seek housing or a housing-related service. *See, e.g.*, *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972) (definition of aggrieved person in the FHA indicates congressional intent to confer standing as broadly as permitted by Article III); *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 103-04 n.9 (1979) (same); *see also City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1277 (11th Cir. 2015) (holding that standing to sue under the FHA extends "as broadly as allowed under Article III").

The same analysis applies under the ADA Title II, which extends

enforcement power to "any person alleging discrimination on the basis of disability." *See Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47 (2d Cir. 1997) (concluding that "the use of such broad language in the enforcement provisions of the statutes evinces a congressional intention to define standing to bring a private action under . . . Title II as broadly as is permitted by Article III of the Constitution" (internal quotation marks and brackets omitted)), *superseded by rule on other grounds*. Thus, standing to sue under the ADA Title II also extends as broadly as Article III. *Id.*

Organizations can therefore sue under the FHA and the ADA Title II based on injuries such as frustration of mission and the diversion of scarce resources. *See, e.g., Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982). In *Havens*, the plaintiff organization, HOME, alleged that it had "been frustrated by defendant's racial steering practices in its efforts to assist equal access to housing through counseling and other referral services . . . [and] had to devote significant resources to identify and counteract the defendants' racially discriminatory steering practices." *Id.* at 379 (internal citation omitted). The *Havens* Court concluded:

> If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income home-seekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities—

37

> with the consequent drain on the organization's resources—
> constitutes far more than simply a setback to the organization's
> abstract social interests. . . .

*Id.*; *see also, e.g.*, *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153,

1165-66 (11th Cir. 2008) (holding that organizational plaintiffs adequately alleged

injury with averments that they would have to "divert personnel and time" to

counteract effects of the challenged conduct and that their ability to conduct

other projects would be frustrated).[12]

The allegations in the FAC concerning Raccoon Hogg and HELP.Org's

injuries satisfy the standard for alleging Article III standing under the FHA and,

indeed, mirror the allegations that the Supreme Court has found sufficient to

establish organizational standing under the FHA. *See* FAC ¶¶ 135, 138, 375-382

(alleging frustration to organizations' missions resulting from Defendants'

discriminatory conduct, leading the Organizational Plaintiffs to divert their

limited resources from other activities to counteracting that conduct in an effort

to protect Plaintiffs and Hogg Hummock).

The County Defendants do not articulate any actual flaw in the way the

---

[12] *See also Hous. Opportunities Project For Excellence, Inc. v. Key Colony No. 4 Condo. Ass'n*, 510 F. Supp. 2d 1003, 1009 (S.D. Fla. 2007) (at motion to dismiss stage, allegations that fair housing organization "devoted significant resources to identifying and counteracting [defendant's] discriminatory policies, which frustrated the organization's counseling and referral services" sufficed).

Organizational Plaintiffs have articulated their Article III standing and instead simply cite cases in which the courts found no standing, without suggesting any similar deficiencies with the Organizational Plaintiffs' allegations regarding standing here. Indeed in *Association for Retarded Citizens of Dallas v. Dallas County Mental Health & Mental Retardation Center Board of Trustees*, 19 F.3d 241 (5th Cir. 1994), the Fifth Circuit held that the plaintiff organization could not establish injury based on its redirection of resources to the "particular advocacy lawsuit" because otherwise a plaintiff could always "bootstrap standing by expending its resource in response to actions of others." *Id.* at 244. In contrast, here the Organizational Plaintiffs do not allege injury based on litigation expenditures.

The Supreme Court's rationale for denying standing in *Warth v. Seldin*, 422 U.S. 490 (1975), is equally inapplicable. In *Warth*, the plaintiffs brought claims under 42 U.S.C. §§ 1981, 1982, and 1983—statutes that, unlike the FHA, are subject to prudential standing limitations, including the prudential limitation on third-party standing. The general prudential rule against third-party standing that the Court applied in *Warth* does not apply under the FHA: "[W]hile in the ordinary case a party is denied standing to assert the right of a third-person, *Warth*, 422 U.S. at 499, 'Congress intended standing under the Fair Housing Act to extend to the full limits of Art. III.'" *Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 881 (8th Cir. 2003) (quoting *Gladstone*, 441 U.S. at 103); *see also Cent. Ala.*

*Fair Hous. Ctr. Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 640 (11th Cir. 2000) ("[F]ederal courts have no authority to erect 'prudential' barriers to standing in suits brought under" the FHA).

Finally, the Organizational Plaintiffs have identified specific projects that they have put on hold in order to respond to and counteract the acts of discrimination alleged in the FAC. *See* ¶¶ 380-381 (alleging, *inter alia*, the diversion of resources from other education, advocacy, and training programs and interference with the organizations' "attempts at improving socioeconomic conditions for all Georgians."). Thus, this case is unlike *NAACP v. City of Kyle*, 626 F.3d 233 (5th Cir. 2010), in which the court dismissed an organizational plaintiff for lack of standing at the summary judgment stage because it had not "demonstrated that [any] diversion of resources . . . concretely and 'perceptibly impaired' its ability to carry out its purpose." *Id.* at 239.[13]

### D. Plaintiffs Have Included Sufficient Allegations to State Disparate Treatment Claims under the FHA, 42 U.S.C. §§ 1981 and 1982, the Equal Protection Clause, and Title VI

Plaintiffs pursue disparate treatment and impact claims under the FHA

---

[13] In *Kyle* the Fifth Circuit further held that the other plaintiff, a membership organization, lacked associational standing to sue on behalf of its members because there was no evidence that any specific member had suffered a concrete and actual or imminent injury. *Id.* at 237. *United Food & Commercial Workers Union Local 751 v. Bowen Group*, 517 U.S. 544 (1996), which the County Defendants also cite, likewise involved associational standing, not organizational standing.

and disparate treatment claims under 42 U.S.C. §§ 1981-1983, the Equal

Protection Clause, and Title VI. Defendants challenge Plaintiffs' disparate

treatment claims but not their disparate impact claims under the FHA or their

ADA Title II claim, which will therefore proceed regardless of the Court's ruling

on the disparate treatment claims.

### 1. The **Arlington Heights** *Factors Provide the Evidentiary Framework for Proving Plaintiffs' Disparate Treatment Claims*

Defendants assert that to survive a motion to dismiss on their disparate

treatment claims, Plaintiffs must allege under the *McDonnell Douglas*[14]

framework that similarly situated comparators were treated differently from

Plaintiffs. This argument is legally flawed and factually incorrect.

As a legal matter, discrimination claims against a governmental entity are

frequently not analyzed under the *McDonnell Douglas* burden-shifting

framework. *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142, 1158

(9th Cir. 2013) ("A plaintiff does not . . . have to rely on the *McDonnell Douglas*

approach to create a triable issue of fact regarding discriminatory intent in a

disparate treatment case."). Instead, as is appropriate here, Plaintiffs use the

"direct and circumstantial evidence" approach for proving discriminatory intent

based on the factors articulated by the Supreme Court in *Arlington Heights*. Those

---

[14] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

factors include:

> [t]he historical background of the decision . . . particularly if it
> reveals a series of official actions taken for invidious purposes, . .
> .[t]he specific sequence of events leading up to the challenged
> decision[,] . . . . [d]epartures from the normal procedural sequence[,]
> . . . [s]ubstantive departures . . . particularly if the factors usually
> considered important by the decisionmaker strongly favor a
> decision contrary to the one reached[, and] . . . [t]he legislative or
> administrative history.

*Arlington Heights*, 429 U.S. at 267-68. These factors are "not exhaustive," and "the

list has been supplemented" to include, *inter alia*, foreseeability and knowledge

of discriminatory impact. *Jean v. Nelson*, 711 F.2d 1455, 1486 (11th Cir. 1983)

(citing *Columbus Bd. of Educ. v. Penick*, 443 U.S. 449 (1979); *NAACP v. Lansing Bd.*

*of Educ.*, 559 F.2d 1042, 1048 (6th Cir. 1977)).

It is proper to rely on the *Arlington Heights* factors to establish

discriminatory intent in a case like this one, which challenges governmental

conduct as implemented by multiple decision-makers. As the Supreme Court has

recognized, "[p]roving the motivation behind official action is often a

problematic undertaking," *Hunter v. Underwood*, 471 U.S. 222, 228 (1985), and

"the very nature of legislative and administrative action makes it difficult to

ascertain the 'intent' of the acting body," *Jean*, 711 F.2d at 1485. The *Arlington*

*Heights* factors thus provide an appropriate framework for deciding claims of

intentional discrimination by governmental entities, without a requirement to

42

present evidence of similarly situated comparators. *See Williams*, 745 F.2d at 1414-15 (holding that plaintiffs' evidentiary showing based on the *Arlington Heights* factors created a triable issue of fact on the defendant city's motivation without requiring comparator evidence); *Dowdell v. City of Apopka*, 698 F.2d 1181, 1185-86 (11th Cir. 1983) (affirming trial court's finding of discriminatory intent based on plaintiffs' *Arlington Heights* showing); *Pac. Shores*, 730 F.3d at 1158 (holding that plaintiffs bringing disparate treatment claims against governmental conduct with broad application are not required to "demonstrate the existence of a similarly situated entity who or which was treated better than the plaintiffs in order to prevail" and applying the *Arlington Heights* factors).

Even if Plaintiffs' claims were analyzed under the *McDonnell Douglas* burden-shifting framework, however, it would be premature to consider whether Plaintiffs identify similarly situated comparators to establish their disparate treatment claims because *McDonnell Douglas* is an evidentiary standard that applies at summary judgment. *See Paskvan v. City of Cleveland Civil Serv. Comm'n*, 70 F.3d 1272, at *5 (6th Cir. 1995) (unpublished) (holding that the *McDonnell Douglas* framework is "designed only to establish an order of proof and production" at summary judgment (internal quotation marks omitted).

Defendants further err in asserting that Plaintiffs must plead in their complaint the elements of a prima facie case. Regardless of whether a plaintiff

43

ultimately attempts to prove the alleged discrimination under the *Arlington Heights* factors, the *McDonnell Douglas* burden-shifting framework, or some other approach, she is not required to plead the elements of a prima facie case to survive a motion to dismiss. *See Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221-22 (11th Cir. 2016). The Eleventh Circuit has recognized that—

> before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case. Thus, the allegations in the complaint should be judged by the statutory elements of an Fair Housing Act claim rather than the structure of the prima facie case . . . . Before discovery, a plaintiff may not be able to plead all the facts necessary to prove that there was discrimination based on the disability.

*Id.*; *see also Jackson v. BellSouth Telecomm.*, 372 F.3d 1250, 1270-71 (11th Cir. 2004) ("[P]leading a *McDonnell Douglas* prima facie case [is] not necessary to survive a motion to dismiss" because "*McDonnell Douglas* [is] an *evidentiary* rather than a *pleading* standard.").

Even though Plaintiffs were not required to plead a prima facie case, the FAC contains more than sufficient allegations that, when proven, will support Plaintiffs' *Arlington Heights* showing. *See, e.g.*, FAC ¶¶ 193-199, 201-212, 311-352 (addressing, *inter alia*, the historical background of challenged conduct, substantive and procedural aberrations, legislative history, and the disproportionate effect of the challenged conduct on African-American, Gullah-Geechee descendants with ties to Hogg Hummock). These allegations are

44

specific, not conclusory, and sufficiently detailed to put Defendants on notice of the conduct alleged to violate the civil rights laws at issue.

And though it is unnecessary to survive the motions to dismiss, Plaintiffs have also alleged that Defendants have extended better treatment—in terms of, among other things, the provision of services, tax assessments, zoning code enforcement, and funding allocations—to white comparators. *See, e.g.*, *id.* ¶¶ 5, 8, 12, 202, 208-210, 221-297, 311-349, 353-366.[15]

While Defendants argue that the comparators identified in the FAC are not similarly situated, that is an issue of fact to be decided by the jury, and not grounds for a Rule 12(b)(6) dismissal. *See Lizardo v. Denny's, Inc.*, 270 F.3d 94, 101 (2d Cir. 2001) ("Whether two people are similarly situated is usually a question of fact for the jury."). Under the proper motion to dismiss standard, the Court should therefore disregard the factual assertions the County Defendants make in their Motion to Dismiss, including the contention that "[m]ainland residents or

---

[15] The County Defendants further assert that Plaintiffs' claims of discriminatory zoning code enforcement in Hogg Hummock are not "ripe" because Plaintiffs do not allege "any zoning decisions the County made with regard to any plaintiff." County Defs.' Mem. at 19. This argument misses the point of Plaintiffs' claim, which is that the County is failing its mandate to protect and preserve the unique, African-American, Gullah-Geechee Hogg Hummock community by allowing zoning variances that encourage the development of high-end vacation homes for white owners. Moreover, Plaintiffs do allege that the County has enforced the code against some Plaintiffs. FAC ¶¶ 316-317.

property owners are absolutely <u>not</u> similar" or that the egregious disparities in services provided on the mainland and on Sapelo Island are justified by the Island's geographic separation. County Defs.' Mem. at 14, 15-16.[16] These assertions are all beyond the pleadings and, while Defendants may try to prove them at trial as a justification for their conduct, they cannot be considered on a motion to dismiss.

### 2. The Fact that the Challenged Conduct May Affect Some Individuals Outside the Protected Group Does Not Undermine Plaintiffs' Disparate Treatment Claims

Defendants next assert that Plaintiffs' disparate treatment claims should be dismissed because Plaintiffs have not alleged that the discriminatory acts only affect people on the Island who are within the protected African-American, Gullah-Geechee class. County Defs.' Mem. at 15-16. But under binding Supreme Court precedent, proving a disparate treatment claim does not require a showing that no one outside the protected group was harmed by the challenged conduct. *See, e.g.*, *Hunter*, 471 U.S. at 331-33 (striking down facially neutral state constitutional provision on grounds that it was motivated by discriminatory animus

---

[16] *Steele v. City of Port Wentworth*, No. CV 1105-135, 2008 WLL 717813 (S.D. Ga. Mar. 17, 2008), *cited in* County Defs.' Mem. at 14-15, was at summary judgment, not a motion to dismiss, and the trial court could rely on the factual record in evaluating whether white neighborhoods were treated similarly.

against African Americans, even though it applied to persons of all races);

*Smith v. Town of Clarkton*, 682 F.2d 1055, 1066 (4th Cir. 1982) (finding

discriminatory intent because although the challenged conduct "will have

an effect touching upon all citizens . . . it is the black population that will

suffer from the defendants' actions in a disproportionate manner").

     As the Ninth Circuit recently explained, the showing that people

outside the protected class were harmed by the discriminatory conduct

actually supports a claim of discrimination—

> *A willingness to inflict collateral damage by harming some, or even all,*
> *individuals from a favored group in order to successfully harm members of*
> *a disfavored class does not cleanse the taint of discrimination; it simply*
> *underscores the depth of the defendant's animus.*

*Pac. Shores Props.*, 730 F.3d at 1159 (emphasis added) (quoting *Abdu-Brisson*

*v. Delta Air Lines, Inc.*, 239 F.3d 456, 468 (2d Cir. 2001); citing *Griffin v. Cnty.*

*Sch. Bd. of Prince Edward Cnty.*, 377 U.S. 218 (1964)));[17] *Children's Alliance v.*

*City of Bellevue*, 950 F. Supp. 1491, 1496 n.23 (W.D. Wash. 1997) (finding

that a determination that the challenged governmental conduct "also

discriminates against individuals unprotected by the FHA does not

eliminate a FHA violation")), *cited in Pac. Shores Props.*

---

[17] *Griffin* held that a municipality violated the Equal Protection Clause by closing
all of its public schools in order to prevent school integration.

The fact that not every African American in McIntosh County suffers the same discrimination as Plaintiffs is also immaterial. A defendant "cannot escape liability for discrimination simply because [it] did not discriminate against every member of a protected class . . . ." *Johnson v. Lockheed Martin Corp.*, 598 F. App'x 364, 368 n.1 (6th Cir. 2015).

Hogg Hummock's long history as an exclusively African-American community is also highly relevant in considering Defendants' conduct. Even though there is now a small white population that owns vacation homes in Hogg Hummock, Defendants' treatment of Hogg Hummock cannot be untethered from the community's long-standing reputation (and reality) as an exclusively African-American, Gullah-Geechee enclave. *See, e.g.*, *Ammons v. Dade City*, 783 F.2d 982, 988 (11th Cir. 1986) (approving trial court's "tracing the history and development of [the city], particularly with respect to race relations, for its connection to present discrimination in the provision of contested municipal services").

### 3. *FHA Liability Extends Beyond the Acquisition of Housing*

Defendants assert that Plaintiffs' claims under the FHA, 42 U.S.C. §§ 3604(a), 3604(b), 3604(f), and 3605, fail because the scope of the FHA is limited to "pre-acquisition discrimination." County Defs.' Mem. at 20; *see also* State Defs.' Mem. at 36 (similar). This assertion is contrary to several Eleventh Circuit

decisions and persuasive authorities from other Circuits, as well as the Act's expansive purpose to "provide, within constitutional limitations, for fair housing throughout the United States." 42 U.S.C. § 3601.

The Eleventh Circuit has repeatedly applied the FHA to acts of housing discrimination that occur after the acquisition of housing. *See, e.g., Hunt*, 814 F.3d at 1222-23 (holding that a housing provider can make housing "unavailable" for purposes of § 3604(f) without "mak[ing] it impossible for a person to occupy a dwelling" and allowing claim by current tenants based on landlord's threatening conduct); *Bhogaita v. Altamonte Heights Condo. Ass'n Inc.*, 765 F.3d 1277 (11th Cir. 2014) (allowing § 3604(f) claim against condominium association by current owner); *Dixon v. Hallmark Cos., Inc.*, 627 F.3d 849 (11th Cir. 2010) (addressing § 3604(b) claim by current tenant); *Hawn v. Shoreline Towers Phase 1 Condo. Ass'n*, 347 F. App'x 464 (11th Cir. 2009) (addressing § 3604(f) claim by current owner); *Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc.*, 3 F.3d 1472 (11th Cir. 1993) (same, for § 3604(a) claim based on discriminatory interference with the continuing use and enjoyment of their dwelling); *Evans v. Tubbe*, 657 F.2d 661, 662-63 & n.3 (5th Cir. 1981) (§ 3604(a) claim by homeowner against neighbors).

A number of district courts in this Circuit have likewise applied the FHA to post-acquisition conduct. *See, e.g., Peklun v. Tierra Del Mar Condo. Ass'n, Inc.*, No. 15-cv-30851, 2015 WL 8029840, at *16 (S.D. Fla. Dec. 7, 2015) (rejecting

defendant's argument that § 3604 "applies only to discrimination related to the acquisition or sale and rental of housing" and holding that "Subsection (f) clearly applie[d]" to the plaintiff's reasonable accommodation claim");[18] *Schwarz v. The Villages Charter Sch., Inc.*, ---F. Supp. 3d---, 2016 WL 787934 (M.D. Fla. Feb. 29, 2016) (post-acquisition § 3604(f) claim); *McHale v. Water's Edge Ass'n, Inc.*, No. 1:14-cv-23381, 2014 WL 7883602, at *3-*4 (S.D. Fla. Dec. 1, 2014) (same); *Smith v. Zacco*, No. 5:10-cv-360, 2011 WL 12450317, at *6 (M.D. Fla. Mar. 8, 2011) (post-acquisition §§ 3604(a) and (b) claims against developer and homeowners' association); *Savanna Club Worship Serv., Inc. v. Savanna Club Homeowner's Ass'n, Inc.*, 456 F. Supp. 2d 1223, 1231 (S.D. Fla. 2005) (discrimination in provision of services that are associated with homeownership in planned communities "would be addressable under the FHA").

The case law from this Circuit is consistent with leading precedent from several other Circuits that have expressly addressed Defendants' "post-acquisition" argument, including *The Committee Concerning Community Improvement v. City of Modesto*, 583 F.3d 690 (9th Cir. 2009) ("*CCCI*"). In *CCCI*, the Ninth Circuit held that the plaintiffs' claims against a municipality relating to the

---

[18] The County Defendants suggest that *Peklun* supports their pre-acquisition argument, but the language Defendants cite from *Peklun* is in fact quoting from another case that the court in *Peklun* explicitly rejected. 2015 WL 8029840, at *16.

discriminatory provision of municipal services could proceed under § 3604(b), rejecting an argument that the FHA was limited to pre-acquisition conduct. *Id.* at 713-15 (considering, *inter alia*, the statutory text of § 3604(b), 24 C.F.R. § 100.65, and the FHA's expansive legislative purpose); *see also Bloch v. Frischholz*, 587 F.3d 771, 777 (7th Cir. 2009) (en banc) (holding that "[a] defendant can engage in post-sale practices" that violate § 3604(a) and (b)). Indeed, without directly addressing a "post-acquisition" argument, the Supreme Court in *Trafficante v. Metropolitan Life Insurance Co.*, 409 U.S. 205 (1972), applied § 3604 to "post-acquisition" claims brought by current tenants who alleged injury based on their apartment owner's screening of new rental applicants.

Courts have regularly applied the fair housing laws to the precise types of conduct alleged here, including discriminatory zoning enforcement, *see, e.g.*, *Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 800 (6th Cir. 1996) (recognizing that discriminatory enforcement of otherwise neutral zoning laws can make housing unavailable in violation of the FHA ); unequal distribution of funds, *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 723 F. Supp. 2d 14, 21-23 (D.D.C. 2010) (applying § 3604(a) to disparities in the allocation of post-hurricane recovery funds to current property owners, which impeded owners' ability to restore their homes); discriminatory denial of water, *Good Shepherd Manor Found. Inc. v. City of Momence*, 323 F.3d 557, 565 (7th

51

Cir. 2003); *Kennedy v. City of Zanesville*, 505 F. Supp. 2d 456 (S.D. Ohio 2007);

discriminatory denial of sewer services, *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*,

421 F.3d 170, 176 (3d Cir. 2005); *United Farmworkers of Fla. Hous. Project Inc. v. City

of Delray Beach*, 493 F.2d 799 (11th Cir. 1974); unequal emergency medical, police,

and fire protection, *CCCI*, 583 F.3d at 713-14; *Davis v. City of New York*, 959 F.

Supp. 2d 324, 367-68 (S.D.N.Y. 2013); discriminatory provision of garbage

services, *Southend Neighborhood Improvement Ass'n v. Cnty. of Saint Clair*, 743 F.2d

1207, 1210 (7th Cir. 1984); and property maintenance, *Concerned Tenants Ass'n of

Indian Trails Apartments v. Indian Trails Apartments*, 496 F. Supp. 522, 525-26 (N.D.

Ill. 1980), *superseded by statute on other grounds*.

    These authorities also rebut the State Defendants' argument that they are

beyond the reach of § 3604 because they are not "in the business of providing

housing to the public." State Defs.' Mem. at 38. The above-cited cases—most of

which are against governmental defendants—show that § 3604(a) and (f) are not

limited to housing providers and instead reach a broad range of both

governmental and private conduct that affects the availability of housing.

    Ignoring the binding Supreme Court and Eleventh Circuit precedent and

the numerous courts that have applied the fair housing laws to the types of

conduct Plaintiffs challenge, Defendants rely primarily on out-of-Circuit

decisions that are distinguishable and unpersuasive. For example, Defendants

cite *Halprin v. Prairie Single Family Homes of Dearborn Park Association*, 388 F.3d 327 (7th Cir. 2004), but ignore the fact that the Seventh Circuit, sitting *en banc*, later explicitly limited *Halprin* and made it clear that the FHA is not limited to discrimination at the time of housing acquisition. *Bloch*, 587 F.3d at 777.

In *Cox v. City of Dallas*, 430 F.3d 734 (5th Cir. 2005), the court found that the plaintiffs lacked a viable FHA claim because their asserted injury—a decrease in "the value or habitability of their property" due to the city's failure to prevent illegal dumping near plaintiffs' homes—did not fall within the scope of § 3604(a)'s prohibition against making housing unavailable, *id.* at 742-44, and the city's failure to prevent the dumping was not sufficiently connected to housing. *Id.* at 745-46. The court did not hold that the FHA never applies to conduct occurring after the point of acquisition and instead emphasized the limited nature of its holding. *Id.* at 742-43 ("We hold only that § 3604(a) gives no right of action to current owners claiming that the value or 'habitability' of their property has decreased due to discrimination in the delivery of protective city services").

The Fourth Circuit's holding in *Jersey Heights Neighborhood Association v. Glendening*, 174 F.3d 180, 192 (4th Cir. 1999), similarly turned on the nature of the injury the plaintiffs alleged and did not announce a bright-line rule concerning the application of the FHA to conduct occurring after housing acquisition. *Id.* at 192 (holding narrowly that the challenged construction of a highway bypass was

53

not sufficiently linked to the denial of housing state to state a claim under §

3604(a); *see also Southend*, 743 F.2d at 1210 (holding that alleged property damage

based on county's maintenance of adjacent tax-deed properties did not make

plaintiffs' housing unavailable within the meaning of § 3604); *see also id.* (holding

that the FHA *would* apply to a challenge to the discriminatory provision of

"services generally provided by governmental units such as police and fire

protection or garbage collection"—some of the same services at issue here).[19]

In sum, there is no support in this Circuit or other Circuits for Defendants'

crabbed reading of the temporal reach of § 3604, and there is ample case law

applying § 3604 to similar types of conduct that is at issue in the FAC here.

### 4.   *Plaintiffs Have Stated a Claim Under the FHA, 42 U.S.C. § 3605*

Plaintiffs have stated a claim under § 3605 against the County and the

Board of Tax Assessors based on the discriminatory property appraisals. Section

3605 prohibits discrimination in real-estate related transactions, which are

defined to include the "appraising of residential real property." 42 U.S.C. §

3605(b)(2). Plaintiffs adequately allege that these Defendants engaged in

---

[19] The remaining cases Defendants cite are not binding or persuasive and do not establish that a "majority of courts" have limited § 3604 to discrimination at the time of housing acquisition. Indeed, the many cases in and outside this Circuit cited above that apply § 3604 to "post-acquisition" conduct show that Defendants' citations express the minority view, which the Eleventh Circuit has not adopted.

property appraisals of Plaintiffs' real property in Hogg Hummock that were procedurally and substantively flawed, resulting in unjustifiably high appraisals because of Plaintiffs' race and national origin. These discriminatory appraisals have caused property values to skyrocket and threaten the community's continuing viability. FAC ¶¶ 324-349. Defendants' only response is to cite a factually inapposite, unpublished decision, *Adamson v. Shaddock Estates Homeowners Ass'n, Inc.*, No. 8:08-cv-354-T-26, 2008 WL 10590598  (M.D. Fla. June 13, 2008), in which the trial court dismissed the § 3605 claim because it was not based on any real-estate related transaction as that term is defined in § 3605. *Id.* at *2-*3. *Adamson* did not address any allegation about appraisals whatsoever and thus provides no insight into the type of allegations that are necessary to state a § 3605 claim.

> **5.** *Plaintiffs Have Stated Claims Under 42 U.S.C. §§ 1981, 1982, and 1983, and the Equal Protection Clause*

> **(a) Plaintiffs have alleged sufficient facts to hold the County, Defendant Jessup, and Defendant Board of Assessors liable for official County policies, customs, and practices**

The County Defendants err in asserting that Plaintiffs have not alleged sufficient facts to hold them liable under §§ 1981-1983 for their employees' acts.

A municipality can be held liable under 42 U.S.C. §§ 1981, 1982, and/or 1983 where conduct by individual officials is pursuant to "(1) an officially

promulgated county policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker." *Grech v. Clayton County*, 335 F.3d 1326, 1392-30 (11th Cir. 2003) (citing *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978)). A single decision by a municipal policymaker may satisfy the "policy or custom" requirement. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). The FAC sufficiently alleges *Monell* liability of the County, Defendant Jessup, and the Board.

With respect to the County, the FAC alleges that "[t]he provision of unequal services, and failure to provide services . . . is pursuant to a longstanding and ongoing policy or custom of McIntosh County to deny or provide unequal services to . . . Hogg Hummock . . . ." FAC ¶ 221; *see also id.* ¶¶ 223-257, 263-284 (alleging County policies, practices, and customs relating to the discriminatory provision of services); *id.* ¶¶ 316-322 (alleging County practices and customs with respect to enforcement of the Hogg Hummock zoning ordinance and refusal to consider historic district preferential tax assessment ordinance); *id.* ¶¶ 326, 330, 342, 348 (alleging County policies and practices with respect to tax appraisals). The FAC further alleges that the acts and omissions alleged against the County have been "pursuant to a long-standing and ongoing policy to interfere with and deny the African-American, Gullah-Geechee community's rights to housing and municipal services . . . ." *Id.* ¶ 384.

56

With respect to Defendant Jessup, the FAC alleges that he "determines law enforcement policies and practices within McIntosh County based on the resources that are allocated to him by McIntosh County," FAC ¶ 157; fails to "make police protection readily available on Sapelo Island," *id.* ¶ 243; and makes decisions about how to utilize the money allocated to his office by the County, *id.* ¶¶ 244-47.

With respect to Defendant Board, the FAC alleges policies, practices, and customs concerning the assessment of real property on Sapelo Island. *Id.* ¶¶ 324-327, 331-342, 348, 370.

These allegations, if proven, will support a finding that each of the County Defendants has been responsible for implementing polices, practices, and customs that have led to violations of Plaintiffs' rights under §§ 1981-1983. Plaintiffs' allegations do not impermissibly rely on a theory of respondeat superior—instead, Plaintiffs allege direct liability by the County Defendants. *See Tucker v. Talladega City Schs.*, 171 F. App'x 289, 297 (11th Cir. 2006) (allowing plaintiff to proceed based on "theory . . . of direct liability" against municipal defendant with "final policy-making authority").

The County Defendants ignore the ample allegations that support their direct liability based on official policies, practices, and long-standing customs, and instead focus on a single phrase in an introductory paragraph concerning

57

"malign neglect." County Defs.' Mem. at 40 (citing FAC ¶ 15), and the absence of an allegation that the County Defendants' policies were the "moving force" behind the violations, *id.* ¶ 41. Of course, as shown above, Plaintiffs have alleged much more than "malign neglect," *cf.* County Defs.' Mem. at 40, and the Court cannot "dismiss an action simply because Plaintiffs fail to use 'magic words' when the pleading is otherwise sufficient." *Bybee v. Knight*, No. 8:15-CV-1026-T-23MAP, 2015 WL 4646119, at *1 (M.D. Fla. Aug. 5, 2015). The FAC contains sufficient allegations to establish the County Defendants are responsible for the conduct giving rise to Plaintiffs' claims under §§ 1981-1983.

### (b) Section 1982

The scope of § 1982 is even broader than that of the FHA in that its coverage is not limited to dwellings but instead includes all real and personal property. It therefore applies to other property-related rights. *See, e.g., Scott v. Eversole Mortuary*, 522 F.2d 1110, 1112-13 (9th Cir. 1975).

Plaintiffs' challenges pursuant to § 3604(a) to conduct that makes housing unavailable based on race therefore also state a claim under § 1982. *See, e.g., Jackson v. Okaloosa County*, 21 F.3d 1531, 1543 (11th Cir. 1994) (finding "no substantial difference between" § 1982 and § 3604(a)).

Plaintiffs' allegations of discrimination in the provisions of services under the FHA, 42 U.S.C. § 3604(b), similarly state a violation of § 1982. *See, e.g., Bloch*,

587 F.3d at 775; *Evans*, 657 F.2d at 662 n.2. With respect to discrimination in the provision of services:

> Section 1982's guarantee of the equal right to purchase, lease, and hold property necessarily carries with it the right to nondiscriminatory terms and conditions, both in the initial sale or rental of housing and in the services, facilities, and privileges that are available to residents after a sale or rental.

Housing Discrimination Law and Litigation § 27:6.

Thus, for all the reasons set forth above and in the FAC, Plaintiffs have adequately stated disparate treatment FHA claims under 42 U.S.C. § 3604(a) and (b), and they have therefore stated viable disparate treatment claims under § 1982.

The State Defendants additionally challenge Plaintiffs' § 1982 claim on the grounds that, according to the State Defendants, SIHA is not a person that can be sued via § 1983 and that Plaintiffs' allegations of disparate treatment are conclusory. Plaintiffs have addressed these arguments above in Parts III.A.3 and III.D.

### (c) Section 1981

Defendants challenge Plaintiffs' § 1981 claim based on a purported failure to identify similarly situated comparators or "contracts . . . that were interfered with." County Defs.' Mem. at 23; State Defs.' Mem. at 45-46 (similar). Plaintiffs have addressed Defendants' comparator argument above in Part III.D.1.

59

Plaintiffs' § 1981 claim is generally subject to the same evidence and standards of proof as their § 1982 claim and therefore succeeds for the same reasons as their § 1982 claim. *See, e.g.*, *Tillman v. Wheaton-Haven Recreation Ass'n Inc.*, 410 U.S. 431, 435-40 (1973); *United Farmworkers*, 493 F.2d at 802 n.4. A number of courts have allowed claims challenging the discriminatory denial of municipal services to proceed under § 1981 on a theory of an implied refusal to contract where the defendant municipality provides unequal or discriminatory municipal services, as Plaintiffs allege here. *See Kennedy*, 505 F. Supp. 2d at 494 (§ 1981 claim challenging denial of water services (collecting cases)); *Davis*, 959 F. Supp. 2d at 366-67; *see also Runyon v. McCrary*, 427 U.S. 160, 170-71 (1976) (Section 1981 prohibits a refusal on account of race to extend the same opportunity to enter into contracts as he extends to white offerees).

### (d) Equal Protection Clause

Plaintiffs agree that their claims under the Equal Protection Clause require similar evidence as their disparate treatment claims under the FHA, 42 U.S.C. §§ 1981 and 1982, and Title VI. For the reasons set forth above and in the following part, Plaintiffs have stated valid disparate treatment claims under each statute.

A long line of cases holds that discrimination in the provision of municipal services, similar to what is alleged here, violates the Equal Protection Clause. *See, e.g.*, *Ammons*, 783 F.2d at 987-88 (city's disparate provision of street paving and

maintenance and storm water drainage facilities violated the Equal Protection Clause); *Hawkins v. Town of Shaw*, 437 F. 1286, 1289-90 (5th Cir. 1971) (similar, for discriminatory provision of paved roads and sanitary sewers); *Williams*, 745 F.2d at 1414-15 (discriminatory allocation of tax revenues to pay for street paving and sewer improvement).

### 6.  *Plaintiffs Have Stated Claims Under Title VI*

Plaintiffs have properly alleged a claim under Title VI, 42 U.S.C. § 2000d (prohibiting discrimination on the basis of "race, color, or national origin . . . under any program or activity receiving Federal financial assistance."). A prima facie case of discrimination under Title VI may be established by showing that "(1) that the defendant is receiving federal funds, (2) that the plaintiff was discriminated against, and (3) the plaintiff's race, color, or national origin was the motive for the discriminatory conduct." *Scarlett v. Sch. of the Ozarks*, 780 F. Supp. 2d 924, 933–934 (W.D. Mo. 2011) (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001)); *see also Thompson v. Bd. of the Special School Dist. No. 1*, 144 F.3d 574, 581 (8th Cir. 1998) ("To establish the elements of a prima facie case under Title VI, a complaining party must demonstrate that his/her race, color, or national origin was the motive for the discriminatory conduct."); *Jackson v. Conway*, 476 F. Supp. 896, 903 (E.D. Mo. 1979) (articulating a two-prong Title VI prima facie case: entity is engaged in discrimination and entity receives federal funds).

61

Plaintiffs have alleged that Defendants have received federal funds. FAC ¶¶ 353, 355, 359, 360 362-366 (setting forth allegations regarding the federal Community Development Block Grant ("CDBG"), HOME Investment Partnershp Program ("HOME"), and U.S. Department of Agriculture ("USDA") funds received by State and/or County Defendants). The allegations of discrimination on the basis of plaintiffs' race, color, and/or national origin appear throughout all sections of the FAC. Indeed, Defendants do not argue to the contrary, but instead, Defendants attempt to import additional requirements for pleading a Title VI claim that do not apply in this context.

First, Defendants erroneously suggest a fourth prima facie case requirement for a Title VI claim: that the plaintiff was the "intended beneficiary" of the federal funds received by the defendant. This suggested prima facie requirement does not apply to Title VI claims that do not involve employment practices. As stated most definitively by the Fourth Circuit, "Title VI does not require that an injured party be the intended beneficiary of federal funds." *Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.*, 745 F.3d 703, 715-16 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 357 (2014); 135 S. Ct. 361 (2014).[20]

---

[20] *See also Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 95 F. Supp. 2d 723, 742 (N.D. Ohio 2000), *aff'd and remanded*, 308 F.3d 523 (6th Cir. 2002) (finding that even if plaintiffs were not intended beneficiaries of money flowing to defendant,

The intended beneficiary languages that appears in some of the cases cited by Defendants, *see, e.g.*, *Commodari v. Long Island Univ.*, 89 F. Supp. 2d 353 (E.D.N.Y. 2000); *Ivey v. Blocker*, No. 6:11-cv-1776, 2012 WL 667937 (M.D. Fl. Feb. 8, 2012), derives from an additional section in Title VI that applies *solely* to claims of employment discrimination:

> Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment.

42 U.S.C. § 2000d-3. Courts have found that the "primary objective of the Federal financial assistance" language in this section requires, in the employment context, "a logical nexus between the use of federal funds and the practice toward which agency action is directed." *Ass'n Against Discrimination in Emp't, Inc. v. City of Bridgeport*, 647 F.2d 256, 276 (2d Cir. 1981). The language in the section is explicitly limited to employment practices and the "logical nexus" and

---

"they nevertheless can bring a Title VI claim on the grounds that the [defendant] qualifies as a 'program or activity' that allegedly subjected them to discrimination"); *Wrenn v. Kansas*, 561 F. Supp. 1216, 1221 (D. Kan. 1983) (finding that there is no requirement for a party to plead that it was an intended beneficiary of the federally funded program); *Bryant v. N.J. Dep't of Transp.*, 998 F. Supp. 438, 445-46 (D.N.J. 1998) ("African-American residents of Atlantic City whose homes may be destroyed as a result of a federally funded highway project [i.e., not intended beneficiaries of the monies] allegedly located in discriminatory manner must be within the zone of interests protected by Title VI.").

"intended beneficiaries" requirements are only properly applied to Title VI employment discrimination claims.

Nonetheless, even if the intended beneficiary element did apply, Plaintiffs would meet it. The FAC specifically identifies the CDBG, HOME, and USDA funds received by the State and County defendants. FAC ¶¶ 353, 355, 359, 360 362-366. As described in the FAC, all three forms of funding are intended for communities like Sapelo Island.

A substantial basis of Plaintiffs' claims center on the discriminatory provision of services on Sapelo Island, which requires many municipal services associated with small towns. *See id.* ¶¶ 221-310. The CDBG program maintains as a specific objective: "the expansion and improvement of the quantity and quality of community services, principally for persons of low and moderate income, which are essential for sound community development and for the development of viable urban communities." 42 U.S.C. § 5301(c)(4). The FAC also focuses on the importance of maintaining the history and culture of the Gullah-Geechee descendants of Sapelo Island, which are threatened by discriminatory acts of Defendants. FAC ¶¶ 168-171. Another objective of the CDBG program is "the restoration and preservation of properties of special value for historic, architectural, or esthetic reasons." 42 U.S.C. § 5301(c)(7). The FAC also describes that Defendants' conduct is leading to unaffordable and unsafe, *i.e.*, without

64

necessary services, housing on Sapelo Island.

HOME funds are designed to allow state and local governments "to expand the supply of decent, safe, sanitary, and affordable housing" in their jurisdictions. 24 C.F.R. § 92.1. The FAC further identifies United States Department of Agriculture Water and Environmental Program funds as well as CDBG funds that were used to construct water systems in McIntosh County. FAC ¶¶ 359-60. The FAC alleges that Plaintiffs are in need of a viable water system on Sapelo Island. *Id.* ¶¶ 238, 280-84.

Second, Defendants argue that they do not qualify as programs or activities under the meaning of Title VI. This argument is primarily based on outdated precedent that was superseded by the Civil Rights Restoration Act of 1987, 20 U.S.C. § 1687. The Restoration Act clarified that Title VI, as well as other laws prohibiting discrimination by entities receiving federal financial assistance, applies to an entire entity if any part of that entity receives federal financial assistance. *Id.*, § 1687(1)(A),(B); *see also Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 271 (6th Cir. 1994), *quoting* S. Rep. No. 64, 100th Cong., 2d Sess. 4, *reprinted in* 1988 U.S.C.C.A.N. 3, 6). Accordingly, all of the pre-1987 precedent cited by Defendants regarding the interpretation of "program or activity" under Title VI is no longer good law. Plaintiffs' allegations that the State and County have received and are receiving federal funds is sufficient to bring both entities

65

within the definition of "program or activity" under Title VI and requires them to comply with the statute's anti-discrimination provisions.

The County additionally cites *Phillip v. Georgia*, No. 1:05-cv-02158, 2006 WL 2918938 (N.D. Ga. Oct. 10, 2006), to argue that it is not a "program or activity" under Title VI. County Defs.' Mem. at 25. *Phillip*, however, only considered *state abrogation* of immunity under Title VI and has no relevance to whether a local government, like the County, is a program or activity.[21] Courts regularly uphold Title VI claims against counties as a program or activity based on the county's receipt of federal funds. *See, e.g.*, *United States v. Maricopa Cnty.*, 915 F. Supp. 2d 1073, 1084 (D. Ariz. 2012); *Russell v. Cnty. of Nassau*, 696 F. Supp. 2d 213, 238-39 (E.D.N.Y. 2010).

### E.  Plaintiffs' Claims Are Timely

Defendants assert that some of Plaintiffs' claims are barred by the applicable statute of limitations. A defendant's argument that a statute of limitations bars a claim is an affirmative defense, and a motion to dismiss may be granted on the grounds of timeliness only if "it is apparent from the face of the complaint that the claim is time-barred." *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir. 2004) (quotation marks omitted). Defendants can make no

---

[21] Plaintiffs discuss the State's abrogation of Eleventh Amendment immunity by virtue of accepting federal funds above in Part III.A.1.

such showing here. Indeed, the County only raises its statute of limitations argument to "preserve" the defense and suggests that it may address the issue more fully at the summary judgment stage. The County Defendants do not provide any substantive arguments regarding any claims they believe are time-barred based on Plaintiffs' allegations.

The State makes a single specific statute of limitations argument, asserting that Plaintiffs' allegations relating to the history of fraudulent land transfers are barred by the statute of limitations. State Defs.' Mem. at 32-33. Plaintiffs' allegations regarding the private theft of Plaintiffs and their families' land is not, standing alone, a basis for Plaintiffs' claims against the State Defendants. Instead, the discussion of those private landowners' actions is necessary background to understanding the context for Plaintiffs' claims regarding the State's more recent and ongoing actions of interfering with Plaintiffs' access to their land and related allegations. *See, e.g.*, FAC ¶¶ 196-199, 200, 202-210.

Further, the continuing violations doctrine applies to all of the claims brought by Plaintiffs, allowing Plaintiffs to challenge acts occurring outside of the limitations period that are part of an ongoing policy or practice. The Supreme Court affirmed the application of the continuing violation doctrine under the fair housing laws in *Havens*, in which it held that where a plaintiff challenges an unlawful practice that continues into the limitations period, the complaint is

67

timely if the last occurrence of the practice occurred within the limitations period. *Havens*, 455 U.S. at 380-81; *see also City of Miami*, 800 F.3d at 1285-86 (same). Plaintiffs have alleged that all Defendants' conduct constitutes a continuing violation. *See*, *e.g.*, FAC ¶ 385.

The County incorrectly suggests that the continuing violations doctrine only applies to Plaintiffs' FHA claims. Courts have applied the doctrine to the other laws invoked by Plaintiffs. *See*, *e.g.*, *Kennedy*, 505 F. Supp. 2d at 491 (applying continuing violations doctrine to plaintiffs' FHA, 42 U.S.C. §§ 1981, 1982 and 1983, and Title VI claims); *Heightened Indep. & Progress, Inc. v. Port Auth. of New York & New Jersey*, No. CIV.A. 07-2982, 2008 WL 852445, at *3 (D.N.J. Mar. 28, 2008), *aff'd*, 693 F.3d 345 (3d Cir. 2012) (applying continuing violations doctrine to ADA claim challenging accessibility of public transportation); *Deck v. City of Toledo*, 56 F. Supp. 2d 886, 895 (N.D. Ohio 1999) (considering application of continuing violations doctrine in ADA challenge to accessibility of public streets and sidewalks).

The County Defendants further assert that the continuing violations doctrine does not appropriately apply here because "the essence of plaintiffs' allegations in this case involve non-action." State Defs.' Mem. at 31. This assertion is factually and legally incorrect. First, Plaintiffs' allegations involve active discrimination by Defendants, including the discriminatory provision of

68

services, discriminatory enforcement of zoning codes, discriminatory appraisals,

and discriminatory expenditure of government funds. As a matter of law,

discriminatory denials of services (which are what the County appears to call

"non-action") fit squarely within the continuing violations doctrine. *See, e.g*,

*Kennedy*, 505 F. Supp. 2d at 491 (applying continuing violations doctrine to local

government's longstanding practice of denying water services).

### F.   Plaintiffs Have Alleged Viable Claims for Injunctive and Declaratory Relief

#### 1.   *Plaintiffs Properly Seek Prospective Injunctive Relief Against Defendants*

Defendants assert that Plaintiffs are not entitled to the injunctive relief

included in Plaintiffs' prayer for relief.[22] Defendants' argument, however, is

premature. Ultimately, "to obtain a permanent injunction, a party must show

---

[22] Plaintiffs seek damages and injunctive and declaratory relief against the State and the DNR under Title VI and Title II of the ADA. FAC ¶¶ 443-458. These claims are not barred by the Eleventh Amendment because, as set forth above, these statutes abrogate the State's Eleventh Amendment immunity. On their remaining claims under the FHA; 42 U.S.C. §§ 1981-1983; and the Equal Protection Clause, Plaintiffs properly seek injunctive relief against Defendants Deal and Williams in their official capacities. FAC ¶¶ 389, 398, 406, 409-414, 421, 429, 437. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 73 (1996). As set forth above in Part III.A.3, SIHA is not an arm of the State and is therefore not shielded from suit under the Eleventh Amendment. Should the Court find that SIHA is an arm of the State, however, Plaintiffs may still pursue prospective injunctive and declaratory relief against SIHA through Defendant Deal in his official capacity as the chairperson of SIHA. O.C.G.A. § 12-3-444(b); *Seminole Tribe*, 517 U.S. at 73.

that: (1) he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; and (3) irreparable harm will result if the court does not order injunctive relief." *See, e.g.*, *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005). Plaintiffs have not yet filed a motion for a preliminary or permanent injunction and at this stage have only put Defendants on notice through their prayer for relief that they will seek injunctive relief if the trier-of-fact concludes that Plaintiffs' rights have been violated. Accordingly, at this motion to dismiss stage, the first requirement for obtaining a permanent injunction is irrelevant. Plaintiffs have properly pleaded the second two requirements. Plaintiffs allege that "Defendants' illegal discrimination has caused Plaintiffs to suffer irreparable and ongoing injury for which there is no adequate remedy at law and which will continue to cause injury to them unless and until injunctive relief is granted." FAC ¶ 367. Plaintiffs further describe in the FAC that the relief they will seek includes an injunction prohibiting Defendants from engaging in the specific conduct that the trier of fact finds to be illegal. These allegations are all that is necessary at the pleading stage.

Defendants' citation to Rule 65(d) of the Federal Rules of Civil Procedure and interpreting caselaw is inapplicable at this stage. When Plaintiffs move for a permanent injunction, the reasons for its issuance and the acts sought to be

70

restrained will be articulated in detail and will be based on the conduct that is found to violate the fair housing laws. Contrary to Defendants' prediction, the injunction Plaintiffs will ultimately seek will not be an "obey the law" type of injunction, but instead will be linked directly to ensuring that the specific conduct found to be discriminatory will not be repeated.

The County quotes extensively from *Burton v. City of Belle Glade,* 178 F.3d 1175 (11th Cir. 1999) in its brief. The Eleventh Circuit's analysis of the appropriateness of an injunction in *Burton*, however, occurred in the unique circumstance of a Voting Rights Act vote dilution challenge, which requires as part of the substantive claim that the plaintiff "demonstrate the existence of a proper remedy." *Id.* at 1199. As a result, in that context, a plaintiff must establish, as part of the liability question, the precise equitable remedy, *i.e.*, an alternate election scheme, that will remedy the challenged discriminatory voting process. Here, on the other hand, it is unnecessary to describe the details of a possible permanent injunction until the trier-of-fact has determined what rights have been violated.

Finally, the County Defendants, citing general and abstract comments in *Rizzo v. Goode*, 423 U.S. 362 (1976), suggest that an injunction against a local government is never appropriate. There is no basis for such an assertion and many courts have ordered permanent injunctions in private litigation against

71

local governments, including in the context of claims under the fair housing laws. *See, e.g., Huntington Branch, NAACP v. Town of Huntington*, 844 F.2d 926 (2d Cir. 1988) (holding that injunctive relief was appropriate where a zoning ordinance had the discriminatory effect of limiting a private builder's ability to build affordable housing), *superseded by regulation on other grounds*; *GNOFHAC*, 641 F. Supp. 2d at 578-79 (finding parish's zoning ordinance to violate the FHA because of its discriminatory effect on African Americans and ordering the parish to rescind it).

### 2.   *Plaintiffs Properly Seek Declaratory Relief Against Defendants*

The County asserts that Plaintiffs are not entitled to a declaratory judgment but provides no persuasive argument in support of its assertion. A plaintiff properly alleges a claim under the Declaratory Judgment Act by showing a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to justify declaratory relief. *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).

The FAC clearly establishes a live and immediate controversy among the parties who have adverse interests and the County has articulated nothing to the contrary. The two cases cited by the County in support of its argument to dismiss Plaintiffs' prayer for injunctive relief are inapposite. In both cases the courts denied the plaintiffs' requests for declaratory judgment because they failed to

establish any threat of future injury from the challenged policy or law and therefore lacked standing to pursue future relief. *Golden v. Zwickler*, 394 U.S. 103 (1969) (former Congressperson did not show likelihood he would be subjected again to the challenged state statute making it a crime to distribute anonymous literature in connection with an election campaign); *Smith v. Montgomery Cnty.*, 573 F. Supp. 604, 608-09 (D. Md. 1983), *on reconsideration*, 607 F. Supp. 1303 (D. Md. 1985) (finding plaintiff lacked standing to seek injunctive relief or declaratory judgment because there was no credible likelihood she would be subjected to the detention center's strip search policy). The County has not, and cannot, make any analogous standing argument here. The policies, practices, and acts challenged by Plaintiffs are continuous and ongoing and are presently harming Plaintiffs and will likely do so in the future. FAC ¶ 367.

The County Defendants also suggest that Plaintiffs' allegations regarding the request for declaratory relief are too general. As in the context of Plaintiffs' prayer for injunctive relief, a general articulation of the declaratory judgment that will be sought is appropriate. When the trier of fact determines what conduct violates the laws alleged by Plaintiffs, the request for declaratory relief will be specific to those findings.

## IV.   CONCLUSION

For all the foregoing reasons, Plaintiffs ask that the Court deny the

pending Motions to Dismiss and allow this case to proceed to discovery.

Dated: April 11, 2016

   Respectfully submitted,

/s/ Reed N. Colfax                        /s/ Robert Jackson
Reed N. Colfax (admitted *pro hac vice*)   Robert Jackson, Esq.
Ryan C. Downer (admitted *pro hac vice*)   (GA Bar #387750)
Jia M. Cobb (admitted *pro hac vice*)      ROBERT B. JACKSON, IV, LLC
Jamie L. Crook (admitted *pro hac vice*)   260 Peachtree Street, Suite 2200
RELMAN, DANE & COLFAX PLLC                 Atlanta, Georgia 30303
1225 19th St., NW, Suite 600              Tel: 404-313-2039
Washington, D.C. 20036                    rbj4law@gmail.com
Tel: 202-728-1888
rcolfax@relmanlaw.com
rdowner@relmanlaw.com
jcobb@relmanlaw.com
jcrook@relmanlaw.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of April, 2016, a copy of Plaintiffs' Consolidated Opposition to State and County Defendants' Motions to Dismiss First Amended Complaint was filed on the CM/ECF system for the Northern District of Georgia which will send notification of such filing to the following:

John E. Bumgartner
Richard K. Strickland
BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue, Post Office Box 220
Brunswick, GA 31521-0220
Tel: (912) 264-8544
Fax: (912) 264-9667
jbumgartner@brbcsw.com
rstrickland@brbcsw.com

*Attorneys for Defendants McIntosh County, Sheriff Stephen Jessup, and McIntosh County Board of Tax Assessors*

Julie Adams Jacobs, Senior Assistant Attorney General
Michelle J. Hirsch, Assistant Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334-1300
Tel: (404) 463-5989
Fax: (404) 657-3239
jjacobs@law.ga.gov
mhirsch@law.ga.gov

*Attorneys for Defendants State of Georgia, Governor Nathan Deal, Georgia Department of Natural Resources, Georgia Department of Natural Resources Commissioner Mark Williams, and Sapelo Island Heritage Authority*

/s/ Reed N. Colfax
Reed N. Colfax
*Attorney for Plaintiffs*