IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | | |
|---|---|---|
| SARAH FRANCES DRAYTON, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 2:16-CV-53-LGW-RSB |
| | ) | |
| MCINTOSH COUNTY, GEORGIA, *et al.*, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**UNITED STATES' RESPONSE AS INTERVENOR IN OPPOSITION TO STATE DEFENDANTS' MOTION TO DISMISS**

The United States respectfully submits this Response pursuant to 28 U.S.C. § 2403(a), which permits the United States to intervene to defend the constitutionality of a federal statute.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As relevant here, plaintiffs allege that a state-run ferry service—the only public means of transportation to a Gullah Geechee community on Sapelo Island, Georgia—is inaccessible to persons with disabilities.  Doc. 29, at 8, 92-95 (Am. Compl.).[1]  They allege that the State of Georgia, the Georgia Department of Natural Resources, and Governor Nathan Deal and Department of Natural Resources Commissioner Mark Williams, both sued in their official capacity, ("state defendants") have intentionally violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12131-12134, by failing to provide accessible parking and bathrooms at the ferry docks, and accessible ramps for boarding and deboarding the ferry. Doc. 29, at 146.  Plaintiffs seek declaratory and injunctive relief, as well as compensatory damages.  Doc. 29, at 147-148.[2]

The state defendants have filed a motion to dismiss, asserting that Title II is not a valid exercise of Congress's authority under Section Five of the Fourteenth Amendment, such that it cannot abrogate the States' Eleventh Amendment immunity in the context of cases involving access to public transportation.  Doc. 48-1, at 16-30.  The Department of Justice has authority to

---

[1]  Plaintiffs include community organizations serving people of Gullah Geechee descent, and persons with disabilities who are of Gullah Geechee descent and who live on, or formerly lived on, Sapelo Island.  According to plaintiffs, the Gullah Geechee population of Sapelo Island at one time numbered more than 900 people, but has been reduced to approximately fifty persons, allegedly due in part to the difficulty of traveling to and from the island by ferry.  Doc. 29, at 67, 88-95.

[2]  Several county officials and entities are also defendants as to other claims filed by the plaintiffs.  While the county defendants have also moved to dismiss (Doc. 46), their motion is not relevant here as the plaintiffs' Title II claim is only pled against certain state defendants. Doc. 29 at 144.

enforce and implement the ADA, 42 U.S.C. §§ 12133-12134, and thus has a strong interest in the resolution of the state defendants' arguments.

In passing the ADA, Congress concluded after numerous hearings and other fact-finding that, "historically, society has tended to isolate and segregate individuals with disabilities," and that "such forms of discrimination * * * continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Based on these findings, Congress "invoke[d] the sweep of congressional authority, including the power to enforce the fourteenth amendment," to enact the ADA. 42 U.S.C. § 12101(b)(4). In doing so, it established a "comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Part of that national mandate is Title II, which addresses discrimination by state and local governments in the operation of public services, programs, and activities. *See* 42 U.S.C. §§ 12131-12165. Title II may be enforced through private suits against public entities, 42 U.S.C. § 12133, and Congress expressly abrogated the States' Eleventh Amendment immunity to such suits in federal court, 42 U.S.C. § 12202.

Contrary to the state defendants' arguments, Title II is a valid exercise of Congress's authority pursuant to Section Five of the Fourteenth Amendment, including as applied to the class of cases implicating access to public transportation. Title II is reasonably designed to remedy past and prevent future unconstitutional treatment of persons with disabilities in accessing public transportation. Plaintiffs' allegations here concern the most basic kind of equal access—the ability of persons with disabilities to use a public ferry that is the sole means of accessing their community, homes, and property on Sapelo Island, as well as employment, medical care, and schools on the mainland. Doc. 29, at 88-95.

**ARGUMENT**

In this filing, the United States respectfully submits that:  (1) this Court should first determine if plaintiffs are entitled to damages for intentional discrimination in violation of Title II of the Americans with Disabilities Act before ruling on the Eleventh Amendment immunity defense; and (2) in the event that the Court should have occasion to reach that question, it should hold that Title II is a proper exercise of Congress's authority under Section Five of the Fourteenth Amendment, and so validly abrogates the States' Eleventh Amendment immunity in cases that seek to ensure access to public transportation.

## I.   RESOLUTION OF THE CONSTITUTIONALITY OF TITLE II OF THE ADA'S ABROGATION OF SOVEREIGN IMMUNITY IS PREMATURE.

This Court should not rule on the state defendants' Eleventh Amendment defense unless and until plaintiffs establish that they are entitled to damages for intentional discrimination in violation of the ADA.  This is so because plaintiffs have a Title II claim for injunctive relief that the state defendants have not challenged, and which is unaffected by Eleventh Amendment immunity.

Plaintiffs seek injunctive relief against Governor Deal and Commissioner Williams, sued in their official capacities, and damages against the State and the Department of Natural Resources.  Doc. 29, at 144.  The state defendants do not argue that they are entitled to outright dismissal of plaintiffs' Title II claim under Rule 12(b)(6) for failure to state a claim.[3]  Instead, the state defendants challenge only the availability of damages against the State and the Department of Natural Resources by arguing that Congress has not validly abrogated their

---

[3]  The state defendants argue that they are entitled to dismissal under Rule 12(b)(6) as to Counts 1 through 4 and Counts 6 through 9 of plaintiffs' amended complaint.  Doc. 48-1, at 31.  They make no such argument as to Count 10, the plaintiffs' Title II claim.

sovereign immunity here.  But as the state defendants acknowledge (Doc. 48-1, at 49), pursuant to the *Ex Parte Young* doctrine, there is no Eleventh Amendment bar to suits against individuals sued in their official capacities for prospective injunctive relief.  209 U.S. 123 (1908); *Summit Med. Assocs. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999), cert. denied, 529 U.S. 1012 (2000).  Thus, regardless of the availability of damages, plaintiffs have a live claim under Title II for injunctive relief against the official capacity individual defendants pursuant to *Ex Parte Young.*

Because the state defendants do not challenge under Rule 12(b)(6) the adequacy of the Title II claim for injunctive relief, this Court will only need to address abrogation if plaintiffs are ultimately entitled to damages.  To prevail on a claim for compensatory damages under Title II, the plaintiffs must show that a defendant acted with discriminatory intent.  *McCullum v. Orlando Reg'l Healthcare Sys. Inc.*, 768 F.3d 1135, 1146-1147 (11th Cir. 2014).  Thus, if plaintiffs are not entitled to damages for intentional discrimination under Title II, this Court will have no reason to decide whether Congress validly abrogated sovereign immunity in this particular context.

Accordingly, this Court should not address the validity of Title II's abrogation of sovereign immunity on the state defendants' motion to dismiss.  Delaying resolution of that question is consistent with the "fundamental and longstanding principle of judicial restraint" that "courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988); *accord Northwest Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009).  Application of this principle is particularly appropriate here given the holding of *United States v. Georgia*, 546 U.S. 151 (2006), in which the Supreme Court instructed lower courts to reach questions of the

4

scope and validity of Title II's abrogation of sovereign immunity only after first determining "which aspects of the [defendant]'s alleged conduct violated Title II." *Id.* at 159.

## II.   TITLE II VALIDLY ABROGATES STATE SOVEREIGN IMMUNITY IN THE CONTEXT OF ACCESS TO PUBLIC TRANSPORTATION.

Should this Court have occasion to reach the question, it should hold that to the extent that Title II requires public entities to make public transportation accessible, it validly abrogates the States' Eleventh Amendment immunity.

To abrogate Eleventh Amendment immunity, Congress must: (1) make clear its intent to do so and (2) do so "pursuant to a valid grant of constitutional authority." *Tennessee v. Lane*, 541 U.S. 509, 517 (2004) (citation omitted). As to the first requirement, there is no question that Congress unequivocally expressed its intent to abrogate the States' sovereign immunity with respect to damages claims under the ADA. *See* 42 U.S.C. § 12202; *Lane*, 541 U.S. at 518. As to the second requirement, it is settled that "Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under Section 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment." *Lane*, 541 U.S. at 518. That is the case here.

Section Five of the Fourteenth Amendment is an affirmative grant of legislative power, *see Kimel v. Florida Bd. of Regents*, 528 U.S. 62, 81 (2000), that gives Congress the "authority both to remedy and to deter violation of [Fourteenth Amendment] rights * * * by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 727 (2003) (quoting *Board of Trs. of the Univ. of Ala. v. Garrett*, 531 U.S. 356, 365 (2001)). Section Five "is a broad power indeed," *Lane*, 541 U.S. at 518 (citation omitted), empowering Congress not only to

remedy past violations of constitutional rights, but also to enact "prophylactic legislation that proscribes facially constitutional conduct, in order to prevent and deter unconstitutional conduct." *Hibbs*, 538 U.S. at 727-728.  Thus, Congress may prohibit "practices that are discriminatory in effect, if not in intent, to carry out the basic objectives of the Equal Protection Clause." *Lane*, 541 U.S. at 520.

In *Lane*, the Supreme Court considered the Title II claims of two plaintiffs, "both of whom are paraplegics who use wheelchairs for mobility" and who "claimed that they were denied access to, and the services of, the state court system by reason of their disabilities."  541 U.S. at 513.  The state defendant in that case argued that Congress lacked the authority to abrogate the State's Eleventh Amendment immunity.  The Court rejected that argument, applying the three-part test for Fourteenth Amendment, Section Five remedial legislation created by *City of Boerne v. Flores*, 521 U.S. 507 (1997).

Under that test, the Court in *Lane* considered:  (1) the "constitutional right or rights that Congress sought to enforce when it enacted Title II," 541 U.S. at 522; (2) whether there was a history of unconstitutional disability discrimination to support Congress's determination that "inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation," *id.* at 529; and (3) "whether Title II is an appropriate response to this history and pattern of unequal treatment" as applied to the class of cases implicating access to judicial services.  *Id.* at 530.

With respect to the first question, the Court in *Lane* found that Title II enforces rights under the Equal Protection Clause as well as an array of rights subject to heightened scrutiny under the Due Process Clause of the Fourteenth Amendment.  541 U.S. at 522-523.  As to the second question, the Court concluded that Congress documented a sufficient historical predicate

6

of unconstitutional disability discrimination so as to justify broad prophylactic legislation.  *Id.* at

523-528.  And as to the third question, the Court found that the congruence and proportionality

of the remedies in Title II should be judged on a category-by-category basis in light of the

particular constitutional rights at stake in the relevant category of public services.  *Id.* at 530-534.

The Court then concluded that "Title II, as it applies to the class of cases implicating the

fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority

to enforce the guarantees of the Fourteenth Amendment."  *Id.* at 533-534.  Following *Lane*, this

Court should likewise conclude that Title II is valid Fourteenth Amendment legislation as it

applies to access to public transportation.[4]

The state defendants contend, however, that Title II does not satisfy *Boerne*'s three-step

test.  They argue that:  (1) "[v]alid § 5 abrogation cannot occur in the absence of a constitutional

violation" (Doc. 48-1, at 18); (2) "Title II is not proper § 5 legislation because there is no history

and pattern of unconstitutional discrimination" (Doc. 48-1, at 23); and (3) "Title II is not a

proportionate or congruent remedy" (Doc. 48-1, at 29).  Each of these arguments fails.

### A.  Abrogation Of Sovereign Immunity Is Not Limited To Instances Where There Is A Constitutional Violation.

#### 1.  *Congress can prohibit facially constitutional conduct to remedy and deter unconstitutional conduct.*

The state defendants' first argument—that "there can be no proper abrogation in the

absence of a constitutional violation" (Doc. 48-1, at 18)—has already been foreclosed by the

---

[4]  The Court in *Lane* did not examine the congruence and proportionality of Title II as a whole because the Court found that the statute was valid Section Five legislation as applied to the class of cases before it.  Because Title II is valid Section Five legislation as applied to the class of cases implicating public transportation, this Court need not consider the validity of Title II as a whole.  The United States maintains, however, that Title II as a whole is valid Section Five legislation.

Supreme Court.  As noted above, Congress is not limited to barring actual constitutional

violations when it passes legislation pursuant to its Section Five powers.  Instead, Congress "may

enact so-called prophylactic legislation that proscribes facially constitutional conduct, in order to

prevent and deter unconstitutional conduct." *Hibbs*, 538 U.S. at 727-728.  And again, Congress

may ban "practices that are discriminatory in effect, if not in intent," notwithstanding that the

Equal Protection Clause bans only intentional discrimination.  *Lane*, 541 U.S. at 520.

The Supreme Court's decision in *United States v. Georgia* makes the error of the state

defendants' argument clear.  *Georgia* holds that abrogation is unquestionably proper for conduct

that violates Title II and would also violate the Fourteenth Amendment.  546 U.S. 151, 159

(2006).  But *Georgia* also instructed courts to determine, on a case-by-case basis, whether

Congress's purported abrogation of sovereign immunity "is nevertheless valid" even as to

misconduct that "violated Title II but did not violate the Fourteenth Amendment."  *Ibid.*  And the

Eleventh Circuit has specifically upheld the abrogation of sovereign immunity under Title II in

the context of access to public education where there was no independent constitutional violation

at issue.  *See Association for Disabled Ams., Inc. v. Florida Int'l Univ.*, 405 F.3d 954 (11th Cir.

2005); *see also R.W. v. Board of Regents of the Univ. of Ga.*, 114 F. Supp. 3d 1260, 1281 (N.D.

Ga. 2015) ("Title II of the ADA is a valid abrogation of a state's sovereign immunity  *  *  *

even for conduct that is not independently unconstitutional.").

### 2.  *Title II enforces important constitutional rights even in cases where there is no allegation of a direct constitutional violation.*

Even in cases where no constitutional violation is directly presented, Title II enforces

vital constitutional rights.  In this case, Title II enforces the Equal Protection Clause's prohibition

on the arbitrary treatment of persons with disabilities based on irrational stereotypes or hostility,

as well as the heightened constitutional protection afforded to a variety of constitutional rights implicated by restrictions on the right to travel.

The Supreme Court has long recognized that the Constitution guarantees a fundamental personal right "to travel throughout the United States." *United States v. Guest*, 383 U.S. 745, 758 (1966). To date, the Supreme Court has considered the right to travel only in the context of interstate and international travel. *See Shapiro v. Thompson*, 394 U.S. 618 (1969) (interstate travel); *Kent v. Dulles*, 357 U.S. 116, 125 (1958) (international travel). Although the Court has expressly reserved the question whether there is a concomitant right to intrastate travel, *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 256 n.9 (1974), the Court has spoken of the right to travel in expansive terms that suggest the possibility that such a right exists.[5] *See*, *e.g.*, *Shapiro*, 394 U.S. at 629-630 ("This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement.").

Moreover, protecting citizens' right to travel is important as a means of protecting their rights to exercise other privileges and attributes of citizenship, such as voting and participation in legal proceedings. *See Kent*, 357 U.S. at 126 ("Freedom of movement is basic in our scheme of

---

[5] Three courts of appeals have recognized a constitutional right to intrastate travel. *See Johnson v. City of Cincinnati*, 310 F.3d 484, 497-498 (6th Cir.) ("we find that the right to travel locally through public spaces and roadways enjoys a unique and protected place in our national heritage"), cert. denied, 539 U.S. 915 (2003); *Lutz v. City of York*, 899 F.2d 255, 268 (3d Cir. 1990) ("We conclude that the right to move freely about one's neighborhood or town, even by automobile, is indeed 'implicit in the concept of ordered liberty' and 'deeply rooted in the Nation's history.'"); *King v. New Rochelle Mun. Hous. Auth.*, 442 F.2d 646, 648-649 (2d Cir.) (citation omitted) ("It would be meaningless to describe the right to travel between states as a fundamental precept of personal liberty and not to acknowledge a correlative constitutional right to travel within a state."), cert. denied, 404 U.S. 863 (1971).

values."); *see also Aptheker v. Secretary of State*, 378 U.S. 500, 517 (1964) ("[F]reedom of travel is a constitutional liberty closely related to rights of free speech and association."). By guaranteeing nondiscriminatory access to public transportation, Title II protects these and other rights that are subject to heightened constitutional review.

Title II also directly enforces the guarantees of the Equal Protection Clause.  Of course, a State "may legitimately attempt to limit its expenditures" for public transportation.  *Shapiro*, 394 U.S. at 633.  "But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens."  *Ibid.*  Such invidious distinctions include discrimination against people with disabilities based on "[m]ere negative attitudes, or fear" alone, *Garrett*, 531 U.S. at 367 (citation omitted), for even rational basis scrutiny is not satisfied by irrational fears or stereotypes, *see ibid.*; *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 447-450 (1985), and simple "animosity" towards individuals with disabilities is not a legitimate state purpose, *see Romer v. Evans*, 517 U.S. 620, 634 (1996).

And while it is generally true that States are not required by the Equal Protection Clause "to make special accommodations for the disabled," this is true only "so long as their actions toward such individuals are rational."  *Garrett*, 531 U.S. at 367.  Thus, as applied to the context of access to public transportation, Title II enforces and protects a host of vital constitutional rights.

**B.  In Enacting Title II, Congress Had Ample Evidence Of Official Discrimination Justifying The Exercise Of Its Section Five Powers.**

**1.  *Congress was not required to make a record of official discrimination for every possible, valid application of Title II.***

The state defendants' second argument against abrogation—that Congress did not document sufficient evidence of unconstitutional discrimination in access to public

transportation—also fails.  Congress was not required to make a record of official discrimination for every context in which Title II may validly apply.  Title II applies to all public services, programs, and activities.  Congress cannot anticipate, let alone justify with evidence, every context in which such a law operates.  What it can do is make a voluminous record demonstrating that individuals with disabilities have faced public discrimination across the board, thus justifying legislation that covers all public services, programs, and activities.  And *Lane* held that Congress did just that.

In *Lane*, the Court remarked on the "sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services," 541 U.S. at 528, including in the areas of "education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services," *id.* at 529 (alteration omitted) (quoting 42 U.S.C. § 12101(a)(3)).  The Court thus concluded that it is "clear beyond peradventure that inadequate provision of public services and access to public facilities was an appropriate subject for prophylactic legislation."  *Ibid.*

Although *Lane* ultimately upheld Title II as valid Fourteenth Amendment legislation specifically as applied to access to courts, its conclusions regarding the historical predicate for Title II are not limited to that context.  The Court did not begin its "as-applied" analysis until it reached the third step of the *Boerne* analysis regarding the Act's congruence and proportionality.  *See Lane*, 541 U.S. at 530-534.  In addressing this question—and only this question—*Lane* engaged in context-specific analysis, because Title II's remedies operate differently in different contexts.  *Id.* at 530-531.  But *Lane* did not leave open, in any context, whether Congress compiled a sufficient history of disability discrimination to trigger its authority to legislate.

The Eleventh Circuit reads *Lane* in exactly this manner, stating that the "Supreme Court considered the record supporting Title II *as a whole*, and conclusively held that Congress had documented a sufficient historical predicate of unconstitutional disability discrimination in the provision of public services to justify enactment of a prophylactic remedy pursuant to Congress's authority under Section 5 of the Fourteenth Amendment." *Association for Disabled Ams., Inc.*, 405 F.3d at 958.  Circuits that have considered this question have overwhelmingly and correctly concluded that, following *Lane*, there is no need to show a history of discrimination in each specific context covered by Title II.  *Bowers v. NCAA*, 475 F.3d 524, 554 & n.35 (3d Cir. 2007); *Klingler v. Director, Dep't of Revenue*, 455 F.3d 888, 896 (8th Cir. 2006); *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 487-488 (4th Cir. 2005); *but see Guttman v. Khalsa*, 669 F.3d 1101, 1119 (10th Cir. 2012).

### 2.  The ADA's legislative history includes voluminous evidence of the harms of official discrimination in public transportation.

The adequacy of Title II's historical predicate to support broad prophylactic legislation is not open to dispute.  But even if Congress had been required to document a history of discrimination more narrowly, the legislative history of the ADA includes voluminous evidence documenting the problem of disability discrimination in transportation and the far-reaching effects of that discrimination.  The account below highlights some of that evidence, rather than attempting to provide an exhaustive and comprehensive presentation.

In passing the ADA, Congress conducted extensive investigations into the extent to which Americans with disabilities experienced discrimination and exclusion.  The information amassed over a number of years led Congress to make statutory findings that "discrimination against individuals with disabilities persists in such critical areas as  *  *  *  transportation," 42

U.S.C. § 12101(a)(3), that "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion [and] the discriminatory effects of * * * transportation * * * barriers," 42 U.S.C. § 12101(a)(5), and that, as a result, "people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally," 42 U.S.C. § 12101(a)(6).

The legislative record of the ADA includes first-hand reports of the inability of persons with disabilities to utilize public transportation and the devastating consequences of that lack of access. A congressionally-designated Task Force held 63 public forums, collected evidence from nearly 5000 individuals, and presented that evidence to Congress.[6] In examining this evidence, the Supreme Court in *Lane* concluded that it provided "hundreds of examples of unequal treatment of persons with disabilities by States and their political subdivisions." *See* 541 U.S. at 526-527. Among those examples are at least 140 accounts of persons with disabilities who were denied the opportunity to use public transportation.[7] Congressional committees also

---

[6] *See* 2 *Staff of the House Comm. on Educ. and Labor*, 101st Cong., 2d Sess., *Legislative History of Pub. L. No. 101-336: The Americans with Disabilities Act* 1039-1040 (Comm. Print 1990) (*Leg. Hist.*) (Justin Dart); *see also* Task Force on the Rights and Empowerment of Americans with Disabilities, *From ADA to Empowerment* 16 (1990). Those "several thousand documents" evidencing "massive discrimination and segregation in all aspects of life," 2 *Leg. Hist.* 1040, 1324 (statement of Justin Dart), are part of the official legislative history of the Disabilities Act, *id.* at 1336, 1389 (Chairman Owens). Those submissions were lodged with the Supreme Court in *Board of Trustees of University of Alabama* v. *Garrett*, 531 U.S. 356 (2001), and catalogued in Appendix C to Justice Breyer's dissent in that case. *See Lane*, 541 U.S. at 526. That Appendix cites to the documents by State and Bates stamp number, 531 U.S. at 391-424, a practice we follow in this brief. The United States can provide this Court copies of the documents cited in this brief, or the entire four-volume set, upon request.

[7] *See* AL 07; AL 09; AL 10; AL 11; AL 13; AL 21; AL 23; AL 26; AL 27; AK 44; AK 57; AK 61; AK 69; AK 70; AZ 110; AZ 121; AR 141; AR 144; AR 150; CA 180; CA 181; CA 211; CA 212; CA 214; CA 215; CA 221; CA 222; CA 223; CA 226; CA 240; CA 241; CA 244; CA 247; CA 248; CA 250; CA 252; CA 253; CO 266; CO 267; CO 268; CO 269; CO 271; CO 274; CO 275; CO 276; DE 301; DE 302; DE 310; DE 323; DE 325; DE 337; DE 343; GA 365; GA 372;

heard testimony from persons with disabilities who were unable to use public transportation due to intentional discrimination.[8]

Congressional committees heard extensive testimony about how the lack of accessible transportation for persons with disabilities prevents them from fully participating in civic life because "[t]ransportation is basic to [the exercise of] other rights."  2 *Leg. Hist.* 1317 (Statement of Joseph Rauh).  For example, numerous witnesses testified that wide-ranging surveys of persons with disabilities revealed that "inaccessible transportation services has been identified as a major barrier [to equal employment opportunities], second only to discriminatory attitudes."  2 *Leg. Hist.* 1571 (Jay Rochlin, Executive Director of President's Comm. on Employment of People with Disabilities).  Congress also learned that the lack of accessible public transportation prevented persons with disabilities from exercising their right to vote[9] and impaired their ability

---

HI 444; HI 446; HI 452; HI 462; HI 463; HI 467; HI 468; HI 469; HI 475; HI 476; HI 488; HI 490; HI 491; HI 494; HI 495; ID 502; ID 505; ID 508; ID 510; ID 516; ID 522; ID 523; ID 524; IL 554; IL 575; IL 576; IL 586; IL 589; IL 590; IL 596; IL 597; IL 600; IL 603; IL 605; IN 613; IN 616; IN 619; IN 621; KS 685; KY 706; KY 709; KY 717; KY 720; KY 733; KY 736; LA 745; LA 751; LA 753; LA 773; MD 785; MD 797; MI 923; MI 926; MI 933; MI 968; MS 853; MS 994; MS 997; MS 1000; MO 1009; MO 1013; NV 1044; NV 1051; NM 1092; OH 1218; OH 1230; OH 1234; OH 1235; OH 1242; OK 1266; PA 1399; PA 1408; PA 1413; PA 1423; PA 1425; PA 1434; SD 1470; TX 1483; TX 1527; TX 1540; UT 1576; UT 1584; VA 1664; VA 1668; VA 1677; WV 1742; WI 1761 (catalogued in *Garrett*, 531 U.S. at 391-423 (Breyer, J., dissenting)). *See also* WA 1716.

[8]  For example, Congress learned that transportation providers "refus[ed] to transport people with certain handicaps, requir[ed] personal attendants to accompany disabled people even if they are fully able to travel alone, and den[ied] passage to guide dogs."  United States Civil Rights Comm'n, Accommodating the Spectrum of Individual Abilities 39 (1983) (Spectrum).  *See also* 2 *Leg. Hist.* 1077 (statement of John Nelson) ("In the areas of transportation, I, personally, face discrimination in getting on trains, getting on planes.  In fact, [I was] not allowed to get on some planes because I did not have an able bodied person traveling with me, even though I had attendants on either end of the flight.").

[9]  *See* H.R. Rep. No. 485, Pt. 2, 101st Cong., 2d Sess., 37 (1990) ("People who cannot get to * * *  the voting place cannot exercise their rights and obligations as citizens."); 2 *Leg. Hist.*

to attend public governmental hearings.[10]  This and other evidence before Congress was more than adequate to support comprehensive prophylactic and remedial legislation, including as against disability discrimination in the context of public transportation.

### C. Title II Is A Congruent And Proportional Response To The Constitutional Rights And The History Of Discrimination At Issue.

#### 1. *Section Five legislation can prohibit facially constitutional conduct and be congruent and proportional.*

The state defendants argue that "conduct that violates Title II, but not the Constitution, cannot pass the 'congruence and proportionality' test."  Doc. 48-1, at 30.  This argument is wrong, and fundamentally misunderstands the purpose of the congruence and proportionality inquiry.  As discussed above, Congress's broad Section Five authority includes the power "to remedy and to deter violation of rights guaranteed [by the Fourteenth Amendment] by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text."  *Lane*, 541 U.S. at 518 (brackets in original) (quoting *Kimel*, 528 U.S. at 81).  It is beyond dispute that the enforcement power gives Congress the ability to "prohibit[] conduct which is not itself unconstitutional."  *Boerne*, 521 U.S. at 518; *accord National Ass'n of Bds. of Pharmacy v. Board of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1316 (11th Cir. 2011).

---

1190 (statement of Cindy Miller) ("The transportation authorities in America do not provide accessible transit because it does not value people with disabilities or the contributions that are gained by Americans with disabilities being able to get to work, vote, medical appointments, or cultural events.").

[10]  *See* 135 Cong. Rec. 8516 (1989) (statement of Sen. Durenberger) ("The Minnesota Governor's Council on Disabilities recently held hearings on the problems persons with disabilities face in the area of transportation.  However, four of the people were unable to attend because their accessible transportation did not arrive.  Several other persons had to leave early because their only transportation home came before they could testify.").

Given this broader sweep of the Section Five power, the inquiry that the Supreme Court requires is whether there is "a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." *Boerne*, 521 U.S. at 520.  Put another way, "the question is not *whether* Title II exceeds the boundaries of the Fourteenth Amendment, but *by how much*." *Constantine*, 411 F.3d at 490.

### 2. Title II provides congruent and proportional remedies as applied to discrimination in public transportation.

As applied to the context of public transportation, Title II's requirements are an appropriately measured response to the pattern of discrimination that Congress documented.[11] Indeed, the state defendants make no argument regarding the actual contents of the Title II's requirements in this context.  That the defendants make only a broad—and fundamentally misplaced—legal argument rather than challenge the actual congruence and proportionality of Title II's requirements is unsurprising.  That is so because "[t]he remedy Congress chose is * * * a limited one." *Lane*, 541 U.S. at 531. Title II prohibits only discrimination "by reason of * * * disability," 42 U.S.C. § 12132, so that the States retain their discretion to exclude persons from programs, services, or benefits for any lawful reason unconnected with their disability or for no reason at all.  Further, even though Title II requires States to take some affirmative steps to avoid discrimination, it "does not require States to compromise their essential eligibility

---

[11]  The decision of the district court in *Everybody Counts, Inc. v. Northern Indiana Regional Planning Commission*, No. 2:98-cv-97, 2006 U.S. Dist. LEXIS 39607 (N.D. Ind. Mar. 30 2006), does not undercut this principle.  In that case, plaintiffs argued that a state agency itself violated Title II by funding separate entities that provided public transportation and were allegedly violating Title II's requirements.  *Id.* at *10.  The district court held that the state's sovereign immunity was not validly abrogated under Title II to the extent that the state defendant was not the actual provider of public transportation, but merely a funding conduit.  The district court concluded that it would not be a congruent and proportional remedy to hold the state "vicariously liable" for failing to "somehow ensure that all of its municipalities that provide public transportation are not violating the ADA."  *Id.* at *35-36.

16

criteria," requires only "'reasonable modifications' that would not fundamentally alter the nature of the service provided," and does not require States to "undertake measures that would impose an undue financial or administrative burden  *  *  *  or effect a fundamental alteration in the nature of the service," *Lane*, 541 U.S. at 531-532.

For example, with respect to public transportation and vehicle accessibility, Title II did not impose its accessibility requirements retroactively, but instead requires that transportation providers purchase accessible vehicles when they opt to purchase new vehicles.  42 U.S.C. §§ 12142(a), 12144, & 12162(a)(1).  Title II likewise requires only that transportation providers make "good faith efforts" to purchase or lease accessible used vehicles when they opt to purchase or lease such vehicles.  42 U.S.C. §§ 12142(b), 12162(c).

Similarly, with respect to physical access to existing facilities (including facilities related to public transportation), Congress required only "reasonable measures to remove architectural and other barriers to accessibility."  *Lane*, 541 U.S. at 531.  Having found that facilities may be made accessible at little additional cost at the time of construction,[12] Congress imposed reasonable architectural standards for new construction and alterations.  *See* 28 C.F.R. § 35.151. For older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services.  28 C.F.R. § 35.150(b)(1).  Only if these measures are ineffective in achieving accessibility is the public entity required to make reasonable structural changes.  *Ibid*.  And in no

---

[12]  *See* GAO, *Briefing Reports on Costs of Accommodations, Americans with Disabilities Act: Hearing Before the House Comm. on Small Business*, 101st Cong., 2d Sess. 190 (1990); *see also*, *e.g.*, S. Rep. No. 116, 101st Cong., 1st Sess. 10-12, 89, 92 (1989); H.R. Rep. No. 485, Pt. 2 101st Cong., 2d Sess., 34 (1990).

event is the entity required to undertake measures that would impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the service.   28 C.F.R. § 35.150(a)(2)-(a)(3); *Lane*, 541 U.S. at 532; *see also* 42 U.S.C. § 12148(a).

Such requirements serve valid remedial and prophylactic functions.  Given the relevant history of unconstitutional discrimination, Congress was entitled to conclude that there exists a real risk that some state officials would continue to make decisions about whether and how persons with disabilities should have access to public transportation based on invidious class-based stereotypes or animus that would be difficult to detect or prove.  *See* 42 U.S.C. § 12101(a)(5).  In such a situation, the risk of unconstitutional treatment is sufficient to warrant Title II's prophylactic response.  *See Hibbs*, 538 U.S. at 735-737 (remedy of requiring "across-the-board" provision of family leave congruent and proportional response to gender-based stereotypes).

Prohibiting disability discrimination in public transportation is also an appropriate means of preventing and remedying discrimination in public services generally.  Congress and the Supreme Court have long acknowledged the Nation's "history of unfair and often grotesque mistreatment'" of persons with disabilities.  *Cleburne*, 473 U.S. at 454 (Stevens, J., concurring); *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 608 (1999) (Kennedy, J., concurring) ("[O]f course, persons with mental disabilities have been subject to historic mistreatment, indifference, and hostility."); *Cleburne*, 473 U.S. at 446 ("Doubtless, there have been and there will continue to be instances of discrimination against the retarded that are in fact invidious."); *Alexander v. Choate*, 469 U.S. 287, 295 n.12 (1985) ("Well-cataloged instances of invidious discrimination against the handicapped do exist.").  Title II's application to public transportation

18

is congruent and proportional because, among other reasons, a simple ban on discrimination would have frozen in place the effects of States' prior exclusion and isolation of persons with disabilities. *See Hibbs*, 538 U.S. at 736-737.

Finally, Title II's application to public transportation must be viewed in light of the broader purpose and application of the statute. Congress found that the discrimination faced by people with disabilities was not limited to a few discrete areas. To the contrary, Congress found that people with disabilities have been subjected to systematic discrimination in a broad range of public services. *See* 42 U.S.C. § 12101(a)(3). Title II's application to public transportation, thus, is part of a broader remedy to a constitutional problem that is greater than the sum of its parts. That is, comprehensively protecting the rights of individuals with disabilities in the transportation context directly remedies and prospectively prevents the persistent imposition of inequalities on a single class, *Lane*, 541 U.S. at 522-529, and the chronic distribution of benefits and services in a way that "impos[es] special disabilities upon groups disfavored by virtue of circumstances beyond their control," *Plyler v. Doe*, 457 U.S. 202, 216 n.14 (1982). Title II's application to public transportation thus combats longstanding unconstitutional treatment of people with disabilities, including programmatic exclusions from public life that threatened very "kind of 'class or caste' treatment that the Fourteenth Amendment was designed to abolish." *Ibid.* (citation omitted).

## CONCLUSION

For the foregoing reasons, the state defendants' motion to dismiss plaintiffs' ADA damages claim on the basis of sovereign immunity should be denied.

Respectfully submitted,


EDWARD J. TARVER                         LORETTA E. LYNCH
United States Attorney                    Attorney General


/s/ *J. Thomas Clarkson*                  VANITA GUPTA
J. Thomas Clarkson                        Principal Deputy Assistant Attorney General
Assistant United States Attorney            Civil Rights Division
 Georgia Bar No. 656069
Post Office Box 8970                      GREGORY B. FRIEL
Savannah, Georgia  31401                  Deputy Assistant Attorney General
(912) 652-4422                              Civil Rights Division
Thomas.Clarkson@usdoj.gov


                                          /s/ *Anna M. Baldwin*
                                          THOMAS E. CHANDLER
                                          ANNA M. BALDWIN
                                            New York Bar No. 4711800
                                          Attorneys
                                          Department of Justice
                                          Civil Rights Division
                                          Appellate Section
                                          Ben Franklin Station
                                          P.O. Box 14403
                                          Washington, D.C.  20044-4403
                                          (202) 305-4278
                                          Anna.Baldwin@usdoj.gov

**CERTIFICATE OF SERVICE**

This is to certify that I have on April 20, 2016, served all the parties in this case in accordance with the notice of electronic filing ("NEF"), which was generated as a result of electronic filing in this Court.

 /s/ *Anna M. Baldwin*
Attorney
Civil Rights Division
U.S. Department of Justice
