IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

SARAH FRANCES DRAYTON, et al.,          *
                                        *
    Plaintiffs                          *
                                        *
    v.                                  *  Case Number: 2:16-cv-00053
                                        *
McINTOSH COUNTY, GEORGIA, et al.,       *
                                        *
    Defendants                          *

**REPLY BRIEF IN SUPPORT OF THE COUNTY DEFENDANTS'
MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Defendants McIntosh County, Georgia, McIntosh County Sheriff Stephen Jessup, in his official capacity, and McIntosh County Board of Tax Assessors (hereinafter sometimes referred to as the "County Defendants") have filed a Motion to Dismiss (Doc. 46) all of the claims asserted by plaintiffs against these defendants in plaintiffs' First Amended Complaint.  The plaintiffs filed a Consolidated Brief in Opposition (Doc. 49) to the Motions to Dismiss filed by both the County Defendants (Doc. 46) and the State Defendants (Doc. 48).  This Reply Brief demonstrates that the plaintiffs' arguments regarding the County Defendants' Motion to Dismiss are completely without merit.

## I.    Sapelo Island, Georgia

The plaintiffs' own Amended Complaint alleges that Sapelo Island is a barrier island off the coast of Georgia separated from the mainland by the Doboy Sound (Amended Complaint, ¶ 2; 164-165).  Plaintiffs allege that Sapelo Island is accessible only by boat across the Doboy Sound and that the only ferry service between the mainland and Sapelo Island is operated by the State of Georgia

and runs three times a day from Meridian, Georgia, to Sapelo Island, Georgia (Amended Complaint, ¶¶ 164-165).  Plaintiffs' Amended Complaint is replete with allegations describing how difficult it is to get to Sapelo Island and how inaccessible the island is from the mainland.  See e.g. plaintiffs' Amended Complaint at ¶¶ 44, 54, 67, 71, 89, 92, 94, 106, 116, 118, 127, 129 and 132.[1]

The plaintiffs' Amended Complaint repeatedly alleges the existence of a white population on Sapelo Island, Georgia, and the existence of many white owners of property in the Hogg Hammock community.  See plaintiffs' Amended Complaint at ¶¶ 8; 319-323.  In fact, the plaintiffs' Amended Complaint specifically alleges that there are "countless" white owners of property in the Hogg Hammock community on Sapelo Island, Georgia (Amended Complaint, ¶ 300).

Under Fed. R. Evid. 201(b)(2), "the Court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  As a matter of law, this Court can judicially notice the public record Census statistics for Sapelo Island and for McIntosh County, Georgia, as a whole taken from the 2010 Census, without converting the County Defendants' 12(b)(6) motion into a Motion for Summary Judgment.  See e.g. Whitaker v. Miami-Dade County, 126 F. Supp. 3rd 1313, 1332, n. 3 (S.D. Fla. 2015);  Bryant v. Avado Brands, Inc., 187 F. 3rd 1271, 1280 (11th Cir. 1999).

According to the 2010 Census, the resident population of Sapelo Island, Georgia at that time was 195 persons, of whom 103 (52.8%) were black or African American and 82 (42.1%) were white. The 2010 Census for McIntosh County as a whole establishes that the total number of residents in

---

[1]Plaintiffs argue in their Brief (Doc. 49 at p. 46) that the Defendants' discussion of the geographic separation between the mainland and Sapelo and the inaccessability of Sapelo constitute matters beyond the pleadings.  However, as noted above, the plaintiffs' own Amended Complaint is replete with allegations on this subject.

McIntosh County at the time of that Census was 14,333 persons of whom 8,811 (61.47%) were white and 5,149 (35.92%) were black or African American.

## II.   Plaintiffs' wholly conclusory allegations of racial discrimination against the County Defendants

The plaintiffs' First Amended Complaint contains nothing but the most conclusory of allegations of racial discrimination as follows:

1.      The County's property tax hikes were part of a systemic effort to drive the Gullah Geechee from the Island and clear the way for a mostly white vacationer population on the island. At the same time, the County favor's whites on the island.  The County regularly allows mostly white developers to come to the island and build expansive vacation homes in contravention of the zoning requirements (First Amended Complaint at ¶ 8).

2.      Working jointly, the County, State and Sapelo Island Heritage Authority have engaged in a policy of malign neglect of the Gullah Geechee on Sapelo Island by denying services, withholding resources, increasing costs and otherwise limiting the use and enjoyment of Gullah Geechee homes and land.  These actions have the purpose and effect of driving the Gullah Geechee from Sapelo Island (First Amended Complaint at ¶ 15).

3.      Starting at Paragraph 172 of their First Amended Complaint and continuing through Paragraph 212, the plaintiffs describe their version of the history of Sapelo Island, starting in the eighteenth century when plaintiffs' ancestors lived on the island as slaves.  The plaintiffs' First Amended Complaint alleges in great detail how following the Civil War the descendants of former slaves lived on Sapelo Island and how in the 1930s, R. J. Reynolds purchased all of Howard Coffin's holdings on Sapelo Island and then obtained (allegedly by fraud) properties owned by Gullah

Geechee residents of the island so that by the early 1960s Reynolds had acquired virtually all of the land in Raccoon Bluff and the northern two-thirds of the island, completely displacing the Gullah Geechee to Hogg Hammock.  Plaintiffs' First Amended Complaint goes on to allege that Reynolds' widow sold all of Reynolds' holdings on Sapelo to the State of Georgia in 1969 and that the State continues to claim title to former Gullah Geechee communities based on R. J. Reynolds' land transfers (First Amended Complaint at ¶¶ 172-212).

4.      There is absolutely nothing contained in Paragraphs 172 through 212 of plaintiffs' First Amended Complaint that has anything whatsoever to do with McIntosh County, with McIntosh County Sheriff Stephen Jessup (or any of his predecessors in that office), or with the McIntosh County Board of Tax Assessors (or any of their predecessors in that office).  The County Defendants are not mentioned in any way, shape or form in this part of plaintiffs' Complaint.  In short, the history of discrimination and shady dealing alleged by the plaintiffs has absolutely nothing whatsoever to do with the County Defendants.

5.      At Paragraph 221 of the First Amended Complaint, plaintiffs allege that McIntosh County expends extensive resources on housing and housing related services in the predominately white McIntosh County mainland, but the County spends little for housing and housing related services on Sapelo Island. Plaintiffs allege that the provision of unequal services or the failure to provide services by McIntosh County on Sapelo Island is pursuant to a long-standing and ongoing policy or custom of McIntosh County to deny or provide unequal services to the predominately African American, Gullah Geechee residents of Hogg Hammock on Sapelo Island, while providing better and more services on the predominately white mainland  (First Amended Complaint at ¶ 221).

6.      Plaintiffs allege that defendant Jessup's failure to provide police protection on Sapelo Island (though there is no allegation that Sapelo Island has a crime problem) is consistent with and/or pursuant to a long-standing and ongoing custom or practice of McIntosh County to deny police protection and emergency, fire and medical services to the predominately African American residents of Sapelo Island while ensuring that these services are provided on the predominately white mainland (First Amended Complaint at ¶ 249).  Plaintiffs do <u>not</u> allege that the Sheriff has ever refused to send a deputy or deputies to the Island if the need arises.

7.      In refusing to provide police protection services on Sapelo Island, defendant Jessup is acting on behalf of defendant McIntosh County and consistent with McIntosh County's long-standing and ongoing policy or custom of providing unequal and discriminatory services to Sapelo Island (First Amended Complaint at ¶ 250).  Again, the plaintiffs' complain that the Sheriff does not station a deputy on the Island.

8.      Given the well-known racial demographics of Sapelo Island as compared to the mainland, defendant Jessup and defendant McIntosh County have been aware that the custom or practice of refusing to provide police protection services on Sapelo Island (though there is no allegation that Sapelo Island has a crime problem) most significantly affects the island's African American and Gullah Geechee residents and they have nonetheless implemented this custom or practice (First Amended Complaint at ¶ 251).

9.      Plaintiffs allege that the County raised property taxes on Sapelo Island in 2012 based upon a "flawed" sales ratio study or analysis  (First Amended Complaint at ¶ 340).  Plaintiffs allege that defendants McIntosh County and McIntosh County Board of Tax Assessors implemented these property tax increases pursuant to a policy with the intended and foreseeable effect of increasing

property values and facilitating the development of high priced vacation homes in Hogg Hammock and elsewhere on the island that most plaintiffs and other Gullah Geechee descendants cannot afford (First Amended Complaint at ¶ 326).

10.     The County and Board of Assessors discriminatory appraisal practices are driving up property values in Hogg Hammock and threaten plaintiffs' ability to maintain continuing ownership of properties (First Amended Complaint at ¶ 370).

11.     McIntosh County has acted pursuant to a long-standing and ongoing policy to interfere with and deny the African American Gullah Geechee community's rights to housing and municipal services for the purpose of forcing them off of Sapelo Island and facilitating the development of high end vacation housing for mostly white developers and buyers  (First Amended Complaint at ¶ 384).

12.     The Board of Tax Assessors' conduct is pursuant to a racially discriminatory policy or custom to prevent African American and Gullah Geechee descendants from continuing to own, occupy and use real property on Sapelo Island  (First Amended Complaint at ¶¶ 427, 435).

13.     Plaintiffs allege that mainland residents and property owners are treated more favorably than Sapelo Island residents and owners of property on Sapelo Island in terms of a wide variety of services provided by the County, including emergency medical services (First Amended Complaint, ¶¶ 223-235), fire services (First Amended Complaint, ¶¶ 236-242), police services (First Amended Complaint, ¶¶ 243-251), trash services (First Amended Complaint, ¶¶ 252-262), roads (First Amended Complaint, ¶¶ 263-279) and water and sewer (First Amended Complaint, ¶¶ 280-284).  Plaintiffs also allege that mainland residents have been treated more favorably than Sapelo Island residents and property owners with regard to property appraisals for property tax purposes

(First Amended Complaint, ¶¶ 324-349)[2] and with regard to the expenditure of funds received by McIntosh County (First Amended Complaint, ¶¶ 353-366).

14.     The plaintiffs compare themselves to white Sapelo Island residents and property owners only in their allegations related to zoning (First Amended Complaint at ¶¶ 311-323) and those allegations are discussed in detail in plaintiffs' initial Brief (Doc. 46 at pp. 16-19).

15.     It is very telling that the plaintiffs do <u>not</u> allege that the County Defendants discriminate against African American residents/property owners on the mainland in the provision of County services.  It is even more telling that the plaintiffs do <u>not</u> allege with regard to the provision of services on Sapelo Island, that the County treats the white residents or property owners of Sapelo Island (or white residents or property owners of <u>any other</u> island within McIntosh County accessible only by boat) more favorably than the African American residents and property owners of Sapelo Island.

16.     Thus, based upon the plaintiffs' own allegations, the 42.1% white population on Sapelo Island is treated exactly the same as the 52.8% black or African American population of Sapelo Island with regard to the County services which are provided or not provided on Sapelo Island.

17.     Moreover, the plaintiffs' own Amended Complaint makes it clear that the "countless" white owners of property on Sapelo Island mostly live together with the African Americans on Sapelo Island in Hogg Hammock because the State claims title to 97% of the Island.  <u>See e.g.</u>

---

[2] Yet, plaintiffs acknowledge that some of them filed successful appeals regarding their property assessments using the state law procedure available to <u>all</u> taxpayers. (Dkt. 29, ¶¶ 343-344). Those who did not file are certainly not victims of discrimination, and even benefitted from the assessment freeze noted in paragraph 344 of the First Amended Complaint.

plaintiffs' First Amended Complaint at ¶¶ 213; 319-323.  In short, according to the plaintiffs' own First Amended Complaint, there are no white sections or neighborhoods and no African American sections or neighborhoods on Sapelo Island.  Almost everyone lives together in Hogg Hammock because the State claims ownership of 97% of the Island.

18.    Plaintiffs concede that the decline of the Gullah Geechee population on Sapelo Island is simply a part of the "arc of history" (First Amended Complaint at ¶ 215).

### III.    Plaintiffs' conclusory allegations cannot survive the County Defendants' 12(b)(6) Motion to Dismiss.

As the County Defendants argue in their initial Brief (Doc. 46 at pp. 10-12) under Ashcroft v. Iqbal, 556 U.S. 662 (2009) and Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), on a 12(b)(6) motion the Court should eliminate all conclusory allegations and threadbare recitals of a cause of action's elements, supported by mere conclusory statements.  The Court then looks at well-pleaded factual allegations and assumes them to be true and then determines whether such allegations plausibly give rise to an entitlement to relief.  In determining plausibility, the Court should draw on its experience and common sense to infer obvious alternative explanations which suggest lawful conduct rather than the unlawful conduct the plaintiffs would ask the Court to infer.

This Court recently explained the standard for resolving a 12(b)(6) motion to dismiss in the case of Almanza v. United Airlines, Inc., et al., 2016 WL 722159 (S.D. Ga. 2016; C.V. 215-033) where the Court held as follows:

> "Ordinarily, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  While a complaint need not contain detailed factual allegations, it nevertheless "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S.Ct. 1955, 167

L.Ed.2d 929 (2007)) (interpreting Fed. R. Civ P. 8(a)(2)).  Facial plausibility requires that the complaint set forth enough facts to "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Thus, a plaintiff must plead more than mere labels and conclusions, and a formulaic recitation of the elements of a particular cause of action does not suffice.  Twombly, 550 U.S. at 555, 127 S.Ct. 1955.  Rather, at a minimum, a complaint should "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam)(quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001))." (Emphasis added).

Following the Supreme Court's decision in Iqbal, the Eleventh Circuit has held that a plaintiff in a discrimination case such as the case sub judice must allege a prima facie case of discrimination. See e.g. McCone v. Pitney Bowes, Inc., 582 Fed. App'x. 798 (11th Cir. 2014) where the Court ruled as follows:

". . . the district court must also consider whether the complaint satisfies Iqbal's "plausible on its face" standard and whether the allegations are sufficient to "raise a right to relief above the speculative level" under Twombly. Edwards v. Prime, Inc., 602 F.3d 1276, 1300 (11th Cir. 2010) (noting that post-Iqbal, a plaintiff must allege a prima facie case of discrimination.) Cf. Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1270-71 (11th Cir. 2004)(explaining, pre-Twombly, that Swierkiewicz "did not even remotely suggest that a pleading could survive dismissal when it consisted of only the barest of conclusory allegations without notice of the factual grounds on which they purpose to be based")." (Emphasis added).

### A.    Plaintiffs' disparate treatment claim fails because Plaintiffs do not allege that similarly situated whites were treated more favorably by the County Defendants

The plaintiffs argue in their Brief (Doc. 49 at p. 4) that under Village of Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252 (1977) they are not required to allege a prima facie case of discrimination and are not required to allege that the County Defendants have treated similarly situated whites more favorably than the plaintiffs, in violation of their

disparate treatment claims.  As the above-quoted language from the Eleventh Circuit's decision in McCone makes clear, this argument is completely incorrect.

As a matter of Eleventh Circuit law and precedent, the plaintiffs were most assuredly required to allege that similarly situated whites were treated more favorably by the County Defendants in order to state a claim.  The following cases make this clear:

1.   "As its name suggests, a disparate treatment claim requires a plaintiff to show that he has actually been treated differently than similarly situated non-handicapped people." Schwarz v. City of Treasure Island, 544 F.3d 1201, 1216 (11th Cir. 2008), discussing FHA claims;

2.   "To establish purposeful discrimination under § 1981 and § 1982 a plaintiff must show that, under similar circumstances, the defendant treated a white individual differently than it treated him." Roy v. Bd. of Cty. Comm'rs, 607 F. Supp. 2d 1297, 1305 (N.D. Fla. 2009);

3.   "To state a § 1983 equal protection claim, plaintiff Freeman must show that she is similarly situated to non-black persons who received more favorable treatment." Douglas Energy Relief Ass'n v. City of Douglas, Ga., 556 F. App'x 820, 822 (11th Cir. 2014);

4.   "The Court initially notes that Sirpal cannot meet the traditional disparate treatment prima facie case in a Title VI context, which requires him to prove that he was 'treated differently from similarly situated students who are not members of the protected class,' Bell v. Ohio State Univ., 351 F.3d 240, 253 (6th Cir.2003), due to the lack of a similarly situated student." Sirpal v. Univ.

-10-

of Miami, 2011 WL 3101791, at *12 (S.D. Fla. July 25, 2011), aff'd, 509 F. App'x 924 (11th Cir. 2013);

5.      "[B]ecause 'discrimination that violates the Equal Protection Clause of the Fourteenth Amendment committed by an institution that accepts federal funds also constitutes a violation of Title VI,' Holton v. City of Thomasville Sch. Dist., 425 F.3d 1325, 1329 n. 1 (11th Cir.2005) (quoting Gratz v. Bollinger, 539 U.S. 244, 276 n. 23 (2003)), the court will utilize the same analysis for the Equal Protection and Titles VI and IX claims. Specifically, the court will determine first whether Defendants treated similarly situated students disparately, and then whether gender or race animus motivated the disparate treatment."Rollins v. Bd. of Trustees of the Univ. of Alabama, 2014 WL 4829540, at *17 (N.D. Ala. Sept. 29, 2014), aff'd, No. 14-14882, 2016 WL 1399375 (11th Cir. Apr. 11, 2016);

6.      "[B]ecause Title VI provides no more protection than the Fourteenth Amendment's Equal Protection Clause, we have said that our Title VI analysis "duplicate[s] exactly our equal protection analysis." Carr v. Bd. of Regents of Univ. Sys. of Georgia, 249 F. App'x 146, 149 (11th Cir. 2007);

7.      "Without a similarly situated comparator, Plaintiffs cannot say that they were treated 'differently.'" Forest Glen, L.L.C. v. City of Montgomery, 2009 WL 387146, at *6 (M.D. Ala. Feb. 13, 2009).

8.      ". . . where the plaintiff relies on circumstantial-rather than direct-evidence of discrimination we use the burden shifting framework set forth in

McDonnell Douglas Corp. v. Green . . . to evaluate the claim of discrimination under the FHA." Boykin v. Bank of America Corporation, 162 F. App'x. 837, 838 (11th Cir. 2005).

9.    "To prove their equal protection claim, the plaintiffs must show (1) that the City treated them differently from similarly situated persons, and (2) that the City unequally applied its zoning laws for the purpose of discriminating against them." Jackson v. City of Auburn, Alabama, 41 F. Supp. 2d 1300, 1308 (M.D. AL 1999).

Clearly, the plaintiffs have not alleged that similarly situated whites were treated more favorably by the County Defendants in relation to any of the subjects of the plaintiffs' claims of discrimination.  Plaintiffs compare themselves to mainland residents and property owners without alleging that African American residents of the mainland are discriminated against in any way in relation to the provision of County services and without alleging that white residents of Sapelo Island are treated more favorably than the plaintiffs in any way in relation to the provision of County services.  Plaintiffs' claims should be dismissed for failure to state a claim since plaintiffs do not allege that similarly situated whites were treated more favorably.  Plaintiffs' argument that with regard to the provision of County services, mainland residents are similarly situated to residents of a barrier island accessible only by boat across a substantial body of water (Doboy Sound), is patently absurd, and is certainly not "plausible."  See e.g. Ashcroft v. Iqbal, supra at 682 where the Supreme Court stated as follows:

"On the facts respondent alleges the arrests Mueller oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed

-12-

> terrorist acts.  As between that "obvious alternative explanation" for the arrests, *Twombly, supra*, at 567, 127 S.Ct 1955, and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion."

Similarly, on the facts alleged by the plaintiffs in the case, the obvious alternative explanation for any disparity of County services between Sapelo Island and the mainland is the fact that Sapelo Island is a barrier island accessible only by boat across a substantial body of water and only a handful of people live on Sapelo Island.  See also Edwards v. Prime, Inc., 602 F.3d 1276, 1301 (11th Cir. 2010), holding that plaintiff did not state a plausible claim of race discrimination where plaintiff claimed racial discrimination because he was a Caucasian, but where he alleged in his complaint that he was threatened by Hispanic co-workers because he had complained about the employer's employment of illegal aliens.  The fact that the plaintiff was Caucasian and his co-workers who were threatening him and shunning him were Hispanic did not state a plausible claim of race discrimination in light of the obvious alternative explanation that it was plaintiff's complaints about the employer hiring illegal aliens which caused the situation about which plaintiff complained.

Here, the plaintiffs' allegations of race discrimination do not set forth any facts whatsoever. They are wholly conclusory in their nature and plaintiffs do not allege any facts which plausibly suggest that race discrimination is the reason why there is a disparity of County services between Sapelo Island and the mainland.  The plaintiffs' lengthy allegations regarding the history of Sapelo Island and the alleged fraud of R. J. Reynolds in acquiring land on Sapelo Island does not mention or implicate the County Defendants in any way, shape or form.

With regard to the allegations against the Board of Tax Assessors regarding the re-appraisal of Sapelo Island property, plaintiffs do not allege that property owned by whites on Sapelo Island was treated any more favorably and the fact that the re-appraisal only dealt with Sapelo Island

-13-

property does not even remotely suggest racial discrimination.[3]  It is the duty of the Tax Assessors to appraise property at its fair market value and it cannot be disputed that "beachfront property [or for that matter property on a barrier island fronting the Atlantic Ocean whether it is actual beachfront or not] is different from non-beachfront [or non-barrier island] property," Crystal Dunes Owners Association, Inc. v. City of Destin, Florida, 476 Fed. App'x. 180, 185 (11th Cir. 2012)(holding that plaintiffs' claims that they were not protected by law enforcement in the same manner as all other landowners in the city failed as a matter of law since plaintiffs (who owned beachfront property) could not allege that they were similarly situated to every landowner in the city with regard to police services).

### B.   Plaintiffs' First Amended Complaint does not even contain a disparate impact claim and certainly does not state such a claim which could survive the County Defendants' Motion to Dismiss

The plaintiffs argue in their Brief (Doc. 49 at p. 41) that their First Amended Complaint also sets forth a disparate impact claim which should survive the County Defendants' 12(b)(6) Motion to Dismiss.  This is complete nonsense.  First of all, the County Defendants submit that the plaintiffs' First Amended Complaint does not even contain any disparate impact claim.  Certainly, the phrase "disparate impact" is nowhere found in the plaintiffs' 151 page, 458 paragraph First Amended Complaint and plaintiffs do not identify anywhere in their Complaint any facially-neutral County policy which is alleged to have a disparate impact on African Americans. The County Defendants do not agree that the plaintiffs' First Amended Complaint even remotely sets forth a disparate impact

---

[3]As discussed in detail in the County Defendants' initial Brief (Doc. 46), the plaintiffs allege that the re-appraisal was based upon a "flawed" sales ratio study, but the plaintiffs' First Amended Complaint also alleges that the plaintiffs who availed themselves of the State law appeal process all prevailed in State Court.  These claims are all barred by the Tax Injunction Act.

claim, no matter how liberally the Complaint may be construed. Certainly, the First Amended Complaint does not set forth any allegations which state a disparate impact claim which could possibly survive the County Defendants' Motion to Dismiss.

"Discrimination based on disparate impact requires a plaintiff to show: 1) there is a significant statistical disparity among members of different [racial] groups; 2) there is a specific, facially-neutral employment policy or practice; and 3) there is a causal nexus between the specific policy or practice and the statistical disparity." Cardelle v. Miami Beach Fraternal Order of Police, 593 F. App'x 898, 901 (11th Cir. 2014).

The Supreme Court recently held in the case of Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc., 135 S.Ct. 2507 (2015) that a disparate impact claim can be asserted under the FHA, noting that disparate-impact liability mandates the "removal of artificial, arbitrary and unnecessary barriers." (Id. at 2522). The Supreme Court went on to state that "a plaintiff who fails to allege facts at the pleadings stage or produce statistical evidence demonstrating a causal connection cannot make out a *prima facie* case of disparate impact." (Id. at 2523). Following the Supreme Court's decision in Inclusive Communities, the Court held as follows in the case of City of Miami v. Bank of America Corporation, 2016 WL 1072488 (S.D. Fla. 2016):

> "Inclusive Communities requires that the FHA disparate impact complaint (1) show statistically-imbalanced lending patterns which adversely impact a minority group; (2) identify a facially-neutral policy used by Defendants; (3) allege that such policy was "artificial, arbitrary, and unnecessary;" and (4) provide factual allegations that meet the "robust causality requirement" linking the challenged neutral policy to a specific adverse racial or ethnic disparity. *See Inclusive Communities*, 135 S.Ct. at 2522-24."

-15-

It can easily be seen that the plaintiffs' allegations in the case *sub judice* utterly fail to state a disparate impact claim for numerous reasons (even if the Court, liberally construing the First Amended Complaint, finds that such a claim is contained therein at all). First of all, the plaintiffs actually allege purposeful and an intentional discriminatory treatment on the part of the County Defendants. Plaintiffs allege repeatedly that the County Defendants' conduct constitutes intentional discrimination  <u>designed and intended</u> to force plaintiffs from the Island. Such allegations negate a disparate impact claim. <u>See</u> <u>City of Miami v. Bank of America Corporation</u>, <u>supra</u> at headnote [3]. Moreover , the plaintiffs' First Amended Complaint does not allege or identify any actual policy of the County Defendants which is being challenged. The plaintiffs' complain about a disparity in the provision of a wide variety of County services between Sapelo Island and the mainland, but plaintiffs do not allege or identify any specific County policy having anything to do with what they complain about. Plaintiffs do not allege or identify the date when any alleged specific policy was adopted or enacted or who enacted it, or what the alleged policy actually provides or states.

Disparate impact claims are subject to dismissal when Plaintiffs fail to allege a specific policy or practice of the County which causes the alleged disparate impact. <u>See</u> <u>Lieberman v. Miami-Dade Cty.</u>, 2000 WL 1717649, at *7 (S.D. Fla. Aug. 16, 2000)("In light of Ms. Lieberman's failure to point to a specific practice of the County which causes a disparate impact upon females, she fails to make out a *prima facie* case for disparate impact discrimination and her claim is dismissed.") In <u>Roy v. Bd. of Cty. Comm'rs</u>, 607 F. Supp. 2d 1297, 1308 (N.D. Fla. 2009), the plaintiffs only alleged vaguely that defendants made "the decision" that caused the discriminatory impact. The court held that, without more, such an allegation does not rise to the requisite level of specificity. "There can be no discriminatory impact of a facially neutral policy to consider if none is alleged. The closest the

Roys come to identifying any facially neutral policy of the defendants is by referring to their having made 'the decision,' without identifying what is meant by 'the decision' or who made 'the decision'; nothing in Count VII identifies anything more than 'Defendants' actions' as the object of the Roys' FHA challenge. This observation by the Court in <u>Roy</u> is precisely apposite to the plaintiffs' First Amended Complaint in the case *sub judice*.

Plaintiffs' Complaint does not identify any statistical evidence to support any disparate impact claim. On the contrary, it posits numerous conclusory allegations instead- for example - "Defendants' conduct has a discriminatory effect on African Americans and Gullah-Geechee descendants," (First Amended Complaint at ¶ 419). These legal conclusions should not be considered. See <u>Jennings v. City of Tuscaloosa</u>, 2013 WL 5299304, at *3 (N.D. Ala. Sept. 19, 2013) ("Jennings relies on two conclusory allegations to support this claim. First, he contends that 'Defendant's DUI policy as enforced has a disparate impact on African–Americans and employees over the age of forty'…This is a legal conclusion that must be stricken. *See Twombly*, 550 U.S. at 555, 127 S.Ct. At 1965 (noting that a plaintiff must provide 'more than labels and conclusions and a formulaic recitation of the elements of a cause of action'). Jennings also states that 'Defendant's selection decisions regarding disqualification decisions had a disparate impact against African–Americans and individuals over the age of (40).' This statement is most logically read to support the disparate treatment claim and not the disparate impact claim, but it is also a legal conclusion that provides no factual support for Jennings's claim…Insofar as Jennings argues that the policy is unfairly enforced, this provides support for his disparate treatment claim discussed below and not his disparate impact claim. Thus, the disparate impact claim is due to be dismissed.") Also see <u>Pouyeh v. UAB Dep't of Ophthalmology</u>, 625 F. App'x 495, 497-98 (11th Cir. 2015), <u>cert. denied</u>

-17-

<u>sub nom</u>. Pouyeh v. Bd. of Trustees of the Univ. of Alabama, 136 S. Ct. 840, 193 L. Ed. 2d 745

(2016), <u>reh'g denied sub nom</u>. Pouyeh v. Bd. of Trustees of Univ. of Alabama, 136 S. Ct. 1253

(2016) ("To make out a disparate-impact claim, Pouyeh must allege facts establishing that the

Board's admission policy has a 'significant adverse effect' on a protected group…That requires

factual allegations—usually a statistical disparity—demonstrating a disparity in treatment between

groups so significant that it supports an inference that discrimination is the cause. ..Pouyeh's

complaint contains no such factual allegations, only the bare assertion that the Board has "excluded

systematically Iranian doctors" and that one of Pouyeh's friends from Iran was also denied a

residency position at UAB's School of Ophthalmology. That is not enough.")

In short, the plaintiffs' First Amended Complaint contains nothing but strictly conclusory

allegations of racial discrimination and does not allege any facts which plausibly support <u>any</u> of

plaintiffs' claims, whether on a disparate treatment or disparate impact theory of recovery.

## IV.   Additional Reasons Why Plaintiffs' Claims Are Subject to Dismissal.

Before specifically addressing the additional defenses that bar the plaintiffs' claims for

various reasons, the county defendants believe that it is worth pointing out that plaintiffs, and now

intervenor United States, focus upon issues which this Court need not reach.  Essentially, the

defenses to follow, while meritorious on their own, are not really in need of analysis because of the

plaintiffs utter failure to illustrate an issue with regard to discrimination, except through their

conclusory allegations (without underlying factual support), which are insufficient to avoid

dismissal.

Plaintiffs spend much time debating whether various sections of the Fair Housing Act apply

to "post acquisition conduct," instead of only "pre-acquisition conduct."  While the Court's ultimate

decision on that issue might conceivably have some bearing in some FHA cases, the issue is purely academic in the instant matter.

Specifically, the plaintiffs' failure to identify sufficient facts to set forth a plausible claim that any action of the County involved unequal treatment of similarly situated persons dooms their First Amended Complaint.  Plaintiffs' reliance on Village of Arlington Heights, supra does nothing to change that analysis.  In fact, a fair reading of Village of Arlington Heights actually appears to be more supportive of the defendants' position in this case.

In a nutshell, it is quite clear from the allegations that all residents and landowners on Sapelo Island are treated the same.  It is equally clear that to the extent there are any differences in services between the remainder of McIntosh County, Georgia and Sapelo Island, the plausible explanation for such differences are found in plaintiffs' own Complaint, i.e. Sapelo Island is a barrier island off the coast of Georgia accessible only by boat across Doboy Sound.  The few relevant facts set forth in plaintiffs' First Amended Complaint illustrate the difficulty in getting to Sapelo Island from mainland McIntosh County.  Simply, the persons to whom plaintiffs attempt to compare themselves are not even remotely "similarly situated."

Further, to the extent the plaintiffs attempt to rely on the Village of Arlington Heights analysis, none of those factors are present in this case with regard to McIntosh County.  Though plaintiffs spend a great deal of time setting forth the history of allegedly improper treatment, that treatment is clearly described as being at the hands of private actors and the State of Georgia. Further, one of the factors noted in Village of Arlington Heights, prior legislative enactments and policies, is not detailed within the plaintiffs' First Amended Complaint in the instant case.

Simply, looking at the elements to set forth claims under the Fourteenth Amendment's Equal Protection Clause, or other bases, plaintiffs have not come close to establishing "plausibility." In fact, it is not only more plausible (from the facts alleged) that any different treatment is based upon Sapelo Island's barrier island status, it appears to be beyond dispute.

With regard to the remaining defenses to the plaintiffs' First Amended Complaint, these defendants continue to rely upon the authority and analysis set forth in Docket Number 46. Rather than republish all of that various authority, these defendants will utilize the remainder of their brief to address just a few of the issues noted in plaintiffs' Consolidated Opposition to State and County Defendants' Motions to Dismiss First Amended Complaint (Docket Number 49).

> **A.   Plaintiffs Fail to Understand the Application of Eleventh Amendment Immunity to Sheriff Jessup.**

Plaintiffs' attempt to characterize the function at issue with regard to Sheriff Jessup as "budgetary allocation function." (Docket 49, p. 20). Though the First Amended Complaint clearly complains about the lack of law enforcement services, in an attempt to avoid the application of Eleventh Amendment immunity to their damages claims, plaintiffs cast this as a simple budgetary issue. Two problems jump out with regard to plaintiffs' analysis. First, plaintiffs rely upon Eleventh Circuit cases that arose in district courts in Alabama and Florida, where sheriffs are treated much differently than they are in Georgia. (*See* Docket 49, p. 20). More significantly, the one Georgia case upon which plaintiffs do rely upon, Keene v. Prine, 477 F.Appx. 575, 579 - 80 (11th Cir. 2012) has been overruled by binding Eleventh Circuit authority. (*See*, Pelliterri v. Prine, 776 F.3d 777 (11th Cir. 2015). In Pelliterri, the Eleventh Circuit noted a flawed analysis set forth in the Keene case upon which the plaintiffs rely. Specifically, with regard to the third factor in the Manders v. Lee,

-20-

338 F.3d 1304 (11th Cir. 2003)(*en banc*) analysis, the Eleventh Circuit noted that "we recognize that [Keene] is inconsistent with this Court's published precedent." Therefore, contrary to the plaintiffs' assertion that this budgetary issue weights in favor of denying immunity, the law is actually clear that the third factor weighs in favor of immunity "because it is the state that mandates counties set a budget for the sheriff's office." Pelliterri, 776 F.3d at 782. The Eleventh Circuit also noted that the county "cannot dictate how the sheriff spends those funds." Id. (emphasis original).

Despite plaintiffs' reliance upon authority that has been discredited, these defendants contend that plaintiffs' attempt to couch the issue as one involving the sheriff is "budgetary allocation function" is misguided. Simply, even if their complaint is about budgetary allocation, it is about budgetary allocation with regard to his "law enforcement functions." Nothing could be a more clear example of a function for which a Georgia sheriff is entitled to Eleventh Amendment immunity.

> **B.     The McIntosh County Board of Tax Assessors is Also Entitled to Eleventh Amendment Immunity.**

In their consolidated response, plaintiffs take issue with the Eleventh Circuit's decision in Ballard v. Chattooga Co. Bd. of Tax Assessors, 615 F.Appx. 621 (11th Cir. 2015). However, rather than citing to even one contrary decision from the Eleventh Circuit, or elsewhere, plaintiffs simply attempt to distinguish Ballard. Once again, plaintiffs attempt to draw distinctions without a difference.

Plaintiffs seem to suggest that this Court interpret Ballard in such a way as to hold that the Eleventh Circuit found a Board of Tax Assessors to be acting as an arm of the state with regard to its role as employer over employees that the instant plaintiffs would contend were engaged in county

functions.  That is simply an illogical reading of <u>Ballard</u>, <u>Manders</u>, and every other Eleventh Amendment immunity case from the Eleventh Circuit Court of Appeals.

Due to page limitations with regard to these defendants' initial brief, they admittedly did not exhaustively analyze each of the four <u>Manders/Ballard</u> factors as applied to the instant case. However, it is difficult to even conceive that a fair reading of <u>Ballard</u> would lead anyone to the conclusion that the McIntosh County Board of Tax Assessors is not an arm of the state when carrying out its "appraisal" function, which plaintiffs criticize herein.  The Eleventh Circuit noted that it was significant that "the end product of the work of Georgia's Boards of Assessors has to be approved or disapproved at the state level." <u>Ballard</u>, 615 F.Appx. at 627.  The court noted that the state level control was "all encompassing." <u>Id</u>.

Even more telling is that even though the "particular function at issue" in <u>Ballard</u> involved discipline and termination, that function was evaluated with regard to "appraiser positions." <u>Ballard</u> at 625.  It would be odd indeed for the Board to be deemed an arm of the state with regard to disciplining and terminating employees that were not deemed to be an arm of the state.  Plaintiffs' position is simply not supported by applicable law and weighing the <u>Manders</u> factors, it is clear that the Board of Tax Assessors is an arm of the state. <u>Ballard</u>, <u>supra</u>.

### C.     Other Miscellaneous Issues.

As noted earlier, both plaintiffs and the United States spend a great deal of time addressing whether various Fair Housing Act provisions apply to "post-acquisition" conduct.  That simply is an issue that need not be reached in this case because the plaintiffs' Complaint fails at the most basic level for a discrimination claim, i.e., failure to identify any similarly situated comparators that were treated differently.  Nevertheless, defendants still contend that none of the statutes relied upon by

the plaintiffs provide them with a cause of action herein because the factual allegations have nothing to do with the "sale or rental" of housing, which is what those statutes protect. Plaintiffs must show both discrimination, and that the discrimination impacted the sale or rental of housing. They have done neither. *See*, <u>Steele v. City of Port Wentworh</u>, 2008 U. S. District Lexis 20637 at *35-36 (S.D. Ga. 2008).

Finally, these defendants continue to rely upon the authority and arguments set forth in their Brief in Support of Motion to Dismiss Plaintiffs' First Amended Complaint. While plaintiffs' Response Brief attempts to discredit defendants' positions with regard to defendants' additional defenses, nothing in plaintiffs' response merits additional briefing by these defendants.

<u>**CONCLUSION**</u>

Plaintiffs' First Amended Complaint sets forth no more than strictly conclusory allegations of racial discrimination (without factual support). Nothing set forth within Plaintiffs' First Amended Complaint plausibly supports any of plaintiffs' claims on either a disparate treatment or disparate impact theory of recovery. That basic failure requires dismissal of plaintiffs' First Amended Complaint.

Further, plaintiffs' First Amended Complaint is barred with respect to damages by the doctrine of Eleventh Amendment immunity against Sheriff Jessup and the McIntosh County Board of Tax Assessors. Further, plaintiffs' Complaint fails to set forth a plausible violation of the statutory claims set forth within the Complaint. Finally, nothing set forth within the plaintiffs' First Amended Complaint is sufficient to set forth a claim for injunctive or declaratory relief against any of these defendants.

WHEREFORE, these defendants pray that the plaintiffs' First Amended Complaint be dismissed.

Respectfully submitted this twenty-fifth day of April, 2016.

/s/ John E. Bumgartner
John E. Bumgartner
Georgia State Bar Number: 094600

/s/Richard K. Strickland
Richard K. Strickland
Georgia State Bar Number: 687830

/s/ Bradley J. Watkins
Bradley J. Watkins
Georgia State Bar Number: 740299
BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
Post Office Box 220
Brunswick, GA 31521
(912) 264-8544
(912) 264-9667 FAX
jbumgartner@brbcsw.com
rstrickland@brbcsw.com
bwatkins@brbcsw.com

**ATTORNEYS FOR McINTOSH COUNTY, GEORGIA, MCINTOSH COUNTY SHERIFF STEPHEN JESSUP, IN HIS OFFICIAL CAPACITY, AND MCINTOSH COUNTY BOARD OF TAX ASSESSORS**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

SARAH FRANCES DRAYTON, et al.,      *
                                    *
        Plaintiffs                  *
                                    *
        v.                          * Case Number: 2:16-cv-00053
                                    *
McINTOSH COUNTY, GEORGIA, et al.,   *
                                    *
        Defendants                  *

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served all parties in this case in accordance with the directives from the Court Notice of Electronic Filing ("NEF"), which was generated as a result of electronic filing.

I also certify that I have mailed by United States Postal Service the document and a copy of the Notice of Electronic Filing to the following non-CM/ECF participant(s):

        Vanita Gupta, Principal Depurty
        Gregory B. Friel, Deputy Assistant Attorney General
        Eve L. Hill, Deputy Assistant Attorney General
        Sameena Shina Majeed, Acting Chief
        Christine Stoneman, Acting Chief
        Michael S. Maurer, Deputy Chief
        Daria E. Neal, Deputy Chief
        Katherine F. Towt, Trial Attorney
        Andra K. Steinacker, Trial Attorney
        Michael J. Mulé, Attorney
        Selin Cherian-Rivers, Attorney
        U. S. Department of Justice
        Civil Rights Division
        950 Pennsylvania Avenue, NW
        Northwestern Building, 7th Floor
        Washington, D.C. 20530

Respectfully submitted this twenty-fifth day of April, 2016.

/s/ Richard K. Strickland
Richard K. Strickland
Georgia Bar Number: 687830
BROWN, READDICK, BUMGARTNER
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue
Post Office Box 220
Brunswick, GA 31521
(912) 264-8544
(912) 264-9667 FAX

**ATTORNEY FOR McINTOSH COUNTY, GEORGIA, MCINTOSH COUNTY SHERIFF STEPHEN JESSUP, IN HIS OFFICIAL CAPACITY, AND MCINTOSH COUNTY BOARD OF TAX ASSESSORS**