## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

| | |
|---|---|
| SARAH FRANCES DRAYTON, *et al.*, | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Case No: 2:16-cv-00053-LGW-RSB |
| | ) |
| MCINTOSH COUNTY, GEORGIA, *et al.*, | ) |
| Defendants. | ) |

## STATE DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED COMPLAINT AND RESPONSE TO INTERVENOR'S OPPOSITION BRIEFS

Plaintiffs filed their First Amended Complaint ("FAC") in the District Court for the Northern District of Georgia. State Defendants filed a motion to dismiss. Plaintiffs filed their response and, thereafter, the Northern District of Georgia transferred this case to this Court. The United States intervened in this action and filed a brief in opposition to the State Defendants' motion to dismiss as it relates to the Title II claims, (Doc. 57), and a Statement of Interest opposing the State Defendants' motion to dismiss the Fair Housing Act and Title VI claims. (Doc. 58). The State Defendants submit their reply in support of their motion to dismiss, as well as their response to the Intervenor's opposition briefs.

1

# I.    ARGUMENT AND CITATIONS TO AUTHORITY[1]

## A.    THE ELEVENTH AMENDMENT BARS PLAINTIFFS' CLAIMS FOR DAMAGES AND DECLARATORY JUDGMENT

Plaintiffs and the Intervenor generally make three arguments in response to the State Defendants' Eleventh Amendment immunity arguments:  1) that the Sapelo Island Heritage Authority ("SIHA") is not an arm of the State; 2) that Eleventh Amendment immunity has been waived for Plaintiffs' Title VI claims; and 3) that Title II is proper § 5 legislation.  None of these has merit.

### 1.    Request for Damages and Declaratory Judgment against SIHA Under the Fair Housing Act Claim (Count 1)

Plaintiffs do not argue that the FHA waives Eleventh Amendment immunity; rather, they argue that SIHA is not an arm of the State, and thus is not entitled to Eleventh Amendment immunity.  (Doc. 49, pp. 18-24).  This is not correct.

The State of Georgia indicated its intent for SIHA to be treated as an arm of the State by expressly preserving for SIHA all rights afforded the State of Georgia under the United States Constitution – which includes the Eleventh Amendment.  <u>See</u> O.C.G.A. § 12-3-443.  In arguing that the State of Georgia does not treat SIHA as an arm of the state, Plaintiffs go to great lengths to distinguish it from the Jekyll Island State Park Authority ("Jekyll"), an Authority that *is* an arm of the State.  <u>See</u> <u>Fouche</u>

---

[1]  Plaintiffs have addressed the issues in a different order than raised, and the Intervenor has made its arguments in two briefs.  For continuity, the State Defendants reply herein to the issues in the order initially raised by them, with liberal citations to responsive portions of the opposition briefs.

v. Jekyll Island State Park Auth., 713 F.2d 1518 (11th Cir. 1983).  However, the factors the Eleventh Circuit found important in declaring Jekyll to be an arm of the State apply equally to SIHA.

For example, Jekyll is defined as "an instrumentality of the state and a public corporation." O.C.G.A. § 12-3-2232.  So is SIHA.  O.C.G.A. § 12-3-443.  Jekyll and SIHA are both attached to DNR for administrative purposes.  Id. (SIHA); Fouche, 713 F.2d at 1520 (Jekyll).  As instrumentalities of the State of Georgia, Jekyll and SIHA must submit their budgets to the State as a part of DNR's budget, which is required under a portion of the Georgia Code entitled "Organization of Executive Branch Generally."  See  O.C.G.A. § 50-4-3.  This suggests that SIHA, like Jekyll, should be considered an arm of the State.  See Fouche, 713 F.2d at 1520 (including of authorities under this code section suggests that an authority should be considered an arm of the state).

In addition, the statutory provisions of SIHA are very similar to those of Jekyll, particularly in the areas the Fouche Court found important.  For example, state statutes determine which state officials will be part of their respective boards, and grants the Governor the authority to appoint civilian members to both of them with term limits.  Fouche, 713 F.2d at 1520 (Jekyll); O.C.G.A. § 12-3-444. ("SIHA")[2]

---

[2] Civil members of SIHA's Board also receive the same amount of pay as is received by members of the State General Assembly.  O.C.G.A. § 12-3-444.

The powers conferred on Jekyll are virtually the same as those conferred on SIHA.  For example, both Authorities can sue and be sued in their own names. O.C.G.A. § 12-3-232; O.C.G.A. § 12-3-443.  Both authorities can acquire, hold, and dispose of property in their own names, both can adopt their own bylaws, rules, and regulations, both can do all things necessary and convenient to carry out the powers expressly given, and both can contract and sue to enforce contracts.  O.C.G.A. § 12-3-234; O.C.G.A. § 12-3-445.  Further, both SIHA and Jekyll are required to submit all financial records annually to the state auditor for inspection.  Id.; O.C.G.A. § 12-3-448.  When it decided that Jekyll is an arm of the State, the Eleventh Circuit found it important that Jekyll's property and income are exempt from taxation.  Fouche, 713 F.2d at 1521.  The property and income of SIHA are also exempt from taxation. O.C.G.A. § 12-3-449.

As shown, there is no material difference between the way the State of Georgia treats Jekyll and the way it treats SIHA.  SIHA, as an authority, "has only such powers as the legislature has expressly, or by necessary implication conferred upon it."  See Bentley v. Board of Medical Examiners, 152 Ga. 836, 838 (1922); Floyd County Board of Commissioners v. Floyd County Merit System Board, 246 Ga. 44 (1980); Bryant v. Employees Retirement System of Georgia, 216 Ga. App. 737 (1995).  Despite Plaintiffs' suggestion, SIHA is not permitted to raise its own revenue.  Even if it was, Jekyll is expressly permitted to do so, and the Eleventh

Circuit still found Jekyll to be an arm of the State.  Fouche, 713 F.2d at 1521.  All of the considerations used in Fouche to find that Jekyll is an arm of the state apply to SIHA.

Plaintiffs' last argument is that the State is not obligated to pay any indebtedness of SIHA.  (Doc. 49, p. 23).  This is not true.  All real and personal property acquired by SIHA becomes "public property and shall be entitled to all the rights, privileges, and protection afforded like situated state owned or claimed property."  O.C.G.A. § 12-3-444(2).  See also O.C.G.A. § 12-3-447 (all property of SIHA is public property and thus is not subject to adverse possession or prescription).  Thus, all of SIHA's assets are property of the State of Georgia.

SIHA is an arm of the State of Georgia.  It has Eleventh Amendment immunity. The request for declaratory judgment found in Count 1 must be dismissed.

## 2. Damages and Declaratory Judgment Claims Under 42 U.S.C. §§ 1981, 1982, and 1983 Against SIHA (Counts 6, 7, 8)

As discussed, SIHA is an arm of the State and is entitled to Eleventh Amendment immunity.  Therefore, the claims in Counts 6, and 8 must be dismissed.

## 3. Request for a Declaratory Judgment Against the State of Georgia under Title VI (Count 9)

Plaintiffs and the Intervenor make three arguments as to why Eleventh Amendment immunity does not bar the Title VI claim claims asserted here: 1) that the receipt of federal funds is not part of a prima facie case,  (Doc. 49, p. 66; Doc. 58,

5

p. 18); 2) that Plaintiffs have alleged that the State of Georgia is a recipient of federal funds, (Doc. 49, pp. 11-12; Doc. 58, pp. 18-20); and 3) that Plaintiffs need not show that the program or service that they claim they were denied access to was the recipient of federal funds. (Doc. 49, pp. 68-69; Doc. 58, pp. 20-24).  None of these arguments has merit.

First, Defendants have not argued that federal funding is an element of prima facie case; rather, they argue that Title VI is Spending Clause legislation and a plaintiff must establish that a state defendant was the recipient of federal funds in order to overcome Eleventh Amendment immunity.   This is a jurisdictional requirement.  Plaintiffs' comments regarding the prima facie case of Title VI miss the point, (see Doc. 49, pp. 66-68), as do the Intervenor's arguments regarding the sufficiency of Spending Clause legislation. (Doc. 58, pp. 17-19).

The State Defendants have never claimed that they "lack authority to waive immunity under the Georgia State Constitution and state law" for Spending Clause legislation, s asserted by the Intervenor.  (See Doc. 58, p. 18).  The State Defendants' comments regarding the State Constitution and state law were intended to explain the ways in which Eleventh Amendment immunity can be abrogated, and to note that the State of Georgia has preserved its immunity, and thus any abrogation can only occur in one of the two methods specified.   (Doc. 48-1, pp. 7-8).  See Ky. v. Graham, 473 U.S. 159, 169 (1985); Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100-

01 (1984) (Eleventh Amendment bars actions against a state, its agencies, and its officials absent a waiver by the State or a valid congressional override, when the State is the real party in interest or when any monetary recovery would be paid from State funds).  Thus, the Intervenor's arguments regarding the Georgia Constitution and the Georgia Tort Claims Act are inapposite.  (See Doc. 58, p. 20).  The issue is whether the FAC has alleged sufficient facts to establish abrogation, and thus subject matter jurisdiction.  The Intervenor's citation to a seventeen-year old district court case that relied on a Ninth Circuit opinion, and which has been vacated by the Eleventh Circuit, (see Doc. 58, p. 18), does not establish the sufficiency of the FAC in this respect.[3]

The Intervenor also misstates Defendants' arguments regarding Title VI itself. The State Defendants have never argued that Title VI is not proper Spending Clause legislation, they have not argued that Title VI does not contain unequivocal statutory language sufficient to abrogate the Eleventh Amendment, and they have not relied

---

[3] It is true that the State Defendants have not "denied" that they received federal financial assistance.  However, the motion before the Court is a motion to dismiss, which must be decided on the well-pleaded facts alleged, not additional facts outside of the complaint.  See Sheppard v. Bank of Am. N.S., 542 F.3d 789, 791 (11th Cir. 2013).  While the Court may consider facts outside the pleadings for purposes of challenging subject matter jurisdiction, see Colonial Pipeline Co. v. Collins, 921 F.2d 1237, 1243 (11th Cir. 1991)(evidence outside the pleadings used to determine jurisdiction), the fact that the State Defendants did not challenge jurisdiction with matters outside the pleadings does not obviate Plaintiffs' obligation to plead sufficient facts to establish subject matter jurisdiction.

upon <u>Atascadero v. State Hosp. v. Scanlon</u>, 473 U.S. 234 (1985)[4] in support of such arguments, as the Intervenor claims.   (<u>See</u> Doc. 58, p. 19).   Instead, the State Defendants challenge whether the FAC states sufficient facts to establish a waiver of Eleventh Amendment immunity under Spending Clause legislation.  The Intervenor's discussion about the sufficiency of Title VI's waiver provisions is not responsive to any argument made by the State Defendants.  (<u>See</u> Doc. 58, p. 19).

The State Defendants agree with Plaintiffs that a private claim seeking to recover under Spending Clause legislation must be made against a defendant who is a recipient of federal funds.  (Doc. 49, p. 11).   The inquiry, however, does not end there.  The mere receipt of federal funds does not establish that a state has consented to suit in federal court.  The State Defendants cited <u>Atascadero</u>, 473 U.S. at 246-47 for this proposition – a proposition that has been affirmed by the Eleventh Circuit in recent years.  <u>See</u> <u>e.g.</u>, <u>Keller v. Fla. Dep't of Health</u>, 397 Fed. Appx. 579, 582 (11th Cir. 2010) (mere receipt of federal funds does not establish that a state has consented to suit in federal court); <u>Rizo v. Ala. Dep't of Human Res.</u>, 228 Fed. Appx. 832, 835 (11th Cir. 2001) (same).

As set forth in the cases cited by the State Defendants, to invoke jurisdiction under Title VI, a plaintiff must allege that the specific program or activity he or she was denied access to, received or directly benefited from federal financial assistance

---

[4] Likewise, State Defendants have not relied upon <u>Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health and Rehab. Servs.</u>, 225 F.3d 1208 (11th Cir. 2000).

at the time of the alleged discrimination.   See e.g., Brown v. Sibley, 650 F.2d 760, 767-71 (5th Cir. July 16, 1981)[5]; Muckle v. UNCF, 420 Fed. Appx. 916, 918 (11th Cir. 2011); Doyle v. Univ. of Ala., 680 F.2d 1323, 1326 (11th Cir. 1982) (program at issue must have directly benefited from federal financial assistance).

Citing to cases outside of this Circuit, Plaintiffs and the Intervenor counter by arguing that the "intended beneficiary" requirement applies only in the context of employment cases.[6]  (Doc. 49, pp. 66-67; Doc. 58, p. 23).  Brown, however, has no such limitation. 650 F.2d at 767-71.  Brown considered whether the receipt of federal assistance by a multi-program entity for specific application to certain programs or activities brings all of the multiple programs or activities within a Spending Clause waiver.  Id. at 767.   In finding that it did not, the Fifth Circuit analyzed the language of the Rehabilitation Act, Title IX, and Title VI.   Id. at 767-68.   Based upon this analysis, the court found that a plaintiff "must show that the program or activity with which he or she was involved, or from which he or she was excluded, itself received or was directly benefited by federal financial assistance."   Id. at 769.   Even though

---

[5] In Bonner v.City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.  The Fifth Circuit decided Brown on July 16, 1981.

[6] The State Defendants have not raised this issue as a standing issue, as Intervenor contends.  (See Doc. 58, p. 22).   Rather, they raise it as an issue of subject matter jurisdiction at this time.

<u>Brown</u> was an employment case, there is no indication that the court intended to limit its holding to such cases and, indeed, did not even cite to 42 U.S.C. § 2000d-3.

No controlling case from this Circuit has limited <u>Brown</u> in the manner suggested by Plaintiffs or Intervenor.  In fact, recent cases have applied the <u>Brown</u> holding in non-employment contexts.  <u>See</u> <u>e.g.</u>, <u>Muckle</u>, 420 Fed. Appx. at 918 (education case); <u>McBay v. City of Decatur</u>, 2014 U.S. Dist. LEXIS 50307, at *23 n.25 (N.D. Ala. April 11, 2014)(alleged denial of access to public programs); <u>Mason v. City of Huntsville</u>, 2012 U.S. Dist. LEXIS, at 145698, at * 13 (N.D. Ala. Oct. 10, 2012)(same).

Plaintiffs and the Intervenor also argue that after the Civil Rights Restoration Act of 1987 ("CRRA") overruled <u>Brown</u>, and that under the CRRA, waiver "applies to an entire entity if any part of that entity receives federal financial assistance." (Doc. 49, p. 69; Doc. 58, pp. 21-24).  The Sixth Circuit case cited by Plaintiffs cannot overrule binding Eleventh Circuit precedent; nor can the Fourth Circuit and the myriad of district court cases cited by the Intervenor.  <u>See</u> <u>Brown</u>, 650 F.2d at 767-

10

71.[7]   Indeed, more than twenty years after passage of the CRRA, the Eleventh Circuit stated that a plaintiff could state a claim under spending clause legislation if it could be shown that the specific program or activity involved received or directly benefited from federal financial assistance.  Muckle, 420 Fed. Appx. at 918 (citing Doyle, 680 F.2d at 1326-27).  Further, several district courts in this Circuit have interpreted these cases as showing the Eleventh Circuit's intent to continue to apply Brown to cases filed after the CRRA.  See Jones v. Allstate Ins. Co., 2015 U.S. Dist. LEXIS 17835, at *3 (N.D. Ala. Feb. 13, 2015); McBay, 2014 U.S. Dist. LEXIS 50307, at *23 n.25; Mason, 2012 U.S. Dist. LEXIS, at 145698, at * 13.

Finally, Plaintiffs argue that they were the intended beneficiaries of federal funds. (Doc. 49, p. 68).  As discussed in the State Defendants' opening brief, (Doc. 48-1, p. 16), the federal programs alleged in the FAC are intended to support the antithesis of what Plaintiffs seek in this case:  maintenance of a rural community for the benefit of descendants of the Gullah Geechee.  Plaintiffs do not seek to develop a viable urban community on Sapelo, with or without historical preservation.  Nor are

---

[7] Brown is still good law in the Fifth Circuit as well.  Nearly 10 years after the passage of the Civil Rights Restoration Act, the Fifth Circuit relied on Brown to uphold the requirement that "to state a § 504 claim a plaintiff must allege that the specific program or activity with which he or she was involved receives or directly benefits from federal financial assistance."  Lightbourn v. Cnty. of El Paso, 118 F.3d 421, 427 (5th Cir. 1997).  Notably, Lightbourn was an access to polling case, not an employment case.

they seeking low cost housing in Hogg Hammock; rather, they seek to limit ownership of property to maintain Hogg Hammock in its rural setting.

The FAC does not establish the applicability of Title VI and immunity bars the request for a declaratory judgment against the State of Georgia in Count 9.

### 4. Claims for Damages and a Declaratory Judgment Under Title II Against the State of Georgia and DNR (Count 10)

The Intervenor argues that this Court should not decide the constitutionality of Title II at this time. (Doc. 57, pp. 4-6). The Intervenor and Plaintiffs argue that Title II is proper Section 5 legislation. (Doc. 49, pp. 13-18; Doc. 57, pp. 6-20). They both misapply the <u>Boerne</u> analysis.

#### a. This Court should consider the constitutionality of Title II

The Intervenor first argues that this Court should not consider the constitutionality of Title II vis-à-vis Plaintiffs' right to damages because Plaintiffs have also asserted a Title II claim for injunctive relief "that the state defendants have not challenged, and which is unaffected by Eleventh Amendment immunity." (Doc. 57, p. 4). The Intervenor bases this argument on its claim that the State Defendants do not seek "outright dismissal" of Plaintiffs' Title II claim. (<u>Id.</u>). This position is simply wrong.

In their motion to dismiss, the State Defendants clearly argue that the FAC fails to state a claim for injunctive relief, including the Title II claim. (<u>See</u> Doc. 48-1, pp. 47-48). The State Defendants *have* sought "outright dismissal" of Plaintiffs' Title II

12

claim, and thus consideration of the constitutionality of a Title II claim for damages is not premature.

### b. Valid Section 5 abrogation cannot occur in the absence of a constitutional violation

Plaintiffs and the Intervenor argue that Title II abrogates Eleventh Amendment immunity, even in the absence of a constitutional violation.  (Doc. 49, pp. 13-14; Doc. 57, pp. 8-9).  Plaintiffs do not discuss Goodman v. Georgia, 546 U.S. 151, 159 (2006).  The Intervenor suggests that the Eleventh Circuit has upheld abrogation in the absence of a constitutional violation *in all cases*.  (Doc. 57, p. 9)(emphasis added).  It does so, however, with citations to cases decided *before* Goodman.  (*Id.*)

In Goodman, the Supreme Court made clear that state sovereign immunity is abrogated under Title II for conduct that actually violates the Constitution. Goodman, 546 U.S. at 159.  The question left open is whether abrogation also extends to conduct that does not violate the Constitution.  Goodman directed the lower courts to:

> [D]etermine in the first instance, on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

Id.  The Eleventh Circuit cases cited by the Intervenor do not answer the question that had yet to be posed.

13

The State Defendants agree that Congress can enact legislation that deters or remedies constitutional violations, even if in the process the legislation prohibits conduct which is not itself unconstitutional.  City of Boerne v. Flores, 521 U.S. 507, 518 (1997).  Such prophylactic legislation may be enacted only to "prevent and deter unconstitutional conduct."  Nev. Dep't of Human Res. v. Hibbs, 538 U.S. 721, 727-28 (2003). Congress' remedial powers may not be applied in the absence of any constitutional violation.

In Goodman, no suggestion was made that sovereign immunity could be abrogated for conduct that did not rise to the level of a constitutional violation.  In their opening brief, the State Defendants cited to a number of cases decided *after* Goodman that have held that there is no abrogation in such cases.  (Doc. 48-1, p. 20, n.4).  The Intervenor cites to a district court case decided after Goodman that held that valid abrogation can occur in the absence of a constitutional violation.  (See Doc. 57, p. 9 (citing R.W. v. Bd. of Regents of the Univ. of Ga., 114 F. Supp. 3d 1260, 1281 (N.D. Ga. 2015)).  But R.W., a public education case, broke no new ground. There, the district court relied on Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ, 405 F.3d 954 (11th Cir. 2005) for the proposition that the Eleventh Circuit explicitly held that Title II of the ADA is a valid abrogation of a state's sovereign immunity with respect to claims of discrimination by public universities, even for conduct that is not independently unconstitutional, and that this holding was not overruled by Goodman.

R.W., 114 F. Supp. 3d at 1281.  Neither Plaintiff nor the Intervenor has cited to a case that has held the same with respect to the facts alleged here.

In arguing that they have alleged a Fourteenth Amendment violation, Plaintiffs proffer a confusing discussion of theories of liability and the evidentiary methods for showing discriminatory intent.   (Doc. 49, pp. 45-52).  The Intervenor argues that a plaintiff is not required to plead the existence of a similarly situated comparator – which is a method of showing discriminatory intent.   (Doc. 58, p. 6).   Their arguments are misplaced.[8]

Discrimination can be shown with direct or circumstantial evidence.  Marable v. Marion Military Inst., 595 Fed. Appx. 921, 924 (11th Cir. 2014).  Direct evidence is evidence which, if believed, proves the existence of a fact without inference or presumption.  Ekokotu v. Boyle, 294 Fed. App. 523, 525 (11th Cir. 2008).  As set

---

[8] Plaintiffs have not, and do not claim to have alleged a disparate impact claim under the Fourteenth Amendment.  (See FAC; Doc. 49, p. 45).  In fact, despite Plaintiffs' arguments, they have not alleged a disparate impact claim under the FHA or Title II.

Unlawful discrimination takes two forms: disparate treatment and disparate impact. Disparate treatment claims involve an intent to discriminate.  See Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15 (1977).  In contrast, disparate impact happens when facially neutral practices fall more harshly on once group or another.  Id.  No proof of discriminatory intent is required for disparate impact claims.  Id.  The FAC has alleged claims premised upon an alleged intent to discriminate; it does not allege the existence of any facially neutral conduct that has a disparate impact.  While Plaintiffs' brief acknowledges the distinction between such claims, (Doc. 49, p. 45), they commingle these concepts throughout their arguments.

forth in Defendants' opening brief, (Doc. 48-1, pp. 20-24), and as conceded by Plaintiffs, (Doc. 49, pp. 45-47), the FAC does not allege any facts that even suggest direct evidence of discrimination on the part of the State Defendants.  Thus, Plaintiffs must allege discrimination with circumstantial facts.  They chose to attempt to do so by comparing themselves to others.

When attempting to show discrimination through comparison to others, the Eleventh Circuit has held that the comparator must be similarly situated in all relevant respects.  Griffin Indus., Inc. v. Irvin, 496 F.3d 1189, 1202-03 (11th Cir. 2007).  Plaintiffs do not argue that they are similarly situated to others in all relevant respects.  Instead, like the Intervenor, they argue that whether a comparator is similarly situated is a question of fact that must be determined by a jury.  (Doc. 48, pp. 49-50; Doc. 58, p. 6).  The Eleventh Circuit, however, disagrees, and has upheld the making of such determinations on motions to dismiss.  See e.g., Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1272-74 (11th Cir. 2004) (sufficiency of similarly situated comparator allegations decided on a motion to dismiss).   Plaintiffs also argue that it is inconsequential that they have been treated the same as individuals who are outside their protected class.  (Doc. 45, pp. 50-52).  However, a plaintiff cannot establish a disparate treatment claim by comparing himself to others who received the same treatment.  Rollins v. Bd. of Trs., 2016 U.S. App. LEXIS 6541, at *41 (11th Cir. April 11, 2016).

Plaintiffs argue that they have also alleged discriminatory intent under the framework of <u>Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252 (1977).  (Doc. 49, pp. 45-50).  The Intervenor appears to support this argument.  (Doc. 58, p. 5, n.3).  It is true that <u>Arlington Heights</u> provides a different method of showing discriminatory intent, but that method has no application here.

In <u>Arlington Heights</u>, the Court recognized that legislative and administrative actions are rarely motivated by one purpose only.  <u>Id.</u> at 266.  To show discriminatory intent for legislative or administrative actions, a plaintiff must show that the action was motivated, at least in part, because of, and not merely in spite of, its adverse effects on an identifiable group.  <u>Personnel Admin. of Mass. v. Feeney</u>, 442 U.S. 256, 279 & n.4 (1979).  Because it is difficult to determine the intent of an acting legislative or administrative body, the Court provided some examples of how such intent might be shown in such cases.  <u>Arlington Heights</u>, 429 U.S. at 266.  These examples do not apply here.

<u>Arlington Heights</u> and its progeny apply to official actions of an acting legislative or administrative body.[9]  <u>See e.g.</u>, <u>Pac. Shores Props., LLC v. City of</u>

---

[9] <u>Arlington Heights</u>, 429 U.S. at 254 (challenge to village zoning decisions); <u>Hunter v. Underwood</u>, 471 U.S. 222 (1985) (state constitutional provision disenfranchising voters); <u>Jean v. Nelson</u>, 711 F.2d 1455 (11th Cir.  1983), <i>vacated by</i> <u>Jean v. Nelson</u>, 727 F.2d 957 (11th Cir. 1984) (Presidential immigration policy); <u>Williams v. Dothan</u>, 745 F.2d 1406-1408 (11th Cir. 1984) (city's distribution of tax assessments); <u>Pac Shores Props. LLC v. City of Newport Beach</u>, 730 F.3d 1142, 1147 (5th Cir. 2013)

Newport Beach, 730 F.3d 1142, 1159 (5th Cir. 2013) ("well established" that Arlington Heights factors provide a way to establish discriminatory intent in cases alleging statutory discrimination).  Here, there are no allegations that any State Defendant took official legislative or official administrative action.

### b. Title II is not proper Section 5 legislation because there is no history and pattern of unconstitutional discrimination

Plaintiffs and the Intervenor argue that there is a Congressional history and pattern of unconstitutional discrimination sufficient to support Title II by alluding to a history of disability discrimination as a whole, (Doc. 49, pp. 15-17; Doc. 58, p. 13-16), and cite to examples of discrimination in the provision of public transportation by non-state entities.  (Doc. 49, pp. 15-18; Doc. 57, pp. 13-16).  The Intervenor also suggests that a history and pattern of unconstitutional discrimination in a specific, "as-applied" context need not be shown.  (Doc. 57, p. 12).  These arguments are misplaced.

### i. The third Boerne step looks to the history of State discrimination on an as-applied basis

The three-step analysis used to determine whether legislation satisfies the Boerne congruence and proportionality test requires the court to determine: 1) the constitutional right or rights that Congress sought to enforce when it enacted the ADA, 2) whether there was a history of unconstitutional discrimination to support

---

(city enacted housing ordinance); Smith v. Town of Clarkton, 682 F.2d 1055, 1058 (4th Cir. 1982)(town pursued official action to terminate housing project).

Congress's determination that prophylactic legislation was necessary; and 3) whether Title II is an appropriate response to this history and pattern of unequal treatment. FIU, 405 F.3d at 957 (citing Bd. of Trs. of the Univ. of Fla. v. Garrett, 531 U.S. 356, 365-70 (2001)).  The Eleventh Circuit has interpreted Lane as establishing the first two Boerne steps when considering Title II as a whole.  Id. at 958.  The Intervenor argues that this interpretation ends the Section 5 analysis, and that Title II has been validly abrogated in every situation involving public services, programs, and activities.  (Doc. 57, pp. 12, 13).  This argument, however, is not supported by Lane or FIU.

In Lane, the petitioners urged that the scope of third Boerne step was best answered by looking to breadth of Title II.   Tenn. v. Lane, 541 U.S. 509, 530 (2004)("According to petitioner, the fact that Title II applies not only to public education and voting-booth access but also to seating at state-owned hockey rinks indicates that Title II is not appropriately tailored to serve its objectives.").   The Supreme Court refused, stating:

> [N]othing in our case law requires us to consider Title II, with its wide variety of applications, as an undifferentiated whole. Whatever might be said about Title II's other applications, the question presented in this case is not whether Congress can validly subject the States to private suites for money damages for failing to provide reasonable access to hockey rinks, or even to voting booths, but whether Congress had the power under § 5 to enforce the constitutional right of access to the courts.

19

> Because we find that Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services, we need go no further.

Id. at 530-31.

The Court went on to consider the third congruence and proportionality step not "as an undifferentiated whole," but as it applied specifically to discrimination involving the fundamental right of access to the courts.  Id. at 531.  While the Intervenor argues that Lane considered the congruence and proportionality test in relation to all public services, (see Doc. 57, pp. 12-13), Lane's consideration of broad categories of public services occurred in its analysis of the *second* Boerne step – whether there was a history of unconstitutional discrimination.  Lane, 531 U.S. at 523-530.  In the third step, the Court limited its analysis to the history of "unequal treatment of disabled persons in the administration of judicial services."  Id. at 531.

Nothing in Lane supports any contention that Section 5 meets the third Boerne step in all applications of Title II.  Furthermore, Goodman dispels that contention.  There, the Court underscored the as-applied focus and directed lower courts to consider each sovereign immunity case on a "claim-by-claim basis."  Goodman, 546 U.S. at 159.

FIU also does not support the Intervenor's argument.  In the passage cited by the Intervenor, the Eleventh Circuit was referring to the *second* Boerne step.  FIU, 405 F.3d at 958.  Notably, the court went on to discuss the third Boerne step on an

individual or "as-applied" basis in light of the particular constitutional rights at stake in the relevant category of public services, and examined specific instances of intentional discrimination by the States in the provision of public education.  Id. at 958-59 & n.4.  Under the Intervenor's analysis, the Eleventh Circuit would not have considered this third step.

Illustrative on this issue is the vacated opinion of Miller v. King, 384 F.3d 1248, 1264 & n.16 (11th Cir. 2004), vacated by Miller v. King, 449 F.3d 1149, 1150 (11th Cir. 2006).[10]  There, when deciding the scope of the third Boerne step, the Eleventh Circuit made the following observations:

> Given Lane, we accepted at step two that Title II was enacted in response to a history and pattern of disability discrimination in the administration of public services and programs generally. To give meaning to the Supreme Court's context-by-context analytical approach, however, we must consider, in step three, the history of discrimination not generally but specifically in the prison context, and the scope of the Eighth-Amendment constitutional right, and determine whether the remedy afforded by Title II is congruent and proportional to its historical backdrop and to the object of enforcing the Eighth-Amendment right to be free from cruel and unusual punishment. Lane, 124 S. Ct. at 1993.

Id. at 1272-73.  Thus, the Eleventh Circuit has indicated its view that to give full meaning to the teachings of Lane, the scope of step three of the congruence and

---

[10] While vacated opinions have no precedential value, see Ridley v. Austin, 496 F.2d 213, 214 (5th Cir. 1974), the analysis utilized by the Eleventh Circuit is helpful to the issues raised here.

21

proportionality test focuses on the history of discrimination in the specific context at issue.

The remaining cases cited by the Intervenor do not hold otherwise.  For example, in Bowers, the Third Circuit found that Lane conclusively established the first two Boerne steps, but considered the third step in the specific context of public education.  Other circuits have also consistently performed the "as-applied" step to the specific context of the case, rather than to a broad category of services.  Bowers v. NCAA, 475 F.3d 524, 555 & n.35 (3d Cir. 2007) (considering history of discrimination in public education).  The same analysis was applied in Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 488 (4th Cir. 2005) and Klinger v. Dep't of Revenue, 455 F.3d 888, 897 (8th Cir. 2006) (analyzing congruence and proportionality in specific context of surcharge on parking placards).  See also Guttman v. Khalsa, 669 F.3d 1101, 1117 (10th Cir. 2012) (applying test in specific context of discrimination in professional licensing).

To give meaning to the "claim-by-claim" analytical approach in Goodman, the third Boerne step must not be analyzed as it relates to discrimination of the disabled in general, but to the specific context at issue, which in this case is the history of irrational discrimination in access to State provided public transportation.  A discussion of the history of discrimination of the disabled in general simply has no relevance to the third Boerne step at issue here.

### ii. There is no legislative history of unconstitutional discrimination of disabled persons by States in the provision of public transportation.

Plaintiffs and the Intervenor emphasize what the State Defendants have already acknowledged: access to *public and private* transportation by individuals with disabilities was an important legislative goal of the ADA. (See Doc. 49, pp. 15-19; Doc. 57, pp. 14-16). This, however, does not satisfy the congruence and proportionality test.

"Congress' § 5 authority is appropriately exercised only in response to state transgressions." Garrett, 532 U.S. at 368. To be valid Section 5 legislation, the legislative record must establish that Congress identified a pattern of irrational discrimination by the *states* in the particular context at issue. Id. at 369-70 (emphasis added). Thus, the legislative record must establish that Congress did, in fact, identify a pattern of irrational state discrimination in the provision of public transportation. See id. Instances of discrimination by non-State actors are not relevant for purposes of the congruence and proportionality analysis. Id. at 369.

Plaintiffs have provided no instances of discrimination by the states in the provision of public transportation that was discussed in the legislative history. The only anecdotal reference of discrimination in access to transportation that has been cited by Plaintiff refers to "surveys in 45 communities." (Doc. 49, p. 17). Nothing about this snippet suggests that these "communities" were 45 separate states. Further,

"[i]solated sentences clipped from floor debates and legislative reports" are insufficient to establish a pattern of discrimination by the states.  Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 89-91 (2000).  However, even if it is assumed that this snippet referred to surveys of public transportation offered by the states (which, again, is unlikely, given that local communities are typically the entity responsible for providing public transportation), it insufficient to suggest a pattern of unconstitutional discrimination by the states in providing access to state transportation to individuals with disabilities that would justify Section 5 legislation.  See Garrett, 531 U.S. at 370 (half dozen examples of discrimination involving the States "fall far short of even suggesting the pattern of unconstitutional discrimination upon which § 5 legislation must be based").

The Intervenor cites to a plethora of examples of discrimination collected by the Task Force on the Rights and Empowerment of Americans with Disabilities. (Doc. 57, p. 14 n.7) (referring to Garrett, 531 U.S. at 391-424, Appendix C to dissenting opinion (Breyer, J.)).  While the Intervenor suggests that the task force findings are part of the Congressional Record, (see Doc. 57, p. 14), the Supreme

Court disagrees.[11]   See Garrett, 531 U.S. at 370-71 (examples in Appendix C were not submitted to Congress, but to a Task Force).

There is no legislative history showing a pattern of discrimination by a State in the context of public transportation services. As a result, Title II is not proper Section 5 legislation in this context.

### c.  Title II is not a proportionate or congruent remedy

Plaintiffs do not appear to address this issue, except to argue that Congress has authority to legislate even constitutional conduct.  For the reasons discussed above, such a position cannot be squared with Goodman.  Even if it could, the remedy still must be proportionate and congruent.  Plaintiffs do not argue that Title II is a proportionate or congruent remedy.  The Intervenor argues that because Congress can prohibit conduct that is not itself unconstitutional, Title II is a proportionate and congruent remedy.  (Doc. 57, pp. 16-20).

In Garrett, the Supreme Court stated that the first step in applying this test is to identify the scope of the constitutional right at issue.  Garrett, 532 U.S. at 365 (emphasis added).  By its very terms, the "congruence and proportionality" fails when

---

[11] Moreover, the vast majority of the Intervenor's references say nothing more than "inaccessible public transportation," without any context.  As the State Defendants have acknowledged from the start, access to public transportation was an important goal of Title II.  The issue, however, is a history of discrimination by the *States* in providing access to public transportation.  A regurgitation of every mention of the word "transportation" in the Task Force report is not helpful to this analysis at all.  In the 140 accounts referred to by the Intervenor, only six could even arguably relate to a State.

applied to facially constitutional conduct.  Thus, conduct that violates Title II, but not the Constitution, cannot pass the "congruence and proportionality" test.  The claims for a declaratory judgment and damages under Title II are barred by the Eleventh Amendment and should be dismissed.

## B.   FAILURE TO STATE A CLAIM

The State Defendants have addressed Plaintiffs' preliminary arguments regarding claims and evidentiary methods above.

### 1.  Plaintiffs' claims to state-owned land are barred by the  statute of limitations (Counts 1 and 2)

Plaintiffs have affirmatively stated that they are not making a distinct claim against the State Defendants based upon allegations relating to allegedly fraudulent land transfers.  (See Doc. 49, p. 71).  Thus, the State Defendants make no reply.

### 2.  The FHA is Unambiguous, and therefore, an Analysis of HUD's Interpretative Rules and Regulations is Unnecessary

The pertinent provisions of 42 U.S.C. § 3604 are unambiguous.  Plaintiffs cannot maintain a claim under the FHA against State Defendants because the FAC is devoid of any allegations that State Defendants sold, financed, rented or otherwise engaged in a "real estate-related transaction" with Plaintiffs.  Despite the plain language contained in the FHA in this regard, the Intervenor contends that this Court must defer to its interpretative Rules and Regulations related to discriminatory conduct.  (Doc. 58, p.8). State Defendants submit that there is no need for this Court

to seek guidance from HUD in this regard when the plain language of the FHA clearly contemplates that the discriminatory conduct involve the sale or rental of housing.

Where the intent of Congress is clear, this Court must apply the plain meaning of the statute.  See generally Chevron, U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-44 (1984) ("if the intent of Congress is clear, that is the end the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").  Only where ambiguity exists must deference be given to HUD's interpretive Rules and Regulations, and only if HUD's Rules and Regulations do not violate the plain meaning of the statute and are a "permissible" or "reasonable" construction of the law.  Id.

In Walker v. Crigler, 976 F.2d 900, 904 (4th Cir. 1992), the Fourth Circuit followed an existing line of judicial precedent rather than existing HUD regulations. The Walker Court indicated that HUD regulations would be entitled to less deference in a private cause of action than in a proceeding filed with HUD.  Id.; Compare NAACP v. American Family Mutual Insurance Co., 978 F.2d 287, 300-01 (7th Cir. 1992).  Similarly, the Seventh Circuit, in DiCenso v. HUD, 96 F.3d 1004, 1007 (7th Cir. 1996), acknowledged that Chevron requires Courts to defer to decisions of executive agencies where the agency has particular expertise in the conflicting policy considerations that underlie a statute.  In DiCenso, however, the Court held that

courts may look to HUD's interpretative rules for "guidance" but "they are not 'controlling upon the courts by reason of their authority.'"  Id., citing Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65 (1986).

The Second Circuit, in Ragin v. Harry Macklowe Real Estate Co., 6 F.3d 898, 911 (2d Cir. 1993), found that its own precedent created binding authority; not HUD's recommendations.  In Ragin, the court declined to retroactively apply attorney's fees provision of the 1988 Amendments Act despite the fact that HUD recommended that it be applied retroactively. Id.  The court elected instead to follow its own precedent in Butts v. City of New York Department of Housing Preservation & Development, 990 F.2d 1397, 1409-11 (2d Cir. 1993), with respect to the retroactivity rule. Id.

Irrespective of HUD's Rules and Regulations, this Court's established precedent in Steele v. City of Port Wentworth, 2008 U.S. Dist. LEXIS 20637 at *35-36 (S.D. Ga. 2008), is consistent with the plain unambiguous text of the relevant FHA provisions.  This Court has already held that based on the "plain language of the statute,"  3604(b) is limited to discrimination involving only the sale or rental of housing.  Id.  In Steele, noting a split in authority, this Court found the majority position among district courts which limits "the scope of § 3604(b) to services provided in connection with the sale or rental of housing" to be most persuasive, holding that the plain language of the statute "extends only to discrimination that

28

impacts the accessibility and availability of housing, not to claims of discretionary conduct relating to the use and enjoyment of previously acquired housing." Id. This Court found that the provision of services is "wholly unrelated to the sale or rental" of real estate. Id. at *36.

Given the unambiguous language contained in the FHA and this Court's existing precedent in this matter, there is no need for this Court to seek guidance from HUD's interpretative rules.

### 3. Post-Acquisition Conduct/ Discrimination

Even if this Court takes the position that the FHA can reach post-acquisition conduct, a point which Defendants do not concede, all of Plaintiffs' claims under the FHA must still be dismissed because State Defendants are not engaged in the sale or rental of housing. The provision of municipal services which is unrelated to the sale or rental of housing is not actionable under the FHA. See Steele, 2008 U.S. Dist. LEXIS at *35-36.

Plaintiffs attempt to create "binding Supreme Court and Eleventh Circuit precedent" which does not exist. (Doc. 49, p. 52). Even the Intervenor concedes that the Eleventh Circuit has not ruled on the issue of post-acquisition discrimination. (Doc. 58, p. 8). Specifically, neither the Supreme Court nor the Eleventh Circuit has addressed the issue of alleged discriminatory conduct in the provision of municipal services. As mentioned in detail above, however, this Court has addressed the issue

in Steele and found that the provision of municipal services that are unrelated to the sale or rental of housing does not come within the purview of the FHA.  2008 U.S. Dist. LEXIS at *35-36.

The Intervenor relies upon a string of cases, all of which involve the rental of housing, to support its position that post-acquisition claims are available under 3604(b) and 3604(f)(2).  Cases involving the rental of housing are inapplicable to this case; it is undisputed that State Defendants are not engaged in the rental of housing.[12] The distinction between a sale and rental is crucial in an FHA analysis.  See Richards v. Bono, 2005 U.S. Dist. LEXIS 43585 at *11-12 (M.D. Fla. 2005). In Richards, the court engaged in a thorough analysis of the distinction, noting that a rental is indicative of an ongoing relationship.  The Court reasoned that:

> a sale of real property is a singular event, something concluded at a determinable point in time.  So, it is easy to see how courts faced with the § 3604 claims of homeowners for post-sale discriminatory conduct could conclude that discrimination after the sale of the dwelling was not discrimination in the sale of the dwelling and therefore not within the purview of § 3604(b).

Id. at *11.  There are no allegations in the FAC that State Defendants engaged in any rental transaction with the Plaintiffs and there exists no authority in this Circuit

---

[12] State Defendants submit that even if this Court were to find that the FHA can reach post-acquisition claims, the Amended Complaint must still be dismissed for failure to state a claim as the allegations against State Defendants are unrelated to the sale or lease of real estate.

applying the FHA to the provision of municipal services.[13]  Quite the opposite is true; this Court has already explicitly held that the provision of municipal services is "wholly unrelated to the sale or rental" of real estate.  Steele, 2008 U.S. Dist. LEXIS at *35-36.

In what appears to be an effort to avoid the application of controlling precedent in this District, Plaintiffs cite to several cases from district courts in Florida, and additionally, attempt to expand their applicability.  (Doc. 49, pp. 49-50).  All of the Florida district court cases cited by Plaintiffs either involve alleged discriminatory conduct by landlords related to the rental of property or alleged discrimination by homeowners/condominium associations.   None of the cases are on point or controlling in this matter.  There is no need for this Court to look to an irrelevant string of cases in Florida which do not address the provision of municipal services when this Court has already firmly addressed the issue.  See Steele, 2008 U.S. Dist. LEXIS at *35-36.

Likewise, the Intervenor cites to the Seventh Circuit decision in Bloch v. Frischholz, 587 F.3d 771 (7th Cir. 2009), to support the erroneous position that the

---

[13] Several Courts have expressed doubt or rejected the applicability of 3604(b) to the provision of municipal services.  See Clifton Terrace Associates, Ltd. v. United Technologies Corp., 929 F.2d 714, 720 (D.C. Cir. 1991); South Camden Citizens in Action v. New Jersey Dep't of Environmental Protection, 254 F. Supp. 2d 486 (D.N.J. 2003); Vercher v. Harrisburg Housing Authority, 454 F. Supp. 423, 425-26 (M.D. Pa. 1978); Jersey Heights Neighborhood Ass'n v. Glendening, 174 F 3d 180, 193 (4th Cir. 1999); Laramore v. Illinois Sports Facilities Authority, 722 F. Supp. 443, 452 (N.D. Ill. 1989).

services State Defendants provided to Plaintiffs are directly connected with their ability to inhabit their homes on Sapelo Island.  (Doc. 58, p. 12).  Intervenors concede that the relationship between the parties in this case is "different" from that in <u>Bloch</u> but fail to acknowledge that <u>Bloch</u> unquestionably involves a real estate transaction between a condominium association and its tenants.  In addition, even if this Court were to follow the Seventh Circuit, the court in <u>Bloch</u> found that the FHA only reaches conduct that makes a dwelling "unavailable" to the owner or tenant if the conduct creates a "constructive eviction."   <u>Id.</u> at 777.   To show "constructive eviction," which is a "tall order," the plaintiff "must show her residence is 'unfit for occupancy,' often to the point that she is 'compelled to leave.' Id., <u>citing</u> Black's Law Dictionary (8th ed. 2004). There are no allegations that the State Defendants have engaged in anything that would amount to constructive eviction.

Plaintiffs' claims under the FHA must be dismissed as its application does not reach post-acquisition conduct.   Even if this Court were to find that there are circumstances in which the FHA could be applied to post-acquisition conduct, under the plain language of the FHA such conduct here would not be related to the rental or acquisition of housing.   Accordingly, Plaintiffs claims under the FHA must be dismissed.

### 4.  The State of Georgia is not Required to Provide Municipal Services

Contrary to Intervenor's assertions, State Defendants acknowledge that the FHA can apply to state governmental entities in certain circumstances. (Doc. 58, pp. 15-17).  The State Defendants contend that Plaintiffs cannot maintain its cause of action against State Defendants for providing alleged discriminatory municipal services because it is not a municipality which is legally required to provide municipal services.  By its very definition, municipal services are not state services. Although counties and municipalities may be required to provide certain essential service delivery systems within their respective areas, the State of Georgia is not. The Georgia Constitution confers upon counties and municipalities the ability to provide essential services.  <u>See</u> Ga. Const., Art. IX, § II, ¶ III.

There are no cases which hold a state governmental entity responsible under the FHA for the inaction or failure of a county or municipality to provide municipal services.  Plaintiffs miss the essence of State Defendants' argument in its Motion to Dismiss when they rely upon the fact that many of their cases are filed against "governmental defendants." (Doc. 49, p. 52).  Plaintiffs fail to acknowledge the lack of any authority whatsoever which holds a state governmental entity responsible under the FHA for the alleged inaction of a county or municipality to provide municipal services.  Similarly, the Intervenor contends that "even if the State is providing services as a "courtesy," . . . it may not provide such services in a

discriminatory manner." (Doc. 58, p. 17).  Because DNR has operations on Sapelo Island, a remote barrier island, it is authorized to provide essential services to <u>state employees</u> on Sapelo Island.  <u>See</u> O.C.G.A. § 12-2-5.  Any essential or municipal services that are currently being provided by DNR are provided as a courtesy.  Simply put, under State law, DNR could discontinue those services.

In addition, there are no allegations in the FAC that the State Defendants are providing unequal services to residents on Sapelo Island.  It is undisputed that all residents on Sapelo Island receive the same "courtesy services" from State Defendants. Under the arguments advanced by the Intervenor, the State would be left with no choice but to discontinue any and all courtesy services, none of which it is legally required to provide, to the residents of Sapelo Island to avoid potential liability under the FHA.  This is a result which none of the parties in this case desire.

### 5. SIHA is not a "person" within the meaning of 42 U.S.C. §§ 1981 or 1983 (Counts 6 and 8)

For the reasons discussed above, SIHA is an arm of the State of Georgia, and is thus not a "person" within the meaning of §§ 1981 and 1983.  As a result, Counts 6 and 8 should be dismissed as to SIHA.

### 6. The FAC fails to sufficiently allege a claim under § 1981 or § 1982 (Counts 6 and 7)

For the reasons discussed above, Plaintiffs have failed to allege intentional discrimination on the part of any State Defendant.  As a result, the §§ 1981 and 1982

claims are subject to dismissal.  Furthermore, the FAC does not allege a refusal to contract.

In Domino's Pizza, Inc. v. McDonald, the Supreme Court stated that "a plaintiff cannot state a [§1981] claim [] unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.'"  546 U.S. 470, 479-80 (2006).  Plaintiff argues that this requirement can be met based on a theory of "implied refusal to contract" when the claim involves the alleged unequal treatment in the provision of government services.  (Doc. 49, p. 64).  The cases cited do not support this proposition.  For example, Runyon v. McCrary, involved the alleged refusal to contract on the basis of race.  427 U.S. 160, 170-71 (1976) *superceded on other grounds by* Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369 (2004).  Similarly, in Kennedy v. City of Zanesville, the district court collected cases where there was a refusal to enter into a contract.  505 F. Supp. 2d 456, 494 (S.D. Ohio Sept. 7, 2007).  No mention was made of "implied contracts" in either of these cases.  And in Davis v. City of New York, the § 1981 claims were based on *actual contracts* – lease agreements with the city housing authority.  959 F. Supp. 2d 324, 366 (S.D.N.Y 2013).  Again, there was no mention or discussion of "implied contracts."  The § 1981 (Count 6) and § 1982 (Count 7) claims should be dismissed.

### 7. The FAC fails to state an equal protection/Title VI claim (Counts 8 and 9)

As discussed above, Plaintiffs have not sufficiently alleged a Fourteenth Amendment claim. As a result, Plaintiffs have also not alleged the discriminatory intent necessary to state a Title VI claim. See Elston v. Talladega Cnty. Bd. of Educ., 997 F.2d 1394, 1405 n.11 (11th Cir. 1992) (Title VI analysis "duplicates exactly" an equal protection analysis). Contrary to Plaintiffs' response, (see Doc. 49, p. 66), the State Defendants have, and do, challenge the sufficiency of the allegations in the FAC in this regard.

### C.   THE CLAIMS FOR EQUITABLE RELIEF

Finally, Plaintiffs have not stated a claim for equitable relief and, moreover, seek equitable relief from improper parties.

### 1. The FAC fails to state a claim for injunctive relief

Plaintiffs do not dispute that they have failed to sufficiently allege the type of injunctive relief sought. They argue, however, that they are not required to do so. They say that after the Court determines what conduct is unlawful, they will seek specific injunctive relief. (Doc. 49, pp. 74-75). The Intervenor agrees with this approach. (Doc. 58, p. 20). Courts, however, have rejected it. "In the Eleventh Circuit, a complaint seeking to require the opposing party to do nothing more specific than 'obey the law' is impermissible." Callaway v. McRae, 2008 U.S. Dist. LEXIS 59328, at * 12-13 (M.D. Ga. Aug. 5, 2008) citing Elend v. Basham, 471 F.3d 1199

36

(11th Cir. 2006); <u>Burton v. City of Belle Glade</u>,178 F.3d 1175 (11th Cir. 1999). <u>See also</u> <u>Mancha v. Immigration and Customs Enf't</u>, 2007 U.S. Dist. LEXIS 89414 (N.D. Ga. Dec. 3, 2007).

In <u>Elend</u>, a complaint seeking declaratory and injunctive relief was dismissed. 471 F.3d at 1202.   On appeal, the court found that the relief requested in the complaint was for an "abstract command" that merely required the defendant to follow the law.  <u>Id.</u> at 1209-10.  The court held that this was insufficient to survive a motion to dismiss because the requested relief lacked redressability.  <u>Id.</u> at 1209

In <u>Mancha</u>, the plaintiff made the same argument that is being made here: that the obligation to provide detail applies only to the order for injunctive relief, and does not require a plaintiff to be any more specific in a complaint than is required by FED. R. CIV. P. 8.  2007 U.S. Dist. LEXIS 89414 at *8.  The court rejected the argument and considered the issue as one of redressability.  <u>Id.</u> at *7.  While Rule 65(d) may not be a concern at the pleadings stage, it does limit the type of relief a federal court is authorized to give.  <u>Id.</u>  at *8.  Since Rule 65(d) prohibits the granting of vague injunctions, "it bear[s] on the question of whether an injunction can redress the injury.  <u>Id.</u> (citing <u>Burton</u>, 178 F.3d at 1201).  Because the relief requested was "little more than a demand that the Court require Defendants to obey the law," the district court dismissed the claims for injunctive relief.

The same is true here.  Plaintiffs fail to identify any specific conduct or action they seek to compel or enjoin.   Plaintiffs' requests for injunctive relief lack redressability – including the injunctive relief requested in the Title II claim -- and they should be dismissed.

### 2.  No injunctive relief from the State of Georgia, DNR, or the SIHA

In Counts 1, 6, 7, 8, 9, and 10, Plaintiffs seek injunctive relief against various combinations of the State of Georgia, DNR, and SIHA.   Injunctive relief is not available from these parties.   Plaintiffs respond by pointing to their arguments regarding Eleventh Amendment immunity.   (Doc. 49, p. 69 n.22).   As discussed above, Eleventh Amendment immunity has not been waived or abrogated, and SIHA is an arm of the State of Georgia.   The claims for injunctive relief brought against the State of Georgia, DNR, and the SIHA in these counts should be dismissed.

### CONCLUSION

For the foregoing reasons, and for the reasons set forth in their opening brief, the State of Georgia, Governor Nathan Deal in his official capacity, the Georgia Department of Natural Resources, Commissioner Mark Williams in his official capacity, and the Sapelo Island Heritage Authority request that Plaintiffs' First Amended Complaint be dismissed.

Respectfully submitted,

SAMUEL S. OLENS       551540
Attorney General

W. WRIGHT BANKS, JR.   036156
Deputy Attorney General

PLEASE ADDRESS ALL
COMMUNICATIONS TO:

JULIE ADAMS JACOBS
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 463-5989
FAX (404) 657-3239
Email:  jjacobs@law.ga.gov

/s/ Julie Adams Jacobs
JULIE ADAMS JACOBS   003595
Senior Assistant Attorney General

/s/ Michelle J. Hirsch
MICHELLE J. HIRSCH    357198
Assistant Attorney General

39

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 16, 2016, I electronically filed the foregoing **STATE DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT AND RESPONSE TO INTERVENOR'S OPPOSITION BRIEFS** with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to all attorneys of record.

/s/ Julie Adams Jacobs
JULIE ADAMS JACOBS        003595
Senior Assistant Attorney General
Attorney for State Defendants

40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 463-5989
E-mail: jjacobs@law.ga.gov