# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

SARAH FRANCES DRAYTON,      *
et al.,                     *
                            *
        Plaintiffs,         *
                            *         CV 216-053
        v.                  *
                            *
McINTOSH COUNTY, GEORGIA,   *
et al.,                     *
                            *
        Defendants.         *

## ORDER

This case comes before the Court on two fully briefed motions to dismiss: The first has been filed by Defendants McIntosh County, Georgia (the "County"); McIntosh County Sheriff Stephen Jessup ("Sheriff Jessup") in his official capacity; and the McIntosh County Board of Tax Assessors (the "Board of Tax Assessors") (collectively, the "County Defendants"). Dkt. No. 46. The second Motion has been filed by Defendants the State of Georgia (the "State"), Governor Nathan Deal ("Governor Deal") in his official capacity, the Georgia Department of Natural Resources (the "DNR"), Commissioner of the DNR Mark Williams ("Commissioner Williams") in his official capacity, and Sapelo Island Heritage Authority ("SIHA") (collectively, the "State Defendants"). Dkt. No. 48. Additionally, United States of

AO 72A
(Rev. 8/82)

America ("USA") has intervened, submitting a Statement of Interest (dkt. no. 58) and a Response to the State Defendants' Motion to Dismiss (dkt. no. 57).

As set forth below, some but certainly not all of Plaintiffs' claims are subject to dismissal based on immunity. For the reasons that follow, the County Defendants' Motion to Dismiss (dkt. no. 46) is **GRANTED in part** and **REMAINS PENDING in part**, and the State Defendants' Motion to Dismiss (dkt. no. 48) is **GRANTED in part, DENIED in part**, and **REMAINS PENDING in part**. The Motions (dkt. nos. 46, 48) are **GRANTED** to the extent that they request that one or more of the following claims be dismissed on the basis of immunity:

- Claims against Sheriff Jessup under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(a) ("Section 3604(a)"), for damages;

- Claims against Sheriff Jessup under the FHA, 42 U.S.C. § 3604(b) ("Section 3604(b)"), for damages;

- Claims against Sheriff Jessup under 42 U.S.C. §§ 1981, 1983 ("Section 1981" and "Section 1983") for damages;

- Claims against Sheriff Jessup under 42 U.S.C. § 1982 ("Section 1982") and Section 1983 for damages;

- Claims against Sheriff Jessup under the Fourteenth Amendment to the United States Constitution, U.S. Const. amend. XIV, for damages;

- Claims against the Board of Tax Assessors under Section 3604(a) of the FHA for damages;

- Claims against the Board of Tax Assessors under Section 3604(b) of the FHA for damages;

- Claims against the Board of Tax Assessors under the FHA, 42 U.S.C. § 3605 ("Section 3605"), for damages;

- Claims against the Board of Tax Assessors under Section 1981 and Section 1983 for damages;

- Claims against the Board of Tax Assessors under Section 1982 and Section 1983 for damages;

- Claims against the Board of Tax Assessors under the Fourteenth Amendment for damages;

- Claims against SIHA under Section 3604(a) of the FHA for damages, declaratory relief, and injunctive relief;

- Claims against SIHA under Section 1981 and Section 1983 for damages, declaratory relief, and injunctive relief;

- Claims against SIHA under Section 1982 and Section 1983 for damages, declaratory relief, and injunctive relief; and

- Claims against SIHA under the Fourteenth Amendment for damages, declaratory relief, and injunctive relief.

AO 72A
(Rev. 8/82)

The State Defendants' Motion (dkt. no. 48) is **DENIED** as to its request for a dismissal of Plaintiffs' claims against the State and the DNR for damages, declaratory relief, and injunctive relief under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12132, 12142, 12146-48 ("Title II"). While the State Defendants' Motion (dkt. no. 48) for the dismissal of Plaintiffs' claims against the State for damages, declaratory relief, and injunctive relief under under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), is not granted on immunity grounds, it nevertheless **REMAINS PENDING** insofar as it seeks a dismissal of these claims for failure to state a claim.

Additionally, the Motions (dkt. nos. 46, 48) **REMAIN PENDING** for resolution by the Court to the extent that they seek a dismissal of one or more of the following claims on grounds other than immunity:

- Claims against Sheriff Jessup under Section 3604(a) of the FHA for declaratory and injunctive relief;
- Claims against Sheriff Jessup under Section 3604(b) of the FHA for declaratory and injunctive relief;
- Claims against Sheriff Jessup under Section 1981 and Section 1983 for declaratory and injunctive relief;
- Claims against Sheriff Jessup under Section 1982 and Section 1983 for declaratory and injunctive relief;

- Claims against Sheriff Jessup under the Fourteenth Amendment for declaratory and injunctive relief;
- Claims against the Board of Tax Assessors under Section 3604(a) of the FHA for declaratory and injunctive relief;
- Claims against the Board of Tax Assessors under Section 3604(b) of the FHA for declaratory and injunctive relief;
- Claims against the Board of Tax Assessors under Section 3605 of the FHA for declaratory and injunctive relief;
- Claims against the Board of Tax Assessors under Section 1981 and Section 1983 for declaratory and injunctive relief;
- Claims against the Board of Tax Assessors under Section 1982 and Section 1983 for declaratory and injunctive relief;
- Claims against the Board of Tax Assessors under the Fourteenth Amendment for declaratory and injunctive relief;
- Claims against the County under Section 3604(a) of the FHA for damages, declaratory relief, and injunctive relief;
- Claims against the County under Section 3604(b) of the FHA for damages, declaratory relief, and injunctive relief;
- Claims against the County under Section 3605 of the FHA for damages, declaratory relief, and injunctive relief;

- Claims against the County under Section 1981 and Section 1983 for damages, declaratory relief, and injunctive relief;

- Claims against the County under Section 1982 and Section 1983 for damages, declaratory relief, and injunctive relief;

- Claims against the County under the Fourteenth Amendment for damages, declaratory relief, and injunctive relief;

- Claims against the County under Title VI for damages, declaratory relief, and injunctive relief;

- Claims against Governor Deal under Section 3604(a) of the FHA for injunctive relief;

- Claims against Governor Deal under Section 3604(b) of the FHA for injunctive relief;

- Claims against Governor Deal under the FHA, 42 U.S.C. § 3604(f)(1) ("Section 3604(f)(1)"), for injunctive relief;

-  Claims against Governor Deal under the FHA, 42 U.S.C. § 3604(f)(2) ("Section 3604(f)(2)"), for injunctive relief;

- Claims against Governor Deal under Section 1981 and Section 1983 for injunctive relief;

- Claims against Governor Deal under Section 1982 and Section 1983 for injunctive relief;

- Claims against Governor Deal under the Fourteenth Amendment for injunctive relief;

- Claims against Commissioner Williams under Section 3604(a) of the FHA for injunctive relief;

- Claims against Commissioner Williams under Section 3604(b) of the FHA for injunctive relief;

- Claims against Commissioner Williams under Section 3604(f)(1) of the FHA for injunctive relief;

- Claims against Commissioner Williams under Section 3604(f)(2) of the FHA for injunctive relief;

- Claims against Commissioner Williams under Section 1981 and Section 1983 for injunctive relief;

- Claims against Commissioner Williams under Section 1982 and Section 1983 for injunctive relief; and

- Claims against Commissioner Williams under the Fourteenth Amendment for injunctive relief.

**BACKGROUND**

Plaintiffs are members of the African American Gullah-Geechee community who own land or reside on or visit Sapelo Island in McIntosh County, Georgia.  Dkt. No. 29 ("Pl.s' Am. Compl."), ¶¶ 19-138.  Several of the Plaintiffs are individuals with disabilities.  See id. at ¶¶ 22, 30, 34, 38, 61, 63, 75, 81, 95, 111, 130.

The State has a 97% ownership interest in Sapelo Island, and the DNR generally manages the land. Id. at ¶ 213. The State legislature created SIHA for the purpose of preserving the cultural and historic values of certain areas of Sapelo Island. Id. at ¶ 147. According to Plaintiffs, the State has received federal financial funding in the form of Community Development Block Grant ("CDBG") funds and HOME funds, a portion of which it has allocated to the County. Id. at ¶¶ 140, 142, 444. Sheriff Jessup is responsible for determining and implementing law enforcement policies in McIntosh County, including allocating budgetary resources provided by the County for the provision of policing services, and the Board of Tax Assessors determines the amount of property tax that the County collects from its residents. Id. at ¶¶ 158, 161.

Plaintiffs filed suit against the State Defendants and the County Defendants on December 9, 2015. Dkt. No. 1. Plaintiffs allege that the State Defendants and the County Defendants have discriminated against them in the provision of housing and housing-related services, as well as other governmental programs and services, on the basis of race, color, national origin, and disability. See generally Pl.s' Am. Compl. Plaintiffs assert, in part, that the State has allocated the federal financial assistance in a discriminatory manner by giving it to the County, which used the funds to benefit White residents on the

mainland, when the State "could have and should have ensured that [the] County used some of the CDBG and HOME funding to promote housing stability and economic development on Sapelo Island." Id. at ¶¶ 353-66. The Amended Complaint also alleges, in relevant part, that certain Plaintiffs having physical disabilities "regularly use a ferry operated by the State and the DNR for the purposes of . . . commuting to and from work or school, shopping, accessing health[]care services, or visiting friends and family." Id. at ¶¶ 454-45. According to Plaintiffs, the ferry, as well as the ferry docks and parking lots on both the mainland and Sapelo Island, are not readily accessible and usable by individuals with disabilities. Id. at ¶¶ 298-310, 456-57. Further, Plaintiffs contend that SIHA has wrongly asserted ownership over lands on Sapelo Island, entered into agreements favoring only White developers, prevented Plaintiffs from using and accessing lands, and refused to entertain Plaintiffs' efforts to create a community-governed land trust that would preserve cultural resources. Id. at ¶¶ 201-12.

Plaintiffs claim that they are entitled to relief pursuant to the Fair Housing Act, Section 1981, Section 1982, Section 1983, the Fourteenth Amendment, Title VI, and Title II. Id. at ¶¶ 386-458. Plaintiffs seek a declaratory judgment that the Defendants committed the statutory violations alleged,

compensatory damages, an injunction prohibiting future discriminatory conduct and requiring remedial steps, and an award of attorneys' fees and costs.  Id. at pp. 147-48.

The State Defendants and the County Defendants have separately moved to dismiss Plaintiffs' claims against them, dkt. nos. 46, 48, and USA has intervened based on its interest in ensuring the correct interpretation and application of the Title II and Title VI provisions at issue, dkt. nos. 57-58.  The parties have fully briefed Defendants' Motions, see dkt. nos. 46, 48-49, 57-58, 74, 76-77, 82-84, and the Motions are now ripe for review.  However, the Court has stayed this action pending a resolution of only the immunity issues raised in the Motions, see dkt. no. 79, and now addresses only those issues, so that the parties may proceed with discovery and reach a resolution of this case expeditiously.

## STANDARDS OF REVIEW

Federal Rule of Civil Procedure 8(a) requires that a plaintiff's complaint contain both "a short and plain statement of the grounds for the court's jurisdiction" and "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(1)-(2).  A responding party thus may move to dismiss the complaint based on a "lack of subject-matter jurisdiction," Fed. R. Civ. P. 12(b)(1) ("Rule 12(b)(1)"), or a "failure to state a claim upon which relief can

be granted," Fed. R. Civ. P. 12(b)(6) ("Rule 12(b)(6)").   In addition, a district court must dismiss an action if it finds at any time that it lacks subject-matter jurisdiction.   Fed. R. Civ. P. 12(h)(3).

Motions to dismiss under Rule 12(b)(1) and Rule 12(b)(6) challenge the legal sufficiency of the complaint.   See Fed. R. Civ. P. 12(b)(1), (6).   While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"   Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (interpreting Fed. R. Civ. P. 8(a)(2)).   To be plausible on its face, a complaint must set forth enough facts to "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   Id.

A plaintiff, therefore, must plead more than mere labels and conclusions, and a formulaic recitation of the elements of a particular cause of action does not suffice.   Twombly, 550 U.S. at 555.   Rather, at a minimum, a complaint should "contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."   Fin. Sec. Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-83 (11th Cir. 2007) (per curiam)

(quoting Roe v. Aware Woman Ctr. for Choice, Inc., 253 F.3d 678, 683 (11th Cir. 2001)).

In evaluating a motion to dismiss, a court must "accept as true the facts as set forth in the complaint and draw all reasonable inferences in the plaintiff's favor." Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010). Ordinarily, a court's review on a motion to dismiss is limited to the factual allegations on the face of the complaint, see Iqbal, 556 U.S. at 678, and a party's presentation of matters outside of the pleadings transforms the motion into one for summary judgment, Fed. R. Civ. P. 12(d). However, there are certain instances in which a court may consider matters outside of the pleadings at the dismissal stage, see Davis v. Self, 547 F. App'x 927, 929 (11th Cir. 2013), including, for example, facts that are subject to judicial notice, see Fed. R. Evid. 201(a)-(d); Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

## DISCUSSION

Both the County Defendants and the State Defendants move, in part, for the dismissal of certain of Plaintiffs' claims based on principles of sovereign immunity under the Eleventh Amendment. Dkt. No. 46-1, pp. 26-29; Dkt. No. 48-1, pp. 7-30, 48-50. Specifically, the County Defendants contend that Sheriff Jessup in his official capacity and the Board of Tax Assessors are entitled to immunity from Plaintiffs' claims for damages.

Dkt. No. 46-1, pp. 26-29.  The State Defendants similarly argue that the State, the DNR, and SIHA are immune from Plaintiffs' claims for damages, declaratory relief, and prospective injunctive relief.  Dkt. No. 48-1, pp. 7-30, 48-50.

The Eleventh Amendment bars a damages action in federal court against a state, its agencies, and its officials in their official capacities, unless the state has waived its sovereign immunity or there has been a valid congressional override.  See Kentucky v. Graham, 473 U.S. 159, 169 (1985); see also Abusaid v. Hillsborough Cty. Bd. of Cty. Com'rs, 405 F.3d 1298, 1303 (11th Cir. 2005) ("Eleventh Amendment immunity bars suits brought in federal court when an 'arm of the State' is sued." (quoting Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003))).  Principles of sovereign immunity also bar a suit in federal court seeking a declaratory judgment that a state official's conduct violated the plaintiff's federal rights in the past.  Green v. Mansour, 474 U.S. 64, 73 (1985).  However, the Eleventh Amendment does not preclude a plaintiff from pursuing an action against such official to obtain prospective injunctive relief or a declaratory judgment relating to a continuing violation of federal law.  Graham, 473 U.S. at 170 n.18 (citing Pennhurst St. Sch. & Hosp. v. Halderman, 465 U.S. 89 (1984), and Ex parte Young, 209 U.S. 123 (1908)); Green, 474 U.S. at 68, 72-73.

The question of whether a defendant entity is an "arm of the state" entitled to the protections of sovereign immunity "must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise." Abusaid, 405 F.3d at 1303 (quoting Manders, 338 F.3d at 1308). To determine whether the entity, while engaging in that particular function, acted as an arm of the state, a court must consider "(1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) the source of the entity's funds; and (4) who bears financial responsibility for judgments entered against the entity." Id. (citing Manders, 338 F.3d at 1309).

As to whether a state has consented to suit in federal court, the test "is a stringent one." Sossamon v. Texas, 563 U.S. 277, 284 (2011) (quoting Coll. Sav. Bank v. Fla. Prepaid Postsecondary Ed. Expense Bd., 527 U.S. 666, 675 (1999)). A state's consent to suit must be "unequivocally expressed" in the text of the applicable statute. Id. (quoting Pennhurst St. Sch. & Hosp., 465 U.S. at 99). Any waiver of sovereign immunity must be "strictly construed, in terms of its scope, in favor of the sovereign." Id. at 285 (quoting Lane v. Peña, 518 U.S. 187, 192 (1996)).

AO 72A
(Rev. 8/82)

I.   **Damages Claims Against Sheriff Jessup (Counts 1-2, 6-8)**

The County Defendants argue that Sheriff Jessup is immune to Plaintiffs' damages claims challenging his allocation of the budget for the provision of police services as discriminatory. See Dkt. No. 46-1, pp. 27-29; Dkt. No. 74, pp. 20-21.   While Plaintiffs recognize that the statutory causes of action asserted against Sheriff Jessup do not abrogate Eleventh Amendment immunity, they argue that Sheriff Jessup cannot rely on such immunity because he was not acting as an arm of the State.   Dkt. No. 49, pp. 24-28.

In Manders, the Court of Appeals for the Eleventh Circuit conducted an in-depth analysis of the Georgia Constitution, as well as Georgia statutes and case law, to ascertain the role and duties of sheriffs within Georgia's local governance regime. 338 F.3d at 1309-18.   The specific issue before the Manders Court was whether the defendant sheriff functioned as an arm of the State in establishing a force policy in a jail and training and disciplining his deputies regarding that policy.   Id. at 1319.   Applying the four-factor test discussed supra, the Court found that the first three factors weighed in favor of immunity, while only the fourth weighed against, and, therefore, concluded that the sheriff was an arm of the State in the performance of the challenged functions and was entitled to sovereign immunity as a result.   Id. at 1328; see also Pellitteri v. Prine, 776

F.3d 777, 780–83 (11th Cir. 2015) (following the Manders analysis and holding that the defendant sheriff was an arm of the State when engaging in the hiring and firing of deputies and thus was immune from suit).

In the case at bar, the Court concludes that Sheriff Jessup was acting as an arm of the State in allocating the budget for the provision of police services. The first and second Manders factors—how Georgia law defines a sheriff's office and where the law vests control over it—weigh in favor of granting Sheriff Jessup immunity. See Pellitteri, 776 F.3d at 780-81 (citing Manders, 338 F.3d at 1312-13, 1319-21). Although sheriffs are labeled as "county officers" under the Georgia Constitution, see Ga. Const. art. IX, § 1, para. 3(a), Georgia law provides that the "essential governmental nature" of a sheriff's office is to (1) "enforce the law and preserve the peace on behalf of the sovereign State" and (2) "perform specific statutory duties, directly assigned by the State, in law enforcement, in state courts, and in corrections," Pellitteri, 776 F.3d at 780 (quoting Manders, 338 F.3d at 1319). Accordingly, sheriffs are "county officers" only in the sense that their geographic jurisdiction is limited. Pellitteri, 776 F.3d at 780 (citing Manders, 338 F.3d at 1312). "[S]heriffs in Georgia derive their power and duties from the State, are controlled by the State, and counties cannot, and do not, delegate any law enforcement

power or duties to sheriffs." Id. (quoting Manders, 338 F.3d at 1313).

As with the use-of-force policies at issue in Manders, and the hiring and firing practices in Pellitteri, Georgia law vests control over a sheriff's duties, including those involving general law enforcement (i.e., the provision of police services), in the State. See id. at 781; Manders, 338 F.3d at 1320. The State requires annual training of sheriffs in all counties, and part of that training focuses on the subject of contemporary law enforcement. See Pellitteri, 776 F.3d at 781 (citing Manders, 338 F.3d at 1320, and O.C.G.A. § 15-16-3). The State Governor has broad investigation and suspension powers regarding misconduct by sheriffs in the performance of their duties and may discipline a sheriff for engaging in misconduct or having problematic policies. See Manders, 338 F.3d at 1321 (citing O.C.G.A. § 15-16-26). Thus, to the extent that Sheriff Jessup's duty to provide general law enforcement involves allocating portions of the budget toward employing and staffing the appropriate number of personnel to police the County, the State retains "direct and substantial control over the [S]heriff's duties, training, and discipline[,]" whereas the County has none. See id. at 1322; see also Grech v. Clayton Cty., 335 F.3d 1326, 1347 (11th Cir. 2003) ("[The] County does

not, and cannot, direct the Sheriff . . . what polices to adopt, or how to operate his office.").

The third factor cuts both ways because—while the State funds annual training for sheriffs, the Governor's disciplinary procedure over sheriffs, and the placement of certain state offenders in the county jails—counties fund most of the expenses of a sheriff's office and the county jail, as mandated by the State.  See Manders, 338 F.3d at 1323.  Still, the fact that the State requires counties to supply a sheriff's budget does not establish county control over the sheriff's office in the performance of law enforcement functions, including how the sheriff allocates the budget to provide police services.  See Pellitteri, 776 F.3d at 782 ("[A]lthough each county sets the total budget for the sheriff's office, it cannot dictate how the sheriff spends those funds." (citing Manders, 338 F.3d at 1323)).  Because the County funds the McIntosh County Sheriff's Office according to State law, "[S]tate involvement is sufficient to tilt the third factor . . . toward immunity."  See Manders, 338 F.3d at 1324; see also Pellitteri, 776 F.3d at 782-83.[1]  As for the fourth factor, Georgia counties are not liable

---

[1]  The Court notes that the Eleventh Circuit stated the following in its analysis of the third factor in Pellitteri:

> Because Lowndes County funds the sheriff's department according to State law requirements, we cannot conclude that this factor weighs in favor of Eleventh Amendment immunity.  See Ross v. Jefferson Cnty. Dep't of Health, 701

for judgments against sheriffs in tort or civil rights actions,
but there is no law expressly requiring the State to pay such
judgments either.  See Pellitteri, 776 F.3d at 783 ("[T]he
financial independence afforded the sheriff's office 'creates
something of a lacuna' because neither the State nor the County
will be required to directly pay for any adverse judgment
against the Sheriff's office." (citing Keene v. Prine, 477 F.
App'x 575, 579 (11th Cir. 2012), and Manders, 338 F.3d at
1327)).  Any adverse judgment against Sheriff Jessup thus would
have to be paid out of the budget of the Sheriff's Office, which
has the potential to implicate both State and County funds.  See
id. (citing Manders, 338 F.3d at 1327).  As the State treasury
would not be required to "foot the bill" in any event, the final
factor weighs in favor of denying immunity in this case.  See
id. (citing Abusaid, 405 F.3d at 1313).

On balance, the Manders factors dictate that Sheriff Jessup
enjoys Eleventh Amendment immunity against Plaintiffs' claims

---

   F.3d 655, 660 (11th Cir. 2012) (per curiam) (holding that
the source of funding for the Health Department does not
"tip the balance against immunity because state law
requires the county to supply those funds" (quotation
omitted)).

776 F.3d at 782.  While this statement initially appears to be
inconsistent with the outcome in this case, the parenthetical
information appended thereto, along with the Court's unequivocal
conclusion later in the opinion that "the first three factors . . .
weigh[ed] in favor of immunity," id. at 782-83, convince this Court
otherwise.

for money damages against him in his official capacity. See id. The County Defendants' Motion is, therefore, **GRANTED** as to these claims.

## II.  Damages Claims Against the Board of Tax Assessors (Counts 1-2, 5-8)

The County Defendants contend that the Board of Tax Assessors enjoys sovereign immunity against Plaintiffs' claims that it appraised the value of real property in the County for property tax purposes in a discriminatory manner.  Dkt. No. 46-1, p. 29.  In response, Plaintiffs do not dispute that the statutory causes of action on which they rely do not overcome immunity; rather, they argue that the Board of Tax Assessors was not an arm of the State when performing this function and, therefore, afforded Eleventh Amendment protection.  Dkt. No. 49, pp. 28-32.

In Ballard v. Chattooga Cty. Bd. of Tax Assessors, the Eleventh Circuit applied the Manders factors in the context of a Georgia county board of tax assessors.  615 F. App'x 621, 625-28 (11th Cir. 2015) (unpublished).  The Ballard Court specifically considered whether the defendant board had acted as an arm of the State, and thus was shielded by sovereign immunity, when it disciplined and terminated individuals who were training for or working in appraiser positions.  Id. at 625-26.  Upon finding that the first three factors weighed in favor of immunity, and

that the fourth did not defeat immunity, the Court held that the board of tax assessors was an arm of the State with regard to this function and thus was entitled to Eleventh Amendment immunity from the plaintiffs' claims.  Id. at 628.

Applying the Manders factors here, the Court finds that the Board of Tax Assessors was acting as an arm of the State when it performed its appraisal function.  The first factor favors immunity, based, in part, on the fact that Georgia law establishes county boards of tax assessors, and, notably, does so in the article of the Georgia Code entitled, "Uniform Property Tax Administration and Equalization," rather than in the articles pertaining to "County Tax Officials and Administration" and "County Taxation."  See O.C.G.A. tit. 5, ch. 5, arts. 3-5.  While the Ballard decision was not published and thus is not binding on this Court, its discussion of the first Manders factor is nevertheless instructive:

> Georgia law establishes the Board [of Tax Assessors] as a separate entity, independent of the local county government.  Indeed, the creation of the boards of assessors by the state legislature was part of a state-level effort to equalize taxes on real property throughout the state.  Georgia Code § 48-5-260, entitled "Purpose of Part" provides in relevant part:
>
> > It is the purpose and intent of this part to:
> >
> > (1) Create, provide, and require a comprehensive system for the equalization of taxes on real property within this state by the establishment of uniform state-wide

> forms, records, and procedures and by the
> establishment of a competent, full-time
> staff for each county of this state to:
>
>> (A)   Assist the Board of Tax Assessors
>>       in each county in developing the
>>       proper information for setting tax
>>       assessments on property[;]
>>
>> (B)   Maintain the tax assessment
>>       records for each county; and
>>
>> (C)   Provide for state-wide duties and
>>       qualification standards for such
>>       staffs;
>
> (2) Provide for the examination of county
> tax digests in order to determine whether
> property valuation is uniform between the
> counties.

The Georgia statutory scheme obviously contemplates
that its boards of assessors shall not only constitute
a separate entity from the local county government,
but the statutes reflect a clear intent that the
boards of assessors shall be independent of the local
county government.  Georgia Code § 48-5-290 provides
that, although members of the boards of assessors are
appointed by the county governing authority, no close
relative of a county commissioner is eligible to serve
as a member of a board of assessors.  Moreover, once
appointed, the local county government cannot change
the length of the term of existing members of boards
of assessors.  Id. § 48-5-295(a).  And a member of a
county board of assessors may be removed only for
cause after a hearing before a judge of the superior
court of the county.  Id. § 48-5-295(b).

615 F. App'x at 626.  Evident here is that the Board of Tax

Assessors' appraisal function falls squarely within the realm of

duties that are defined by State law and that are to be carried

out independently from the County.

The second Manders factor, which looks at where State law
vests control, also falls in favor of immunity.  As the Ballard
Court recognized, "there is extensive state-level control over
virtually every aspect of the work of Georgia's boards of
assessors."  Id. at 627.  State law establishes the following:
the minimum number of appraisers required in each county, see
O.C.G.A. § 48-5-262; the qualifications, duties, and
compensation of appraisers, id. § 48-5-263; the training of
appraisers, id. § 48-5-268; and the forms, books, records,
methods, and procedures to be used or followed in appraising
property and maintaining appraisal records, id. § 48-5-269; see
also id. § 48-5-297 ("The county board of tax assessors shall
adhere to the assessment standards and techniques as required by
law, by the commissioner, and by the State Board of
Equalization.").  Furthermore, "the end product of the work of
Georgia's boards of assessors has to be approved or disapproved
at the state level."  Ballard, 615 F. App'x at 627 (citing
O.C.G.A. § 48-5-304 (State commissioner must evaluate a county's
tax digest and, in doing so, disapprove a digest or any portion
thereof and withhold State funding where a county "has
substantially failed to comply with the provisions of this title
or the rules and regulations of the commissioner for valuation
of such class or strata of property")).  Though Ballard
concerned a county board of tax assessors' "employer" function,

the Ballard Court's finding that state-level control over such
boards is "all encompassing," in contrast to the lack of any
control vested in the local county governments, applies equally—
and perhaps with greater force—in the context of the Board of
Tax Assessors' performance of its essential "appraisal"
function.   See id.

With regard to the third factor, "[t]he Georgia statutory
scheme for funding its boards of tax assessors very closely
parallels the funding scheme for sheriffs as described in
Manders," id., and as set forth supra.  While a county board of
tax assessors is funded primarily by the county, it is thus
funded at the State's direction.   See id.  Georgia law fixes the
minimum number of appraisers that each county must employ, see
O.C.G.A. § 48-5-262, and directs that the compensation of such
appraisers "be paid from county funds," id. § 48-5-263.
Nevertheless, "both state and county funds are involved, . . .
because a portion of the salary of these appraisers is paid by
the State."  Ballard, 615 F. App'x at 627 (first quoting
Manders, 338 F.3d at 1324; then citing O.C.G.A. § 48-5-267).
Accordingly, as with sheriffs, State involvement in the funding
of county boards of tax assessors is such that the third factor
tilts toward immunity.   Id. (citing Manders, 338 F.3d at 1324).
The fourth factor also tracks the sheriffs analysis in Manders,
as Georgia law places liability for paying an adverse judgment

AO 72A
(Rev. 8/82)

assessed against a board of assessors on neither the State nor the county.  Id.  As a judgment against the Board of Tax Assessors would, therefore, be paid out of its budget, which is comprised of both State and County funds, the State's treasury is not implicated in the manner contemplated under this factor. See id.

Thus, as the Court in Ballard concluded, the similarities in the relevant facts and statutory schemes relating to Georgia's boards of tax assessors and sheriffs support—and, in some areas, "point more overwhelmingly"—toward granting sovereign immunity in this case.  The County Defendants' Motion seeking to dismiss Plaintiffs' damages claims against the Board of Tax Assessors on this basis is **GRANTED**.

## III. Title VI Claims Against the State for Damages and Declaratory Judgment (Count 9)

The State Defendants assert that the State is entitled to immunity against Plaintiffs' Title VI claims, which allege that the State has received federal financial assistance and allocated it in a discriminatory fashion—giving it to the County to use for the benefit of White residents on the mainland instead of "ensur[ing] that [the] County used some of the CDBG and HOME funding to promote housing stability and economic development on Sapelo Island."  Dkt. No. 48-1, pp. 13-16; see also Pl.s' Am. Compl., ¶¶ 140, 142, 362, 366, 444.

AO 72A
(Rev. 8/82)

Specifically, while conceding that Title VI does, in fact, abrogate a state's Eleventh Amendment immunity, the State Defendants maintain that the State's acceptance of federal financial assistance for certain purposes did not operate as a waiver of its immunity as to all governmental programs and activities. Dkt. No. 48-1, pp. 13-16; Dkt. No. 82. Plaintiffs and the USA counter that a waiver of immunity under Title VI is not limited to the specific program or activity directly benefitting from federal financial assistance. Dkt. No. 58, pp. 18-20; Dkt. No. 84, p. 10. Plaintiffs further argue that the State, as a recipient of federal funding, is liable for discrimination in any program or activity, and that the expanded definition of "program or activity" set forth in the Civil Rights Restoration Act, 42 U.S.C. § 2000d-4a ("CRRA"), includes "all of the operations of . . . a department, agency, special purpose district or other instrumentality of a State or of a local government," as well as any entity of a state or local government that distributes or receives such assistance. Dkt. No. 84, p. 9 (quoting 42 U.S.C. § 2000d-4a(1)(A)-(B)).

42 U.S.C. § 2000d-7 ("Section 2000d-7") states, in pertinent part, that "[a] State shall not be immune . . . from suit in Federal court for a violation of . . . title VI of the Civil Rights Act of 1964 . . . or the provisions of any other Federal statute prohibiting discrimination by recipients of

Federal financial assistance." 42 U.S.C. § 2000d-7(a)(1)
(citations omitted). Accordingly, Congress, through Section
2000d-7, has conditioned a state's receipt of federal financial
assistance on its waiver of Eleventh Amendment immunity in suits
under Title VI. See id. Title VI, in turn, makes it unlawful
to discriminate "on the ground of race, color, or national
origin" in "any program or activity receiving Federal financial
assistance." 42 U.S.C. § 2000d.

The State in this case is not immunized from suit under
Title VI. Assuming the truth of Plaintiffs' allegation that the
State receives federal funding, it appears, at this stage, that
the State has consented to a Title VI suit alleging, as do
Plaintiff here, that it has allocated these funds in a
discriminatory manner. While the State Defendants devote much
of their briefing to disputing whether Plaintiffs demonstrate a
sufficient nexus between the State's receipt of federal funds
and the allegedly discriminatory "program or activity," this
argument goes to the sufficiency of Plaintiffs' pleading of a
Title VI violation, not the State's immunity to such a claim at
the outset. Tellingly, the primary authority on which the State
Defendants rely explored only a governmental entity's liability
for the allegedly discriminatory conduct of one of its
departments in a Title VI suit, not its immunity from such suit
altogether. See McMullen v. Wakulla Cty. Bd. of Cty. Com'rs,

No. 15-14032, 2016 WL 3002286, at *1-3 (11th Cir. May 25, 2016)
(considering whether a county as a whole could be liable under
Title VI when one of its departments receiving federal funding
engaged in discriminatory conduct).  As the State Defendants
raise only issues pertaining to the sufficiency of Plaintiffs'
claims in alleging conduct for which the State could be held
liable, the State Defendants fail to demonstrate that
Plaintiffs' Title VI claims are subject to dismissal on immunity
grounds.  The State Defendants' Motion remains pending to the
extent that it seeks a dismissal of these claims for failure to
state a claim.

## IV.  Title II Claims Against the State and the DNR for Damages and Declaratory Judgment (Count 10)

The State Defendants also move for the dismissal of
Plaintiffs' claims against the State and the DNR for disability
discrimination under Title II, arguing that Title II does not
abrogate sovereign immunity with respect to a state's provision
of public transportation.  Dkt. No. 48-1, pp. 16-30.  Plaintiffs
and the USA respond that Congress, acting pursuant to its
authority under § 5 of the Fourteenth Amendment ("Section 5"),
validly abrogated state immunity in this context.  Dkt. No. 49,
pp. 13-18; Dkt. No. 57, pp. 6-20.

In determining whether Congress has abrogated Eleventh
Amendment immunity in a given case, a court "must resolve two

predicate questions: first, whether Congress unequivocally expressed its intent to abrogate that immunity; and second, if it did, whether Congress acted pursuant to a valid grant of constitutional authority." Tennessee v. Lane, 541 U.S. 509, 517 (2004) (quoting Kimel v. Fla. Bd. of Regents, 528 U.S. 62, 72-73 (2000)). As the United State Supreme Court has recognized, "[t]he first question is easily answered" in a case under the Americans with Disabilities Act, which expressly provides: "A State shall not be immune under the eleventh amendment to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter." Id. at 518 (quoting 42 U.S.C. § 12202). Title II of the Act states, in turn, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The State Defendants do not appear to dispute Congress's expression of its intent to override sovereign immunity in this regard. Rather, the crux of the State Defendants' argument is that, as to the second question, Title II is not proper legislation in the context of public transportation.

"Congress can abrogate a State's sovereign immunity when it does so pursuant to a valid exercise of its power under

[Section] 5 of the Fourteenth Amendment to enforce the substantive guarantees of that Amendment." Lane, 541 U.S. at 518 (citing Fitzpatrick v. Bitzer, 427 U.S. 445, 446 (1976)). Congress's authority under Section 5 includes "the authority both to remedy and to deter violation of rights guaranteed [by the Fourteenth Amendment] by prohibiting a somewhat broader swath of conduct, including that which is not itself forbidden by the Amendment's text." Id. (quoting Kimel, 528 U.S. at 81). Congress may enact prophylactic legislation proscribing facially constitutional conduct, in an effort to prevent and deter unconstitutional conduct. Id. (quoting Nev. Dep't. of Human Res. v. Hibbs, 538 U.S. 721, 727–28 (2003)) ("When Congress seeks to remedy or prevent unconstitutional discrimination, [Section] 5 authorizes it to enact prophylactic legislation proscribing practices that are discriminatory in effect, if not in intent, to carry out the basic objectives of the Equal Protection Clause.").

While Congress has "wide berth in devising appropriate remedial and preventative measures for unconstitutional actions," its Section 5 power is not unlimited and may not effect a "substantive change in the governing law." Id. at 520 (quoting City of Boerne v. Flores, 521 U.S. 507, 518 (1997)). The test for deciding whether congressional action crosses the line from remedial legislation into substantive redefinition is

as follows: it: "Section 5 legislation is valid if it exhibits 'a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end.'" Id. (quoting City of Boerne, 521 U.S. at 520). This test requires that a court consider (1) the constitutional right that Congress sought to enforce in enacting the ADA; (2) "whether there was a history of unconstitutional discrimination to support Congress's determination that prophylactic legislation was necessary"; and (3) "whether Title II is an appropriate response to this history and pattern of unequal treatment." Ass'n for Disabled Ams., Inc. v. Fla. Int'l Univ., 405 F.3d 954, 957 (11th Cir. 2005) (citing Board of Trustees v. Garrett, 531 U.S. 356, 365-70 (2001), and City of Boerne, 521 U.S. at 519).[2]

### A. Constitutional Right Enforced

"Title II seeks to enforce the Fourteenth Amendment's 'prohibition on irrational disability discrimination.'" Ass'n for Disabled Ams., Inc., 405 F.3d at 957 (quoting Lane, 541 U.S.

---

[2] In its Response to the State Defendants' Motion, USA initially argues that ta ruling on the Title II sovereign immunity issues at this time would be premature, because, regardless of whether Plaintiffs can pursue damages and declaratory relief against the State and the DNR under this statute, the State Defendants do not move for a dismissal of the Title II claims for injunctive relief against the individual State Defendants in their official capacities. Dkt. No. 57, pp. 4-6. According to USA, the Court will only need to address abrogation if Plaintiffs are ultimately entitled to damages. Id. However, because sovereign immunity protects governmental entities from suit altogether, it would be remiss to allow these claims to remain pending through the liability phase.

at 541). It is well established that "[Section] 5 grants
Congress the power to 'enforce . . . the provisions' of the
[Fourteenth] Amendment by creating private remedies against the
States for actual violations of those provisions." United
States v. Georgia, 546 U.S. 151, 158 (2006). It is also clear
that this power to "enforce" the Fourteenth Amendment includes
the authority "to deter violation of rights guaranteed
thereunder by prohibiting a somewhat broader swath of conduct,
including that which is not itself forbidden by the Amendment's
text" and, as such, as facially constitutional. Hibbs, 538 U.S.
at 727-28 (quoting Garrett, 531 U.S. at 365; City of Boerne, 521
U.S. at 536; and Katzenbach v. Morgan, 384 U.S. 641, 658
(1966)). Where conduct is alleged to have violated Title II but
does not independently give rise to a Fourteenth Amendment
violation, a court must determine, on a case-by-case basis,
"whether Congress's purported abrogation of sovereign immunity
as to that class of conduct is nevertheless valid." Georgia,
546 U.S. at 159.

The Eleventh Circuit considered this precise situation in
Association for Disabled Americans, Inc.. 405 F.3d at 957-58.
The Title II claims in that case involved allegations of
discrimination in access to public education. Id. at 956. The
Court held that Congress has validly exercised its Section 5
authority to abrogate sovereign immunity with respect to such

claims, notwithstanding the fact that the discriminatory conduct violates Title II without directly implicating any constitutional right.  Id. at 957-58.  The Court noted that the Supreme Court has not specified that a fundamental right be at stake in order to satisfy this prong of the inquiry.  Id. at 957 n.2.  It further reasoned that, although classifications relating to education receive only rational-basis scrutiny under the Fourteenth Amendment Equal Protection Clause, education plays an important and necessary role in the life of a child and the future success of our society.  Id. at 957-58; see also R.W. v. Bd. of Regents of the Univ. Sys. of Ga., 114 F. Supp. 3d 1260, 1281 (N.D. Ga. 2015) (noting that Association for Disabled Americans, Inc.'s holding that Title may validly abrogate sovereign immunity in the absence of an independent constitutional violation remains good law following the Supreme Court's ruling in Georgia, 546 U.S. at 159).

Like access to education, access to public transportation, though not fundamental, is vital to the everyday lives of many individuals and to the functioning of our society.  Indeed, the Supreme Court has recognized that the Constitution guarantees a fundamental right to travel between states and to other countries.  See Shapiro v. Thompson, 394 U.S. 618, 629-31 (1969) (interstate travel); Kent v. Dulles, 357 U.S. 116, 126 (1958) (international travel).  The Supreme Court has explained:

> Freedom of movement across frontiers in either
> direction, and inside frontiers as well, was a part of
> our heritage.  Travel abroad, like travel within the
> country, may be necessary for a livelihood.  It may be
> as close to the heart of the individual as the choice
> of what he eats, or wears, or reads.  Freedom of
> movement is basic in our scheme of values.

Kent, 357 U.S. at 126.  While the Supreme Court has not

expressly acknowledged a fundamental right to intrastate travel,

access to public transportation is necessary for many

individuals to exercise other rights and privileges of their

citizenship, such as obtaining an education, maintaining

employment, or voting.[3]  Accordingly, the Court finds that, as in

the context of public education, Congress's abrogation of

sovereign immunity as to claims for discrimination in access to

public transportation was properly done in furtherance of

Fourteenth Amendment objectives.

**B. History of Unconstitutional Discrimination**

In Lane, the Supreme Court analyzed the second prong of the

congruence and proportionality test and specifically noted "the

record of constitutional violations . . . including judicial

findings of unconstitutional state action, and statistical,

legislative, and anecdotal evidence of the widespread exclusion

---

[3]  Recognizing the "practical necessity" of "travell[ing] locally
through public spaces and roadways," three other circuits have
recognized a constitutional right to intrastate travel.  Johnson v.
City of Cincinnati, 310 F.3d 484, 498 (6th Cir. 2002); accord Lutz v.
City of York, 899 F.2d 255, 267 (3d Cir. 1990); King v. New Rochelle
Mun. Hous. Auth., 442 F.2d 646, 648 (2d Cir. 1971).

of persons with disabilities from the enjoyment of public

services." 541 U.S. at 529. The Court found that

> [t]he conclusion that Congress drew from this body of
> evidence is set forth in the text of the ADA itself:
> "[D]iscrimination against individuals with
> disabilities persists in such critical areas as . . .
> education, transportation, communication, recreation,
> institutionalization, health services, voting, and
> access to public services." 42 U.S.C. § 12101(a)(3)
> (emphasis added). This finding, together with the
> extensive record of disability discrimination that
> underlies it, makes clear beyond peradventure that
> inadequate provision of public services and access to
> public facilities was an appropriate subject for
> prophylactic legislation.

Id. (emphasis added). The Eleventh Circuit has since recognized

that "the Supreme Court in Lane in effect has decided the step-

two inquiry as to Title II, and we must follow the Supreme

Court's lead." Ass'n for Disabled Ams., Inc., 405 F.3d at 958

(quoting Miller v. King, 384 F.3d 1248, 1271 n.25 (11th Cir.

2004)). Thus, the second prong is indisputably satisfied in

this case.

### C. Appropriate Response

In assessing the third prong—whether Title II is an

appropriate response to the history and pattern of unfair

treatment—a court must not consider Title II "as an

undifferentiated whole." Lane, 541 U.S. at 530. Rather, "the

congruence and proportionality of the remedies in Title II

should be judged on an individual or 'as-applied' basis in light

of the particular constitutional rights at stake in the relevant

category of public services." Ass'n for Disabled Ams., Inc.,

405 F.3d at 958 (citing Lane, 541 U.S. at 530-31). The Lane

Court explained this approach as follows:

> Whatever might be said about Title II's other
> applications, the question presented in this case is
> not whether Congress can validly subject the States to
> private suits for money damages for failing to provide
> reasonable access to hockey rinks, or even to voting
> booths, but whether Congress had the power under
> [Section] 5 to enforce the constitutional right of
> access to the courts.

541 U.S. at 530-31.

The question in this case is therefore whether Title II, as

applied to access to public transportation, constitutes a valid

exercise of Congress's Section 5 enforcement power, and the

Court finds that it does. In light of the long history of

unequal treatment of individuals with disabilities in the

provision of public transportation, as discussed supra, Congress

had adequate reason to believe that such discrimination would

persist absent prophylactic measures. See id. at 531; Ass'n for

Disabled Ams., Inc., 405 F.3d at 959. Congress's chosen remedy—

a prohibition on discrimination in the "services, programs, or

activities of a public entity"—serves to remedy and deter

discrimination in this context. See 42 U.S.C. § 12132. This

remedy is appropriately limited in scope, as it precludes

unequal access to public services only when it is "by reason of

[a] disability," see id., allowing states to retain their

discretion to exclude persons from public services for any lawful reason unrelated to their disability, Ass'n for Disabled Ams., Inc., 405 F.3d at 959.  Moreover, Title II requires only that the state make "'reasonable modifications' that would not fundamentally alter the nature of the service provided." Lane, 541 U.S. at 532.

As all three prongs of the City of Boerne inquiry are satisfied with respect to access to public transportation, the relief provided in Title II is congruent and proportional to the injury.  Accordingly, Congress validly exercised its Section 5 authority to abrogate state sovereign immunity in this particular context.  The State Defendants, therefore, cannot obtain a dismissal of Plaintiffs' Title II claims on the basis of immunity.

## V. Damages and Declaratory Judgment Claims Against SIHA (Counts 1, 6-8)

The State Defendants also raise an immunity challenge to Plaintiffs' claims against SIHA for damages and declaratory relief relating to its decisions regarding the use of property on Sapelo Island.  Dkt. No. 48-1, pp. 9-11.  Plaintiffs do not assert that sovereign immunity has been abrogated or waived as to these claims; rather, they oppose the State Defendants' Motion on the basis that SIHA is not an arm of the State entitled to immunity.  Dkt. No. 49, pp. 18-24.

In Fouche v. Jekyll Island-State Park Authority, the
Eleventh Circuit explored whether the Jekyll Island-State Park
Authority (the "Park Authority"), an entity bearing many
similarities to SIHA, acted as an arm of the State for sovereign
immunity purposes.  713 F.2d 1518, 1519 (11th Cir. 1983).  Based
upon the same considerations later adopted as the Manders
factors, the Court held that the Park Authority was an arm of
the State entitled to Eleventh Amendment immunity absent a valid
waiver.  Id. at 1519-22.  The Court specifically highlighted the
following: (1) that Georgia law established the Park Authority
as an arm of the State rather than a municipal corporation or
political subdivision, because the Georgia Code—while defining
the Park Authority as both an instrumentality of the State and a
public corporation—included the entity in the chapter entitled,
"Organization of Executive Branch Generally" and required that
"the carrying out of its corporate purpose [be] in all respects
for the benefit of the people of this [S]tate and constitute[] a
public purpose"; (2) that the Park Authority was subject to the
State's control, based on Georgia law mandating that the Park
Authority be attached to the DNR for administrative purposes,
submit its budget for review by the State as part of the DNR's
budget, and be comprised entirely of members that were State
officials or individuals appointed by the Governor; (3) that
although the Park Authority was largely self funded with only

AO 72A
(Rev. 8/82)

some appropriations from the State, its finances were controlled by the State, based on the requirements that it submit its budget for approval, submit its financial records to the State auditor for inspection, and obtain approval by the State for the sale of land; and (4) that "because the Park Authority's budget [was] submitted to the General Assembly, presumably the [S]tate would be responsible for any debts incurred by it that could not be paid out of its revenues." Id. at 1520–21.

Similar to Fouche, the Manders factors applied in this case support the conclusion that SIHA acted as an arm of the State in making decisions regarding land use on Sapelo Island.  The first and second factors, which look at the State's definition of and degree of control over the entity, weigh heavily in favor of immunity here.  Like the Park Authority, the Georgia Code defines SIHA as both an instrumentality and a public corporation, O.C.G.A. § 12-3-443(a), but indicates that its "creation . . . and the carrying out of its corporate purposes are in all respects valid charitable and public purposes" relating to the "preservation of the culture in this endangered historical area, id. § 12-3-441(b).  Georgia law provides that SIHA is assigned to the DNR for administrative purposes, id. § 12-3-443(c), and, as such, must submit its budget to the State through the DNR, id. § 50-4-3(a)(2).  Additionally, SIHA's members include only individuals that are State officials or

AO 72A
(Rev. 8/82)

appointed by the Governor.  Id. § 12-3-444(a).  Georgia law

provides that SIHA can acquire its own property, but that the

property is deemed public property and is entitled to the rights

and protections afforded to State-owned property.  Id. § 12-3-

445(2).

The third and fourth factors—the source of SIHA's funding

and the responsibility for any judgment against it—likewise

favor immunity.  Relevant to SIHA's source of funds, the State

compensates SIHA members for their service.  Id. § 12-3-444(c).

While SIHA may accept grants and contributions of money or

property from any person or from the State, id. § 12-3-445(6),

it must submit its budget through the DNR for approval by the

State, id. § 50-4-3(a)(2), and submit its financial books and

records to the State auditor for inspection annually, id. § 12-

3-448.  Additionally, it appears that the State treasury would

fund the payment of any judgment against SIHA, as SIHA is

composed largely of state officials, id. § 12-3-444(a); SIHA

property is public property entitled to the same protections as

property of the State, id. § 12-3-445(2); and the Georgia

Attorney General is responsible for providing legal services in

the event of a suit involving SIHA, id. § 12-3-450.  Moreover,

as the Eleventh Circuit reasoned in Fouche, "because [SIHA's]

budget [was] submitted to the General Assembly, presumably the

[S]tate would be responsible for any debts incurred by it that could not be paid out of its revenues."  713 F.2d at 1520-21.

The Manders factors thus suggest that SIHA was functioning as an arm of the State when it made decisions relating to the use and development of Sapelo Island property.  As a result, SIHA is immune to Plaintiffs' suit for damages and declaratory relief on the basis of those decisions.  The State Defendants' Motion is **GRANTED** in this regard.

## VI. Claims for Prospective Injunctive Relief Against the State, the DNR, and SIHA (Counts 1, 6-10)

The State Defendants maintain that Eleventh Amendment immunity bars Plaintiffs' claims against them for prospective injunctive relief.  Dkt. No. 48-1, pp. 48-50.  In opposition to the State Defendants' Motion, Plaintiffs argue that because they seek prospective injunctive relief against the State and the DNR only under Title II and Title VI, and these statutes abrogate sovereign immunity, these Defendants are not immune from their claims for injunctive relief.  Dkt. No. 49, p. 73 n.22.  As to SIHA, Plaintiffs refer back to their argument that SIHA is not an arm of the State and, therefore, cannot rely on immunity in any event.  Id.

As discussed supra, the State and the DNR do not enjoy immunity against Plaintiffs' Title II and Title VI claims.  As such, these Defendants are subject to suit under these statutes

for both damages and injunctive relief alike.  As for SIHA, the Court has determined that this entity acted as an arm of the State and thus is entitled to immunity with respect to the conduct challenged by Plaintiffs in this case.  Plaintiffs have not identified any exception to SIHA's immunity that would allow their claims for prospective injunctive relief, nor can they do so.  See Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261, 269 (1997) (explaining that Eleventh Amendment immunity applies, unless the case falls within the Supreme Court's exception for certain suits seeking declaratory and injunctive relief against individual state officers (citing Ex parte Young, 209 U.S. 123, 123 (1908))).  Thus, the State Defendants' Motion is **GRANTED** only as to Plaintiffs' claims for prospective injunctive relief against SIHA.

**CONCLUSION**

In light of the foregoing, the County Defendants' Motion to Dismiss (dkt. no. 46) is **GRANTED in part** and **REMAINS PENDING in part**: it is granted as to the dismissal of Plaintiffs' damages claims against Sheriff Jessup and the Board of Tax Assessors on immunity grounds, but otherwise remains pending.  The State Defendants' Motion to Dismiss (dkt. no. 48) is **GRANTED in part, DENIED in part**, and **REMAINS PENDING in part**: it is granted with respect to the dismissal, on the basis of immunity, of Plaintiffs' claims for damages and declaratory and prospective

injunctive relief against SIHA; it is denied as to the request for a dismissal of Plaintiffs' Title II claims against the State and the DNR; and it remains pending as it relates to all other claims. As all claims against SIHA are hereby **DISMISSED**, the Clerk of Court is **DIRECTED** to terminate this Defendant from this case.

**SO ORDERED**, this 17TH day of June, 2016.

LISA GODBEY WOOD, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)