**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION**

SHIRLEY GRANT on behalf of the ESTATE
OF SARAH FRANCES DRAYTON;
CAROLYN BANKS; MELVIN BANKS,
SR.; CEASER BANKS; NANCY BANKS;
LORIE BANKS on behalf of herself and the
ESTATE OF MELVIN BANKS, JR.;
MARION BANKS; ROBERTA BANKS;
RICHARD BANKS; ELLEN BROWN;
EARLENE DAVIS; ANDREA DIXON;
DEBORAH DIXON; SAMUEL L. DIXON;
DAN GARDNER; CHERYL GRANT;
BOBBY GROVNER; CELIA GROVNER;
DAVID GROVNER, SR., on behalf of
himself and the ESTATE OF VERNELL
GROVNER; DAVID GROVNER, JR.;
IREGENE GROVNER, JR.; IREGENE
GROVNER ,SR.; RALL GROVNER;
ANGELA HALL; ANGELINA HALL;
REGINALD HALL; BENJAMIN HALL;
FLORENCE HALL; MARGARET HALL on
behalf of herself and the ESTATE OF
CHARLES HALL; VICTORIA HALL on
behalf of herself and the ESTATE OF
JOSEPH HALL; ROSEMARY HARRIS;
DENA MAE HARRISON on behalf of the
ESTATE OF HAROLD HILLERY and on
behalf of the ESTATE OF JOHNNIE
HILLERY; BRENDA JACKSON; JESSE
JONES; TEMPERANCE JONES; SONNIE
JONES; HARRY LEE JORDAN; DELORES
HILLERY LEWIS; JOHNNY MATTHEWS;
FRANCES MERCER; MARY DIXON
PALMER; LISA MARIE SCOTT; ANDREA
SPARROCK; DAVID SPARROCK; AARON
WALKER; VERDIE WALKER; MARCIA
HALL WELLS; STACEY WHITE; SYLVIA
WILLIAMS; VALERIE WILLIAMS; HELP
ORG, INC.; and RACCOON HOGG, CDC,

     *Plaintiffs*,

Case No. 2:16-cv-00053-RSB-BWC

**SECOND AMENDED
COMPLAINT FOR DAMAGES
AND DECLARATORY AND
INJUNCTIVE RELIEF**

**JURY TRIAL DEMANDED**

1

v.

MCINTOSH COUNTY, GEORGIA, by and
through its BOARD OF COMMISSIONERS;
STATE OF GEORGIA; GOVERNOR
BRIAN KEMP, in his official capacity;
GEORGIA DEPARTMENT OF NATURAL
RESOURCES; GEORGIA DEPARTMENT
OF NATURAL RESOURCES
COMMISSIONER MARK WILLIAMS, in
his official capacity; and GEORGIA
DEPARTMENT OF COMMUNITY
AFFAIRS,

*Defendants*.

## I.      NATURE OF THE ACTION

1.      Shirley Grant on behalf of the estate of Sarah Frances Drayton; Carolyn Banks;

Melvin Banks, Sr.; Ceaser Banks; Nancy Banks; Lorie Banks on behalf of herself and the estate

of Melvin Banks, Jr.; Marion Banks; Roberta Banks; Richard Banks; Ellen Brown; Earlene

Davis; Andrea Dixon; Deborah Dixon; Samuel L. Dixon; Dan Gardner; Cheryl Grant; Bobby

Grovner; Celia Grovner; David Grovner, Sr., on behalf of himself and the estate of Vernell

Grovner; David Grovner, Jr.; Iregene Grovner, Jr.; Iregene Grovner, Sr.; Rall Grovner; Angela

Hall; Angelina Hall; Reginald Hall; Benjamin Hall; Florence Hall; Joseph Hall; Margaret Hall

on behalf of herself and the estate of Charles Hall; Victoria Hall on behalf of herself and the

estate of Joseph Hall; Rosemary Harris; Dena Mae Harrison on behalf of the estate of Harold

Hillery and on behalf of the estate of Johnnie Hillery; Brenda Jackson; Jesse Jones; Temperance

Jones; Sonnie Jones; Harry Lee Jordan; Delores Hillery Lewis; Johnny Matthews; Frances

Mercer; Mary Dixon Palmer; Lisa Marie Scott; Andrea Sparrock; David Sparrock; Aaron

Walker; Verdie Walker; Marcia Hall Wells; Stacey White; Sylvia Williams; Valerie Williams;

Help Org, Inc.; and Raccoon Hogg, CDC ("Plaintiffs") bring this action against Defendants McIntosh County, Georgia, by and through its Board of Commissioners; State Of Georgia; Governor Brian Kemp, in his official capacity as the Governor of Georgia and the Chairperson of the Sapelo Island Heritage Authority ("SIHA"); Georgia Department Of Natural Resources ("DNR"); and DNR Commissioner Mark Williams, in his official capacity (collectively, "Defendants"). Plaintiffs seek a declaratory judgment, permanent injunctive relief, and damages resulting from discrimination on the basis of race, national origin, and/or disability in the provision of housing, housing-related, and other services. This action arises under the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, and 1983; the Fourteenth Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1, cl. 4; Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d *et seq.*; and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*.

## II.    INTRODUCTION

2.      Sixty miles south of Savannah, across the marshy Doboy Sound sits the small island of Sapelo. The residents of Sapelo Island are the largest community of Gullah Geechee in the country. For centuries, these descendants of slaves, brought from West Africa to work early America's plantations, populated the Sea Islands all along the southeast coast. Today, the very existence of the Gullah-Geechee population faces extreme peril.

3.      Like the islands of Hilton Head, South Carolina and St. Simons, Georgia before it, Sapelo Island struggles to resist the pressures of development that threaten to convert the Island from a community that has been home to the same families for nine generations into a vacation destination spot with luxury second homes and resorts. The pressure against Sapelo's Gullah Geechee comes from all sides.

3

4.      McIntosh County, Sapelo Island's local government, provides essentially no services on the Island. The Island has no school, no firehouse, no medical services, and no police. The County does not adequately maintain the roads and does not contribute to any water or sewer system. Nonetheless, the County charges the Sapelo's Gullah-Geechee landowners significant property taxes.

5.      From 2011 to 2012, the County raised property taxes on the Island by as much as 1000% for some parcels. The 2012 appraisals were based on an analysis that was flawed on numerous levels and led to taxes that the Gullah-Geechee residents could not afford.

6.      County services benefitting the Gullah Geechee on the Island did not appear with the tax hikes. Instead, the millions of property tax and state and federal grant dollars the County spent for years on infrastructure and emergency services throughout the County, including monies specifically allocated for Sapelo Island, continued to be spent exclusively on the predominantly white mainland.

7.      The County's use of the Gullah Geechee's money to fund the mainland is perhaps most clearly exemplified by the provision of trash services. The County charges every County resident an annual garbage fee. On the mainland, that fee guarantees curbside pickup. On the Island, the fee guarantees nothing. The Island's Gullah Geechee must haul their own trash, in their own vehicles, to a *State*-maintained dumpsite. Nonetheless, the County charges Sapelo residents the same garbage fee as mainland residents.

8.      The County tax hikes were part of a larger systemic effort to drive the Gullah Geechee from the Island and clear the way for a mostly white vacationer population on the Island. At the same time that it exploits Sapelo's Gullah Geechee, the County favors whites on the Island. The County maintains a zoning ordinance for the Island that is, on its face, designed

4

to protect the Gullah-Geechee community. But, the County has regularly allowed mostly white developers to come to the Island and build expansive vacation homes in direct contravention of the zoning requirements.

9.      The State of Georgia claims ownership of 97% of Sapelo Island, leaving the Gullah Geechee confined to the only permanent residential area on the island—Hogg Hummock. The State's ownership stake is based on a history of fraudulent land transfers and land theft by white millionaires throughout the twentieth century.

10.     After former slaves and their descendants purchased land on the Island in the wake of the Civil War and grew a number of thriving communities, Howard Coffin and R.J. Reynolds, Jr., came to the Island and turned it into their own personal playgrounds. Through various coercive and exploitative tactics, Reynolds claimed ownership to all of the Island except portions of Hogg Hummock, where he forced all of the Gullah-Geechee descendants to live.

11.     Ever since Reynolds' widow transferred his land, except most of Hogg Hummock, to the State, the State has excluded the Gullah Geechee from reclaiming or even visiting their ancestors' land, including the Raccoon Bluff area of the Island where the community's church still stands, where Gullah Geechee still have provable ownership interests, and where Gullah Geechee still pay property taxes.

12.     Though the State has done much to promote its interests on the Island, it has done little for the residents of Hogg Hummock, which the State legislature has described as a historic community with important cultural and historic values that should be preserved. The State even created SIHA to protect and promote Gullah-Geechee culture, history, and traditions. The State, through SIHA, has failed in its duty by resisting Gullah-Geechee claims of land ownership and forcing Gullah Geechee off their lands, while, at the same time, assisting white developers on the

Island.

13.     The State, which plays a pseudo-sovereign role for the entire Island, has made some attempt to provide services that the County has neglected on the Island. The State's water system, dumpsite, and minimal offers to make some emergency personnel and equipment available, however, are inadequate and far short of the level of services that other communities in the State and County receive. Having chosen to provide the Island with services, the State must do so in an equitable manner and not leave the Island's Gullah Geechee bereft of basic amenities.

14.     The State runs the Sapelo Island ferry, which is the sole means to travel from the mainland to the Island. The ferry schedule makes it practically impossible to live on the Island and have a job on the mainland or to have children, whose nearest school is in Darien, participate in after-school activities. The ferry is also inaccessible to people with disabilities, preventing some of the aging Gullah-Geechee population on the Island from travelling to or from their homes and the mainland.

15.     Working jointly, the County and State are engaged in a policy of malign neglect of the Gullah Geechee on Sapelo Island: denying services, withholding resources, increasing costs, consolidating land, and otherwise limiting the use and enjoyment of Gullah-Geechee homes and land. These actions have the purpose and effect of driving the last intact Gullah-Geechee community from Sapelo Island and into history books.

16.     Through their actions, as described herein, Defendants have violated the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, 1982, 1983; the Fourteenth Amendment to the United States Constitution, U.S. Const. Amend. XIV, § 1, cl. 4; Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d *et seq.*; and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq*.

6

### III.    JURISDICTION

17.    The Court has original jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, and 2202.

18.    Venue is proper in this District and Division pursuant to 28 U.S.C. §§ 90 and

1391 because all Defendants reside in the State of Georgia and a substantial part of the events

and omissions giving rise to the claims occurred in this District.

### IV.    PARTIES

**A.    <u>Plaintiffs</u>**

19.    Plaintiff Sarah Frances Drayton is African American and of Gullah-Geechee

heritage. She currently owns a parcel of land in Hogg Hummock, Sapelo Island and has lived in

a mobile home on the property since 1996. She travels back and forth between the mainland and

the Island several times a week.

20.    On July 14, 2012, Ms. Drayton filed a United States Department of Housing and

Urban Development ("HUD") complaint. She alleged in the HUD proceeding discrimination on

the basis of race and/or national origin, in part because of Defendants' failure to provide

adequate government services to Sapelo Island's African-American/Gullah-Geechee property

owners and residents.

21.    Ms. Drayton passed away in July 2017. Her daughter, Shirley Grant, now

represents her estate in this action.

22.    Plaintiff Carolyn Banks is an African-American resident of Brunswick, Georgia.

She is married to Plaintiff Melvin Banks, Sr.

23.    Plaintiff Melvin Banks, Sr. was born and raised on Sapelo Island. He is African

American and of Gullah-Geechee heritage. He moved to the mainland when he was twenty years

old to find work because there were limited job opportunities available on Sapelo Island, and currently lives in Brunswick, Georgia. Mr. Banks, Sr. is eighty-one years old. He is a qualified individual with a disability, as defined by the FHA and ADA, because he is unable to walk and uses a wheelchair full-time.

24.     Mr. and Mrs. Banks own two parcels of land in Hogg Hummock, Sapelo Island. Mr. and Mrs. Banks have paid and continue to pay an annual garbage fee charged by the County.

25.     On July 14, 2012, Mr. and Mrs. Banks filed a complaint with HUD. They alleged in the HUD proceeding, discrimination on the basis of disability, race, and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

26.     Plaintiff Ceaser Banks is African American and of Gullah-Geechee heritage. He is currently a full-time resident of Sapelo Island. He was born and raised on the Island. Until the age of three, he lived in Lumber Landing, an ancestral Gullah-Geechee settlement in the central uplands of the Island. But R.J. Reynolds took possession of his family's land—giving the family about three acres of land in Hogg Hummock in return. Documents memorializing this land swap were apparently forged. Mr. Banks' name appears on the property deed, despite the fact that he was only three years old on the date that the deed was purportedly signed. Defendant State of Georgia now claims possession of the land that R.J. Reynolds took from Mr. Banks' family. Mr. Banks has attempted to challenge the State's claim to his family's property, but his efforts have been unsuccessful.

27.     Plaintiff Nancy Banks is African American and a full-time resident of Sapelo Island. She is married to Plaintiff Ceaser Banks.

28.     Mr. and Mrs. Banks own two parcels of land in Hogg Hummock, Sapelo Island.

8

Mr. and Mrs. Banks have paid and continue to pay an annual garbage fee charged by the County.

29.     On September 11, 2013, Mr. and Mrs. Banks filed a complaint with HUD, and they have alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

30.     Plaintiff Lorie Banks is an African-American resident of Waynesville, Georgia, and the widow of Plaintiff Melvin Banks, Jr. She brings claims on her own behalf and on behalf of her late husband.

31.     Plaintiff Melvin Banks, Jr. was African American and of Gullah-Geechee heritage. He was married to Plaintiff Lorie Banks. Prior to his death, Mr. Banks, Jr. suffered from chronic obstructive pulmonary disease, cardiomegaly, and cardiomyopathy. Mr. Banks, Jr. was dependent on supplemental oxygen twenty-four hours a day and used a power wheelchair to assist ambulation. Accordingly, Mr. Banks, Jr. was a qualified individual with a disability, as defined by the FHA and ADA.

32.     For a time period relevant to the allegations made herein, Melvin Banks, Jr. owned a one-acre parcel of land in Hogg Hummock, Sapelo Island. During this time period, Melvin Banks, Jr. and his wife Lorie Banks maintained a home on the Sapelo Island property and visited Sapelo Island on a regular basis. After Melvin Banks, Jr. passed away, ownership of the parcel passed to his son, Kelvin Banks. The Banks family has paid and continues to pay an annual garbage fee charged by the County.

33.     On July 14, 2012, Mr. and Mrs. Banks filed a HUD complaint. They alleged in the HUD proceedings discrimination on the basis of disability, race, and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's

African-American/Gullah-Geechee property owners and residents.

34.     Plaintiff Marion Banks was born and raised on Sapelo Island. He is African American and of Gullah-Geechee heritage. He left the Island when he was nineteen years old in order to find a job. He is married to Plaintiff Roberta Banks, and they currently reside in Williamstown, New Jersey. If there were better services on the Island, however, they would move back.

35.     Plaintiff Roberta Banks is African American and of Gullah-Geechee heritage. She is a qualified individual with a disability, as defined by the FHA and ADA, because she has had two knee replacement surgeries and is substantially limited in her ability to walk.

36.     Mr. and Mrs. Banks own a parcel of land in Hogg Hummock, Sapelo Island.

37.     On November 15, 2013, Mr. and Mrs. Banks filed HUD complaints, and they have alleged discrimination on the basis of race and/or national origin, and, for Roberta Banks, disability, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

38.     Plaintiff Richard Banks is African American and of Gullah-Geechee heritage. He currently lives in Hinesville, Georgia. Since 1979, Mr. Banks has owned land in Hogg Hummock, Sapelo Island. He visits Sapelo Island on a monthly basis.

39.     Mr. Banks is also a disabled veteran. He suffers from a lumbar spine condition that substantially limits his ability to walk. Mr. Banks often relies on a cane for assistance. Accordingly, Mr. Banks is a qualified individual with a disability, as defined by the FHA and ADA.

40.     On September 11, 2013, Mr. Banks filed a complaint with HUD, and he has alleged discrimination on the basis of disability, race, and/or national origin, in part because of

Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

41.     Plaintiff Ellen Brown was born and raised on Sapelo Island. She is African American and of Gullah-Geechee heritage. When she was sixteen years old, she moved to the mainland to continue her schooling. She currently lives in Darien, Georgia. With her brother, Plaintiff Joseph Hall, Ms. Brown co-owns a parcel of land in Hogg Hummock, Sapelo Island in the name of the Martin Hall Estate. Ms. Brown has paid and continues to pay an annual garbage fee charged by the County.

42.     On September 11, 2013, Ms. Brown filed a HUD complaint, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

43.     Plaintiff Earlene Davis was born and raised on Sapelo Island. She is African American and of Gullah-Geechee heritage. When she was twelve years old, her family left the Island because of the lack of jobs there. She currently resides in Brunswick, Georgia. Ms. Davis has an ownership interest in a parcel of land in Hogg Hummock, Sapelo Island, and she paid taxes on the property from approximately 2007 to 2012. She also visited family members on the Island several times a year up until six years ago when she had to stop visiting for health reasons. Ms. Davis would live on the Island if it were more accessible and if the services were better.

44.     On September 11, 2013, Ms. Davis filed a HUD complaint, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

45.     Plaintiff Andrea Dixon is African American. Her late husband, Herbert Dixon, was a Gullah-Geechee descendant from Sapelo Island. Ms. Dixon owns property in Hogg Hummock, Sapelo Island. She lives part-time on her Sapelo Island property and part-time in Savannah, Georgia.

46.     On September 11, 2013, Ms. Dixon filed a HUD complaint, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents. Ms. Dixon's HUD complaint also alleged discrimination against disabled persons because her mother (who often travels with her to Sapelo Island) uses a wheelchair and, accordingly, has substantial difficulty traveling on the ferry between Sapelo Island and the mainland.

47.     Plaintiff Deborah Dixon was born and raised on Sapelo Island. She is African American and of Gullah-Geechee heritage. Ms. Dixon left the Island to attend college. She currently resides in Kennesaw, Georgia. Ms. Dixon has an ownership interest in two parcels of land in Hogg Hummock, Sapelo Island. She owns a one-acre parcel in Hogg Hummock and co-owns with her siblings an additional one-acre parcel of land in the name of the Dixon York Estate. She is also a partial heir to two additional properties on the Island. Ms. Dixon visits Sapelo Island regularly.

48.     On November 25, 2013, Ms. Dixon filed a HUD complaint, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

49.     Plaintiff Samuel L. Dixon is African American and of Gullah-Geechee heritage.

12

He was born and raised on Sapelo Island. Mr. Dixon left Sapelo Island to attend high school on the mainland. He currently lives in Brunswick, Georgia. Mr. Dixon owns two parcels of land in Hogg Hummock, Sapelo Island, one of which is held in the name of the Dan Dixon Estate. He visits his Sapelo Island property frequently. Mr. Dixon has paid and continues to pay an annual garbage fee charged by the County.

50.     On December 11, 2013, Mr. Dixon filed a HUD complaint, and he has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

51.     Plaintiff Dan Gardner is African American and of Gullah-Geechee heritage. He currently lives in Jacksonville, Florida. As a child, he lived on Sapelo Island, but eventually his family moved to the mainland to pursue job opportunities. Mr. Gardner currently co-owns two parcels of land in Hogg Hummock, Sapelo Island with his two siblings, Andrea Gardner and Kathy Hill. They inherited the parcels from their father. Mr. Gardner visits his Sapelo Island property regularly. Mr. Gardner has paid and continues to pay an annual garbage fee charged by the County.

52.     On November 8, 2013, Mr. Gardner filed a HUD complaint, and he has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

53.     Plaintiff Cheryl Grant is African American and of Gullah-Geechee heritage. She currently lives in Stone Mountain, Georgia. Ms. Grant's father was born and raised on the Island, and she and her brother inherited a parcel of land in Hogg Hummock from him in 2013. She

maintains a mobile home on the property and visits the Island approximately once a month. Ms. Grant would visit her Sapelo Island property more frequently if the ferry schedule was more accommodating to her work schedule.

54.     On November 8, 2013, Ms. Grant filed a HUD complaint, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

55.     Plaintiff Bobby Grovner is African American and of Gullah-Geechee heritage. He was raised on Sapelo Island. In 1979, he left for the mainland because of limited job opportunities on the Island. He owns land and maintains a home in Hogg Hummock, Sapelo Island. Currently, Mr. Grovner splits his time between his home in Brunswick, Georgia and his home on Sapelo Island. Mr. Grovner has paid and continues to pay an annual garbage fee charged by the County.

56.     On December 9, 2013, Mr. Grovner filed a HUD complaint, and he has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

57.     Plaintiff Celia Grovner is African American and of Gullah-Geechee heritage. She currently lives on St. Simons Island, Georgia. Ms. Grovner was born and raised in Raccoon Bluff, a former ancestral Gullah-Geechee waterfront settlement on Sapelo Island.

58.     As a teenager, Ms. Grovner moved to the mainland to attend high school in Glynn County, Georgia. In 1967, she moved permanently to the mainland in order to pursue work opportunities that living on Sapelo Island would have precluded. Along with her siblings, Ms.

14

Grovner currently co-owns a parcel of land located in Hogg Hummock, Sapelo Island, which they inherited from their parents, as well as another parcel of property that they inherited from their brother. Ms. Grovner has paid and continues to pay an annual garbage fee charged by the County. She visits the Island approximately two to three times every month to attend church and maintain the properties.

59.     On November 25, 2013, Ms. Grovner filed a HUD complaint, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

60.     Plaintiff David Grovner, Sr. is African American and of Gullah-Geechee heritage. Mr. Grovner was born and raised on Sapelo Island but left the Island when he was a teenager. He currently lives on St. Simons Island, Georgia. Mr. Grovner visits Sapelo Island approximately once a year, but because he has disabilities that require him to use a motorized scooter, he is unable to visit more often given the poor condition of the roads. Mr. Grovner is a qualified individual with a disability, as defined by the FHA and ADA.

61.     David Grovner, Sr. also brings claims on behalf of the estate of Vernell Grovner, his late wife. Vernell Grovner was African American and of Gullah-Geechee heritage. She was born on Sapelo Island and lived there until she was about twelve years old. Until her death on July 13, 2014, Mrs. Grovner co-owned, along with her siblings, a three-and-a-half-acre parcel of land in Hogg Hummock on Sapelo Island.

62.     Mrs. Grovner suffered a stroke in 2003. Following the stroke, her left side was rendered completely motionless. After being diagnosed with a rare blood disorder in 2013, Mrs. Grovner was left unable to walk and only ambulated with a wheelchair. Accordingly, Mrs.

15

Grovner was a qualified individual with a disability, as defined by the FHA and ADA.

63.    On September 11, 2013, Mrs. Grovner filed a complaint with HUD. She alleged in the HUD proceedings discrimination on the basis of disability, race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

64.    Plaintiff David Grovner, Jr. is African American and of Gullah-Geechee heritage. He is the son of Vernell Grovner and Plaintiff David Grovner, Sr. Mr. Grovner has been paying a portion of the property taxes for the parcel that is co-owned by David Grovner, Sr. (through the Estate of Vernell Grovner) and three of Vernell Grovner's siblings. As a child, he grew up on St. Simons Island and would visit Sapelo Island every summer. He currently lives in Driftwood, Texas, but visits his family's property on Sapelo Island once a year. Despite paying taxes on his family's property, Mr. Grovner has not enjoyed much use or benefit from his family's land because of Defendants' failure to provide basic services to Sapelo Island's residents. If the services improve, he would like to retire to the Island.

65.    On September 11, 2013, Mr. Grovner filed a complaint with HUD, and he has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

66.    Plaintiff Iregene Grovner, Jr. is African American and of Gullah-Geechee heritage. He was born and raised on Sapelo Island. Mr. Grovner currently lives in Eulonia, Georgia. Until 2012, Mr. Grovner lived in Hogg Hummock, Sapelo Island. Mr. Grovner had to move from the Island because the limited ferry schedule was not compatible with his family's work schedules. Mr. Grovner visits Sapelo Island frequently. He regularly stays in a trailer on a

relative's property on Sapelo Island.

67.     On September 11, 2013, Mr. Grovner filed a complaint with HUD, and he has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

68.     Mr. Grovner has filed two related discrimination cases against Defendant DNR regarding its refusal to hire him for positions on the Sapelo Island ferry and for retaliation carried out by refusing to consider his application for a Sapelo Island ferry position that became available after he filed the first case. The first case is pending before the United States Court of Appeals for the Eleventh Circuit. The second case is pending before Judge Steve C. Jones of the United States District Court for the Northern District of Georgia.

69.     Plaintiff Iregene Grovner, Sr. is African American and of Gullah-Geechee heritage. He has lived on Sapelo Island for over 60 years. He currently owns a home on a ½-acre parcel of land in Hogg Hummock, where he lives almost full-time (spending weekends at a home that he owns in Darien, Georgia).

70.     Plaintiff Rall Grovner is African American and of Gullah-Geechee heritage. He was born and raised on Sapelo Island. Mr. Grovner moved from Sapelo Island to the mainland when he was seventeen years old because there were no job opportunities on the Island. He currently lives in Townsend, Georgia. Mr. Grovner visits Sapelo Island regularly. He co-owns a parcel of land in Hogg Hummock, Sapelo Island.

71.     Mr. Grovner suffers from diabetes. As a result of his diabetes, Mr. Grovner has lost all of his sight in one eye and most of his sight in his other eye. He also had a portion of his foot amputated. Mr. Grovner has extreme difficulty walking and seeing. Accordingly, Mr.

Grovner is a qualified individual with a disability, as defined by the FHA and ADA.

72.     On April 4, 2014, Mr. Grovner filed a HUD complaint, and he has alleged discrimination on the basis of disability, race, and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

73.     Plaintiff Angela Hall is African American and of Gullah-Geechee heritage. She is the daughter of Plaintiffs Benjamin Hall and Florence Hall. She has an inheritance interest in her parents' property in Hogg Hummock and has assisted her parents in paying the property taxes for their land. She frequently visits her family's residence on Sapelo Island every one or two months.

74.     Plaintiff Angelina Hall is African American. She is married to Plaintiff Reginald Hall.

75.     Plaintiff Reginald Hall is African American and of Gullah-Geechee heritage. He is married to Plaintiff Angelina Hall. He currently lives in Atlanta, Georgia. Mr. and Mrs. Hall co-own three parcels of land in Hogg Hummock, Sapelo Island that were formerly owned by Mr. Hall's father, Plaintiff Charles Hall. Mr. Hall has a home on his largest parcel of land. He visits his Sapelo Island land on a regular basis.

76.     On September 11, 2013, Mr. and Mrs. Hall filed a complaint with HUD, and they have alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

77.     Plaintiff Benjamin Hall is African American and of Gullah-Geechee heritage. Mr. Hall is married to Plaintiff Florence Hall. He was born and raised on Sapelo Island. At the age of

twelve, Mr. Hall moved to the mainland to attend school. He moved back to Sapelo Island in

1994, after serving in the military and working abroad for several years. Currently, he is a full-

time resident of Sapelo Island, and he and his wife own property in Hogg Hummock.

78.     Mr. Hall has a spinal condition that substantially limits his ability to walk and to

work. Accordingly, Mr. Hall is a qualified individual with a disability, as defined by the FHA

and ADA.

79.     Plaintiff Florence Hall is African American and of Gullah-Geechee heritage.

Along with her husband, Plaintiff Benjamin Hall, she resides full-time in Hogg Hummock,

Sapelo Island.

80.     On November 1, 2013, Mr. and Mrs. Hall filed a HUD complaint, and they have

alleged discrimination on the basis of race and/or national origin, in part because of Defendants'

failure to provide adequate government services to Sapelo Island's African-American/Gullah-

Geechee property owners and residents.

81.     Plaintiff Margaret Hall is African American. She was married to Plaintiff Charles

Hall. She currently lives in Coral Springs, Florida, but she used to live with her husband in Hogg

Hummock, Sapelo Island.

82.     Plaintiff Margaret Hall also brings claims on behalf of the Estate of Charles Hall,

her late husband. Mr. Hall was African American and of Gullah-Geechee heritage. He was a

lifelong resident of Sapelo Island until his death on July 17, 2014. Mr. Hall owned three parcels

of land on Sapelo Island.

83.     On September 11, 2013, Mr. and Mrs. Hall filed a complaint with HUD, and they

have alleged discrimination on the basis of race and/or national origin, in part because of

Defendants' failure to provide adequate government services to Sapelo Island's African-

American/Gullah-Geechee property owners and residents.

84.     Plaintiff Joseph Hall is African American and of Gullah-Geechee heritage. Mr. Hall currently lives in Hogg Hummock on Sapelo Island on property that he co-owns with his sister, Plaintiff Ellen Brown, in the name of the Martin Hall Estate. Mr. Hall's family has lived on the Martin Hall Estate property for more than sixty years. Mr. Hall has paid and continues to pay an annual garbage fee charged by the County.

85.     On July 14, 2012, Mr. Hall filed a HUD complaint. He alleged in the HUD proceedings discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

86.     Mr. Joseph Hall passed away in July 2018. His daughter, Victoria Hall, now represents his estate in this action.

87.     Plaintiff Victoria Hall is African American and of Gullah-Geechee heritage. She has an inheritance interest in her family's property in Hogg Hummock (the Martin Hall Estate that was co-owned by her father, Plaintiff Joseph Hall), and has regularly assisted her family with property taxes for their family parcel. Ms. Hall frequently visits Sapelo Island several times per month. She would like to reside on Sapelo Island full-time, but has not moved there because of Defendants' failure to provide adequate services to Sapelo Island residents.

88.     Plaintiff Rosemary Harris is African American and of Gullah-Geechee heritage. She currently lives in San Antonio, Texas. Ms. Harris' mother, Sarah Bell Edmond, is a Sapelo Island descendant who co-owns a three-and-a-half-acre parcel of land in Hogg Hummock, Sapelo Island with her siblings (including the late Vernell Grovner). Because her mother is in poor health, Ms. Harris has power of attorney over her mother's affairs and has assumed

responsibility for paying taxes on her mother's Sapelo Island property. Despite paying taxes on her family's property, Ms. Harris has not enjoyed much use or benefit from her family's land because of Defendants' failure to provide basic services to Sapelo Island's residents.

89.     On December 5, 2013, Ms. Harris filed a complaint with HUD, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

90.     Plaintiff Harold Hillery was African American and of Gullah-Geechee heritage. With his brother, Plaintiff Johnnie Hillery, Mr. Hillery co-owned a one-acre parcel of land in Hogg Hummock, Sapelo Island, which he visited several times a year. He and his brother inherited the property from their father in 2006. In 2010, Mr. Hillery made arrangements to live on the Island full-time, but he could not make it work because of the poor condition of the roads, the poor lighting, the unaccommodating ferry schedule, and the lack of a school for his son, who was in high school at the time.

91.     On September 11, 2013, Mr. Hillery filed a HUD complaint, and he alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

92.     Mr. Harold Hillery passed away in March 2017. His mother, Dena Harrison, now represents his estate in this action.

93.     Plaintiff Johnnie Hillery is African American and of Gullah-Geechee heritage. Plaintiff Harold Hiller was his brother. He currently resides in Brunswick, Georgia, and, with his brother's estate, co-owns a parcel of land in Hogg Hummock, Sapelo Island. Mr. Hillery used to

visit the Island several times a year, but due to his disability, he has not been able to visit as often because of the Island's lack of accessibility.

94.     Mr. Hillery suffers from stenosis, a disease of the spine. He has sensory problems in his feet and often experiences sharp pains when he walks, and he relies on a cane for assistance. Accordingly, Mr. Hillery is a qualified individual with a disability, as defined by the FHA and ADA.

95.     On September 11, 2013, Mr. Hillery filed a HUD complaint, and he has alleged discrimination on the basis of disability, race, and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

96.     Mr. Johnnie Hillery passed away in June 2018. His mother, Dena Harrison, now represents his estate in this action.

97.     Plaintiff Brenda Jackson is African American and of Gullah-Geechee heritage. She currently lives in Brunswick, Georgia. Ms. Jackson has a co-ownership interest in a parcel of land in Raccoon Bluff, Sapelo Island, along with her brother, Plaintiff Harry Lee Jordan, and three cousins. As a child, she visited the Island nearly every summer. Ms. Jackson now visits her property several times a year and would live on Sapelo Island full-time if Defendants provided adequate services.

98.     On September 11, 2013, Ms. Jackson filed a complaint with HUD, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

99.     Plaintiff Jesse Jones was born and raised on Sapelo Island. He is African

American and of Gullah-Geechee heritage. Mr. Jones left Sapelo Island in 1970, after graduating from high school, because there were no job opportunities available to him. He currently lives in Brunswick, Georgia. Mr. Jones maintains ownership of a parcel of land in Hogg Hummock, Sapelo Island.

100.    Plaintiff Temperance Jones is African American and of Gullah-Geechee heritage. She is married to Plaintiff Jesse Jones.

101.    On November 15, 2013, Mr. and Mrs. Jones filed a complaint with HUD, and they have alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

102.    Plaintiff Sonnie Jones was born and raised on Sapelo Island. He is African American and of Gullah-Geechee heritage. He moved to the mainland before starting the ninth grade because there was no high school on Sapelo Island. Mr. Jones currently lives in Brunswick, Georgia and owns a parcel of land in Hogg Hummock, Sapelo Island. He visits his Sapelo Island property regularly.

103.    On November 25, 2013, Mr. Jones filed a HUD complaint, and he has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

104.    Plaintiff Harry Lee Jordan is African American and of Gullah-Geechee heritage. He currently lives in Brunswick, Georgia. Mr. Jordan has a co-ownership interest in a parcel of land in Raccoon Bluff, Sapelo Island, along with his sister, Plaintiff Brenda Jackson, and three cousins. He visits the Island once every four months. If the services and ferry schedule improve,

he plans to move to the Island.

105.    On November 1, 2013, Mr. Jordan filed a complaint with HUD, alleging discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

106.    Plaintiff Delores Hillery Lewis is African American and of Gullah-Geechee heritage. She was born and raised on Sapelo Island. In the late 1980s, she moved to Brunswick, Georgia, where she currently lives, because there were no job opportunities for her on Sapelo Island. Ms. Lewis owns land and a home in Hogg Hummock, Sapelo Island. Ms. Lewis has paid and continues to pay an annual garbage fee charged by the County. She visits her property regularly.

107.    On November 15, 2013, Ms. Hillery Lewis filed a complaint with HUD, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

108.    Plaintiff Johnny Matthews is African American. He currently lives in Brunswick, Georgia. For the past thirty years, Mr. Matthews has owned a parcel of land in Hogg Hummock, Sapelo Island. His wife, who is of Gullah-Geechee heritage, grew up on the Island, and he and his wife now visit the property approximately one to two times a month. They visit his nephew and sister-in-law who currently live there.

109.    On November 8, 2013, Mr. Matthews filed a complaint with HUD, and he has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-

Geechee property owners and residents.

110.    Plaintiff Frances Mercer is African American and of Gullah-Geechee heritage. Her mother was born and raised on Sapelo Island. Ms. Mercer was raised on St. Simon's Island, Georgia. Ms. Mercer owns two parcels of land in Hogg Hummock, Sapelo Island, and she visits the Island several times a year. She would like to visit more often, but the ferry schedule does not accommodate her work schedule.

111.    On November 15, 2013, Ms. Mercer filed a complaint with HUD, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

112.    Plaintiff Mary Dixon Palmer is African American and of Gullah-Geechee heritage. Ms. Palmer was born and raised on Sapelo Island. She left Sapelo Island when she was eighteen years old to find a job on the mainland. She currently lives in Brunswick, Georgia. For the past fifteen years, Ms. Palmer has owned land in Hogg Hummock, Sapelo Island. Ms. Palmer has paid and continues to pay an annual garbage fee charged by the County. She visits the Island at least twice a month to attend church, maintain the property, and enjoy the Island. She would visit her property even more often if the ferry schedule was more accommodating.

113.    On November 8, 2013, Ms. Palmer filed a complaint with HUD, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

114.    Plaintiff Lisa Marie Scott is African American and of Gullah-Geechee heritage. She co-owns property in Raccoon Bluff, Sapelo Island with her cousins, Plaintiffs Brenda

Jackson and Harry Lee Jordan. She currently lives on the mainland, and she visits her family on the Island every couple of years. Ms. Scott would like to retire and live on the Island if the Gullah-Geechee residents were treated more equitably.

115.    On November 25, 2013, Ms. Scott filed a complaint with HUD, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

116.    Plaintiff Andrea Sparrock is African American and of Gullah-Geechee heritage. She is married to Plaintiff David Sparrock. Mr. and Mrs. Sparrock own a parcel of land in Hogg Hummock, Sapelo Island. Mrs. Sparrock lived on Sapelo Island full-time until she was eleven years old, when she left to attend school on the mainland. For the past thirty years, she has visited her property on Sapelo Island on a regular basis.

117.    Plaintiff David Sparrock is African American and of Gullah-Geechee heritage. He is married to Plaintiff Andrea Sparrock. He has been visiting Sapelo Island with his wife regularly over the last thirty years.

118.    On December 23, 2013, Mr. and Mrs. Sparrock filed a complaint with HUD, and they have alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

119.    Plaintiff Aaron Walker is African American and of Gullah-Geechee heritage. He grew up on Sapelo Island, but left when he was seventeen years old in order to find a job. He joined the military when he was twenty years old. Mr. Walker currently works and lives in Meridian, Georgia. He owns land and a small home in Hogg Hammock, Sapelo Island, which he

visits frequently. Mr. Walker has paid and continues to pay an annual garbage fee charged by the County.

120.     On November 1, 2013, Mr. Walker filed a complaint with HUD, and he has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

121.     Plaintiff Verdie Walker is African American and of Gullah-Geechee heritage. She currently lives in Montclair, New Jersey. She was born on Sapelo Island and lived there until she was thirteen, when she moved to the mainland for high school.

122.     Ms. Walker owns land in Hogg Hummock, Sapelo Island, which she pays taxes on. Ms. Walker used to visit Hogg Hummock regularly, until she suffered a stroke in 2013.

123.     Ms. Walker's stroke substantially impacted her mobility. As such, she is a qualified individual with a disability as defined by the ADA. Because of the lack of medical services on Sapelo Island, the inaccessibility of the Sapelo Island ferry, and the overall difficulty getting to and from Sapelo Island, Ms. Walker cannot live on Sapelo Island or even visit on a frequent basis.

124.     Plaintiff Marcia Hall Wells is African American and of Gullah-Geechee heritage. She is the daughter of Plaintiffs Benjamin Hall and Florence Hall. She has an inheritance interest in her parents' property in Hogg Hummock and has assisted her parents in paying the property taxes for their land. Ms. Wells generally visits Sapelo Island on a monthly basis. She would like to visit more often but is limited by the ferry schedule.

125.     Plaintiff Stacey White is African American and of Gullah-Geechee heritage. Ms. White owns two parcels of land in Hogg Hummock, Sapelo Island. As a child, she grew up

spending weekends and summers on the Island. She now lives full-time on her property on the Island. She works on the mainland and often has to spend the night on the mainland because of the limited ferry schedule.

126.   On August 20, 2014, Ms. White filed a complaint with HUD, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

127.   Plaintiff Sylvia Williams is African American and of Gullah-Geechee heritage. She pays property taxes for the parcel that her mother, Plaintiff Sarah Frances Drayton, owns in Hogg Hummock, Sapelo Island. Ms. Williams currently lives in Parkton, North Carolina. She visits the Island and uses her family's home and property approximately once a month, but because of the ferry schedule, she often cannot visit the Island on holidays. If the ferry were more accessible and the ferry schedule were more convenient, she would travel to the Island much more frequently.

128.   Ms. Williams is a disabled veteran who wears a back brace and a knee brace, and uses a walker. Accordingly, Ms. Williams is a qualified individual with a disability, as defined by the FHA and ADA.

129.   On November 1, 2013, Ms. Williams filed a complaint with HUD, alleging discrimination on the basis of disability, race, and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

130.   Plaintiff Valerie Williams is African American and of Gullah-Geechee heritage. She currently lives in Brunswick, Georgia. Ms. Williams owns a parcel of land in Hogg

Hummock, Sapelo Island. She lived on Sapelo Island until she was approximately twelve years old, when she moved to the mainland to attend middle school. She currently visits Sapelo Island about once a month. Upon her retirement, she hopes to move to Sapelo Island to live there full-time. Moreover, if the ferry schedule were more accommodating, she would move back to the Island now.

131.    On November 15, 2013, Ms. Williams filed a complaint with HUD, and she has alleged discrimination on the basis of race and/or national origin, in part because of Defendants' failure to provide adequate government services to Sapelo Island's African-American/Gullah-Geechee property owners and residents.

132.    Plaintiff HELP Org Inc. ("HELP") is a non-profit organization committed to promoting and improving the social, economic, and educational conditions of marginalized communities in Georgia, regardless of race, color, national origin, religion, or disability. It does so through community organizing, outreach, and advocacy efforts. Many of HELP's projects focus on assisting low-wealth communities of color in retaining, reclaiming, and recovering land for their own use and benefit. HELP is headquartered in Atlanta, Georgia.

133.    HELP has engaged in a variety of activities to assist Gullah-Geechee descendants in promoting and preserving their culture and property ownership on Sapelo Island. Those activities have included designing and implementing the Sapelo Ancestral Land Trust ("SALT"), gathering and collecting information and research regarding historical Gullah-Geechee ownership of Sapelo Island lands, identifying and counteracting Defendants' discriminatory treatment of Gullah-Geechee descendants associated with Sapelo Island, raising funds to assist Gullah-Geechee descendants' attempts to preserve their culture and land, and collaborating with federal, state, and local agencies for training and for planning strategies to assist Gullah-Geechee

residents associated with the Island.

134.     HELP filed a complaint with HUD on November 8, 2013, and it has alleged the frustration of HELP's mission and the diversion of its resources as a result of Defendants' discriminatory conduct.

135.     Plaintiff Raccoon Hogg CDC ("Raccoon Hogg") is a registered corporation in the State of Georgia dedicated to preserving Gullah-Geechee culture, as well as developing and implementing strategies for sustainable economic growth on Sapelo Island. Raccoon Hogg works toward this mission by engaging in advocacy, education, direct services, data collection and research, community organizing, and community planning. Similar to HELP, Raccoon Hogg has focused on empowering lower-income indigenous people on Sapelo Island, both by retaining and protecting their land and by creating platforms to explore new opportunities for economic growth on the Island.

136.     Raccoon Hogg has engaged in a variety of activities to further its cultural and economic mission on Sapelo Island, including entering into a strategic partnership with HELP. For example, Raccoon Hogg collected and organized the community-level data that played a key role in HELP's development of SALT, the community-driven land trust program. In addition, Raccoon Hogg provides direct assistance to heirs of Sapelo Island property through its Land Ownership Rights Division initiative, which educates heirs on their property rights, assists them in exercising their rights, and provides administrative assistance and technical support in the process. As part of its public policy initiative, Raccoon Hogg has also presented its findings on community development, historic preservation, and economic development before the Georgia General Assembly, the DNR, and the Board of Commissioners of McIntosh County. Raccoon Hogg was instrumental in the development and passage of Georgia State Senate Resolution No.

727 on August 17, 2011, which created the Senate Preservation of Sapelo Island Study Committee.

**B.**   **Defendants**

137.    Defendant McIntosh County ("County") is a governmental entity created by the Georgia legislature with the capacity to be sued.

138.    McIntosh County is governed by its Board of Commissioners, which is composed of four Commissioners and the McIntosh County Manager.

139.    The Board of Commissioners is the governing authority of McIntosh County with authority to, *inter alia*, direct and control all of the property of the County; levy taxes; establish and maintain roads, bridges, and ferries; manage, keep, collect, and disburse money belonging to the County; and examine, settle, and allow all claims against the County.

140.    McIntosh County does not have a water department, and all decisions regarding the provision of water in the County are made and implemented by the Board of Commissioners. Payments for water service are collected by the Board of Commissioners.

141.    At times relevant to this action, the County, through its Board of Commissioners, has applied for and been awarded federal financial assistance, including Community Development Block Grant ("CDBG") funds, a grant from the U.S. Department of Agriculture ("USDA"), and a grant from the U.S. Department of Transportation ("USDOT").

142.    Defendant State of Georgia ("State") is a state of the United States. The State has declared ownership of most of Sapelo Island. The State acknowledges its responsibility to protect the natural and cultural resources of and the public interest in Sapelo Island. The State has acknowledged that it has a duty to protect Hogg Hummock's culture and heritage as developed by the slave descendants occupying the Island. The State of Georgia is governed from the

Georgia State Capitol located at 206 Washington Street, Southwest, Atlanta, GA 30334.

143.   Defendant Georgia Department of Community Affairs is an agency of the State of Georgia with its headquarters in Atlanta. The DCA allocates federal financial assistance that it receives from the federal government to Georgia counties, municipalities, and other state agencies.

144.   At times relevant to this action, the State, through its DCA, has been a recipient of federal financial assistance, including CDBG funds, some of which the DCA has allocated to McIntosh County and its Board of Commissioners.

145.   Defendant Brian Kemp ("Kemp") is the Governor of Georgia and is sued in his official capacity as the Governor of Georgia and the Chairperson of SIHA for prospective injunctive and declaratory relief. Governor Kemp has the ultimate authority within the executive branch of the government of the State of Georgia to direct and control the operation of Defendant DNR and Defendant DCA. As the Chairperson of SIHA, Defendant Kemp has the authority to direct and control that entity.

146.   Defendant Georgia Department of Natural Resources ("DNR") is a department of the State of Georgia, which is responsible for, among other things, promoting the conservation and development of the State's natural resources; promoting profitable use of lands and waters; promoting the development of commerce and industry; and establishing and maintaining cooperation with any and every agency of the federal government that is interested in or dealing with the DNR's subject matter. The DNR has the capacity to be sued. The DNR Commissioner's office is located at 2 Martin Luther King Junior Drive Northwest, Atlanta, GA 30334.

147.   The DNR has been delegated the State's acknowledged responsibility to protect the natural and cultural resources of and the public interest in Sapelo Island. To carry out that

responsibility, the DNR has been granted the authority to provide essential services and water transportation for residents of Sapelo Island.

148.     The DNR has applied for and been awarded federal financial assistance, including grants from the National Oceanic and Atmospheric Administration ("NOAA"). Some of the NOAA grants received by the DNR have been for projects and activities related to Sapelo Island.

149.     Defendant Mark Williams ("Williams") is the Commissioner of Defendant DNR and is sued in his official capacity for prospective injunctive and declaratory relief. Commissioner Williams is responsible for supervising, directing, accounting for, organizing, planning, administering, and executing the functions vested in the DNR under Title 12, Chapter 2 of the Official Code of Georgia. Commissioner Williams serves at the pleasure of the Board of Natural Resources, the members of which are appointed by the Governor. The Board's decision to appoint or remove a commissioner is subject to approval of the Governor. Commissioner Williams' office address is 2 Martin Luther King Junior Drive SE, Atlanta, Georgia 30334.

## V.     FACTUAL BACKGROUND

### A.     Sapelo Island Background

150.     Sapelo Island is a 16,500-acre, low-lying barrier island off the coast of Georgia, in McIntosh County. Sapelo Island is northeast of Darien, Georgia, and approximately equidistant from Savannah, Georgia and Jacksonville, Florida.

151.     Sapelo Island is only accessible by crossing the Doboy Sound waterway separating the Island from mainland Georgia. Defendant DNR operates a ferry that makes three round trips between Sapelo Island and Meridian, Georgia every day.

152.     While McIntosh County as a whole is approximately 35% African American and over 63% white, the permanent residents of Sapelo Island are virtually all African American. The

few white residents on the Island are generally employees of the DNR or the University of

Georgia, Marine Institute ("UGAMI") on the Island who are there because of their employment.

During the course of the year, Sapelo Island has many vacationers and temporary residents

comprised of people with second homes and staff and students who perform research at a

University of Georgia facility.

153.    The vast majority of the permanent residents of Sapelo Island are Gullah

Geechee. Sapelo Island is home to the United States' last intact Gullah-Geechee community. The

Gullah Geechee are descendants of peoples from various parts of West Africa, whose ancestors

were brought as slaves to the southeastern coast of the United States. Gullah-Geechee

communities once populated many parts of the coast ranging from southern North Carolina to

northern Florida.

154.    Due in part to their geographic isolation, the Gullah Geechee developed a distinct

culture, bringing together diverse practices and customs from their ancestors' West African

homelands. That culture appears in unique arts, crafts, food, and music, as well as the Gullah

language, a creole language based on English with strong influences from West African

languages.

155.    In 2006, Congress established the Gullah Geechee Cultural Heritage Corridor

Commission ("GGCHCC"). (National Heritage Areas Act of 2006, Pub. L. No. 109-338, 120

Stat. 2006). The GGCHCC is charged with recognizing and preserving the culture and history of

the Gullah Geechee who settled in the coastal areas of North Carolina, South Carolina, Florida,

and Georgia.

156.    South Carolina Congressman James E. Clyburn declared when proposing the

creation of the GGCHCC, "[t]he Gullah Geechee culture is the last vestige of fusion of African

and European languages and traditions brought to these coastal areas. I cannot sit idly by and watch an entire culture disappear that represents my heritage and the heritage of those who look like me." *Gullah Geechee Culture Initiative*, www.gullahgeecheeculture.org (last visited Dec. 8, 2015).

157.    In May 2004, the National Trust for Historic Preservation ("NTHP") named the Gullah-Geechee corridor, coastline, and Sea Islands, which includes Sapelo Island, on its list of Eleven Most Endangered Historic Sites. The NTHP described threats that "have opened up the pristine area to tourism and land development…. Family cemeteries, archaeological sites and fishing grounds are being paved over or put off-limits by new owners, and familiar landmarks such as stores, churches, schools and houses are being demolished or replaced with new structures." *Preserving Gullah: A Georgia Southern professor seeks to interpret, translate and preserving the rapidly fading dialect*, Savannah Morning News (Jul. 1, 2005), http://savannahnow.com/stories/070105/3137154.shtml#.Vme7ULgrIdU.

**B.    Sapelo Island History**

  *1.    Sapelo Island Settlement: 1700s-1930s*

158.    In the eighteenth century, Sapelo Island was home to hundreds of enslaved West Africans who had been brought to the Island to clear the land and plant, tend, and harvest various agricultural products. By the turn of the nineteenth century, Thomas Spalding had acquired ownership of the vast majority of the Island, as well as the slaves living there. Spalding turned Sapelo Island into the most successful plantation—Sapeloe Plantation—in Georgia.

159.    In the early years of the Civil War, Thomas Spalding's heirs, who were then operating the Sapeloe Plantation, took the slaves off the Island and deep into the interior of Georgia hoping to avoid the Union Army. The Sapelo Island slaves, however, were moved

directly into General Sherman's path and when the South surrendered and the slaves were freed, many of the former Sapelo Island slaves followed General Sherman's path to the sea and returned to the Island.

160.    After returning to Sapelo Island, the former slaves began to pursue land ownership. Some former slaves obtained land through the Freedmen's Bureau, a federal agency charged with providing aid to freed slaves in the South during Reconstruction. Among other things, the Freedmen's Bureau supervised claims to land in connection with the resettlement of African Americans on the Sea Islands, such as Sapelo Island. Tunis Campbell, an African-American appointee to the Freedman's Bureau, was assigned to supervise land claims on Sapelo Island and recruited hundreds of former slaves to resettle there. Those former slaves who moved back to Sapelo Island began to carve out their own livelihoods and communities, as well as to establish schools on the Island. Most Plaintiffs, as well as other permanent residents of Sapelo Island, are direct descendants of the former slaves who resettled Sapelo following the Civil War.

161.    In 1871, three descendants of former slaves who had returned to Sapelo Island formed a land company and purchased 1000 acres in the area known as Raccoon Bluff. The land in Raccoon Bluff purchased by the slave descendants was divided into smaller lots and distributed among various Gullah-Geechee families.

162.    The freed slaves and their descendants established at least thirteen privately owned communities across the Island, including Hogg Hummock, Raccoon Bluff, Shell Hummock, Lumber Landing, and Belle Marsh. The former slaves and their families remained involved in various agricultural pursuits, commercial fishing, and lumbering.

163.    In 1912, Howard E. Coffin, a Detroit-born automotive magnate and heir to the Hudson Motor Company, purchased the old Spalding plantation on Sapelo Island from Thomas

Spalding's descendants. He later acquired more land through a series of transactions with Spalding's descendants, eventually securing ownership of nearly all land on the Island that was not already owned by Gullah-Geechee descendants.

164.   It was during this time period that the Gullah-Geechee population on Sapelo Island reached over 900. The majority of this population lived in Raccoon Bluff, and many were employed by Coffin, who ran a number of successful agricultural and lumber operations, including an oyster and shrimp canning industry. Most of the much smaller white population on the Island was also employed by Coffin.

165.   In 1934, Coffin sold all of his holdings on the Island to Richard J. Reynolds, Jr., the wealthy tobacco heir from North Carolina.

> **2.    1950s-1960s: Sapelo Island's Gullah-Geechee Population Is Relocated to Hogg Hummock Through Coercive and Fraudulent Land Swaps**

166.   Beginning in the 1950s, Reynolds, who by then had control of all the land on Sapelo Island except the communities where the Gullah-Geechee populations were clustered, sought to expand his land ownership by initiating a series of coercive "land swaps" with the Gullah-Geechee residents of Raccoon Bluff, Shell Hummock, Lumber Landing, and Belle Marsh.

167.   Through these land swaps, Reynolds forced Gullah-Geechee families off desirable waterfront properties in Raccoon Bluff and other communities where they had lived for generations, and onto less desirable and smaller parcels in Hogg Hummock, a low-lying swampy enclave in the southern portion of the Island.

168.   For many of the Reynolds transfers, evidence of coercion and fraud is clear from the face of the recorded deeds. Deed transfers purportedly signed by two or more Gullah-Geechee descendants were penned by the same hand as Reynolds' representatives. This is

exemplified in the deed from Mrs. Katie W. Bolden, Mrs. Mary W. Lewis and Mrs. Azola W. Arvinger, Deed Book 38, Page 77, which conveys an interest of sixteen acres in Raccoon Bluff Lot 4 to Reynolds:



169.   In other cases, deeds purportedly executed by Gullah-Geechee descendants who were literate are signed with a mark as if the grantors could not write. For example, a deed recorded on December 1, 1955 from Gertie Sams Grovner to Reynolds that purports to convey her interest in sixty-five acres of land in Lumber Landing (also called Sams Settlement), is signed with the mark of an "X." However, a deed recorded just six months later, in which she supposedly conveyed nineteen acres in Raccoon Bluff to Reynolds bears her full signature. At least one, if not both, of these deeds was forged. The validity of the deed conveying nineteen acres in Raccoon Bluff is suspect for the additional reason that it again bears identical signatures for multiple grantors. The signatures of the other grantors on that deed, Mary Pinckney, Dorothy Campbell, and Thomas Carter all appear to be signed by the same person.

IN WITNESS WHEREOF, the said part __y__ of the first part ha __s__
hereunto set __her__ hand __ and affixed __her__ seal__, the day and
year first above written.

Signed, sealed and delivered                *her*
in the presence of:                     _Gertie X Grovner_ (SEAL)
                                              *Mark*
_Mary Anderson_                           Gertie Sams Grovner.

_____                 _____ (SEAL)
_Paul J Varner_
Notary Public.                            _____ (SEAL)

IN WITNESS WHEREOF, The said part __ies__ of the first part ha __ve__ hereunto
set __their__ hand __s__ and affixed __their__ seal __s__, the day and year first
above written.

Signed, sealed and delivered
in the presence of:                       _Mary Pinckney_ (SEAL)
                                           Mary Pinckney
_O. L. Foxworth_                          _Dorothy Campbell_ (SEAL)
                                           Dorothy Campbell
_Paul J Varner_                           _Gertrude Grovner_ (SEAL)
Notary Public.                             Gertrude Grovner
                                          _Thomas Carter_ (Seal)
                                           Thomas Carter

170.    Other deeds transferring Sapelo Island land to Reynolds are signed by grantors

who were too young to have granted land to Reynolds. For example, Deed Book 17, page 13

shows that Plaintiff Ceaser Banks along with his siblings and father purportedly signed away

their sixty-acre property in Lumber Landing in 1948. At the time, Mr. Banks was three years old,

and his sister Esther Banks, whose signature also purportedly appears on the deed, was only six

years old. Moreover, all of the alleged grantors signed with an "X," even though Mr. Banks'

older siblings attended school and were able to read and write. Through this fraudulent

conveyance, the family was relocated from their sixty-acre homestead to a three-acre plot in

Hogg Hummock.

171.    When Mr. Banks was twelve or thirteen years old, the Sapelo Island Research

Foundation (now called the Sapelo Foundation), which was established by Reynolds, gave him

and each of his siblings approximately fifteen dollars as compensation for their property in Lumber Landing. Two deeds dated 1959, allegedly signed by Mr. Banks and his siblings, purport to relinquish any property interests on Sapelo Island outside of Hogg Hummock. Mr. Banks, however, did not sign any deed at that time.

172.    Even for those deeds in which a Gullah-Geechee owner of legal age may have legitimately signed a deed conveying his or her Raccoon Bluff property to Reynolds, the land transfers were often coerced through threats to the Gullah-Geechee descendants' jobs. At the time, Reynolds was the principal employer on the Island.

173.    Reynolds would also threaten to block Gullah-Geechee land owners' access to the ferry, the only connection to the goods, services, and economic opportunities on the mainland. Gullah-Geechee descendant Allen Green, one of the last holdouts from Raccoon Bluff who refused to transfer his land to Reynolds, was finally forced to cede to Reynolds' coercive land grab when Mr. Green's wife fell seriously ill and Reynolds refused them access to the ferry.

174.    Another tactic employed by Reynolds to take land was to promise other consideration, such as timber, as a component of the land swap. Reynolds would never exchange the timber or would later charge the descendant for the timber.

175.    In many cases, the sheer disparity in the amount and quality of land exchanged is indicative of coercion and fraud. A few examples where more acres of land in the more desirable Raccoon Bluff were exchanged for fewer acres of land in the less desirable Hogg Hummock include:

> a.  A 1956 transaction in which Gullah-Geechee descendant Mack Grovner exchanged his ownership interest in nine acres in Raccoon Bluff for a half-acre parcel in Hogg Hummock.

b.   A 1956 transaction in which Gullah-Geechee descendant Rosa Walker traded her sixteen-acre parcel of land in Raccoon Bluff for fewer than six acres of land in Hogg Hummock.

c.   A 1956 transaction in which Gullah-Geechee descendants Prince Carter and Elizabeth Carter exchanged a nine-acre parcel in Raccoon Bluff for a two-acre parcel in Hogg Hummock.

d.   A 1962 transaction in which Gullah-Geechee descendants Katie Bolden, Mary Lewis, and Azola Arvinger conveyed their interest in a sixteen-acre parcel in Raccoon Bluff in exchange for three acres in Hogg Hummock.

176.   By the early 1960s, through his campaign of fraud and coercion, Reynolds had acquired virtually all the land in Raccoon Bluff and the northern two-thirds of the Island, completely displacing all of those Gullah-Geechee residents to Hogg Hummock. Sapelo Island's Gullah-Geechee community fell to just over 200.

### 3.   1960s-1970s: The State of Georgia Obtains Ownership of Most of Sapelo Island Based on Reynolds' Coercive and Fraudulent Land Swaps

177.   After Reynolds died in 1964, his widow, Annemarie Reynolds, arranged in 1969 for the State of Georgia to purchase the now depopulated northern two-thirds of the Island. Using Pittman-Robertson funds, federal funds to be used for the purpose of wildlife restoration, the State acquired the former Gullah-Geechee communities of Raccoon Bluff, Lumber Landing, and Belle Marsh, among others.

178.   Mrs. Reynolds then deeded the remainder of her Sapelo Island land holdings to the Sapelo Island Research Foundation, Inc., now called the Sapelo Foundation. The State ultimately purchased this land, in the southern part of the Island, as well, using Department of Commerce (NOAA) funds. Through these purchases, the State acquired control of almost all the

land on Sapelo Island and placed the Island under the control of the DNR. As a condition of

using the NOAA funds, the State created the Sapelo Island National Estuarine Research Reserve

to preserve the estuarine environment on the Island.

179.    The State continues to claim title to the former Gullah-Geechee communities

based on Ms. Reynolds' land transfers. As described above, the land that Ms. Reynolds

transferred to the State was fraudulently and coercively obtained. The State knew or should have

known this because the fraudulent nature of these deeds is apparent, as set forth above.

180.    The State has been put on direct notice of the fact that its ownership of lands in

Raccoon Bluff was clouded through its commissioning of a preliminary title study. That study,

completed by an independent title researcher, concluded that Gullah-Geechee descendants have

valid claims to land in several of the original twenty lots in Raccoon Bluff and that the State's

interest in some lots is, at best, only a minority interest.

181.    The Georgia Supreme Court has similarly affirmed a jury verdict in which the

jury found that the DNR did not hold valid title to a parcel in Raccoon Bluff over which the

DNR had asserted an ownership interest. In *Tanner v. Brasher*, 254 Ga. 41, 326 S.E.2d 218

(1985), the Georgia Supreme Court squarely rejected the DNR's argument that its sovereign

immunity protected it from a suit in which Raccoon Bluff property owners sought to vindicate

their right to physically access the land they owned. When the Raccoon Bluff owners won their

case before a jury trial, the Georgia Supreme Court affirmed their verdict. *Brasher v. Tanner*,

256 Ga. 812, 353 S.E.2d 478 (1987).

182.    The State has nonetheless affirmatively continued to interfere with Gullah-

Geechee descendants' efforts to access their families' lands in Raccoon Bluff. The road to

Raccoon Bluff was originally gated by the State. After a lawsuit forced the State to remove the

42

gate, the DNR placed no trespassing signs along the road. These signs discourage even those Gullah-Geechee descendants who have ownership interests in Raccoon Bluff parcels, such as Plaintiff Sarah Frances Drayton, from visiting their land. When Gullah-Geechee descendants have attempted to fence or otherwise demarcate their Raccoon Bluff lands, the DNR has followed behind and removed the fences and markings.

183.    For example, Plaintiffs Brenda Jackson, Lisa Marie Scott, and Harry Lee Jordan's family inherited an interest in Raccoon Bluff Lot 13 through their ancestor Curry Walker, and their family has paid property taxes on the land in the amounts assessed and billed by McIntosh County. When Mr. Jordan attempted to reach the family's property with a surveyor, DNR officials demanded papers demonstrating an ownership interest. Unable to produce such documentation immediately, Mr. Jordan was not allowed to access his family's property that day.

184.    DNR officials similarly interfered with Gullah-Geechee descendant Steve Wilson's efforts to access the property in Raccoon Bluff Lot 13, in which he also has an ownership interest. When DNR officials encountered Mr. Wilson demarcating his property on the lot with stakes and wire, they ordered Mr. Wilson to take the fence down and leave the property. After Mr. Wilson departed, the DNR removed the stakes and wire.

185.    In interfering with Gullah-Geechee property owners' access to their property in Raccoon Bluff, even though it is well aware that its own title to the property is far from absolute, Defendant DNR is continuing its unlawful conduct in a way that deprives Plaintiffs and other similarly-situated individuals of their rights.

### 4.    *1980s-Present: The State-Created Sapelo Island Heritage Authority Has Further Worked Against the Ownership Interests of Sapelo Island's Remaining Gullah-Geechee Community*

186.    SIHA has similarly restricted Plaintiffs' access to lands on Sapelo Island based on

fraudulent conduct.

187.    The State created SIHA in 1983 for the express purpose of maintaining Hogg
Hummock "as it currently exists, a historic community, occupied by the direct descendants of the
slaves of Thomas Spalding." O.C.G.A. § 12-3-441(a)(9). The legislature has mandated that
SIHA "further the preservation of the cultural and historic values of [the Hogg Hummock]
community." *Id.*, § 12-3-441(a)(10).

188.    Far from acting to fulfill this mandate, however, SIHA has acted directly contrary
to these goals. SIHA has engaged in and facilitated discrimination against the Island's Gullah-
Geechee descendants by obtaining land on the Island through a process infected by fraud and
illegitimacy, and by conducting land transactions that favor white land owners over the very
community SIHA is charged with protecting.

189.    SIHA has repeatedly asserted ownership claims to land in Hogg Hummock at the
expense of Gullah-Geechee descendants and based on suspect or fraudulent chains of title. SIHA
currently claims to own over 130 acres in Hogg Hummock, a community recognized by the state
legislature as a Gullah-Geechee community that is "the last community of its kind in the State of
Georgia" and "which reflects the past culture of this state." O.C.G.A. § 12-3-441(a). SIHA
cannot demonstrate clear title for the land.

190.    The history of the Walker Estate is emblematic of SIHA's assertion of title based
on dubious claims and against the interests of Gullah-Geechee descendants. In 2006, the heirs of
Charles Walker, a Gullah-Geechee descendant, filed an action to quiet title to Lot 19X in Hogg
Hummock, claiming ownership of a parcel that the Walker family had worked for many years.

191.    SIHA opposed the Walkers' petition and asserted ownership of the parcel, relying
on a chain of deeds originating from Reynolds that purported to convey "all of Sapelo Island,"

with some exceptions in Hogg Hummock. The Reynolds' deed chain asserted in a conclusory fashion that the parcels he owned in Hogg Hummock "were conveyed to him by various deeds from time to time" and that the pertinent deeds were "on record in the Clerk's Office, McIntosh Superior Court."

192.    In the ensuing litigation, *Walker v. Sapelo Island Heritage Authority*, 285 Ga. 194, 674 S.E.2d 925 (2009), SIHA claimed that Lot 19X was one of the properties Reynolds had owned and then conveyed to SIHA. As with several similarly situated properties, however, no record exists of Lot 19X's transfer to Reynolds apart from his bald assertion of ownership. Accordingly, the legitimacy of SIHA's ownership of Lot 19X is far from clear and the chain of title relied upon by SIHA in the Walker litigation is highly suspect. SIHA's conduct was moreover directly contrary to the interests of the Walker family, part of the dwindling Gullah-Geechee community in Hogg Hummock.

193.    In 2009, SIHA similarly asserted ownership over a portion of Lot 26 in Hogg Hummock, against the interests of Plaintiffs Marion and Roberta Banks. Mr. and Mrs. Banks had consistently paid taxes on the parcel since 1989, installed a mobile home there in 2007 (at the direction of and the approval of DNR's so-called "Island Manager"). SIHA nonetheless asserted claim to the portion of Lot 26 where the Banks have their trailer and has attempted to force the Banks to move their mobile home. Again, SIHA's action is directly contrary to its very purpose of preserving Hogg Hummock as a historic community, occupied by the direct descendants of the slaves of Thomas Spalding, like Mr. and Mrs. Banks.

194.    In addition to challenging the Gullah-Geechee descendants' ownership rights to land in Hogg Hummock based on suspicious claims to title, SIHA has entered into agreements that blatantly favor white developers, while concurrently rejecting the efforts of Gullah-Geechee

descendants to use SIHA-controlled land.

195.    For example, in 2009, SIHA granted white developers Patterson and Hodges a ninety-nine-year lease to land in Hogg Hummock. Patterson and Hodges have since developed the land, building a three-story house with an elevator.

196.    At the same time, SIHA has ignored specific proposals made by Gullah-Geechee descendants seeking to lease SIHA-held land in Hogg Hummock for purposes of residential, economic, and agricultural development. Community members have sought to lease SIHA-held land in order to build cottage-style units that would attract cultural tourism and to cultivate hay to feed cattle maintained by Gullah-Geechee descendants on the Island. The SIHA Board has refused numerous requests made by and on behalf of Gullah-Geechee descendants to meet with community members or consider their proposals. Despite its clear mission, SIHA has never leased land to Gullah-Geechee descendants for any purpose even as it engages in such transactions with whites.

197.    Pursuant to its enabling statute, SIHA does not pay taxes on the 130 acres it claims to own in Hogg Hummock. Meanwhile the community's Gullah-Geechee descendants have in recent years been assessed with crippling property tax bills they cannot afford.

198.    SIHA has furthermore refused to engage with efforts by Gullah-Geechee descendants, HELP, and Raccoon Hogg to work through SIHA to create a community-governed land trust in Hogg Hummock that would preserve the community's cultural resources and ensure that Gullah-Geechee descendants are able to use, enjoy, and benefit from land on Sapelo Island.

C.    **Present-Day Conditions for Hogg Hummock's Gullah-Geechee Community**

199.    Except for the small community of Hogg Hummock, the State continues to assert ownership over the remaining 97% of land on Sapelo Island. This land is generally managed by

the DNR. UGAMI occupies 1,500 acres on the southern end of the Island, including the former Gullah-Geechee settlement of Shell Hummock. The western edge of the Island is dedicated to the Sapelo Island National Estuarine Research Reserve, part of NOAA's National Estuarine Research Reserve system.

200.    At its peak, the Gullah-Geechee community on Sapelo Island numbered more than 900 residents, living in at least thirteen different communities. Today, the Gullah-Geechee resident population hovers near fifty and is confined to Hogg Hummock.

201.    The arc of the history of Sapelo Island's Gullah-Geechee community is tracking a broader trend among the United States' Gullah-Geechee populations that has ended in the devastation of their communities. Originally, the Gullah-Geechee population extended from the southern end of North Carolina to the Florida-Georgia line. The Gullah-Geechee population on these barrier islands has succumbed to the mid-twentieth century developers who have forced, in cooperation and conjunction with governments and government officials, the Gullah Geechee off the islands to make way for resorts and other tourist attractions.

202.    Perhaps no island exemplifies the destruction of the Gullah-Geechee populations of the barrier islands more starkly than Hilton Head, an island off the coast of South Carolina. Just fifty years ago, Hilton Head was mostly inhabited by the Gullah-Geechee people, but as real estate developers collected the land and launched the construction of resorts all over the island, the Gullah-Geechee population quickly became confined to small areas of the island.

203.    Hilton Head is one of many islands whose Gullah-Geechee population has suffered greatly due to the encroachment of developers. Islands such as St. Simons and Daufuskie Island that once had large Gullah-Geechee populations have also now been taken over in large part by resort developments.

204.    Defendants have now set their sights on Sapelo Island as the next Gullah-Geechee island that is ripe for conversion from a community with a significant and unique history and cultural importance to a resort island owned by and catering to predominantly white populations. Those community members who have remained in Hogg Hummock have struggled to balance their traditional Gullah-Geechee culture with the economic pressures that threaten to break up their community. The Gullah-Geechee community on Sapelo Island is one of the last of its kind, and it continues to shrink in the face of unchecked development and state control that fails to prioritize the preservation of this vital heritage.

205.    Economic opportunities for any Gullah-Geechee descendant who desires to live full-time on the Island are extremely limited. Apart from jobs with the DNR and UGAMI, there are virtually no employment opportunities on the Island. While several residents are interested in developing sustainable tourism initiatives, the DNR monopolizes tourism on the Island, leaving few opportunities for Gullah-Geechee descendants.

206.    Indeed, many Gullah-Geechee descendants have already been forced off the Island, unable to sustain their way of life as a result of the lack of services, crippling tax increases, and unchecked development.

207.    In its 2018 Comprehensive Plan,[1] McIntosh County describes its intentions to continue promoting the development of tourism and commerce on Sapelo Island. The Plan sets out a clear intention by the County to develop Sapelo Island as a tourist destination.

208.    For example, the Plan identifies "promoting Sapelo Island" as an opportunity for the County's economic development, and articulates as goals making historic sites on Sapelo

_____

[1] A comprehensive plan is a planning document that sets out a community's short- to near-term goals for development, zoning, etc.

more accessible and identifiable to tourists, making the ferry schedule more visitor-friendly, building a public dock on the Island for day visitors, incentivizing residents to engage in tourist-friendly cottage industries, and enhancing access to and restoring facilities on the Island for the economic benefit of the County.

209.    Nothing in the 2018 Comprehensive Plan indicates that the County's goals for Sapelo were decided based on consultation with Island residents or their families.

210.    Plaintiffs and other Sapelo Island residents have sought for years to have the State and County Defendants increase the frequency of the ferry service and to build a fire station on the Island to protect residents. *See infra* Paragraphs 227-233, 268-280. The 2018 Comprehensive Plan identifies each of these as objectives—not for the benefit of residents or Gullah-Geechee descendants with familial connections to the Island, but instead for the benefit of tourists. Defendants have only been willing to provide these services when it could be in their own economic interests, but not to protect Plaintiffs and other Gullah-Geechee descendants.

**D.    Unequal and Absent Services on Sapelo Island**

211.    While McIntosh County expends extensive resources on housing and housing-related services in the predominantly white McIntosh County mainland and other islands within the County, County resources for housing and housing-related services to the predominantly African-American and Gullah-Geechee Sapelo Island are scant or non-existent. The provision of unequal services, and failure to provide services, described below is pursuant to a longstanding and ongoing policy or custom of McIntosh County to deny or provide unequal services to the predominantly African-American, Gullah-Geechee residents of Hogg Hummock while providing better and more services on the predominantly white mainland.

212.    Defendants State and DNR have followed a long-standing and ongoing policy of

allowing McIntosh County to deny equal services on Sapelo Island. While Defendants State and DNR have attempted to provide some services on the Island, they have failed to provide an adequate or equal level of services compared to those provided in other communities throughout the County and State.

      1.    *Emergency Medical Services*

      213.    McIntosh County provides no emergency medical services to Sapelo Island. Such services are readily available to residents on the mainland and the County spends a significant portion of its general fund each year on EMS and ambulance services—approximately $900,000 each year. Virtually none of those dollars benefits Sapelo Island residents.

      214.    In the past, medical professionals regularly traveled to Sapelo Island to perform check-ups and assist residents with their health issues and concerns. There was also a community health clinic for residents on Sapelo Island. Those programs have long since ended. Currently, there are no medical services whatsoever available to Sapelo Island residents and visitors.

      215.    Anyone injured or ill, or otherwise in need of medical attention, on Sapelo Island must travel to the mainland. Most often, individuals arrange for their own travel to the mainland by boat. In the most dire of circumstances, a medical helicopter has transported individuals from Sapelo Island to the mainland. At night, however, because there is no lighted space on Sapelo Island for the helicopter to land, residents generally have to assist with the landing by lighting a field or clearing with vehicle headlights.

      216.    While the DNR claims to have a roster of trained first responders on Sapelo Island to respond to medical emergencies, Plaintiffs are not familiar with any list of first responders. Further, no particular first responder is on call at any one time and there is nothing to prevent any first responder from leaving Sapelo Island at any given time. As a result, it is difficult for any

Sapelo Island resident to know whom to contact in the event of a medical emergency.

217.    For example, on one occasion, Plaintiff Andrea Dixon's late husband, who suffered a chronic illness, was on Sapelo Island and in need of emergency medical services. Ms. Dixon did not know whom to call. Another resident contacted someone by telephone, who made calls to other residents in an effort to track down anyone to contact for help. The series of phone calls delayed her husband's medical treatment. While her late husband would have benefited from a defibrillator, no one on Sapelo Island knew how to use one.

218.    Because there are no medical services on Sapelo Island, a person who is chronically ill, severely disabled, or otherwise in need of regular medical treatment, cannot live on Sapelo Island full-time.

219.    Many Plaintiffs elect not to travel to Sapelo Island or use their property as frequently as they would otherwise because they are not willing to risk the possibility of being unable to access medical treatment. For example, Plaintiff Lorie Banks and her late husband often refrained from visiting their property on Sapelo Island because it was too dangerous to go to the Island without any available medical services.

220.    Plaintiff Earlene Davis has family members who still live on Sapelo Island, but she cannot live there permanently, visit her family members, or use family property as regularly as she would like, in large part because of the lack of medical services available on the Island. Ms. Davis receives kidney dialysis treatment three days per week, which cannot be done on the Island. If she had a medical emergency on Sapelo Island, she would have to track down someone who could operate the ferry or another boat to take her to the mainland to receive treatment. Rather than risk being unable to receive medical treatment when necessary, Ms. Davis has stopped traveling to Sapelo Island as frequently as she has in the past.

221.    When Plaintiff Samuel L. Dixon's niece was bitten by a snake on Sapelo Island, Mr. Dixon was responsible for getting her to the dock. Although there is supposed to be a speedboat—owned by the DNR—at the dock to take residents to the mainland in the event of an emergency, Mr. Dixon had to find (on his own) a resident who was available to operate it.

222.    There was another incident on Sapelo Island where a man was experiencing chest pains. Residents had to assist him in getting to the mainland on the ferry. After significant delay, the man finally made it to a hospital in Brunswick; however, he died before he could receive treatment.

223.    On another recent occasion, an elderly Sapelo Island resident experienced symptoms of diabetic shock and needed emergency medical attention. It took approximately one hour to get the resident from her home to the ambulance. Other residents assisted her because the County makes no medically trained personnel available to Sapelo Island residents.

224.    The County and State's failure to provide residents with emergency medical services affected Plaintiff Charles Hall firsthand when his cousin died on Sapelo Island before he could make it to the mainland. In that case, it took several hours to get Mr. Hall's cousin to a hospital on the mainland and he passed away before doctors could treat him.

225.    The incidents of death or complications occasioned by a lack of medical services discourage or prevent Sapelo Island property owners, including Plaintiffs who are not residents on the Island, from living on the Island full-time.

    2.    *Fire Services*

226.    Defendants McIntosh County and DNR fail to provide sufficient fire protection on Sapelo Island. In recent years, there has been a small fire truck parked by the Senior Citizen Center on Sapelo Island, but Plaintiffs have never seen it in operation. The County does not

regularly test the truck, hose, or other equipment and the truck sits, exposed to the elements, untouched and unused for months and even years. Even if it does work, Plaintiffs are not aware of any person trained to operate it in the event of a fire emergency.

227.    The County estimates that it would require ten volunteers to adequately staff a fire station on Sapelo Island, but currently there is neither a fire station nor volunteers on the Island.

228.    For years, there have been fire hydrants sitting on their sides, not hooked to the water lines running under the ground along Sapelo Island roads, in an almost mocking gesture of how easy it would be to provide this necessary service. Those fire hydrants that have been installed are significant distances apart and not reliably within reach if a house fire were to break out. The total of four hydrants in all of Hogg Hummock that are standing up and are presumably attached to a waterline may or may not work. Plaintiffs have not seen them tested or operated. In addition, the lack of water pressure in the waterlines on the Island make it likely that the hydrants would not provide sufficient water to fight a fire.

229.    Many Plaintiffs have come to accept that in the event that their house catches fire, it will likely burn down. There is no formal protocol available to residents in the event of a fire emergency. Rather, neighbors rely on each other for help—members of the community come together to fight blazes with buckets of water and whatever other impromptu tools they can muster. Because of the weak water pressure on Sapelo Island, hoses are largely ineffective at fighting fires.

230.    In 2012, a fire broke out at Plaintiff Deborah Dixon's family property after a County-approved shrub burn spread too far. The family was forced to put out the fire without any assistance from any government entity. As a result of the fire, a family storage house, containing antiques and other personal property, was completely destroyed.

231.    A fire almost burned down Plaintiff Valerie Williams' grandparents' home. There were no fire hydrants by the property. Nor were there any individuals trained or employed by Defendants McIntosh County and DNR to contact. Instead, other residents came to her family's aid.

232.    Plaintiffs, like Reginald Hall, have assisted residents in putting out fires on Sapelo Island because Defendants McIntosh County and DNR have no fire breaks, fire-fighting equipment, or trained personnel on Sapelo Island. On one occasion, Mr. Hall and other residents filled large buckets with water to douse a fire. There were no nearby fire hydrants. Over four hours after the fire started, County fire personnel from the mainland reached the Island. When they arrived, they attempted to operate the fire truck, but it would not start.

3.    *Trash Services*

233.    Defendant McIntosh County charges all Plaintiffs who have developed properties on the Island for trash collection services. The trash fee—$128.40, which for many Sapelo Island property owners reflects a significant amount of money—is the same for mainland and Island property owners. The services are not.

234.    Mainland residents receive curbside pickup with residents having to do no more than wheel their County-provided garbage cans to the ends of their driveways.

235.    No such services are provided for Sapelo Island residents. There is no curbside trash pickup on Sapelo Island and Plaintiffs are not provided with a trash can for waste

236.    Sapelo Island residents and property owners visiting their properties, including Plaintiffs, must load their garbage into their vehicles and travel from their homes to a remote dumpsite in order to dispose of their trash.

237.    Prior to September 2013, the Island dumpsite consisted of several large

dumpsters. Residents and visitors threw their waste into the dumpsters. Animals, birds, and vermin congregated at the dumpsters, pulled trash out, and scattered it all around the dumpsite. Residents and visitors seeking to dump trash would have to chase off the animals and pick their way through the spilled waste as they made their way to the dumpsters.

238.    After the filing of HUD complaints by many of the Plaintiffs, who alleged, *inter alia*, that the County's charging a garbage fee to Island property owners while providing *no* garbage services on the Island was discriminatory, the State through the DNR (and notably not the County), installed a trash compactor at the dumpsite alongside the dumpsters.

239.    The State, through the DNR, has accepted responsibility for maintaining the dumpsite, but it does not adhere to its obligations. The area surrounding the trash compactor remains filthy and poorly maintained. Trash continues to remain scattered on the ground. Frequently, there are large buzzards and other animals at the trash compactor site because of the excess garbage, which continues to be deposited in the large dumpsters. The door to the compactor is also regularly left open, allowing animals and vermin into the compactor. The DNR does not maintain a regular schedule for trash removal and site cleanup.

240.    Much of the garbage accumulated at the dumpsite is deposited by the DNR and UGAMI employees. Private developers also deposit commercial waste at the site. As a result, Plaintiffs and other residents and property owners frequently do not enjoy full use of the dumpsite because there is often little or no room remaining in the compactor or dumpsters for their household trash. Frequently, garbage is left on the ground in front of the compactor because the compactor is full.

241.    Even if there is room in the compactor or surrounding dumpsters, disposal of the trash is difficult, or impossible, for some. Residents are forced to lift their trash into the trash

compactor for disposal. This task cannot be done by elderly residents and residents with disabilities. Plaintiff Sarah Frances Drayton, for example, loads her trash into a car and keeps it there day after day until she sees another person heading for the dumpsite. She follows that person so that they can help her deposit her trash in the compactor. Neither the State nor the County provides any services to assist these residents with their trash disposal.

242.    Recently, the locking mechanism on the trash compactor broke. Rather than repairing the lock, the DNR simply removed it. Currently, there is no safety mechanism on the trash compactor and, accordingly, nothing to prevent children from accessing the compactor. There is no lighting at the dump site and nighttime visits are particularly dangerous.

243.    While the State and its agencies and representatives or the County and its representatives could easily remedy the inadequate garbage disposal situation by providing basic trash collection services to Sapelo Island residents, using the garbage fees Island residents have been paying for years, they have chosen not to.

    4.    *Inadequate Roads*

244.    A number of roads have been constructed on Sapelo Island to allow residents, property owners, and visitors to travel to their homes and parcels, travel to and from the dock, and other areas of the Island. The roads on Sapelo Island include: East Perimeter Road, Bailey Road, Hall Road, Walker Road, Carter Road, Banks Road, Old Field Road, Wilson Road, Johnson Road, Baptism Road and Church Road. Hillery Road, Shell Hummock Road, North/South Autobahn, East/West Autobahn, King Savannah, Dogpatch Road, Miller Pump Road, Airport Road, Behavior Road, West Perimeter Road, Dock Road, Belle Marsh Road, Duck Pond Road, Beach Road, and Old Beach Road. Most of the roads on the Island are dirt roads.

245.    Defendant McIntosh County is responsible for the construction, maintenance, and

repair of County roads on Sapelo Island. The County Road Department spends an average of $1,000,000 on roads in the County. On Sapelo Island, the County occasionally grades the roads but fails to provide the necessary maintenance to ensure that the roads are safe and passable.

246.    In the absence of such maintenance, the dirt roads on Sapelo Island are unpaved, excessively bumpy, filled with holes, and poorly lit. The large potholes have existed for decades. Potholes that were observed by some Plaintiffs when they were children still remain.

247.    The bumpy and pothole-ridden roads are difficult for Plaintiffs to navigate. For example, Plaintiff Johnnie Hillery was often unable to drive on the bumpy roads because of his medical condition. Other Plaintiffs with disabilities have the same problem. Plaintiffs Andrea Dixon, Sarah Frances Drayton, Reginald Hall, and many others have sustained damage to their cars as a result of the potholes on Sapelo Island.

248.    When it rains, the potholes in the roads on Sapelo Island fill with mud and water up to one foot deep. The County has made no provisions for ensuring an adequate drainage system on Sapelo Island. The drainage pipes alongside the roads are decomposing. Ditches along the side of the road, which were intended to control water runoff, are filled with tree limbs, litter, and other debris, rendering them useless. After a few days of rain, these ditches overflow and flood the roads. Forced to drive through standing water, residents' vehicles have become waterlogged and inoperable.

249.    After an especially heavy rain, Sapelo Island's roads are washed away to the point that residents and visitors have to drive over each other's property. The frequently impassable roads are particularly problematic when there are medical emergencies because it is impossible to get to the ferry dock and off Sapelo Island.

250.    Plaintiff Sarah Frances Drayton has had her van stall in the water and mud and

been forced to leave her vehicle in the middle of the road and walk home. Plaintiff Stacey White, who runs a Sapelo Island tour business, has been forced to cancel scheduled tours when it rains because the roads are impassable.

251.    When it rains on Sapelo Island, some residents choose to remain at home and many property owners do not come to their parcels to avoid the conditions.

252.    Many Plaintiffs have experienced difficulty with flooding on Sapelo Island as a result of the Defendant McIntosh County's failure to maintain the roads and drainage system.

253.    Roads on Sapelo Island's North End are in even worse condition. Driving to the North End of the Island—where many of Plaintiffs' ancestors lived and owned properties and where some Plaintiffs still have an ownership interest in, and pay taxes on, parcels—is nearly impossible in inclement weather.

254.    Plaintiffs face other obstacles as they attempt to navigate Sapelo Island's narrow, underserviced roadways. For example, fallen trees are a common problem on the roads. Residents who encounter a downed tree may be required to drive in reverse down roads, as there is often no way to turn around or bypass the fallen tree without a chainsaw. Low hanging and downed trees pose a hazard to drivers on Sapelo Island. Again, the County does not maintain the trees. When low hanging trees are cut, it is done by residents, the DNR, or Georgia Power.

255.    Several culverts on the Island have fallen into disrepair or have collapsed and not been replaced. The failure of a culvert located near Behavior Cemetery has made the road leading to the cemetery virtually impassable. To circumvent the collapsed culvert, residents must drive through the graveyard where their ancestors are buried.

256.    Many of Plaintiffs' ancestors and other descendants of Sapelo Island slaves are buried in Behavior Cemetery. The cemetery is listed on the national Register of Historic Places

and is a unique African-American burial ground reflecting traditional African-American burial customs. The nomination form for the cemetery's placement on the National Register of Historic Places noted that the cemetery has the potential to yield an enormous amount of information about the burial customs of African-American communities.

257.    Plaintiffs have made several requests to both the County and the DNR to repair the culvert and reopen Behavior Road to allow access to their cemetery without damaging the burial grounds. Defendants McIntosh County and DNR have failed to make any efforts to replace the damaged culvert or otherwise repair the road.

258.    At the same time, Defendant DNR has provided a culvert for the driveway to a white property owner and his family—Karekin and Virginia Goekjian—who built a vacation home on the Island that they visit occasionally.

259.    Plaintiffs have complained to Defendants McIntosh County and DNR about the condition of the roads, but to no avail. Plaintiff Sarah Frances Drayton, for example, attended several County Commissioner meetings to request assistance and was reduced to tears when she was dismissed and told that nothing would be done.

260.    In contrast to Sapelo Island, McIntosh County adequately maintains the roads throughout the rest of the County. In fact, the Board of Commissioners recently announced the completion of a road-paving project for two predominantly white communities on the mainland. The two communities—Poppell Farms and Sapelo Circle—are of similar size to Sapelo Island in terms of population, but the racial composition of these communities is substantially different than Sapelo Island. Poppell Farms, a community of approximately 225 people, is more than eighty percent white. Sapelo Circle, a community of approximately fifty people, is one hundred percent white.

5.      *Insufficient Water and Sewer Services*

261.    Defendant McIntosh County is responsible for providing water service to unincorporated parts of the County, including Sapelo Island. The County, however, does not participate at all in the provision of water on Sapelo Island. The County has received millions of dollars from the USDA and on many occasions has spent over two million dollars a year on water projects in the County. It has not expended any of that grant money on Sapelo Island.

262.    Currently, the DNR provides water services on the Island. Those services are objectively inadequate. Water on Sapelo Island is rust-colored, cloudy, and has a foul taste and odor. At times the water is foamy and has particles floating in it.

263.    Most often, Plaintiffs do not drink the water. Instead, they rely on water from the mainland. Many Plaintiffs boil Sapelo Island's water before consuming or cooking with it.

264.    A recent report indicated that the water on Sapelo is chemically contaminated with high (and unsafe) levels of polychlorinated biphenyl ("PCB"). According to the Agency for Toxic Substances and Disease Registry, PCBs have been classified as carcinogenic, and may causes neurobehavioral and immunological changes in children. *See* Polychlorinated Biphenyls – ToxFAQs, Agency for Toxic Substances and Disease Registry Division of Toxicology and Health Human Services, http://www.atsdr.cdc.gov/toxfaqs/tfacts17.pdf.

265.    In December 2017, Island Manager Fred Hay sent a letter to "Hog Hammock Water System Customers" informing them that in August 2017, the DNR conducted testing of a water sample that had more than double the allowable amount of lead.

266.    Additionally, Sapelo Island residents do not have access to a sanitary sewer system and encounter obstacles in dealing with their human waste. Plaintiffs' properties must rely on septic tanks, which require frequent and costly maintenance, particularly because

pumping truck services have to come to the Island on the cargo barge that only occasionally makes trips to the Island. As a result, septic tanks on Sapelo Island are emptied infrequently and it is not uncommon for these septic tanks to become overloaded and to overflow.

6.     *Infrequent Ferry Services*

267.     The vast majority of Sapelo Island residents and visitors—all of those who do not have access to a private boat—are at the mercy of the Sapelo Island ferry, which is operated by Defendant DNR, as the sole means of public transportation between Sapelo Island and the mainland. The ferry runs only three times each day, with the first ferry leaving Sapelo Island at 7:00 a.m. and last ferry returning to Sapelo Island at 5:30 p.m.

268.     The ferry's limited schedule significantly restricts Plaintiffs' ability to maintain employment, go to appointments, run errands, or participate in other activities on the mainland.

269.     There is no school on Sapelo Island and children who live on the Island attend school in Darien. These children are largely unable to participate in after-school activities due to the ferry schedule. For example, football games at McIntosh County Academy (the County's only public high school) typically start at 7:30 p.m., hours after the last ferry has left for the day. The Academy's other sports' teams, including baseball and basketball, begin their games after 5:00 p.m. or 6:00 p.m. After-school practice for these sports can last between two and three hours each weekday. Students cannot participate in the Academy's sports or other after-school activities and make the 5:30 p.m. ferry back to the Island.

270.     One of Sapelo Island's more famous former residents, Allen Bailey, who now is the Kansas City Chiefs starting right defensive end, was forced to stay with friends on the mainland during high school football season when he was growing up so that he could attend football practice and games during the week.

271.     It is virtually impossible to maintain full-time employment while living on Sapelo Island. There are very few jobs available on Sapelo Island itself. The closest major job market on the mainland is in Savannah, Georgia. To hold a job in Savannah (while commuting from Sapelo Island each day) an Island resident would be required to leave Savannah no later than 4:00 p.m., presumably before the work day ended, to take the 5:30 p.m. ferry back to Sapelo Island. Even working in Brunswick, Georgia, which is closer than Savannah, is difficult. A resident would need to leave work in Brunswick before 5:00 p.m. in order to make it back to the dock in time.

272.     Many residents and property owners, who would live on the Island if they could live there and have a job on the mainland, have requested that the last ferry leave the mainland later than 5:30 p.m., but Defendant DNR has ignored these requests. To the contrary, Defendant DNR has demonstrated little flexibility in modifying its scheduling practices to fit the needs of Plaintiffs and other Sapelo Island residents and property owners. Plaintiffs arriving even one minute late for the ferry have been left at the dock with no other way to get home.

273.     Plaintiffs have suffered adverse consequences as a result of the DNR's refusal to alter the ferry schedule to accommodate Sapelo Island residents and property owners. For example, Plaintiff Harold Hillery, who was a photographer, was unable to accept jobs on Sapelo Island to photograph weddings and other events because the DNR would not make accommodations to the ferry schedule.

274.     Plaintiff Samuel L. Dixon wants to live on Sapelo Island full-time. However, the limited ferry schedule makes it impossible for him to live on the Island and work on the mainland. Mr. Dixon is one of many Plaintiffs who has attempted to persuade the DNR to make accommodations to the ferry schedule for those residents who need to work on the mainland, but his efforts and other Plaintiffs' efforts have been unsuccessful.

275.     Plaintiff Iregene Grovner, Jr. would live on Sapelo Island permanently if Defendant DNR made adjustments to the ferry schedule. Until 2012, Mr. Grovner and his family lived on Sapelo Island, but his family had to move from the Island because the limited ferry schedule was not compatible with his or his wife's work schedule.

276.     Additionally, the ferry does not run on holidays, which makes it difficult for residents to visit with their families then.

277.     While there are some home health care workers prepared to come to the Island to assist residents, they are unable to travel to Sapelo Island because of the ferry schedule.

278.     At the same time that it has mostly disregarded the requests of Sapelo Island's Gullah-Geechee residents, the DNR has catered its schedule to fit the needs of (the mostly white) employees of the State and tourists.

279.     Defendant State of Georgia and its agencies have exercised their authority and expended resources to provide a variety of public transportation services on the mainland, from constructing and maintaining roads and sidewalks to participating in the establishment of the Coastal Regional Coaches system, the region's coordinated public transportation system. Meanwhile, the State and the DNR have done little to improve the transportation available to Sapelo Island residents and property owners.

7.     *Ferry Inaccessibility*

280.     In addition to running at times that make living on the Island impossible for some, the Sapelo Island ferry is inaccessible to persons with disabilities.

281.     Accessible parking is limited at the dock on the mainland-side. Many of the spaces are covered in gravel and difficult for a person using a cane or wheelchair. There are no designated spaces for persons with disabilities on the Sapelo Island dock. The bathrooms at the

63

dock are not accessible, and there is no bathroom on the ferry.

282.    Neither McIntosh County nor the State and its agencies, including the DNR, provide services or make accommodations for persons with disabilities attempting to board the ferry. Often, the best system is an old and unreliable wheelchair brought by a Gullah-Geechee descendant to the dock for travelers with disabilities to use.

283.    The ramps leading up to the ferry are steep when the tide is low. The ramps are made of metal and are slippery when wet. In the past, there was a lift to assist persons with disabilities to board the ferry; however, it no longer exists. Now, wheelchair users and travelers who use canes or walkers must be lifted off the ground and physically carried onto the ferry by family members or other travelers.

284.    The State and DNR's failure to make the ferry accessible has deprived many Plaintiffs of the use and enjoyment of their homes and properties. For example, Plaintiff Johnnie Hillery, who is disabled, has experienced difficulty getting on and off the ferry because it is inaccessible to persons with disabilities. Mr. Hillery has frequently been prevented from parking close to the ferry (on both the mainland side and the Sapelo Island side) because of the limited parking available to persons with disabilities at the docks. As a result of the DNR's failure to make the ferry accessible to persons with disabilities or provide any resources for individuals with disabilities or health conditions, Mr. Hillery is unable to visit his Sapelo Island property with any regularity.

285.    Plaintiff Melvin Banks, Jr., who is now deceased, used a wheelchair and experienced substantial difficulty traveling on the ferry. He would often have to rely on workers or fellow travelers to carry him onto the ferry. Eventually, travel on the ferry became too difficult, and he and his wife, Plaintiff Lorie Banks, could no longer visit or use their property on

the Island.

286.    Plaintiff Roberta Banks also has difficulty traveling to and from Sapelo Island because the ferry is not accessible to persons with disabilities. It is painful for Mrs. Banks to walk the steep ferry ramp.

287.    Plaintiff Rall Grovner, who had a portion of his foot amputated and has extreme difficulty walking, frequently has to park a significant distance from the dock on the Sapelo side where there are no designated disabled parking spots. This makes it difficult for him to use the ferry.

288.    Traveling to and from Sapelo Island is taxing for Plaintiff Richard Banks because of his mobility impairments. Similarly, Plaintiff Melvin Banks, Sr. uses a wheelchair and has to be lifted onto the ferry by anyone who is nearby and willing to assist. Both Plaintiffs fear that they will be dropped or injured attempting to board or disembark the ferry. Moreover, Plaintiff Melvin Banks, Sr. used to visit and use his property on a weekly basis, but cannot any longer because of the difficulty traveling to and from Sapelo Island. Plaintiff Andrea Dixon finds it difficult to bring her elderly mother to Sapelo Island for the same reasons. Plaintiff Richard Banks has repeatedly told Defendant DNR that the ferry is dangerous for persons with disabilities. The DNR, however, has not responded to Mr. Banks' concerns.

289.    In the years before her death, Plaintiff Vernell Grovner rarely visited or used her Sapelo Island property because of the inaccessibility of the ferry.

290.    Plaintiff Verdie Walker was born on and owns property on Sapelo Island and used to visit regularly. In 2013, she had a stroke that left her with mobility impairments and ongoing health concerns. Now she struggles to use the ferry and therefore visits her birthplace less frequently than she would like.

291.     Defendants State and DNR's obligations under federal accessibility laws are well-established, and many Plaintiffs have made Defendant DNR aware of these issues and requested accommodation of their disabilities. Yet the State and the DNR have taken no steps to remedy the problems or make the ferry and dock accessible to persons with disabilities.

292.     The discriminatory and unequal services provided on Sapelo Island that are described above in Paragraphs 214-292 result not only from the policies and customs of McIntosh County but also from Defendant State's failure to monitor the County's use of state-allocated CDBG and HOME funds, as described in more detail below in Paragraphs 336-361.

**E.     Discriminatory Application of Zoning Codes**

293.     Both the State and the County have recognized that the preservation of the Hogg Hummock community on Sapelo Island is of vital historic and cultural importance for the benefit of present and future generations, but they have failed to take steps to preserve it and indeed have jointly taken countless actions that have harmed and continue to harm the viability of the community.

294.     The State of Georgia has recognized that the Hogg Hummock community "is composed primarily of the direct descendants of the slaves of Thomas Spalding" and that the community and "many of the buildings and structures located therein date back to the mid-nineteenth century;" that "[i]t is important to the citizens of the State of Georgia that this community, which reflects the past culture of this state, be preserved for the benefit of present and future generations." O.C.G.A. § 12-3-441(a).

295.     The State has stated that "[t]he best and most important use of this area of Greater Sapelo Island is for [Hogg Hummock] community to remain, as it currently exists, a historic community, occupied by the direct descendants of the slaves of Thomas Spalding . . . ."

66

O.C.G.A. § 12-3-441(a).

296.    McIntosh County has likewise recognized in its Code of Ordinances that the Hogg

Hummock Historic District "has unique needs in regard to its historic resources, traditional

patterns of development, [and] threat from land speculators and housing forms." The Code

therefore maintains restrictive zoning for the "Hog Hammock" district in an effort "to reserve

this area for low intensity residential and cottage industry uses which are environmentally sound

and will not contribute to land value increases which could force removal of the indigenous

[Gullah-Geechee] population." McIntosh County Zoning Ordinance, Art. IV, Sec. 1 and Art. VI,

Sec. 16.1.

297.    The County's zoning code establishes use restrictions and area regulations that

limit development in the Hogg Hummock Historic District. Among other restrictions, the zoning

code provides that land parcels in Hogg Hummock cannot "be assembled in areas greater than

one acre unless it is for the purposes of community conversation by a certified land trust;"

prohibits condominiums and multifamily housing; prohibits the paving of lots beyond the

parameters of a building footprint; and imposes a square footage limitation of 1,400 square feet

and a one-and-a-half story height limitation. *Id.*, Art. VI, Sec. 16.4.

298.    This zoning code has been enforced against Gullah-Geechee residents of Hogg

Hummock. For example, County officials informed Plaintiffs Charles Hall, Margaret Hall, and

Reginald Hall that their home was out of compliance.

299.    Plaintiff Johnnie Hillery was told by County officials that he was not permitted to

place a manufactured home on his property because of restrictions related to flooding. At least

one white resident has been granted permits by County officials to build a home on a

neighboring parcel of land. Another has been permitted to build a home right on the edge of the

marsh.

300.     Another Gullah-Geechee descendant who wanted to bring a trailer across Doboy Sound to place on his property was told by DNR officials that trailers were not permitted on the Island and refused to allow him to load his trailer on the DNR-operated cargo barge.

301.     Meanwhile, the County has allowed countless white property owners to construct large vacation homes and place cottages in direct violation of the zoning code. The DNR has supported and assisted in the construction of these out-of-compliance homes.

302.     The County has violated its own zoning ordinance by permitting these white developers and vacationers, who are unrelated to Gullah-Geechee descendants, to build large, well-appointed homes on the Island. These homes have indisputably lead to the increase of property values and property taxes. This "could" and in fact *has* forced Gullah-Geechee descendants to lose their land and move from the Island, exactly as the zoning ordinance predicted and was supposedly designed to prevent.

303.     Whites building second homes on the Island have been given permits by the County Building Inspector even though they violate the maximum square footage limitation set forth in the zoning code. Homes built by Mary Alice Thomas, the Patterson/Hodges development syndicate, Judge Robert L. Russell, and Kenneth Sams, as well as others, have exceeded the 1,400 square foot limitation, along with height limitations, as reflected in the building permits issued by the County.

304.     The County Building Inspector approved a home being built by a white vacationer on the very day the McIntosh Historic Preservation Commission recommended that the home construction not be approved.

305.     Another home being built on SIHA-controlled land in Hogg Hummock by a white

vacationer was approved by McIntosh County and the DNR, even though, upon information and belief, it violates the provisions of Georgia's Coastal Marshlands Protection Act**.**

## F.   <u>Discriminatory Property Appraisals</u>

306.   The McIntosh County Board of Tax Assessors' appraisals of real property in the County form the basis for annual tax assessments that the County collects from its residents.

307.   In 2012, Defendant County and its Board of Tax Assessors dramatically increased the appraisals of real property and homes on Sapelo Island owned by Gullah-Geechee descendants, including Plaintiffs.

308.   Defendant County and its Board of Tax Assessors implemented these dramatic increases in the appraisals of real property and homes on Sapelo Island pursuant to a policy with the intended and foreseeable effect of increasing property values and facilitating the development of high-priced vacation homes in Hogg Hummock and elsewhere on the Island that most Plaintiffs and other Gullah-Geechee descendants cannot afford.

309.   In 2012, the Board of Tax Assessors performed a sales-ratio analysis based on recent Sapelo Island land sales. The Board of Tax Assessors then used this sales-ratio analysis to create a land-rate schedule that it used to determine the land values for Hogg Hummock properties, including all of the properties at issue in this action.

310.   The result was extreme and unjustified increases in the appraised values of the Hogg Hummock properties. Plaintiffs' properties saw an approximate average five-fold increase of the assessed value of their land. The assessed value of Plaintiff Benjamin Hall's parcel went from $10,500 in 2011 to $331,650 in 2012, a one-year increase of 3059%. Plaintiff Earlene Davis' family land had an assessed value of $7,500 in 2011 but an assessed value of $191,000 in 2012. Plaintiffs Sonnie Jones, Valerie Williams, and Mary Dixon Palmer each saw the appraised

values of their Sapelo Island properties rise from $10,000 in 2011 to $181,250 the next year.

311.   Every Plaintiff's property had similarly unjustified increases in the assessed value.

312.   Defendant County has approved and adopted its Board of Tax Assessors' discriminatory appraisals by, *inter alia*, directing its Tax Commissioner to collect *ad valorem* taxes consistent with the Board of Tax Assessors' appraisals and assessments.

313.   The appraisal increases were a result of an unsupported, discriminatory appraisal process that violated Title 48, Chapter 5 of the Official Code of Georgia and the Georgia Department of Revenue's Appraisal Procedure Manual, which sets forth the uniform procedures to be used by local tax appraising officials in the appraisal of all real and personal property for property tax purposes. *See* O.C.G.A. § 48-5-269.1; Ga. Comp. R. & Regs. 560-11-10.08, 560-11-10.09. At least eight demonstrable errors in the appraisal process appear from the face of the appraisals.

314.   First, the Board of Tax Assessors did not consider the zoning classification of the properties, a mandatory factor identified in the Appraisal Manual. This factor is particularly important on Sapelo Island where the zoning district requires the preservation of Gullah-Geechee culture, as set forth above, and which limits the value of parcels in Hogg Hummock. Many of the sales used in the County's sales-ratio analysis involved parcels that are not in compliance with the requirements of the County's zoning ordinance. None of the purchasers of parcels included in the County's sales-ratio analysis were Gullah-Geechee descendants. The County did not consider the fact that the sales involved properties with non-conforming uses, which artificially inflated their appraised values as compared to Hogg Hummock properties.

315.   Second, the Board of Tax Assessors' sales-ratio analysis and the resulting

appraisals of Hogg Hummock properties did not take account of the fact that, as described above, the typical municipal services are inadequate or non-existent on the Island.

316.    Third, seventy-five percent of the sales used to set values in the sales-ratio analysis involved a sale or purchase by a single person who appears to be a land speculator. The sales were therefore not reflective of what a *bona fide* purchaser, who is being governed by typical market forces, would pay for the parcels. *See* O.C.G.A. § 48-5-2(3).

317.    Fourth, two of the sales involved a purchase of a parcel by an adjoining landowner. A parcel is typically more valuable to an adjoining landowner than any other prospective purchaser. The Board of Tax Assessors did not make any adjustment for the properties included in the sales-ratio analysis that involved purchases by adjoining landowners.

318.    Fifth, four of the sales occurred in a one-week period three years before the analysis. In fact, more sales in the analysis were from 2010 than from 2012, the first tax year for which the Board of Tax Assessors applied the sales-ratio analysis.

319.    Sixth, no adjustment was made for a sale in Raccoon Bluff, which is in a unique area of the Island. The sale was being used for a purpose different from the Hogg Hummock homes and lots being assessed.

320.    Seventh, the Board of Tax Assessors made no effort to determine the motivation of the purchasers or the uses that they planned for the property. The Georgia Appraisal Procedure Manual requires that the appraising official determine the motivations of buyers and sellers to ensure that comparable sales are the product of arms-length transactions. *See* Ga. Comp. R. & Regs. 560-11-10-.09(3)(a)2, (4)(b)2. The County, however, made no effort to contact the purchasers or sellers of the properties used in the sales-ratio analysis.

321.    Eighth, the Board of Tax Assessors did not consider the list prices of properties

that were currently on the market. One property sat on the market for nearly two years at a list price $16,000 *below* the Board of Tax Assessors' appraised value. Another property did not sell at a price $23,000 below the Board of Tax Assessors' appraised value. These facts establish that the Board of Tax Assessors' appraised values were far above what a knowledgeable purchaser would pay for a parcel.

322.     The values that resulted from the flawed sales-ratio analysis threatened the viability and survival of Hogg Hummock. Some Hogg Hummock property owners, many of whom are on fixed incomes or otherwise have limited means, were forced to sell or forfeit land that had been in their families for generations. Some property owners who could not pay the inflated taxes, including Plaintiff Stacey White, were forced to see their property sold by the County at a delinquent property tax sale.

323.     The Board of Tax Assessors' determination of the 2012 and 2013 Fair Market Values for real property located on the majority white mainland of McIntosh County was not based on the same erroneous and legally flawed procedures that it used to determine the Fair Market Values for real property in the majority African-American, Gullah-Geechee community of Hogg Hummock on Sapelo Island.

324.     Defendant County and its Board of Tax Assessors' decisions relating to the appraisal and taxation of properties on Sapelo Island as set forth above demonstrate a disregard for the survival of the Hog Hummock community, despite its status as a nationally recognized historic and cultural resource that should be preserved.

325.     When numerous Sapelo Island property owners appealed the tax assessments to the McIntosh County Board of Equalization, that Board rubber-stamped the increases even while acknowledging the erroneous nature of the underlying appraisals.

326.    Ultimately, the County settled the tax appeals that were brought in state court and has reduced the tax assessments for most Plaintiffs' properties to approximately twenty-five percent over the 2011 value.

327.    The discriminatory and flawed appraisals have injured Plaintiffs and other Sapelo Island property owners, all of whom were forced to face three years of exorbitant tax bills. Some were forced to sell their land, or had their land sold, for failing to pay the taxes before their appeals successfully lowered the tax assessments.

328.    The erroneously high appraisals furthermore adversely affected property values and owners' and would-be purchasers' ability to buy, sell, and obtain financing.

329.    In addition to the financial strain, all of these effects have threatened the continuing viability of this last remaining intact Gullah-Geechee community, causing the individual Plaintiffs substantial emotional distress and frustrating the mission of Plaintiffs HELP and Raccoon Hogg (collectively, "Organizational Plaintiffs"). That emotional distress and mission frustration is ongoing as there is no guarantee that the County and Board of Tax Assessors will not impose similarly flawed and discriminatory assessments in the future, after the settlement terms expire.

330.    Defendant County and its Board of Tax Assessors have refused to reduce the inflated 2012-2014 tax assessments for some Plaintiffs, including David Grovner, Jr., Deborah Dixon, Cheryl Grant, Celia Grovner, Benjamin Hall, Reginald Hall, Jesse Jones, and Stacey White, and other Sapelo Island property owners who did not appeal their assessments to the County Board of Equalization.

331.    While the property tax appraisals stood at exceedingly, and unjustifiably, high levels, Sapelo Island residents and property owners, including Plaintiffs, were receiving virtually

no County services on the Island. Even prior to 2012, and now that the assessments have been reduced again, Plaintiffs pay amounts similar to what is paid by property owners on the mainland, but Sapelo Island's Gullah Geechee receive essentially none of the services seen on the mainland.

**G.**     **County's Refusal to Consider Historic District Preferential Tax Assessment**

332.    Despite recognizing the historic value of Hogg Hummock, having placed it on the County's list of historic places, and understanding the destructive effect of the property tax assessment increases, the Board of Commissioners refused to even consider a proposed ordinance that would have established preferential tax assessment freezes for Hogg Hummock properties as being in a historic district pursuant to Official Code of Georgia Section 48-5-7.3.

333.    When the sole African-American County Commissioner, Charles Jordan, circulated a proposed ordinance to create a historic property preferential tax assessment for the County's historic districts—including Hogg Hummock—Commissioner Spratt, who is white and once owned property on Sapelo Island herself, required a motion and a second in order for the County Attorney to draft a resolution that would have allowed the legislation to be considered. Even the County Attorney noted that Spratt was deviating from the normal procedure for the Commission's consideration of new legislation. No other commissioner seconded Commissioner Jordan's motion, and the proposed legislation was defeated on the spot, without being allowed to go through any legislative process

334.    The Gullah Geechee Cultural Heritage Corridor Commission ("GGHCC") had written a letter to the Commission confirming the historical and cultural significance of Hogg Hummock and the need to protect the unique community from land value increases that could force the Gullah-Geechee descendants off land that had been inhabited by their families since the nineteenth century. The GGHCC's views were not considered by the Board of Commissioners,

who prevented even a reading of the proposed ordinance. Instead, the Board of Commissioners let the excessive tax increases stand.

**H.**   **State and County's Discriminatory Expenditure of Funds**

335.   Each year, the State receives tens of millions of dollars in federal financial assistance, including CDBG and HOME funds. The State, through Defendant DCA, allocates some of this federal funding to McIntosh County.

336.   Annually, for at least six years, $100,000 has been budgeted as income received by McIntosh County for Sapelo Island. There is no indication of that money being spent on Sapelo Island or to otherwise benefit the Island's Gullah-Geechee population. Upon information and belief, there has been no reporting of how that money has been spent.

337.   NOAA routinely allocates funds to Defendant DNR to fund the Georgia Coastal Management Program, and did so again as recently as November 2016. That funding supports, among other things, jobs for coastal management, public access, water quality, and coastal community development.

338.   NOAA also allocates funds to the DNR for operations, research, monitoring, education, training, stewardship, and the visitors center at the Sapelo Island National Estuarine Research Reserve, and did so as recently as 2017.

339.   The DNR allocates some of the NOAA funding it receives to subrecipients in Georgia as Coastal Incentive Grants. The DNR does so pursuant to its administration of the Georgia Coastal Management Program, which has a mission to balance economic development in Georgia's coastal area with the preservation of natural, environmental, historic, archaeological, and recreational resources.

340.   Despite the mission of the Georgia Coastal Management Program, Defendant

DNR has not allocated any of the federal financial assistance it has received from NOAA to improve water quality on Sapelo Island, promote job and economic development for Hogg Hummock residents, or preserve historic and natural resources for Hogg Hummock residents or Gullah-Geechee descendants.

341.    Defendant DCA has failed to ensure that when it allocates federal financial assistance to other agencies and to local governments including McIntosh County, that any of that federal funding is used to benefit the African-American, Gullah-Geechee community on Sapelo Island.

342.    For Defendant County, its Board of Commissioners decides whether to apply for federal financial assistance and decides how to spend any federal financial assistance that the County receives.

343.    There is no other agency, office, or department within the McIntosh County government that has authority to decide whether to apply for federal financial assistance and how to allocate whatever federal financial assistance the County receives.

344.    McIntosh County has been a regular recipient of CDBG funds from Defendant DCA. Between 2010 and 2015, McIntosh County's budgets reflect receipt and expenditure of approximately one million dollars in CDBG funds. The expenditures have primarily been on a mainland waterline project and administrative costs.

345.    The Board of Commissioners has submitted applications for CDBG funding from HUD to Defendant DCA, which decides how to allocate CDBG funding across the State.

346.    Although it has received and disbursed CDBG funds at least as recently as 2015, the last time the Board of Commissioners allocated any CDBG funding for Sapelo Island was twenty or more years ago, to build the Sapelo Island Senior Center.

347.    The Board of Commissioners authorized the submission of an application for a grant from the USDA to improve water quality and the availability of water service on the mainland. The assistance from the USDA comprised both a loan and grant money.

348.    Millions of dollars have been spent by the Board of Commissioners to build water projects with the USDA award. For example, close to two million dollars of USDA grant money was spent in 2010 for water projects and over three million dollars was spent in 2011. The County budgeted another $800,000 in expenditures of USDA funds for fiscal year 2015. None of those millions of dollars have gone or are budgeted to go to Sapelo Island, which has, for years, desperately needed construction and improvements to the Island water system.

349.    The Board of Commissioners has decided to use CDBG funds from HUD via the DCA to augment the USDA loan for the provision of water services on the mainland, but not for any improvements to water services or other services on Sapelo Island.

350.    The Board of Commissioners has not allocated any of the funding the County has received from the USDA to improve water quality or water service for residents on Sapelo Island and has not applied for any other USDA or other federal agency grants to support water service or other services on Sapelo Island.

351.    Defendant State and Defendant DCA have allowed Defendant County by and through its Board of Commissioners to use CDBG and HOME funds and other financial assistance that the DCA has allocated to the County in the discriminatory manner described above.

352.    The purpose of state-administered CDBG funding is to enable States to help local governments carry out community development activities, with an emphasis on providing services to vulnerable communities in need of housing stability and economic development—

communities like Hogg Hummock.

353.    The purpose of state-administered HOME funding is to enable States to help local governments expand housing stability for vulnerable groups, including through assistance to local non-profits.

354.    CDBG and HOME funds are therefore intended to benefit groups like the Gullah-Geechee community on Sapelo Island as well as Plaintiffs HELP and Raccoon Hogg.

355.    Defendant State and Defendant DCA could and should have ensured that Defendant County used some of the CDBG and HOME funding to promote housing stability and economic development on Sapelo Island for the benefit of Hogg Hummock's Gullah-Geechee community and to begin remedying the stark inequalities suffered by Plaintiffs and other African-American, Gullah-Geechee descendants with connections to Sapelo Island that are presented above.

356.    The Board of Commissioners also authorized the submission of an application for a grant from the U.S. Department of Transportation ("USDOT") for the development of a wildlife nature trail on the mainland. Continuing through at least fiscal year 2017, the Board of Commissioners has not allocated any of the funding it received from the USDOT to develop trails or transportation services on Sapelo Island, and it has not applied for any other USDOT or other federal agency grants to support transportation opportunities to or on Sapelo Island.

357.    Property taxes make up approximately forty percent of McIntosh County's annual revenue. Sapelo Island property owners have been assessed a disproportionate, or from 2012-2014 a significantly disproportionate, share of the property taxes, particularly when compared to the services they receive. The predominantly Gullah-Geechee Sapelo Island residents and property owners receive almost no benefit from the property taxes they pay.

358.     In addition to the differential expenditure of County funds for emergency, road, trash, water, and sewer services on the mainland as compared to the Island, as described above, each year the County spends approximately $350,000 to $450,000 on its "Department of Leisure Services." There are no leisure services on the Island. Even mosquito control is absent on the Island. On some populated islands within McIntosh County, visitors can have a comfortable stay almost any time of the year. On Sapelo Island, there are months when mosquitos and gnats force most to stay indoors. That is in large part because none of the monies spent by the County for mosquito control have been used on Sapelo Island.

359.     McIntosh County has been allocated $9.5 million in Georgia Special Purpose Local Option Sales Tax ("SPLOST") funds to be spent on County capital improvement projects during fiscal years 2011-2016. The expenditure of the County's SPLOST funds is to be used for capital outlays to benefit the County. County budgets show no indication of such monies being spent on Sapelo Island. When HUD investigators asked what capital improvement monies had been spent on Sapelo Island, a County official responded that the County had built a fire station on the Island. The "fire station" is a cement pad on which the decades-old, largely inoperable fire truck is parked.



360.    Rather than expending funds to benefit the Gullah-Geechee residents and property owners on Sapelo Island, the County and the State of Georgia have directed the money to predominantly white areas on the mainland. Indeed, even when funds are directed toward the Island, they do not benefit the Gullah Geechee. For example, the State chose to spend close to one million dollars building a Sapelo Island Visitor Center as a public outreach facility for the Sapelo Island National Estuarine Research Reserve. Despite requests for the center to be built on Sapelo Island where it could provide jobs for Sapelo Island residents, the State chose to build the Center on the mainland. As expected, the employees staffing the Center are not Sapelo Island Gullah-Geechee descendants. The visitor center only helps the State recruit visitors to DNR-run Island tours and away from the numerous Gullah-Geechee tour operators on the Island who are trying to develop the on-Island economy.

## VI.    INJURY TO PLAINTIFFS

361.    Defendants' illegal discrimination has caused Plaintiffs to suffer irreparable and ongoing injury for which there is no adequate remedy at law and which will continue to cause injury to them unless and until injunctive relief is granted.

362.    As a direct result of Defendants' discriminatory conduct as described above, individual Plaintiffs have suffered, and continue to suffer, mental and emotional distress, humiliation, embarrassment, pecuniary loss, and the deprivation of their housing and civil rights. By providing inferior and unequal services to the African-American and Gullah-Geechee population on Sapelo Island, Defendants have deprived Plaintiffs of the full use, benefit, and enjoyment of their land, as well as the opportunity to take advantage of the services Defendants normally provide.

363.    While Plaintiffs spend money on property taxes for Sapelo Island land, they receive scant, if any, municipal and housing-related services in return.

364.    Defendant County's approval and implementation of its Board of Tax Assessors' discriminatory appraisal practices are driving up property values in Hogg Hummock and threaten Plaintiffs' ability to maintain continuing ownership of properties that have been in their families for generations, threatening the stability and viability of the Hogg Hummock community.

365.    The lack of basic services combined with the specific threat of losing land because of property taxes is a significant source of emotional distress occasioned by Defendants' discrimination.

366.    As a result of Defendants' discriminatory conduct described above, Plaintiffs with disabilities have suffered, and continue to suffer, additional mental and emotional distress, humiliation, embarrassment, deprivation of their housing and civil rights, as well as physical injury and/or the substantial risk of physical injury. For Plaintiffs with disabilities, traveling the steep ramp leading to and from the ferry is taxing, humiliating, and painful. By failing to make both the dock and the ferry traveling to and from Sapelo Island accessible to persons with disabilities, Defendants deter, and in some cases deny altogether, the ability of these Plaintiffs to

access, use, and enjoy their property.

367.    Defendants' discriminatory provision of services adversely affects housing conditions of the individual Plaintiffs who reside on Sapelo Island.

368.    But for the discriminatory and unequal services that Defendants provide on Sapelo Island, many of the individual Plaintiffs who do not currently reside there would reside on Sapelo Island and/or use and enjoy property they own on Sapelo Island more frequently.

369.    After receiving and investigating a complaint from a Sapelo Island descendant regarding Defendants' discriminatory conduct on Sapelo Island, HELP and Raccoon Hogg initiated programs and engaged in community outreach in an effort to counteract Defendants' discrimination.

370.    The Organizational Plaintiffs attended local government meetings to advocate on behalf of Sapelo Island residents. The Organizational Plaintiffs have spoken about Defendants' discrimination at a public hearing at the Georgia State Capitol and have attended Board of Commissioners meetings in support of Sapelo Island residents. Additionally, the Organizational Plaintiffs have met with local and state agencies in an effort to bring the agencies' attention to Defendants' discriminatory conduct and secure assistance for Sapelo Island residents. The Organizational Plaintiffs advocated on behalf of Sapelo Island residents and property owners when residents were charged taxes and fees but received no services from Defendant McIntosh County.

371.    Because Defendants have not adequately responded to Plaintiffs' concerns, the Organizational Plaintiffs have hosted town hall meetings on Sapelo Island to inform residents and property owners about government action related to Sapelo Island, including municipal services and tax assessments. On other occasions, the Organizational Plaintiffs have hosted

"Know Your Rights" forums on Sapelo Island to educate Sapelo Island residents and property owners regarding their civil rights. The Organizational Plaintiffs have recruited and dispatched volunteers to Sapelo Island to provide logistical support for these meetings. The Organizational Plaintiffs have hosted economic workshops and other forums aimed at revitalizing Sapelo Island and assisting descendants in retaining their ancestral lands.

372.    In direct response to Defendants' discrimination, the Organizational Plaintiffs have worked with Sapelo Island residents to create a Sapelo Island community land trust (the Sapelo Island Ancestral Land Trust or "SALT") to acquire and manage land on behalf of Sapelo Island descendants. To do so, their staff have conducted substantial research and have recruited students and academics at local institutions to conduct research regarding the land trust program.

373.    The Organizational Plaintiffs have also worked to bring public attention to Sapelo Island, particularly to the threat to Sapelo Island's Gullah-Geechee population occasioned by Defendants' discriminatory conduct. For example, HELP created the Gullah Geechee Culture Initiative website devoted to educating the public on issues impacting the Sapelo Island population. The website includes information about Gullah-Geechee culture and Sapelo Island descendants' fight to maintain both their land and cultural identity in the face of Defendants' conduct.

374.    The Organizational Plaintiffs have been directly and substantially harmed by Defendants' discriminatory conduct. Defendants' actions have undermined their programs and frustrated their respective missions. Additionally, given the scope of Defendants' discrimination, and the number of individuals impacted, the Organizational Plaintiffs have had to devote significant time and resources to additional education, outreach, and advocacy efforts on Sapelo Island. Accordingly, they have had to divert scarce staff time and resources to their efforts on

Sapelo Island, which has required them to forgo the other programmatic activities they would have otherwise pursued.

375.    Through the acts and omissions alleged herein, all Defendants have frustrated the mission and diverted the resources of both HELP and Raccoon Hogg by: (a) undermining their education, advocacy, and training programs designed to improve social and economic conditions in Georgia; (b) requiring them to commit scarce resources and substantial time to addressing Defendants' conduct, engaging in a counteractive education and outreach campaign, and developing educational materials to identify and address Defendants' unlawful actions; and (c) interfering with their attempts at improving socioeconomic conditions for all Georgians.

376.    Through the acts and omissions alleged herein, Defendants have impaired the Organizational Plaintiffs' ability to serve people with disabilities by making it difficult or impossible for their employees, board members, and clients to attend meetings on Sapelo Island and to reach people with disabilities in the community.

377.    Through the acts and omissions described herein, Defendants have acted negligently, intentionally, maliciously, and with willful, wanton, callous, and reckless disregard for the rights guaranteed by federal civil rights laws.

378.    Through the acts and omissions described herein, Defendant County has acted pursuant to a long-standing and ongoing policy to interfere with and deny the African-American, Gullah-Geechee community's rights to housing and municipal services, for the purpose of, among other reasons, forcing this community off of its historic home on Sapelo Island and facilitating the development of high-end vacation housing for mostly white developers and buyers.

379.    Defendants' patterns, policies, and practices of discrimination as described herein

constitute a continuing violation of the federal civil rights laws.

## VII.   CAUSES OF ACTION[2]

### FIRST CAUSE OF ACTION
### 42 U.S.C. §§ 1981, 1983

*Brought by All Plaintiffs Except HELP and Raccoon Hogg*

**For Injunctive and Declaratory Relief Against Defendants Kemp, Williams, and County**

**For Damages Against Defendant County**

380.   42 U.S.C. § 1981 prohibits discrimination based on race, color, and ancestry or ethnic characteristics in the making and enforcement of contracts.

381.   As set forth in more detail above, including in Paragraphs 5-6, 13-15, 145, 182-185, 204-206, 212-232, 233-243, 255-259, 262-291, 305, 335-351, and 360, Defendant Kemp in his capacity as Governor and Defendant Williams in his capacity as the Commissioner of DNR have violated and are violating § 1981 by, *inter alia*:

  a.   Providing unequal and discriminatory services on Sapelo Island, including essential municipal services such as garbage removal; emergency fire and medical services; water and sewer services; road maintenance; and transportation to and from the mainland.

  b.   Denying African Americans and Gullah-Geechee descendants the ability to use, access, occupy, and/or possess real property on Sapelo Island.

382.   As set forth in more detail above, including in Paragraphs 12, 186-198, and 305,

---

[2] The Court has previously dismissed claims brought in the First Amended Complaint (ECF Doc. 29) pursuant to 42 U.S.C. §§ 3604(a), (b), (f)(1), (f)(2), and 3605. The Court has also dismissed all of Plaintiffs' claims against the Sapelo Island Heritage Authority and the Board of Tax Assessors as well as Plaintiffs' claims for damages against Defendant Jessup. The Court dismissed all of these claims based on legal conclusions for which amendment would be futile, and Plaintiffs have therefore not included these dismissed claims in the Second Amended Complaint but reserve their right to challenge the dismissals of the Sapelo Island Heritage Authority and the Board of Tax Assessors on appeal.

Defendant Kemp, in his capacity as Chairperson of SIHA, has violated and is violating § 1981 by, *inter alia*:

    a.  Refusing to preserve, protect, or promote the ability of African Americans and Gullah-Geechee descendants to acquire land in Hogg Hummock or elsewhere on the Island while engaging in real estate transactions that favor white owners and investors and refusing to honor Plaintiffs' claims to land on Sapelo Island.

    b.  Denying African Americans and Gullah-Geechee descendants the ability to use, access, occupy, and/or possess real property on Sapelo Island.

383.    As set forth in more detail above, including in Paragraphs 4-8, 204-210, 213-266, 280-292, 296-334, and 342-360, Defendant County has violated and is violating § 1981 by, *inter alia*:

    a.  Providing unequal and discriminatory services on Sapelo Island, including essential municipal services such as garbage removal; emergency fire and medical services; water and sewer services; road maintenance; and transportation to and from the mainland.

    b.  Enforcing zoning restrictions against African Americans and Gullah-Geechee individuals and families who own land on Sapelo Island but not against white property owners and conducting unequal appraisals.

    c.  Denying African Americans and Gullah-Geechee descendants the ability to use, access, occupy, and/or possess real property on Sapelo Island.

384.    These Defendants' conduct is motivated by discriminatory intent to deny equal contracting rights and opportunities because of the individual Plaintiffs' race, color, and/or

national origin.

385.    These Defendants' conduct is pursuant to a racially discriminatory policy or custom to prevent African Americans and Gullah-Geechee descendants from continuing to own, occupy, use, and enjoy real property on Sapelo Island.

## SECOND CAUSE OF ACTION:
### 42 U.S.C. §§ 1982, 1983

#### *Brought by All Plaintiffs Except HELP and Raccoon Hogg*

#### For Injunctive and Declaratory Relief Against Defendants Kemp, Williams, and County

#### For Damages Against Defendant County

386.    42 U.S.C. § 1982 prohibits conduct that denies people of color the same rights as are enjoyed by white citizens to inherit, purchase, lease, sell, hold, or convey real property.

387.    As set forth in more detail above, including in 5-6, 13-15, 145, 182-185, 204-206, 212-232, 233-243, 255-259, 262-291, 305, 335-351, and 360, Defendants Kemp in his capacity as Governor and Defendant Williams in his capacity as Commissioner of the DNR have violated and are violating § 1982 by, *inter alia*:

a.    Providing unequal and discriminatory services on Sapelo Island, including essential municipal services such as garbage removal; emergency fire and medical services; water and sewer services; road maintenance; and transportation to and from the mainland.

b.    Denying African Americans and Gullah-Geechee descendants the ability to use, access, occupy, and/or possess real property on Sapelo Island.

388.    As set forth in more detail above, including in Paragraphs 12, 186-198, and 305, Defendant Kemp, in his capacity as Chairperson of SIHA, has violated and is violating § 1982 by, *inter alia*:

    a.  Refusing to preserve, protect, or promote the ability of African Americans and Gullah-Geechee descendants to acquire land in Hogg Hummock or elsewhere on the Island while engaging in real estate transactions that favor white owners and investors and refusing to honor Plaintiffs' claims to land on Sapelo Island.

    b.  Denying African Americans and Gullah-Geechee descendants the ability to use, access, occupy, and/or possess real property on Sapelo Island.

389.    As set forth in more detail above, including in 204-210, 213-266, 280-292, 296-334, and 342-360, Defendant County has violated and is violating § 1982 by, *inter alia*:

    a.  Providing unequal and discriminatory services on Sapelo Island, including essential municipal services such as garbage removal; emergency police, fire, and medical services; water and sewer services; road maintenance; and transportation to and from the mainland.

    b.  Enforcing zoning restrictions against African Americans and Gullah-Geechee individuals and families who own land on Sapelo Island but not against white property owners and conducting unequal appraisals.

    c.  Denying African Americans and Gullah-Geechee descendants the ability to use, access, occupy, and/or possess real property on Sapelo Island.

390.    These Defendants' conduct is motivated by discriminatory intent to deny African Americans and Gullah-Geechee descendants the same rights as are enjoyed by white citizens to inherit, purchase, lease, sell, hold, or convey real property on Sapelo Island.

391.    These Defendants' conduct is pursuant to a racially discriminatory policy or custom to prevent African Americans and Gullah-Geechee descendants from continuing to own,

occupy, use, and enjoy real property on Sapelo Island.

### THIRD CAUSE OF ACTION:
**U.S. Const. Amend. XIV, § 1, cl. 4; 42 U.S.C. § 1983**

***Brought by All Plaintiffs Except HELP and Raccoon Hogg***

**For Injunctive and Declaratory Relief Against Defendants Kemp, Williams, and County**

**For Damages Against Defendant County**

392.    The Equal Protection Clause of the Fourteenth Amendment makes it unlawful for a State to "deny to any person within its jurisdiction the equal protection of the laws."

393.    As set forth in more detail above, including in Paragraphs 5-6, 13-15, 145, 182-185, 204-206, 212-232, 233-243, 255-259, 262-291, 305, 335-351, and 360, Defendants Kemp in his capacity as Governor and Defendant Williams in his capacity as Commissioner of the DNR have violated and are violating the Fourteenth Amendment by, *inter alia*:

> a.    Providing unequal and discriminatory services on Sapelo Island, including essential municipal services such as garbage removal; emergency fire and medical services; water and sewer services; road maintenance; and transportation to and from the mainland.

> b.    Denying African Americans and Gullah-Geechee descendants the ability to use, access, occupy, and/or possess real property on Sapelo Island.

> c.    Failing to ensure that federal and state funding is allocated without regard for Plaintiffs' race.

394.    As set forth in more detail above, including in Paragraphs 12, 186-198, and 305, Defendant Kemp, in his capacity as Chairperson of SIHA, has violated and is violating the Fourteenth Amendment by, *inter alia*:

> a.    Refusing to preserve, protect, or promote the ability of African Americans

and Gullah-Geechee descendants to acquire land in Hogg Hummock or elsewhere on the Island while engaging in real estate transactions that favor white owners and investors and refusing to honor Plaintiffs' claims to land on Sapelo Island.

b.   Denying African Americans and Gullah-Geechee descendants the ability to use, access, occupy, and/or possess real property on Sapelo Island.

395.   As set forth in more detail above, including in Paragraphs 4-8, 204-210, 213-266, 280-292, 296-334, and 342-360, Defendant County has violated and is violating the Fourteenth Amendment by, *inter alia*:

a.   Providing unequal and discriminatory services on Sapelo Island, including essential municipal services such as garbage removal; emergency fire and medical services; water and sewer services; road maintenance; and transportation to and from the mainland.

b.   Enforcing zoning restrictions against African Americans and Gullah-Geechee individuals and families who own land on Sapelo Island but not against white property owners and conducting unequal appraisals.

c.   Denying African Americans and Gullah-Geechee descendants the ability to use, access, occupy, and/or possess real property on Sapelo Island.

d.   Failing to ensure that federal and state funding is allocated without regard for Plaintiffs' race.

396.   Defendants' conduct is motivated by discriminatory intent to deny African Americans and Gullah-Geechee descendants the same rights as are enjoyed by white citizens.

91

**FOURTH CAUSE OF ACTION:**
**Title VI of the 1964 Civil Rights Act, 42 U.S.C. § 2000d *et seq.***

**Brought by All Plaintiffs Except HELP and Raccoon Hogg**

**For Injunctive and Declaratory Relief and Damages Against Defendants DCA, DNR, and County by and through its Board of Commissioners**

397.    42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

398.    At times relevant to this action, Defendant DCA has received and disbursed federal financial assistance, including CDBG and HOME funds from HUD.

399.    At times relevant to this action, Defendant DNR has received and disbursed federal financial assistance, including funding for Sapelo Island-related activities from NOAA.

400.    At times relevant to this action, Defendant McIntosh County by and through its Board of Commissioners has received and disbursed federal financial assistance, including CDBG funds via Defendant DCA, funding from the USDA for the installation of improved water services on the mainland, and funding from the USDOT for the construction of a nature trail.

401.    As set forth in more detail above, including in Paragraphs 6, 141, 143-144, and 335-360, Defendants DCA, DNR, and County have violated and are violating 42 U.S.C. § 2000d by, *inter alia*, failing to ensure that federal and state funding is allocated without regard for Plaintiffs' race so as to ensure that Plaintiffs are not excluded from participation in, denied the benefits of, or subjected to discrimination under programs and activities receiving federal financial assistance.

402.    These Defendants' conduct is motivated by discriminatory intent based on

Plaintiffs' race, color, and/or national origin.

## FIFTH CAUSE OF ACTION:
### Title II of the ADA, 42 U.S.C. §§ 12132, 12142, 12146-12148

***Brought by Plaintiffs Melvin Banks, Sr.; Carolyn Banks; Lorie Banks on behalf of herself and the estate of Melvin Banks, Jr.; Roberta Banks; Marion Banks Richard Banks; Andrea Dixon; David Grovner, Sr. on behalf of himself and the estate of Vernell Grovner; Rall Grovner; Benjamin Hall; Florence Hall; Dena Mae Harrison on behalf of the estate of Johnnie Hillery; Verdie Walker; Sylvia Williams; HELP; and Raccoon Hogg***

**For Damages and Injunctive and Declaratory Relief Against Defendants State and DNR**

**For Injunctive Relief Pursuant to § 1983 Against Defendants Kemp and Williams**

403.    42 U.S.C. § 12132 provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

404.    42 U.S.C. § 12142 prohibits discrimination by public entities operating fixed route transportation systems.

405.    42 U.S.C. § 12146 prohibits public entities from constructing new facilities to be used in the provision of public transportation services that are not readily accessible to and usable by individuals with disabilities.

406.    42 U.S.C. § 12147 requires that public entities making alterations to an existing facility or part thereof used in the provision of designated public transportation services make such alterations in such a manner that, to the maximum extent feasible, the altered portions of the facility are readily accessible to and usable by individuals with disabilities, including individuals who use wheelchairs, upon the completion of such alterations.

407.    42 U.S.C. § 12148 requires that public entities operating existing facilities used in the provision of designated public transportation services to do so in a manner that, when viewed

in its entirety, the program or activity is readily accessible to and usable by individuals with disabilities.

408.    As set forth in more detail in Paragraphs 14, 23, 31, 35, 39, 60, 61-62, 71, 78, 93, 123, and 128, above, Plaintiffs Melvin Banks, Sr.; Melvin Banks, Jr.; Roberta Banks; Richard Banks; David Grovner, Sr.; Vernell Grovner; Rall Grovner; Benjamin Hall; Johnnie Hillery; Verdie Walker; and Sylvia Williams are qualified individuals with a disability within the meaning of 42 U.S.C. § 12131(2). These Plaintiffs have physical impairments that substantially limit major life activities, including the major life activity of walking.

409.    These Plaintiffs regularly use Defendants' ferry for the purposes of commuting to and from work or school, shopping, accessing health care services, or visiting friends and family.

410.    Defendants State and DNR are public entities within the meaning of 42 U.S.C. § 12131(1). By providing the Sapelo Island ferry service, they operate a fixed route public transportation system within the meaning of 42 U.S.C. § 12141(2)-(4).

411.    The Meridian and Sapelo Island ferry docks and parking lots constitute facilities used in the provision of designated public transportation systems within the meaning of §§ 12146 and/or 12147.

412.    As set forth in more detail above, including in Paragraphs 14 and 281-293, Defendants State, DNR, Kemp, and Williams have violated and are violating 42 U.S.C. §§ 12132, 12142, and 12146-12148 by, *inter alia*: failing to make the Sapelo Island ferry and the Meridian and Sapelo Island docks and parking lots readily accessible to and usable by individuals with disabilities. For example, these Defendants have failed to provide accessible parking at the Meridian and Sapelo Island docks and accessible ramps for boarding and deboarding the Sapelo Island ferry.

413.     These Defendants' violations of the Title II of the ADA are knowing and intentional. Despite these Plaintiffs' repeated complaints about the inaccessibility of the ferry, parking lots, and ramps, Defendants have taken no or insufficient steps to make this transportation system accessible.

## VIII.   PRAYER FOR RELIEF

414.     WHEREFORE, Plaintiffs request that this Court grant the following relief:

(a)     Enter a declaratory judgment finding that the conduct set forth in the foregoing causes of action violates 42 U.S.C. §§ 1981, 1982, 1983, and the Fourteenth Amendment to the Constitution; Title VI of the Civil Rights Act of 1964; and Title II of the Americans with Disabilities Act.

(b)     Enter a permanent injunction prohibiting Defendants from engaging in the illegal discriminatory conduct described herein and requiring all Defendants to take all steps necessary to remedy the effects of such conduct and prevent similar occurrences in the future;

(c)     Award the individual Plaintiffs compensatory damages, in an amount to be determined at trial, to fully compensate them for injuries including, but not limited to, monetary loss, humiliation, embarrassment, mental anguish, emotional distress, the deprivation of statutory and constitutional rights, and other damages they have suffered as a result of Defendants' actions described above;

(d)     Award Plaintiffs HELP Org and Raccoon Hogg compensatory damages, in an amount to be determined at trial, to fully compensate them for their diversion of resources, frustration of mission, and other damages they have suffered as a result of Defendants' actions described above;

(e)     Award Plaintiffs their reasonable attorneys' fees and costs, pursuant to 42

U.S.C. §§ 1988 and 12205;

(f)     Award Plaintiffs prejudgment interest; and

(g)     Award any such other relief as the Court deems fair and equitable.

## DEMAND FOR JURY TRIAL

415.    Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury of all issues so

triable as of right.

Dated: March 27, 2019


Respectfully submitted,

/s/ Reed N. Colfax                                    /s/ Robert Jackson
Reed N. Colfax (admitted *pro hac vice*)              Robert Jackson (GA Bar #387750)
Jia M. Cobb (admitted *pro hac vice*)                 ROBERT B. JACKSON, IV, LLC
Angela Groves (admitted *pro hac vice*)               260 Peachtree Street, Suite 2200
RELMAN, DANE & COLFAX PLLC                             Atlanta, Georgia 30303
1225 19th St., NW, Suite 600                           Tel: 404-313-2039
Washington, D.C. 20036                                 rbj4law@gmail.com
Tel: 202-728-1888
Fax: 202-728-0848
rcolfax@relmanlaw.com
jcobb@relmanlaw.com
agroves@relmanlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of March, 2019 a copy of the foregoing Second

Amended Complaint for Damages and Declarative and Injunctive Relief was filed on the

CM/ECF system for the Southern District of Georgia, which will send notification of such filing

to the following:

Richard K. Strickland
Bradley J. Watkins
Emily Rose Hancock
BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue, Post Office Box 220
Brunswick, GA 31521-0220
Tel: (912) 264-8544
Fax: (912) 264-9667
rstrickland@brbcsw.com
bwatkins@brbcsw.com
ehancock@brbcsw.com

*Attorneys for Defendant McIntosh County*

Julie Adams Jacobs, Senior Assistant Attorney General
Brian Edward Goldberg
Alkesh Patel
Brittany Bolton
OFFICE OF THE ATTORNEY GENERAL
40 Capitol Square, SW
Atlanta, GA 30334-1300
Tel: (404) 463-5989
Fax: (404) 657-3239
jjacobs@law.ga.gov
bgoldberg@law.ga.gov
apatel@law.ga.gov
bbolton@law.ga.gov

Patrick O'Connor
Patricia T. Paul
OLIVER MANER LLP
218 West State Street
Savannah, GA 31401
Tel: (912) 236-3311
pto@olivermaner.com

ppaul@olivermaner.com

*Attorneys for Defendants State of Georgia, Governor Nathan Deal, Georgia Department of Natural Resources, and Commissioner Mark Williams*

Anna Baldwin
U.S. DEPARTMENT OF JUSTICE – CIVIL RIGHTS DIVISION
905 Pennsylvania Ave., NW
Washington, DC 20036
Tel: (202) 305-4278
anna.baldwin@usdoj.gov

Shannon Heath Statkus
Tara M. Lyons
U.S. ATTORNEY'S OFFICE
PO Box 2017
600 James Brown Blvd., Suite 200
Augusta, GA 30901
Tel: (706) 724-0517
shannon.statkus@usdoj.gov
tara.lyons@usdoj.gov

*Counsel for Intervenor United States*


        I further certify that the foregoing Second Amended Complaint for Damages and

Declaratory and Injunctive Relief will be served according to law on the following Defendants,

who have not yet appeared in this action:

Georgia Department of Community Affairs
2231, 60 Executive Park South
Atlanta, GA 30329

                                                    /s/ Reed N. Colfax
                                                    Reed N. Colfax
                                                    *Attorney for Plaintiffs*