# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA
# BRUNSWICK DIVISION

| | |
|---|---|
| SARAH FRANCIS DRAYTON, et al., | |
| Plaintiffs, | CIVIL ACTION NO.: 2:16-cv-53 |
| v. | |
| MCINTOSH COUNTY, GEORGIA, et al., | |
| Defendants. | |

## O R D E R

This matter is before the Court on Defendant McIntosh County, Georgia's Motion to Dismiss Plaintiffs' Second Amended Complaint, (doc. 211). Plaintiffs, all of whom purport to have some interest (or to represent others with some interest) in property on Sapelo Island in McIntosh County, Georgia, filed this suit against Defendant McIntosh County (hereinafter "McIntosh County" or the "County") and numerous other governmental officials and entities, seeking both equitable relief and damages for Defendants' alleged discrimination against them, based on race and/or disability, in the assessment of property taxes and the provision of services to them. (Doc. 206.) After the Court dismissed several of Plaintiffs' claims, (doc. 158), Plaintiffs filed a Second Amended Complaint, (doc. 206). McIntosh County then filed a Motion to Dismiss seeking dismissal of claims asserted against it in Plaintiffs' Second Amended Complaint. (Doc 211.) Plaintiffs filed a Response, (doc. 213), and McIntosh County filed a Reply, (doc. 214). For the reasons explained more fully below, the Court **GRANTS IN PART** and **DENIES IN PART** McIntosh County's Motion to Dismiss, (doc. 211). Specifically, to the extent Counts I, II, and III seek relief based on McIntosh County allegedly conducting unequal tax appraisals, those claims

are **DISMISSED**. Count IV, however, will stand against McIntosh County as well as the other Defendants.

## BACKGROUND

Sapelo Island is a 16,500-acre barrier island located in McIntosh County. (Doc. 206, p. 33.) All of the individual Plaintiffs in this case are African Americans—most of whom claim to be "of Gullah-Geechee heritage"—who live on, own property on and/or visit Sapelo Island.[1] (Id. at pp. 7–29.) The Gullah-Geechee people are descendants of peoples from various parts of West Africa who were brought to the coast of the southeastern United States and were sold into slavery. (Id. at p. 34.) Over time, the group developed their own language and culture. (Id.) Plaintiffs allege that their specific community, which is comprised of only about fifty people, (id. at p. 47), is the largest remaining Gullah-Geechee community in the country, (id. at p. 3). The State of Georgia owns almost all of Sapelo Island, (id. at p. 46), except for a small area of privately-owned land called Hogg Hummock where the individual Plaintiffs live, own land, or visit, (id. at pp. 10, 47). The Georgia Department of Natural Resources ("DNR") manages the state-owned land on the island. (Id. at p. 32.) According to the Second Amended Complaint, while McIntosh County as a whole has a majority white population, the population of Sapelo Island is almost exclusively African-American.[2] (Id. at p. 33.)

McIntosh County, through the McIntosh County Board of Tax Assessors, appraises the value of the county's privately-owned property, including property on Sapelo Island, and uses

---

[1] The following two entities are also Plaintiffs in this action: Help Org, Inc,. a non-profit organization that helps marginalized communities in Georgia, (doc. 206, p. 29), and Racoon Hogg, CDC, a corporation working to preserve Gullah-Geechee culture, (id. at p. 30).

[2] Many of the Plaintiffs also assert that they are disabled. (Doc. 206, pp. 8–10, 12, 15–19, 22, 27, 28.) However, Plaintiffs' alleged disability status is not pertinent in any way to the claims that McIntosh County seeks to dismiss in the Motion presently before the Court.

those appraisals to set each parcel's property taxes.  (Id. at p. 69.)  The County expends the revenue it generates from property taxes, as well as funds it receives from the federal government, on services and projects in the County, including Sapelo Island.  (Id. at pp. 4, 76.)

Plaintiffs filed suit on December 9, 2015, (doc. 1), and amended their Complaint as a matter of right on February 22, 2016, (doc. 29).  Plaintiffs named McIntosh County, the McIntosh County Board of Tax Assessors, and the McIntosh County Sherriff in his official capacity, as well as the State, the DNR, the Sapelo Island Heritage Authority, the Governor of Georgia, and the Commissioner of the DNR (both in their official capacities) as Defendants.  (Id.)  Generally, Plaintiffs alleged in their First Amended Complaint that Defendants have discriminated against them based on their race and disability status, deprived them of essential services, and caused them to be gradually removed from Sapelo Island.  (Id. at pp. 119–47.)

Defendants responded by moving to dismiss Plaintiffs' claims on several grounds, including sovereign immunity, the statute of limitations, and various deficiencies in the pleadings. (Docs. 46, 48.)  In an October 20, 2017 Order, the Court dismissed several of the counts in the First Amended Complaint for failure to state a claim, including Count IX which alleged a violation of Title VI of the 1964 Civil Rights Act.[3]  (Doc. 158, pp. 30–34).  Title VI prohibits racial discrimination in "any program or activity receiving Federal financial assistance."  42 U.S.C. § 2000d.  Plaintiffs had argued that the County itself qualified as a "program or activity" and thus could be held liable for discrimination under Title VI.  (Doc. 49, pp. 65–66.)  The Court disagreed and dismissed the Title VI claim against McIntosh County.  (Doc. 158, pp. 30–34.)  In the same Order, the Court also dismissed the McIntosh County Board of Tax Assessors from the suit,

---

[3] The Court also dismissed claims asserted pursuant to 42 U.S.C. §§ 3604(a)–(b), (f)(1)–(2), and 3605. (Doc. 158, pp. 42–43.)  Plaintiffs did not assert any similar claims in their Second Amended Complaint but reserved their right to challenge that dismissal on appeal.  (Doc. 206, p. 86 n.2.)

holding that the Tax Injunction Act (at times, the "TIA" or the "Act"), 28 U.S.C. § 1341, which forbids district courts from "enjoin[ing], suspend[ing] or restrain[ing] the assessment, levy or collection of any tax under State law where a plain, speedy, and efficient remedy may be had in the courts of such State," deprived the Court of jurisdiction over the claims against that entity. (Id. at pp. 35–40 (citation omitted).)

On July 23, 2018, Plaintiffs moved, and were granted leave, to amend their complaint purportedly in an effort to, *inter alia*, "add specificity to their claim under Title VI," to "clarif[y] that their claims against McIntosh County are brought by and through its Board of Commissioners," and to "clarif[y] their claims for injunctive and declaratory relief." (Doc. 173, p. 2; doc. 198, p. 18.) Specifically, the Second Amended Complaint alleges that the McIntosh County Board of Commissioners possesses the discretion to both apply for and spend federal funds, and that no "other agency, office, or department within the McIntosh County government" possesses this authority. (Doc. 206, p. 76.) Plaintiffs allege that the Board of Commissioners "has applied for and been awarded federal financial assistance, including Community Development Block Grant ("CDBG") funds, a grant from the U.S. Department of Agriculture ("USDA"), and a grant from the U.S. Department of Transportation ("USDOT")." (Id. at p. 31.) Allegedly, none of the CDBG funds that McIntosh County received between 2010 and 2015 were spent on Sapelo Island, and the Board of Commissioners had not allocated CDBG funds to the Island for at least twenty years. (Id. at p. 78.) The Second Amended Complaint also alleges that the Board of Commissioners spent millions of dollars in USDA grants on water projects for the County's mainland but spent none of that money on Sapelo Island, (id. at p. 77), and that the Board of Commissioners did not spend any of the USDOT funds on Sapelo Island either, (id. at p. 78).

In addition, while the Second Amended Complaint does not assert any claims against the Board of Tax Assessors of McIntosh County (which the Court had dismissed as a defendant in light of the TIA), it does include multiple allegations that McIntosh County, in and of itself, implemented unequal and "discriminatory appraisal" practices and it describes the problems with the appraisal process at length. (Id. at pp. 70–73, 81, 87, 89, 91.) Specifically, in Count I, Plaintiffs allege that McIntosh County violated 42 U.S.C. § 1981 partly by "conducting unequal appraisals." (Id. at pp. 86–87.) In Counts II and III, they allege that McIntosh County's unequal appraisals violated 42 U.S.C. §§ 1982 and 1983 and the Fourteenth Amendment. (Id. at pp. 88–91.) They also describe the harmful effects of the "County's approval and implementation of its Board of Tax Assessors' discriminatory appraisal practices" and the "threat of losing land because of property taxes" in the Second Amended Complaint's "Injury to Plaintiffs" section. (Id. at p. 81.) Finally, in their "Prayer for Relief," Plaintiffs request a "declaratory judgment finding that the conduct set forth in the foregoing causes of action violates 42 U.S.C. §§ 1981, 1982, 1983, and the Fourteenth Amendment," as well as "a permanent injunction prohibiting Defendants from engaging in the illegal discriminatory conduct described herein," and damages.[4] (Id. at p. 95.)

McIntosh County filed this Motion to Dismiss Plaintiffs' Second Amended Complaint, (doc. 211). The County argues that a Title VI claim against it by and through its Board of Commissioners is equivalent to a claim against the County itself which the Court already dismissed. (Id. at pp. 3–5.) In addition, McIntosh County contends that any claim that is "predicated on a matter of taxation" should be dismissed under the Tax Injunction Act. (Id. at p.

---

[4] Additionally, while no request is stated in the Second Amended Complaint, Plaintiffs claim, in their Response to the County's Motion to Dismiss, that part of the injunctive relief they seek is for the McIntosh County Board of Commissioners to be ordered to give "proper consideration" to a previously-proposed ordinance that would grant Hogg Hummock a preferential tax assessment. (Doc. 213, p. 9.)

6.) Plaintiffs filed a Response to the County's Motion, (doc. 213), and the County filed a Reply, (doc. 214).

## **LEGAL STANDARD**

Under a motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6), such as the County's Motion here, a court must "accept[] the allegations in the complaint as true and constru[e] them in the light most favorable to the plaintiff." Belanger v. Salvation Army, 556 F.3d 1153, 1155 (11th Cir. 2009) (citing Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1262 (11th Cir. 2004)). A complaint must state a facially plausible claim for relief, and "'[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir. 2010) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" does not suffice. Ashcroft, 556 U.S. at 678 (internal quotations omitted).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal punctuation and citation omitted). While a court must accept all factual allegations in a complaint as true, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. Id. (internal citation omitted). In addition, when a dispositive issue of law allows for no construction of the complaint's allegation to support the cause of action, dismissal is appropriate. Neitzke v. Williams, 490 U.S. 319, 326 (1989).

Besides accepting all factual allegations as true, the Court may consider a document attached to the complaint without converting a motion to dismiss to one for summary judgment motion. Solis-Ramirez v. U.S. Dep't of Justice, 758 F.2d 1426, 1430 (11th Cir. 1985) (per curiam). Moreover, the Court "may take judicial notice of [public records] without converting a motion to dismiss into a motion for summary judgment." Universal Express, Inc. v. U.S. SEC, 177 F. App'x 52, 53 (11th Cir. 2006) (per curiam) (citations omitted); see also Laskar v. Peterson, 771 F.3d 1291, 1295 n.3 (11th Cir. 2014) (stating district courts may properly consider public records and certain documents attached to a motion to dismiss in resolving the motion).

## DISCUSSION

McIntosh County argues that several claims asserted against it in Plaintiffs' Second Amended Complaint should be dismissed. First, McIntosh County contends that Counts I, II, and III assert claims involving alleged unequal and discriminatory tax appraisals by the County, and that the Tax Injunction Act bars the Court from hearing those claims. (Doc. 211, pp. 5–6.) The County also argues that Count IV should be dismissed because Plaintiffs cannot bring a Title VI claim against it by and through its Board of Directors. (Id. at pp. 3–5.) For the following reasons, the Court finds that Counts I, II, and III should be dismissed to the extent they assert claims premised upon tax appraisals. As to Count IV, however, the Court concludes that Plaintiffs can make out a Title VI claim against the County by and through its Board of Directors, so that count stands.

### I. Plaintiffs' Claims against the County that are Premised upon Tax Appraisals Must Be Dismissed

"The Tax Injunction Act . . . operates to divest the federal courts of subject matter jurisdiction over claims challenging state taxation procedures where the state courts provide a 'plain, speedy, and efficient remedy.'" Lussier v. Fla., Dep't of Highway Safety & Motor

Vehicles, 972 F. Supp. 1412, 1417 (M.D. Fla. 1997) (quoting Rosewell v. LaSalle Nat'l Bank, 450 U.S. 503, 515 n.19 (1980)). While the plain language of the statute applies to taxes levied under State law, it applies equally to local taxes. Hibbs v. Winn, 542 U.S. 88, 100 n.1 (2004). The Act "drastically" limits the jurisdiction of district courts so as to not "interfere with so important a local concern as the collection of taxes." Rosewell, 450 U.S. at 522 (citations omitted). Although the TIA bars injunctive relief on its face, it has been judicially expanded by the United States Supreme Court to include suits for declaratory relief. See California v. Grace Brethren Church, 457 U.S. 393, 417 (1982) ("[W]e hold that their remedy under state law was 'plain, speedy and efficient' within the meaning of the Tax Injunction Act, and consequently, that the District Court had no jurisdiction to issue . . . declaratory relief."). The Act has also been applied to actions for damages. See Fair Assessment in Real Estate Ass'n v. McNary, 454 U.S. 100, 113 (1981) ("[P]etitioners' § 1983 action would be no less disruptive of Missouri's tax system than would the historic equitable efforts to enjoin the collection of taxes . . . ."). The plaintiff bears the burden to show sufficient facts "to overcome the jurisdictional bar of the Tax Injunction Act." Amos v. Glynn Cty. Bd. of Tax Assessors, 347 F.3d 1249, 1256 (11th Cir. 2003), *abrogated on other grounds as recognized in* Kelly v. Ala. Dep't of Revenue, 638 F. App'x. 884, 889 (11th Cir. 2016) (per curiam).

### A. Plaintiffs are Seeking Relief for McIntosh County's Allegedly Discriminatory Appraisals

Three counts in Plaintiffs' Second Amended Complaint are premised in part on the allegation that McIntosh County conducted "unequal appraisals." (Doc. 206, pp. 86–91.) In Count I, Plaintiffs allege that the County's unequal appraisals violated 42 U.S.C. §§ 1981 and 1983. (Id. at pp. 86–87.) Count II alleges that the unequal appraisals violated 42 U.S.C. §§ 1982 and 1983. (Id. at pp. 88–89). Count III asserts that that the unequal appraisals violated the Fourteenth

Amendment and 42 U.S.C. § 1983. (Id. at pp. 90–91). For all these claims, Plaintiffs seek damages, injunctive relief, and declaratory relief against the County. (Id. at pp. 86, 88, and 90.)

Plaintiffs argue that although these discriminatory appraisal allegations are included within specific counts of the Second Amended Complaint, they are not intended to state claims in and of themselves but are simply included as evidence of McIntosh County's "discriminatory intent." (Doc. 213, p. 8.) However, a fair reading of Plaintiff's Second Amended Complaint indicates that Plaintiffs actually do seek relief for the County's allegedly unequal tax appraisals. For example, in its "Injury to Plaintiffs" section, Plaintiffs specifically state that:

> Defendant County's approval and implementation of its Board of Tax Assessors' discriminatory appraisal practices are driving up property values in Hogg Hummock and threaten Plaintiffs' ability to maintain continuing ownership of properties that have been in their families for generations, threatening the stability and viability of the Hogg Hummock community.

(Doc. 206, p. 81.) The Second Amended Complaint also goes into extensive detail in describing the alleged errors in the appraisal process, (id. at pp. 70–72), and notes that Plaintiffs suffer from emotional distress because "there is no guarantee that the County and Board of Tax Assessors will not impose similarly flawed and discriminatory assessments in the future," (id. at p. 73). Finally, when asking for damages and equitable relief, Plaintiffs refer to "conduct set forth in the foregoing causes of action violat[ing] 42 U.S.C. §§ 1981, 1982, 1983, and the Fourteenth Amendment," "illegal discriminatory conduct described herein," and "Defendants' actions described above." (Id. at p. 95.) All of these statements would include the alleged discriminatory appraisal practices set forth in multiple instances in the Second Amended Complaint. Viewing the allegations in the context of the entire complaint, Plaintiffs appear to seek redress for injuries caused by the alleged unequal appraisal process. See Downing v. Fidelity Nat'l Title Ins. Co., 3:15-CV-154-TCB, 2016 WL 3526064, at *4 (N.D. Ga. June 9, 2016) (noting that when ruling on a motion to dismiss, allegations should be read "in light of the rest of the complaint"). In addition, Plaintiffs cite no

cases, and this Court is aware of none, where a court used claims barred by the Tax Injunction Act as evidence to help prove a party's discriminatory intent, much less cases where a plaintiff was required to allege those details in the complaint in order for them to be considered later as evidence.

## B. The Tax Injunction Act Bars the Court from Hearing these Claims

Since Plaintiffs seek redress for alleged unequal appraisals, any potential remedy this Court could provide would implicate the Tax Injunction Act. First, the Court could not provide damages for any violation of 42 U.S.C. §§ 1981–83. See Kelly, 638 F. App'x. at 889 ("Under our binding precedent, the TIA also bars claims for damages because a monetary award against the state or its tax administrators would have the same detrimental effect on the state as equitable relief, and would dampen state tax collectors.") (citation omitted). Likewise, any action by the Court to enjoin McIntosh County from implementing allegedly discriminatory rates in the future would directly violate the Tax Injunction Act. See 28 U.S.C. § 1341 ("The district court *shall not enjoin*, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.") (emphasis added).

Plaintiffs also purport (in their Response to the Motion to Dismiss) to seek an injunction requiring the McIntosh County Board of Commissioners to "properly" consider an ordinance that would establish "a preferential tax assessment procedure for Hog Hummock as a historic district," and they argue that the Tax Injunction Act is not implicated by this request. (Doc. 213, p. 9.) Plaintiffs emphasize that they seek an injunction forcing only *consideration* of the ordinance, not its immediate implementation. (Id.) Even assuming Plaintiffs have adequately requested this injunctive relief in their Second Amended Complaint,[5] however, the Court finds that the request is barred by the Tax Injunction Act. It is well-established by both Supreme Court and Eleventh

---

[5] The Court notes again that nowhere in the Second Amended Complaint do Plaintiffs request an injunction forcing the County to give proper consideration to the previously-proposed ordinance.

Circuit Court of Appeals precedent that the primary purpose of the Tax Injunction Act is to prevent federal interference with local taxation issues. See Grace Brethren Church, 457 U.S. at 409 n.22 ("[T]he legislative history of the Tax Injunction Act demonstrates that Congress worried not so much about the form of relief available in the federal courts, as about *divesting the federal courts of jurisdiction to interfere with state tax administration*.") (emphasis added); Colonial Pipeline Co. v. Collins, 921 F.2d 1237, 1242 (11th Cir. 1991) ("[T]he principle underlying the Tax Injunction Act [is] that the federal courts should generally avoid interfering with the sensitive and peculiarly local concerns surrounding state taxation schemes."). Overseeing or placing requirements on the County Commission's consideration of the ordinance would constitute an intrusion by the federal court upon the County Commission's autonomy in managing and, as necessary, revising its highly-localized tax assessment system. See, e.g., Barfield v. Cty. of Palm Beach, Office of the Prop. Appraiser, No. 10-80980-CIV, 2011 WL 1458003, at *2 (S.D. Fla. Apr. 15, 2011) (holding that an injunction compelling a Florida county appraiser's office to change how it calculates assessments would intervene in Florida's tax system and thus fall within the scope of the Tax Injunction Act.)

Because Plaintiffs' requested relief will "enjoin, suspend or restrain" McIntosh County's tax assessment system, the only way this Court can hear the claims is if the state affords no "plain, speedy, and efficient remedy." 28 U.S.C. § 1341. The Court already considered this issue in determining whether the McIntosh County Board of Tax Assessors should be dismissed from this action. (Doc. 158, pp. 38–40.) The Court finds no reason to divert from its previous determination that the "Plaintiffs have a plain, speedy, and efficient remedy in the state tax system." (Id. at pp. 39–40.) Therefore, the Court does not have jurisdiction over Plaintiffs' 42 U.S.C. §§ 1981–83 claims or their Fourteenth Amendment claim to the extent those claims are based on McIntosh

County allegedly having conducted unequal and discriminatory tax appraisals. Accordingly, those parts of Counts I, II, and III are **DISMISSED**. All other allegations making up Counts I, II, and III may still go forward.

## II.     Plaintiff's Title VI Claim is Valid

The Court next turns to Count IV which is Plaintiffs' Title VI claim against McIntosh County by and through its Board of Commissioners. Under Title VI, "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Plaintiffs allege that McIntosh County's Board of Commissioners applied for and received federal CBDG funds as well as federal funds from the USDA and USDOT, that the Board of Commissioners had direct authority to allocate those federal funds, and that "no other agency, office, or department within the McIntosh County government" had that authority. (Doc. 206, pp. 31, 76.) Plaintiffs claim that the Board of Commissioners used these federal funds for projects on the McIntosh County mainland rather than for the benefit of Sapelo Island and its almost exclusively African-American population. (Id. at pp. 76–78.)

This Court previously held that Plaintiffs could not sue McIntosh County directly under Title VI because the County was not a "program or activity" for purposes of the statute. (Doc. 158, p. 34.) In its Motion to Dismiss, McIntosh County decries Plaintiffs' effort, in their Second Amended Complaint, to revive what is essentially the same claim by now asserting it specifically against the Board of Commissioners, which, Plaintiffs *now* allege, controls the allocation of federal funds. The County argues that the Court's dismissal of Plaintiffs' Title VI claim against the County applies equally to the County's Board of Commissioners and the claim should therefore again be dismissed. (Doc. 211, pp. 3–5). Determining the outcome of this issue requires the Court

to revisit the Eleventh Circuit Court of Appeals' decision in McMullen v. Wakulla County Board of County Commissioners, which the Court relied upon in its prior dismissal Order. (See Doc. 158, pp. 32–34 (citing McMullen v. Wakulla Cty. Bd. of Cty. Comm'rs, 650 F. App'x 703 (11th Cir. 2016) (per curiam)).)

In McMullen, the plaintiff was denied a promotion by the local fire department, allegedly based upon a physical disability. Id. at 704. The plaintiff sued under the Rehabilitation Act, which makes it unlawful for any federally funded "program or activity" to discriminate on the basis of disability.[6] Id. (citation omitted). The plaintiff sought to hold the county as a whole liable on the basis that the county received federal funds, citing the broader "operations of" language of the Civil Rights Restoration Act of 1987 ("CRRA"). Id. at 704–05. The Eleventh Circuit assuredly held that the revised language under the CRRA broadened government liability. Id. (approving the district court's determination that the entire Fire Rescue Department, which was comprised of three divisions, could be held liable if any one of the three divisions received federal funds). Yet, the court also found that the "County as a whole" is not liable under subsection (b)(1)(A) of the Act simply because a "relevant unit" within the County receives federal funds. Id. at 707.

In making this determination, the Eleventh Circuit cited with approval the statement in Schroeder v. City of Chicago, 927 F.2d 957 (7th Cir. 1991), that the CRRA was not "intended to sweep in the whole state or local government, so that if two little crannies ([i.e.,] the personnel and medical departments) of one city agency ([i.e.,] the fire department) discriminate, the entire city

---

[6] Since Title VI and the Rehabilitation Act define "program or activity" in identical terms as a result of the same legislation (the Civil Rights Restoration Act of 1987 ("CRRA")), see Pub. L. No. 100-259, §§ 2, 4, 6, case law interpreting the scope of "program or activity" under the Rehabilitation Act is applicable in determining the scope of the term "program or activity" for purposes of Title VI. See Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573, 589–90 (2010) ("We have often observed that when 'judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its . . . judicial interpretations as well.'") (citing Bragdon v. Abbott, 524 U.S. 624, 645 (1998)).

government is in jeopardy of losing its federal financial assistance." McMullen, 650 F. App'x at 706 (quoting Schroeder, 927 F.2d at 962). The McMullen court added that "if the entire state [or county] government were subject to the Rehabilitation Act whenever one of its components received federal funds, subsection (b)(1)(B), which provides that both the government entity that distributes federal funds and the entity that receives them are covered by the Rehabilitation Act, would be redundant." Id. at 707 (quotation and citation omitted).

In their Second Amended Complaint, Plaintiffs here, unlike the plaintiffs in either McMullen or Schroeder, are not seeking to hold McIntosh County liable for the discriminatory actions of one its departments. Instead, Plaintiffs now allege that the Board of Commissioners received federal funds and that it then directly used those funds in a way that was discriminatory against Plaintiffs. (Doc. 206, pp. 75–78.) According to the Second Amended Complaint, McIntosh County did not have a separate and discrete "agency, office, or department" authorized and charged with allocating federal funds. (Id. at p. 76.) Borrowing the parlance from Schroeder, Plaintiffs' Title VI claim does not assert a challenge against the County as a whole for actions by some "little crann[y]" or department within the County government, but instead, as the County acknowledges, it asserts a challenge against the County for actions undertaken directly by that "governing authority" itself (the County through its Board of Commissioners). (Doc. 211, p. 4.) Therefore, this case is fundamentally distinguishable from McMullen and Schroeder.

The Tenth Circuit has dealt with the issue of interpreting "program or activity" in the context of suing a county board of commissioners for direct acts of discrimination, and its analysis supports the Court's conclusion here. See Bentley v. Cleveland Cty. Bd. of Cty. Comm'rs, 41 F.3d 600 (10th Cir. 1994). In Bentley, the plaintiff sued the county board of commissioners, arguing that their decision to fire him was discriminatory and violated the Rehabilitation Act. Id.

at 601. The county, citing Schroeder in support, argued that it was "not a covered 'program or activity' because Congress did not intend entire county governments to be programs or activities as defined in the Act." Id. at 603. The Tenth Circuit, considering both subsections (1)(A) and (1)(B) of the definition, rejected this argument because the county (through its board of commissioners)—as opposed to some sub-unit of the county government—was one of the "very parties [plaintiff] claim[ed] discriminated against him." Id.

The issues and facts in this case bring it squarely within the Tenth Circuit's reasoning in Bentley. Here, Plaintiffs are suing McIntosh County, through its Board of Commissioners, for directly allocating federal funds in allegedly discriminatory ways. Subsection (1)(B)'s definition of "program or activity," which the Eleventh Circuit implicitly recognized includes entire government entities, covers this type of discriminatory conduct. See 42 U.S.C. § 2000d-4a(1)(B) ("[T]he term 'program or activity' . . . mean[s] all the operations . . . of the entity of such State or *local government that distributes such assistance . . . .*") (emphasis added). It is also consistent with district court decisions allowing Rehabilitation Act suits against city councils. See, e.g., Am. Ass'n of People with Disabilities v. Smith, 227 F. Supp. 2d 1276, 1293 (M.D. Fla. 2002) (holding that the city council could be sued for spending federal funds on voting machines that disabled individuals could not use). Moreover, an alternative holding dismissing Plaintiffs' claim would allow a county to avoid Title VI liability simply by conducting all its discriminatory practices through its board of commissioners instead of one of its departments. Thus, for all the reasons given above, the Court finds Plaintiffs have made out a valid claim under Title VI against McIntosh County by and through its Board of Commissioners sufficient to survive the County's Motion to Dismiss. The Court therefore **DENIES** the County's Motion to Dismiss Plaintiffs' Title VI claim, and Count IV stands.

## CONCLUSION

In light of the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** McIntosh County's Motion to Dismiss, (doc. 211). To the extent Counts I, II, and III seek relief based on McIntosh County allegedly conducting unequal tax appraisals, those Counts are **DISMISSED**. Count IV, however, will stand against Defendant McIntosh County.

**SO ORDERED**, this 17th day of January, 2020.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA