**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

MELVIN BANKS, SR., et al.,

        Plaintiffs,

    v.

MCINTOSH COUNTY, GEORGIA,

        Defendant.

CIVIL ACTION NO.: 2:16-cv-53

## O R D E R

      This lawsuit centers around Sapelo Island, one of Georgia's acclaimed barrier islands, situated within McIntosh County, Georgia. The Plaintiffs are African American individuals, and most are part of Sapelo's Gullah-Geechee community, which is comprised of descendants of West Africans who were brought to the United States as enslaved persons. Plaintiffs filed this lawsuit against Defendant McIntosh County ("McIntosh County" or the "County") generally alleging that the County has continually discriminated against them on account of their race by providing inferior services to their community on Sapelo Island. The County denies these allegations and has filed a Motion for Summary Judgment arguing that Plaintiffs have failed to present sufficient evidence to support any of their remaining claims. (Doc. 274.) The Court has reviewed the parties' extensive briefs on this Motion and the evidence of record. As an initial matter, though some Plaintiffs have standing to sue the County for discriminatory services on Sapelo, other Plaintiffs have failed to establish they have standing and, therefore, must be dismissed from the suit. As for the substance of Plaintiffs' claims, Plaintiffs have not produced sufficient evidence of discriminatory treatment as to some municipal services to survive summary judgment, but they

have presented sufficient evidence of racial discrimination as to other services.  Therefore, they

will have the opportunity to present their claims based on those services to a jury.  Consequently,

in the manner and the for the reasons explained more fully below, the Court **GRANTS IN PART**

and **DENIES IN PART** McIntosh County's Motion for Summary Judgment.[1]  (Doc. 274.)

## BACKGROUND[2]

### I.    Demographics of Sapelo Island, McIntosh County, and the County Government

Sapelo Island (hereinafter, at times, the "Island" or "Sapelo") is a 16,500-acre barrier island

located in McIntosh County, Georgia.  (Doc. 343-2, p. 4.)  Members of the Gullah-Geechee

community have resided on Sapelo Island for centuries.  (Id.)  Today, the state of Georgia owns

---

[1]  Plaintiffs also filed a Notice Requesting Oral Argument on Defendant's Motion for Summary Judgment. (Doc. 356.)  In response, the County stated that it did not believe that oral argument would "provide some additional benefit to the Court" but it would "defer to the Court's judgment about whether oral argument is warranted."  (Doc. 357, pp. 2–3.)  This Court's Local Rule 7.2 provides that "[m]otions shall generally be determined upon the motion and supporting documents filed as prescribed herein," but a court "may allow" for oral arguments.  Here, both sides have provided extensive briefing explaining their arguments in this case and have had ample opportunity to present their positions.  Oral arguments would not provide any benefit to the Court's consideration of those positions.  Accordingly, the Court **DENIES** Plaintiffs' Notice Requesting Oral Argument.  (Doc. 356.)

[2]  This Court's Local Rule 56.1 requires that "[e]ach statement of material fact [in support of a motion for summary judgment] shall be supported by a citation to the record."  This requirement "protects judicial resources by making the parties organize the evidence rather than leaving the burden upon the district judge."  Reese v. Herbert, 527 F.3d 1253, 1268 (11th Cir. 2008) (internal quotation and citation omitted) (referring to an analogous local rule from the Northern District of Georgia); see also Nw. Nat'l Ins. Co. v. Baltes, 15 F.3d 660, 662–63 (7th Cir. 1994) ("District judges are not archaeologists. They need not excavate masses of papers in search of revealing tidbits—not only because the rules of procedure place the burden on the litigants, but also because their time is scarce."); Caban Hernandez v. Philip Morris USA, 486 F.3d 1, 7 (1st Cir. 2007) ("Given the vital purpose of [local rules requiring record citations], litigants ignore them at their peril.").  Here, both the County's Brief in Support of its Motion for Summary Judgment and its Statement of Undisputed Material Facts cite to several deposition transcripts that the County did not include in the record.  (See generally doc. 274-1; doc. 274-2.)  Plaintiffs have attached portions of these depositions, (see, e.g., doc. 343-3; doc. 343-40; doc. 345-5; doc. 345-2; doc. 345-13; doc. 345-14; doc. 343-4), but many of the pages that the County cites are not included.  The County never moved for Plaintiffs to offer any other part of these depositions into evidence as is allowed under the Federal Rules of Civil Procedure.  See Fed. R. Civ. P. 32(a)(6).  Thus, the Court will not consider the County's factual assertions that are based on deposition testimony that is not in the record.  See, e.g., Jay v. Auburn Univ. 829 F. App'x 393, 397 n.6 (11th Cir. 2020) (per curiam) ("[A party] cannot fault the [court] for failing to consider evidence not in the record.").

97% of the Island.  (Id. at p. 8.)  Around 24 state employees—none of whom are of Gullah-Geechee descent—live on this portion of the Island, (doc. 321, p. 4), but McIntosh County does not receive property taxes for the state-owned land, (doc. 274-2, p. 2).  On the portion of Sapelo Island that is not owned by the State, more than thirty individuals live as permanent residents in the Hogg Hummock[3] community.[4]  (Doc. 343-3, p. 17; doc. 343-6, p. 7.)  According to Fred Hay, who is the Island Manager employed by the Georgia Department of Natural Resources, there are seven people living in Hogg Hummock who are not of Gullah-Geechee descent.  (Doc. 321, pp. 2, 5.)  The remainder (and thus the majority) of the individuals living there are African American and of Gullah-Geechee descent.  (Doc. 343-6, p. 4; doc. 343-3, p. 18; doc. 343-4, pp. 3–7.)  In contrast, the residents of McIntosh County as a whole are predominantly white.  (Doc. 343-6, p. 8; doc. 324, p. 1.)

The McIntosh County Board of Commissioners annually sets the County's budget which includes expenditures for municipal services.  (See doc. 343-41; doc. 343-42; doc. 343-43; doc. 343-44; doc. 343-45; doc. 343-46.)  The Board of Commissioners is comprised of five members.  (Doc. 343-20, p. 2.)  Commissioner Charles Jordan served as a commissioner from 1990 to 2018.  (Doc. 343-14 pp. 4–5.)  Commissioner Jordan was the only African American on the Board of Commissioners during his tenure except for a four-year period where Nathaniel Grovner was also on the Board.  (Doc. 343-23, p. 3; doc. 343-17, p. 2.)  According to the minutes from a 2011 Board of Commissioners meeting, Commissioner Jordan has voiced concern about the Commission not appointing African American citizens to various McIntosh County boards.  (Doc. 343-20, p. 5.)

[3] The evidence in the record provides several variations for the spelling of "Hogg Hummock."  According to Plaintiffs' Brief, the correct spelling is Hogg Hummock, which the Court will use throughout.  (Doc. 341, p. 12.)

[4] There is also some privately-owned land on Sapelo Island located in Raccoon Bluff outside of the Hogg Hummock Community.  (Doc. 274-1, p. 4.)

3

## II.    Plaintiffs

The Plaintiffs in this case are more than forty individuals who have some relationship to Sapelo Island.[5]  (See doc. 206.)  All the Plaintiffs are African American, and most are part of the Gullah-Geechee community.  (Doc. 343-2, p. 4.)  Plaintiffs each have varying interests and involvement in the Island.  Some Plaintiffs live on Sapelo full-time while others live there part-time or not at all.  Some have well-documented ownership interests in real property on the Island while others have questionable or no ownership interest at all.  Though Plaintiffs' varying interests and involvement in the Island could confound an heirs property expert, they are germane to the legal questions raised in Defendant's Motion.  Thus, the Court attempts to account for each Plaintiff's respective interest and involvement below.

As for the full-time residents, Plaintiffs Benjamin and Florence Hall live together on Sapelo Island permanently in a house they own.  (Doc. 329-1, p. 19; doc. 291-1, pp. 5, 10.)  Benjamin and Florence Hall's daughters, Angela Hall and Marcia Hall Wells are also Plaintiffs to this lawsuit. (Doc. 278-1, p. 7; doc. 301-1, p. 7.)  Neither Angela Hall nor Marcia Hall Wells lives or owns property on Sapelo Island, though they help pay their parents' property taxes.  (Doc. 278-1, pp. 6, 39; doc. 301-1, pp. 6, 30–31.)  Plaintiff Iregene Grovner, Sr., also lives full time on the Island on property that he owns with his wife.[6]  (Doc. 296-1, pp. 11, 13.)  Sarah Francis Drayton and Joseph

---

[5] HELP Org, Inc., and Raccoon Hogg, CDC, are also Plaintiffs in this action.  (Doc. 206.)  However, in the Second Amended Complaint, these two Plaintiffs only asserted an ADA claim against the State of Georgia, the Georgia Department of Natural Resources, Governor Brian Kemp (in his official capacity), and Natural Resources Commissioner Mark Williams (in his official capacity) (hereinafter, collectively, the "State Defendants").  (Id. at pp. 93–95.)  During the course of this litigation, Plaintiffs and the State Defendants filed a Joint Motion for Entry of Order of Dismissal of the State Defendants.  (Doc. 351.)  The Court subsequently granted that Motion, dismissing "Plaintiffs' claims against the State Defendants with prejudice."  (Doc. 353, p. 2.)  As HELP Org, Inc., and Raccoon Hogg, CDC, no longer have any claims pending in this case, the Court **DISMISSES** them from the case.  The Court **DIRECTS** the Clerk of Court to terminate these plaintiffs on the docket of this case.

[6] Iregene Grovner, Sr.'s wife, Yvonne Grovner, is not a plaintiff in this action.  (See doc. 1.)

Hall, who have both died during the course of this litigation, were also permanent residents of the Island.  (Doc. 313-1, p. 6; doc. 320-1, pp. 6, 11, 13.)  Prior to her death, Sarah Francis Drayton lived on property that she owned.  (Doc. 313-1, p. 87.)  Joseph Hall's daughter Plaintiff Victoria Hall says that Joseph Hall inherited property from his father, (doc. 320-1, p. 11), but there is no record of a conveyance of any Sapelo Island property to Joseph Hall, (doc. 283, p. 9).  Sarah Francis Drayton's estate is now represented by Shirley Grant, (doc. 203), and Joseph Hall's estate is represented by Victoria Hall, (doc. 202).  Plaintiff Bobby Grovner also lives full-time on Sapelo Island on land that he says he inherited from his parents.  (Doc. 280-1, pp. 13–14.)  The deed to the property shows that Bobby Grovner inherited the property from his father but then transferred it to his mother Mildred Grovner.  (Doc. 280, pp. 7–8.)

Some of the Plaintiffs do not live on the Island full-time, but they spend some or most of their time there.  Plaintiff Iregene Grovner, Jr., spends every day except Sunday working on the Island and stays there a couple nights a week.  (Doc. 295-1, p. 6.)  He spends most of his nights at his home in Townsend, Georgia.  (Id.)  He does not own any land on Sapelo Island, (id. at p. 20), but he does have an ownership interest in Stay Sapelo, LLC, which owns property in Hogg Hummock.[7]  (Doc. 343-5, p. 2.)  Plaintiff Samuel Dixon spends four days a week on the Island on property that he and his sister inherited from his father, and he also owns other tracts of land in

---

[7] Stay Sapelo, LLC is organized under Georgia law.  See Georgia Secretary of State, Corporations Division, https://ecorp.sos.ga.gov/BusinessSearch/BusinessInformation?businessId=2646595&businessType=Domestic%20Limited%20Liability%20Company&fromSearch=True (last visited Mar. 19, 2021).  The Court takes judicial notice of the records available on the Georgia Secretary of State's website as matters of public record.  Generally, a court may judicially notice a fact not subject to reasonable dispute because it is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.  Fed. R. Evid. 201(b).  Courts routinely take judicial notice of factual information found on official governmental agency websites.  See, e.g., Hill v. Mark A. Nestor, P.C., No. 1:15-cv-1177-LMM-ECS, 2015 WL 13777184, at *2 (N.D. Ga. June 18, 2015) (taking judicial notice of documents available on the Georgia Secretary of State's website); Mitchell v. Nix, No. 1:05-cv-2349-JOF, 2007 WL 779067, at *4 (N.D. Ga. Mar. 8, 2007) (taking judicial notice of information from Georgia Department of Corrections' website).

Hogg Hummock.  (Doc. 312-1, pp. 5–6, 9, 11.)  Plaintiff Andrea Dixon also owns property on Sapelo and spends half of her time on the Island.  (Doc. 276-1, pp. 17, 19, 157.)

Many other Plaintiffs—including Dan Gardner, Mary Palmer, Richard Banks, Deborah Dixon, Jesse Jones, Delores Lewis, Johnny Matthews, Verdie Walker, Sonnie Jones, Valerie Williams, Cheryl Grant, Angelina Hall, Reginald Hall, Marion Banks, Sr., Roberta Banks, Stacey White, Andrea Sparrock, David Sparrock, Frances Mercer, and Rall Grovner—own property on Sapelo and visit the Island.[8]  (Doc. 285-1, pp. 11, 71; doc. 285, p. 1; doc. 304-1, pp. 10, 13; doc. 309-1, p. 12; doc. 289-1, pp. 5, 10; doc. 297-1, pp. 13, 15;  doc. 290-1, pp. 12–13; doc. 298-1, pp. 10–11, 13; doc. 319-1, pp. 14–16; doc. 314-1, pp. 9–10, 12; doc. 318-1, pp. 9, 11; doc. 284-1, pp. 8, 10; doc. 279-1, pp. 7–8, 110; doc. 308-1, pp. 26; doc. 303-1, pp. 9, 18; doc. 310-1, p. 13; doc. 315-1, p. 5; doc. 286-2, p. 9; doc. 286-1, pp. 14–16; doc. 346-40, p. 2; doc. 307-1, pp. 6, 18.) Harold and Johnnie Hillery also jointly owned property on Sapelo Island that they visited before their deaths.  (Doc. 330-1, pp. 7, 45; doc. 293-1, p. 19.)  Plaintiff Dena Mae Harrison now represents the Hillerys' estates in this action. (Doc. 156; doc. 196.)  Plaintiffs Temperance Jones and Jesse Jones have been married since 1972. (Doc. 317-1, p. 40.) Jesse Jones purchased property on Sapelo Island sometime in the 1970s.  (Doc. 297-1, p. 13.)  He still owns this property, and he and Temperance Jones visit Sapelo two to three times per year.  (Id. at pp. 15–16.)

Three other Plaintiffs—Ceaser Banks, Nancy Banks, and Melvin Banks, Sr.—owned property on Sapelo Island but have conveyed it to others during the pendency of this suit. (Doc.

---

[8] Of these Plaintiffs, Dan Gardner, Mary Palmer, Richard Banks, Deborah Dixon, Jesse Jones, Delores Lewis, Verdie Walker, Valerie Williams, Marion Banks, Sr., Roberta Banks, Frances Mercer, Andrea Dixon, and Samuel Dixon stated that they have plans to visit Sapelo Island in the future.  (Doc. 285-1, p. 71; doc. 304-1, p. 12; doc. 309-1, p. 26; doc. 289-1, pp. 10, 172; doc. 297-1, p. 15; doc. 290-1, p. 11; doc. 319-1, p. 16; doc. 318-1, p. 11.; doc. 303-1, p. 18; doc. 292-1, p. 11; doc. 276-1, p. 157; doc. 312-1, pp. 6–7; doc. 295-1, p. 60.)

282, p. 8; doc. 305, pp. 6–10.)  Melvin Banks, Sr., passed away after Plaintiffs filed their Motion

for Summary Judgment.[9]  (Doc. 358; doc. 358-1.)  Carolyn Banks, the wife of Melvin Banks, Sr.,

(doc. 305-1, p. 7), joined in this lawsuit as a Plaintiff but has also passed away during its pendency;

her claims are now brought by Richard Banks on behalf of her estate, (doc. 206).

Charles Hall, who was married to Plaintiff Margaret Hall,[10] inherited property on Sapelo

Island sometime in the 1980s.  (Doc. 302-1, p. 28.)  On February 26, 2007, Charles Hall signed a

quit claim deed creating a life estate in his Sapelo Island property for himself and vesting the

remainder interest in his property in Reginald Hall.  (Doc. 302, p. 7.)  Charles Hall passed away in

2014.  (Doc. 302-1, p. 10.)  Margaret Hall brings claims on behalf of herself and the estate of

Charles Hall, which are premised upon Charles Hall's aforementioned property interest.  (Doc.

206.)

Plaintiffs Harry Jordan and Brenda Jackson inherited Sapelo property from their mother,

(doc. 294-1, p. 12; doc. 281-1, pp. 10–11), but then transferred this property to their brother Charles

Jordan, (doc. 281, pp. 8–9; doc. 294, pp. 9–13).  Charles Jordan (who is not and has never been a

---

[9] While Plaintiffs have filed a Suggestion of Death of Plaintiff Melvin Banks, Sr., and a copy of his death certificate, (doc. 358; doc. 358-1), Plaintiffs have not filed a motion to substitute another party for him. Federal Rule of Civil Procedure 25(a)(1) provides that:

> [i]f a party dies and the claim is not extinguished, the court may order substitution of the proper party. A motion for substitution may be made by any party or by the decedent's successor or representative. If the motion is not made within 90 days after service of a statement noting the death, the action by or against the decedent must be dismissed.

Fed. R. Civ. P. 25(a)(1).  The Court has already determined that the claims in this case survive a party's death, so substitution is appropriate.  (See doc. 156; doc 197; doc 202; doc 203; doc 233; doc. 234; see also Carringer v. Rodgers, 331 F.3d 844, 848–839 (11th Cir. 2003) (finding that Section 1983 claim survived the plaintiff's death)).  As Plaintiffs have not yet indicated whether they wish to substitute a party for Melvin Banks, Sr., the Court will continue to refer to the estate of Melvin Banks, Sr., as Melvin Banks, Sr., for purposes of this Motion for Summary Judgment.  In addition, if Plaintiffs do not substitute another party for Melvin Banks, Sr., by May 31, 2021 then his estate will be dismissed in accordance with Federal Rule of Civil Procedure 25(a)(1).

[10] Charles and Margaret Hall married in 1979.  (Doc. 302-1, p. 8.)

plaintiff in this case) died intestate and had no children or living parents.  (Doc. 346-12, p. 5; doc. 294-1, p. 12; doc. 346-13, p. 2.)  Harry Jordan and Brenda Jackson have paid the property tax on the land since 2008.  (Doc. 346-13, p. 2.)   Plaintiff Lisa Marie Scott says she also inherited an interest in the same land that Brenda Jackson (who is her cousin) inherited, but she admits that the property is not in her name.  (Doc. 299-1, pp. 11, 19.)  However, she does help pay taxes on the land.  (Doc. 346-19, p. 2.)

Similarly, Plaintiff Celia Grovner says that her parents left her an interest in property on Sapelo Island, and it is undisputed that she pays property taxes on the land.  (Doc. 283-1, pp. 8–9, 98.)  A title search, however, showed no conveyance of Sapelo property to Celia Grovner.  (Doc. 283, p. 9.)

Plaintiff Aaron Walker pays taxes on some property on Sapelo Island that was owned by his grandmother, though he never received title to the land.  (Doc. 275-1, pp. 9–11, 71–72.)

Plaintiff Sylvia Williams, who is the daughter of Sarah Francis Drayton, has never "lived [on Sapelo Island] but [she] would go and spend a lot of time there."  (Doc. 316-1, p. 23.)  She and her siblings take turns paying the taxes on her mother's property.  (Id. at p. 31.)  At her deposition in 2018, she testified that she expected to inherit her mother's land on Sapelo with her siblings and that the property transfer was "still processing."  (Id. at p. 29.)

Plaintiff Lorie Banks, who brings suit on behalf of herself and her deceased husband Melvin Banks, Jr., claims that she "holds a life estate in her [late] husband's property," (doc. 341, p. 103), though she admitted in her deposition that she has no legal interest in the property, (doc. 300-1, p. 29).  While Melvin Banks, Jr., who died in 2013, did own property on Sapelo that he purchased prior to marrying Lorie, the property was inherited by Lorie's stepson, though she is allowed to "access" it.  (Id. at pp. 24, 29.)

David Grovner, Sr., is bringing suit on behalf of himself and on behalf of the estate of his deceased wife, Vernell Grovner, who died in 2014.  (Doc. 206.)  He testified that he does not own any property on Sapelo Island, but he says his wife and her siblings received "an interest" in some land on Sapelo Island when her grandmother passed away.  (Doc. 288-1, pp. 13–14, 41.)  He also states that he does not know if his wife's name "is on the deed of the Sapelo Island property."  (Id. at p. 15.)  Vernell Grovner's will did not mention any property on Sapelo Island, but it did leave "her entire estate, both real and personal" to David Grovner, Sr., "for the remainder of his natural life."  (Doc. 346-10, p. 2.)  After his death, Vernell Grovner's estate is to go to her sons, Plaintiff David Grovner, Jr., and Curtis Lamar Grovner (who is not a Plaintiff in this case.)  (Id.)  David Grovner, Jr., on the other hand, claims that he and his father and his brother all jointly inherited his mother's interest in the property on Sapelo Island when she passed away.  (Doc. 287-1, p. 11.)  However, a title search shows no record of any conveyance from Vernell Grovner's estate to David Grovner, Jr.  (Doc. 283, p. 9.)   David Grovner, Sr., lives on St. Simon's Island, (doc. 288-1, p. 12), and David Grovner, Jr., lives in Texas, (doc. 287-1, p. 10).

Plaintiff Victoria Hall lives in Jacksonville, Florida.  (Doc. 320-1, p. 15.)  She says she expects to inherit property on Sapelo Island from her father who died without a will.[11]  (Id. at pp. 8–10.)  A title record search does not show a record of any conveyance to Victoria Hall.  (Doc. 283, p. 9.)

Plaintiff Rosemary Harris lives in San Antonio, Texas.  (Doc. 311-1, p. 6.)  Her mother, Sara Edmond (who has never been a plaintiff in this case), owned property on Sapelo Island, (doc. 346-20, pp. 2–4), until her death on August 29, 2020, (doc. 346-21, p. 2).  Harris expects to share

---

[11]  As previously mentioned in this Section, Victoria Hall also represents her father's estate in this case.

in Edmond's estate equally with her sister (who is not a plaintiff in this case).  (Id.; doc. 311-1, p. 7.)

Earlene Davis, who was originally a plaintiff in this case, died on September 16, 2018, (doc. 232-1, p. 2), and the Court substituted Davis with Tia Legree who is the beneficiary of Davis' estate, (doc. 234, p. 1).  Before her death, Davis told the Department of Housing and Urban Development that she owned land on Sapelo Island and that she had paid property taxes for it, but that the property was in the name of her aunt, Sarah Louise Grovner.  (Doc. 346-16, p. 3.)  A title record search "did not locate any Sapelo property interest belonging to Earlene Davis or Sarah Louise Grovner."  (Doc. 283, p. 10.)

## III.    McIntosh County's Services and Zoning Rules

### A.    Fire Services

Fire services in McIntosh County are provided by the McIntosh Volunteer Fire Department which is its own 501(c)(3) organization, though McIntosh County provides the organization with its equipment and facilities.  (Doc. 274-2, pp. 12–13.)  As for equipment, the County has supplied "approximately sixteen vehicles with fire suppression capabilities."  (Id.)  The County, however, did not provide Sapelo Island a fire truck until 2010.  (Doc. 345-14, p. 6.)  Even then, the truck that the County placed on the Island was built in 1969 and was 17 years older than the next-oldest fire truck used in McIntosh County.  (Doc. 345-13, pp. 18–19.)  This truck stopped working in 2019, and the County took two to three months to replace it with another used fire truck.  (Doc. 274-2, p. 15; doc. 345-4, pp. 17–18.)

As for facilities, the County provides nine fire stations to the Volunteer Fire Department.  (Doc. 274-2, p. 13.)  Eight of these fire stations are located on the McIntosh County mainland, and one is located on Sapelo Island.  (Id.)  The mainland fire stations are enclosed buildings that include

"a small office . . . or a training room and [room for] the housing of the trucks." (Doc. 345-4, pp. 24–25.) On Sapelo Island, the fire station consists of a concrete pad (that has been repurposed from another project) with a metal roof which is supported by six metal poles on each side. (See doc. 345-17, p. 2; doc. 345-4, p. 28.) On August 11, 2009, the McIntosh County Board of Commissioners unanimously voted to use 2010 SPLOST funds "for construction of [a] fire station" on Sapelo. (Doc. 344-1, p. 5.) However, the project was ultimately not included as one of the 2010 SPLOST projects, (doc. 343-50), because, according to Commissioner Jordan, the Commission did not consider the fire station a priority, (doc. 343-14, p. 38). It is unusual for the Board of Commissioners to vote to spend SPLOST funds on a project and then not initiate that project. (Doc. 343-3, p. 42.) Funding for a fire station on Sapelo Island was included in the 2016 SPLOST. (Doc. 343-48, p. 4.) As of August 12, 2019, construction of the fire station had not begun, and a County representative said that the process of getting cost estimates for the build-out had "just beg[u]n." (Doc. 343-40, p. 41.)

"ISO" ratings, which are "fire protection class[ifications]" assigned to different places and used by insurance companies to set insurance rates for their insureds' homeowner's insurance, have been assigned to McIntosh County's mainland and to Sapelo Island. (Doc. 345-13, pp. 23–24.) The general ranking system ranges from Class 1 to Class 10 with "1 being the best you can get." (Id. at p. 25.) The McIntosh County mainland as a whole has an ISO Class 5 rating while Sapelo Island has an ISO Class 10 rating, signifying that it "is basically unprotected." (Id. at pp. 23–24.) The reason that Sapelo Island has a Class 10 rating is because freezing weather could damage the Island's sole fire truck since it is not housed in an enclosed building. (Id. at pp. 24–25.)

B.      **Emergency Medical Services**

As for emergency medical services ("EMS"), the County currently provides "two stations on the mainland with two [advance life support] trucks." (Doc. 343-19, p. 40.) These trucks can reach anyone in need on the mainland in fifteen minutes or less. (Doc. 345-2, pp. 8–9.) Individuals on Sapelo Island can access EMS services in two ways. (Doc. 343-14, p. 72; doc. 345-2, pp. 14–17.) First, they can travel to the mainland dock and meet EMS there. (Doc. 343-14, p. 72.) Second, EMS can travel by boat directly to Sapelo Island.[12] (Doc. 345-2, pp. 14–17.) If EMS is asked to meet a patient (who is, at that time, on the Island) at the mainland dock, approximately thirty to thirty-five minutes will elapse between the time 911 is activated and the time the paramedic is able to begin administering care to the patient at the dock. (Doc. 344-50, p. 30.) If EMS must travel to Sapelo Island, then the elapsed time between the time 911 is activated and the time the paramedic is able to begin administering care to the patient is forty-one to forty-five minutes. (Id.) Plaintiffs' expert witness Dr. William Fales opines that because Sapelo is a barrier island, "there are challenges associated in providing EMS" to it, but "these challenges are not at all insurmountable, nor are they substantively different than those facing other rural communities throughout the United States." (Id. at p. 7.)

According to Fales' report, EMS "has historically not served, or underserved, Sapelo Island." (Id.) In addition, Jane Garbisch, who lived on Sapelo from late 1998 or early 1999 until 2009, states that during her first few years on the Island, EMS "would not dispatch emergency medical technicians" to the Island and "[a]nyone on the Island who was in need of emergency medical care had to find his or her own means of traveling to the mainland in order to receive

---

[12] Commissioner Jordan testified that the County "feel[s] that it should be the state['s] responsibility" to transport people in need of EMS to the mainland dock. (Doc. 343-14, p. 72.) However, the evidence also shows that EMS does travel to Sapelo Island. (Doc. 345-2, pp. 15–16.)

care." (Doc. 344-49, p. 2.)  Garbisch also states that, because of this, in 1999 or 2000 she organized first responder training courses with the help of the Emergency Medical Services and Trauma Section of the State Department of Public Health.  (Id. at p. 3.)  McIntosh County "resist[ed] [her] effort" to implement this training—telling her at one point to "stop it"—and she had to seek help from nearby Liberty County.  (Id. at pp. 3–4.)  Garbisch believes that "McIntosh County's backlash against [her] efforts" was motivated by the fact that "most permanent residents of Hogg Hummock are African-American and Gullah[-]Geechee."  (Id. at p. 5.)  Warren Nettles, who has been the EMS Director in McIntosh County since 2015, (doc. 345-2, p. 4), states that, during his time as director, EMS has responded to calls from Sapelo no more than once per month, and that EMS has only been dispatched to travel to the Island three or four times in the past two or three years,  (id. at p. 19).

The EMS stations on the mainland have also provided direct services to the public such as "[b]lood pressure checks and blood sugar checks."  (Doc. 345-5, p. 4.)  McIntosh County EMS has provided outreach to inform the community about these services, but the department never provided any outreach to Sapelo Island regarding the services available at the EMS stations.  (Id. at p. 6.)

### C.    Road Maintenance Services

All the roads in Hogg Hummock are dirt roads.  (Doc. 345-20, p. 6.)  The minutes from a March 3, 1925 McIntosh County Board of Commissioner's meeting state that "[o]n petition, from the citizens, and after duly advertising the same[,] the public Roads on Sapelo Island were discontinued, and made private roads."  (Doc. 345-21, p. 2.)  On October 12, 2010, the McIntosh County Board of Commissioners passed the "Sapelo Island Roadway Resolution" stating that "the McIntosh County Board of Commissioners has never declared any [Sapelo Island] roads to be

abandoned, nor has such Board transferred ownership of them to any other entity or person, and currently maintains some roads on Sapelo Island." (Doc. 345-19, p. 2.)

According to McIntosh County Manager John Zoucks, the County has worked on the roads in Hogg Hummock two or three times since 2017. (Doc. 343-19, pp. 28–29.) This was at the request of the State of Georgia. (Id.) The itemized invoices sent to the State for road services in 2017 indicate that the County spent 160 hours that year on work related to Sapelo Island roads.[13] (Doc. 324, pp. 2, 10.) On the mainland, County-owned dirt roads are maintained weekly by the County. (Doc. 343-19, p. 30.) In the past, the County has mixed clay or rocks into dirt roads on the mainland, to help manage their condition, but they have not done this for the roads in Hogg Hummock.[14] (Doc. 344-14, pp. 20–21.)

In his Engineer's Report on the Roadways of Sapelo Island, Plaintiffs' witness Michael Tuttman found that the "[f]ailure of McIntosh County Department of Public Works to maintain the roads in the Hogg [Hummock] community on an adequate, and frequent, basis has created an unreasonably dangerous condition that presents a danger to the residents of, and the traveling public on, Sapelo Island." (Doc. 345-20, p. 14.) Commissioner Jordan has also stated that the roads on the Island are in poor shape "especially when it rains." (Doc. 343-14, p. 55.) Residents of Sapelo Island have complained about the condition of the roads. (Doc. 344-13, p. 4.)

---

[13] The County also maintains dirt roads on Sapelo that are outside of Hogg Hummock when so requested by the State. (Doc. 344-14, p. 23.) In the past, the County has provided itemized invoices to the State to be reimbursed for services it provided to State-owned land in the County. (Doc. 324, pp. 2, 10–11, 13.)

[14] Several Plaintiffs testified that they would prefer that the Hogg Hummock roads not be paved. (See, e.g., doc. 313-1, p. 38; doc. 296-1, p. 83.) However, the County points to no evidence showing that any Plaintiff opposes road maintenance such as mixing clay or rock into the dirt.

### D.     Trash Services

According to Commissioner David Stevens, the County has, in the past, operated dumpsters on Sapelo Island for the residents' trash needs.  (Doc. 343-15, p. 37.)  The dumpsters, however, were deemed "a nightmare" and a "mess" because trash would blow out of them, and they were dirty.  (Id.)  In approximately 2011 or 2012, Waste Management of Georgia, Inc. ("Waste Management") began handling trash services in McIntosh County as a third-party provider pursuant to a four-year contract that would automatically extend for another two years unless one party objected.  (Doc. 274-2, p. 15; doc. 345-34, p. 5.)  While the contract states that Waste Management would provide "once per week curbside collection of all Municipal Solid Waste," it did not extend this service to McIntosh County's "barrier islands."  (Id.)  The County did not discuss or negotiate with Waste Management about the idea of providing curbside collection to Sapelo Island.  (Doc. 343-15, p. 42; doc. 343-19, p. 51.)  Instead, Waste Management agreed to "provide one (1) 34-yard self[-]contained compactor for" Sapelo Island.  (Doc. 345-34, p. 6.)  Waste Management also agreed to "provide one (1) pull per month for the compactor, at no charge."  (Id.)  Evidence in the record shows that the compactor, which is still in use on the Island pursuant to the Waste Management contract, sometimes overflows, which results in trash falling on the ground.  (Doc. 329-1, p. 54; doc. 297-1, p. 33.)

McIntosh County "pays a contract amount [to Waste Management] and "does not separate the amounts paid geographically," so it is unable to identify the total funds spent for trash services on the mainland versus Sapelo Island.  (Doc. 345-38, p. 5.)  Russ Hightower, an employee of Waste Management, is "familiar" with the contract between McIntosh County and Waste

Management.[15]   (Doc. 322, p. 1.)   Hightower says that, pursuant to the contract, Waste Management provides two compactors to Sapelo Island, though only one compactor is on the Island at any given time.  (Id. at pp. 1–2.)  Approximately nine times per year, it removes the full compactor that is on the Island and replaces it with the other (empty) compactor, and the full one is taken to the landfill to be dumped.  (Id. at p. 2.)  Hightower estimates that the cost of labor to service the compactors is approximately $11,475 per year, and that the rental cost for the two compactors used on the Island is approximately $12,000 per year.  (Id.)

### E.     Zoning

The County Board of Commissioners drafts the County's zoning ordinances.  (Doc. 344-16, p. 42.)  The County is also responsible for enforcing the zoning code.  (Doc. 344-17, p. 17.)  In 1995, the County created the "Hog Hammock District" and passed zoning ordinances "to allow [for the] continued use and activities of the community of Hog Hammock on Sapelo Island."  (Doc. 343-12, p. 3.)   The purpose of these regulations was "to reserve [the] area for low intensity residential and cottage industry uses which are environmentally sound and will not contribute to land value increases which could force removal of the indigenous population."  (Id.)  One of the provisions of the ordinance stated, "Maximum dwelling unit size: 1,400 square feet."  (Id. at p. 4.)

Melvin Amerson, who was the building inspector for McIntosh County from 1999 to 2016, interpreted this regulation to mean 1,400 square feet of heated space.  (Doc. 344-16, pp. 4, 21.)  According to Amerson, heated space means "where you're going to be living," so an enclosed porch with a fireplace as a heat source would not count toward the total dwelling unit square footage.  (Id. at pp. 28–29.)  This was the only zoning ordinance, to Amerson's knowledge, where

---

[15] Hightower's signed affidavit is dated July 31, 2020.  (Doc. 322, p. 2.)  McIntosh County's contract with Waste Management was set to expire on November 1, 2017 at the latest.  (Doc. 345-34, p. 5.)  No other contract between the two parties is in the record.

the "heated space" versus "not heated space" distinction applied.  (Id.)  He said he was told to interpret the rule this way by the previous building inspector.  (Id. at pp. 22, 38.)  In 2011, the Board of Commissioners voted to enshrine the "heated space" exception in the ordinance.  (Doc. 274-2, p. 22; doc. 341-2, p. 48.)  Amerson stated that he would normally inspect a proposed building plan and "the layout of the house when we looked at it on the outside" in order to determine compliance with the zoning ordinance.  (Doc. 344-16, pp. 12–13.)  Amerson has approved several building permits for structures on Hogg Hummock that exceed 1,400 square feet, and those permits do not state whether the excess footage is for non-heated space.  (See, e.g., doc. 344-37, p. 2; doc. 344-33, p. 2; doc. 344-38, p. 2; doc. 344-39, p. 2.; doc. 344-40, p. 2; doc. 344-41, p. 2; doc. 344-35, p. 2.)  Ceaser Banks states that when he built a cottage in Hogg Hummock, he was told that the building, *including* any porch, would have to be no more than 1,400 total square feet, so he built a much smaller porch than he originally planned and desired to have.  (Doc. 282-1, p. 81.)  However, a sketch of the layout of his home from the McIntosh County Assessor's records shows that the "main level" covers 1,368 square feet, and that it also has a screened porch and a deck that bring the square footage total above 1,400.  (Doc. 282, p. 37.)

The McIntosh County building inspector is also in charge of enforcing requirements set by the Federal Emergency Management Agency ("FEMA").  (Doc. 274-2, p. 23; doc. 341-2, p. 51.)  FEMA regulations prohibit mobile homes from being placed on Sapelo Island.  (Doc. 344-16, pp. 52–53.)  The County has informed some Plaintiffs that they cannot place a mobile home on their property on Sapelo Island.  (Doc. 343-31, p. 10; doc. 344-44, p. 11; doc. 343-33, pp. 20–21.)

F.     **Water and Miscellaneous Services**[16]

McIntosh County operates a water system that provides water to 80% of individuals living on the McIntosh County mainland.  (Doc. 343-14, p. 59.)  McIntosh County has received federal funds to pay for work on the water system.  (Doc. 344-11, pp. 2–8; doc. 344-7, p. 2.)  The State of Georgia has installed a water system on Sapelo Island to provide water to Hogg Hummock.  (Doc. 345-41, pp. 5–6.)  Some Plaintiffs have described the water as being discolored and having a bad smell and taste.  (Doc. 282-1, p. 58; doc. 276-1, p. 81; doc. 280-1, p. 46; doc. 329-1, p. 59; doc. 291-1, p. 33.)  Commissioner Jordan was not aware of any problems with water services on Sapelo Island and believes that the water "should meet all the federal specifications."  (Doc. 343-14, p. 61.)

Finally, the County also expends money on leisure services and mosquito control.  (Doc. 343-42, pp. 25, 27; doc. 343-43, pp. 26, 28.)  During his deposition, County Manager Zoucks did not know of any expenditures earmarked for leisure services on "activities or structures" on Sapelo Island.  (Doc. 343-40, p. 13.)   Zoucks stated that the County responds to complaints about mosquitos from individuals on the mainland by sending out a "spraying machine in the back of a pickup truck" but does not do this for complaints about mosquitos on Sapelo Island.  (Id. at p. 17.)  However, Zoucks also noted that the County's mosquito control efforts also included a one-time "aerial spraying" that was for "the populated areas of the county [which] did include [Hogg Hummock]."   (Id. at p. 18.)

---

[16]  In their Response Brief, Plaintiffs also make claims based on the County "expend[ing] minimal money on the Library and Community Center on Hogg Hummock." (Doc. 341, pp. 89–90.)  However, Plaintiffs' ninety-six-page Second Amended Complaint did not base any of its claims on minimal library or community center expenditures.  (See doc. 206.) "In this circuit, a plaintiff cannot amend his complaint through argument made in his brief in opposition to the defendant's motion for summary judgment." Miccosukee Tribe of Indians of Fla. v. U.S., 716 F.3d 535, 559 (11th Cir. 2013).  Therefore, the Court will not consider Plaintiffs' claims based on library and community center expenditures.

## LEGAL STANDARD

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the non-moving party only

if there is a 'genuine' dispute as to those facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." <u>Id.</u> (citation and emphasis omitted).

## DISCUSSION

Plaintiffs' Second Amended Complaint assert a Section 1982 claim (Count II), a Fourteenth Amendment claim (Count III) brought by and through Section 1983, and a Title VI claim (Count IV).[17] (Doc. 206, pp. 88–93.) They seek damages, declaratory relief, and injunctive relief from and against McIntosh County. (<u>Id.</u>) McIntosh County makes several arguments in support of its position that the Court should grant summary judgment in its favor on all of these claims. (Doc. 274-1.) It argues that many of Plaintiffs' claims are time-barred. (<u>Id.</u> at pp. 36–37.) The County then argues that "[a] number" of Plaintiffs do not have standing to assert their claims in this suit. (<u>Id.</u> at pp. 34–36.) Finally, it also asserts that all of Plaintiffs' claims should be

---

[17] The Court has previously dismissed Plaintiffs' Fair Housing Act claims against the County, (doc. 158, p. 20), and all of Plaintiffs' claims to the extent they were based on the County allegedly conducting unequal and discriminatory tax appraisals, (doc. 240, p. 12). Plaintiffs' Second Amended Complaint also includes a 42 U.S.C § 1981 claim (Count I) bought by and through 42 U.S.C §1983. (Doc. 206, pp. 86–88.) However, in a previous Order, the Court "merge[d]" this claim into Plaintiffs' Fourteenth Amendment claim, which is brought by and through Section 1983, and stated that it would "treat them as a single claim under § 1983." (Doc. 158, p. 21.) As the United States Court of Appeals for the Eleventh Circuit has explained, "§ 1983 'provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor[,]'" and as such a plaintiff "has no claim for damages . . . under § 1981." <u>Brown v. City of Fort Lauderdale</u>, 923 F.2d 1474, 1482 (11th Cir. 1991) (quoting <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 735 (1989)); <u>see also</u> <u>Arnold v. Bd. of Educ. of Escambia Cty.</u>, 880 F.2d 305, 317 (11th Cir. 1989) ("[W]e find it unnecessary at this time to delve into the question of the scope . . . of § 1981 since we see no difference in a claim for racial discrimination which [plaintiffs] could assert under the equal protection clause of the fourteenth amendment and a discrimination claim which they could assert under § 1981."), <em>overruled on other grounds by</em>, <u>Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163 (1993). Accordingly, the Court again merges the 42 U.S.C § 1981 claim into Plaintiffs' Fourteenth Amendment claim, which is brought by and through Section 1983, and will treat them as a single claim under Section 1983.

analyzed under the <u>McDonnell-Douglas</u> framework, and that under that framework these claims

fail on the merits.  (<u>Id.</u> at pp. 37–50.)  The Court will address each of these arguments in turn.

## I.      Statute of Limitations

In a two-sentence argument in its Brief in Support of Summary Judgment, the County

asserts that Plaintiff's claims are subject to a two-year statute of limitations and that, "to the extent

Plaintiffs' claims are based on events that occurred prior to December 9, 2013, those claims are

time-barred." (Doc. 274-1, pp. 36–37.)  The County does not specify precisely which of Plaintiffs'

claims it believes are time-barred.  In response, Plaintiffs argue that their claims are not time-

barred because of the continuing violations doctrine.  (Doc. 341, pp. 108–10.)  "The continuing

violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional

violations of the law occur within the statutory period." <u>Ctr. For Biological Diversity v. Hamilton</u>,

453 F.3d 1331, 1334 (11th Cir. 2006).  The County did not respond to this argument in its Reply

or otherwise.

Federal Rule of Civil Procedure 56 states that a party seeking summary judgment must

"identify[ ] each claim . . . or the part of each claim . . . on which summary judgment is sought."

Fed. R. Civ. P. 56(a).  The County's scant statute of limitations argument does not satisfy this

requirement.  Thus, the Court **DENIES** the County's request for summary judgment due to

untimeliness for failing to meet the summary judgment standard.  However, McIntosh County's

argument, while insufficient for summary judgment at this time, raises a host of issues that the

parties have not addressed. Should the County intend to stand by its timeliness argument, the

parties and the administration of justice would benefit from fully addressing these issues in

advance of trial.  Therefore, the Court finds good cause to provide the County additional time to

file a supplemental motion for summary judgment on this issue.  The County may file a new motion

for summary judgment within **twenty-one (21) days of this Order** specifically addressing, and only addressing, which of Plaintiffs' remaining claims should be time-barred by the applicable statute of limitations.  Should the County file such a motion, it must, at a minimum: explain whether and to what extent its statute of limitations defense applies to each remaining Plaintiff; clarify whether the County contends that all Plaintiffs' requested remedies (damages, declaratory relief, and injunctive relief) are time-barred or only a portion of those remedies; separately address the timeliness of Plaintiffs' remaining substantive claims (i.e. fire services, trash services, EMS, and road maintenance); and discuss the application of the continuing violations doctrine.  Plaintiffs will have **twenty-one (21) days from the date of the County's filing** to file a response.

## II.      Standing

McIntosh County argues that any Plaintiffs who "do not have, and have not at any time during the applicable statute of limitations had, an interest in property on Sapelo Island" do not have standing to sue. (Doc. 274-1, p. 35.)  The County also asserts that Plaintiffs who are "visitors or part-time residents on Sapelo" also do not have standing.[18]  (Id. at pp. 35–36.)  "[S]tanding is a threshold question that must be explored at the outset of any case." Corbett v. Transp. Sec. Admin., 930 F.3d 1225, 1232 (11th Cir. 2019).  "To satisfy the standing requirement, a plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Debernardis v. IQ Formulations, LLC, 942 F.3d 1076, 1083 (11th Cir. 2019) (internal quotation and citation omitted).  An injury in fact must be both "(a) concrete and particularized and (b) actual or imminent, not

---

[18] While McIntosh County disputes that the majority of Plaintiffs do not have standing, it does not dispute that Benjamin Hall and Iregene Grovner, Sr. are "full-time residents of Sapelo Island who appear to have an interest in property on Sapelo." (Doc. 274-1, p. 33.)  It is also clear from the record that Florence Hall is a full-time resident who owns a home with her husband Benjamin Hall on Sapelo Island. (Doc. 291-1, p. 10.)  In addition, before he death, Sarah Francis Drayton was a full-time resident on Sapelo Island living on property she owned. (Doc. 313-1, pp. 5–6, 87.)

conjectural or hypothetical." Women's Emergency Network v. Bush, 323 F.3d 937, 943 (11th Cir. 2003).  In addition, "a plaintiff seeking injunctive relief 'must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future.'"  Houston v. Marod Supermarkets, Inc., 733 F.3d 1323, 1328–29 (11th Cir. 2013) (quoting Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1284 (11th Cir. 2001)).   "The plaintiff bears the burden of establishing each element" for Article III standing.  Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1268 (11th Cir. 2019) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).  And "that burden increase[s] with the successive stages of litigation: although mere allegations suffice[] at the pleading stage, actual evidence [is] required to withstand summary judgment." City of Miami Gardens v. Wells Fargo & Co., 956 F.3d 1319, 1320 (11th Cir. 2020) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992)).

### A.       Plaintiffs Who Own Property on Sapelo But Are Not Full-Time Residents

McIntosh County argues that the Plaintiffs who are not full-time residents on Sapelo Island are merely "concerned bystanders asserting undifferentiated claims" and as such do not have a concrete and particularized injury in fact.  (Doc. 274-1, p. 36.)  These Plaintiffs include Dan Gardner, Mary Palmer, Richard Banks, Deborah Dixon, Jesse Jones, Delores Lewis, Johnny Matthews, Verdie Walker, Sonnie Jones, Valerie Williams, Cheryl Grant, Angelina Hall, Reginald Hall, Marion Banks, Roberta Banks, Stacey White, Andrea Sparrock, David Sparrock, Frances Mercer, Andrea Dixon, Samuel Dixon, and Rall Grovner, all of whom own property on Sapelo Island but are not permanent residents.  (See Background Section II, supra.)  This category would also include the following individuals asserting claims on behalf of the estates of deceased individuals who owned property on Sapelo Island but who did not live there full-time: Lorie Banks (on behalf of the estate of Melvin Banks, Jr.), Dena Mae Harrison (on behalf of the estates of

Harold Hillery and Johnnie Hillery), and Margaret Hall (on behalf of the estate of Charles Hall).[19]

Id.  In their Brief, these Plaintiffs argue that they are receiving (or, for those who have died, previously received) inadequate municipal services for their own property.  (Doc. 341, pp. 20–23.)

Courts have found that the provision of inadequate municipal resources can cause a sufficient injury in fact for standing purposes.  See, e.g., Kennedy v. City of Zanesville, 505 F. Supp. 2d 456, 484 (S.D. Ohio 2007) (finding that plaintiffs had alleged "an actual, particularized injury in fact" where plaintiffs "claim[ed] that the pattern and practice of discrimination by Defendants have resulted [in among other things] lack of fire suppression").  Although not bound by this authority, the Court finds it persuasive as it is logical that any individual who owns property would be injured if a governmental authority provided unequal municipal services to the property because of the individual's race.  Indeed, it is difficult to conceive of these Plaintiffs as only "concerned bystanders, who will [use standing] simply as a vehicle for the vindication of value interests," Hollingsworth v. Perry, 570 U.S. 693, 707 (2012) (citation and quotation omitted), when they are seeking tangible municipal services that are on par with the County mainland in exchange for the tax dollars paid on their property.  Even the County, in its Reply Brief, acknowledges that property owners have an expectation of receiving municipal services in exchange for property taxes.  (See doc. 354, p. 44 ("Property owners pay ad valorem taxes to the County, and in return they receive basic government services.")).  Because these Plaintiffs have provided evidence that they own Sapelo Island property (and no party disputes that the taxes for their properties are in fact paid), they have standing to assert their claims concerning unequal municipal services.

---

[19] Lorie Banks and Margaret Hall each also bring claims on their own behalves.  (See doc. 206.)  The Court will address whether these Plaintiffs have standing to assert those claims in a separate section.  (See Discussion Section I.C, infra.)

In addition to seeking damages, these Plaintiffs seek injunctive relief, which requires them to show "a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury." Shotz v. Cates, 256 F.3d 1077, 1081 (11th Cir. 2001) (quotation and citation omitted) (emphasis in original). McIntosh County does not assert that any of the Plaintiffs who own Sapelo Island property have stopped paying taxes on their property, and the evidence shows that the Board of Commissioners continues to provide services the same way it did before the suit, so the injury persists. (Doc. 343-1, p. 4.) The County, relying on the Eleventh Circuit Court of Appeals' decision in Kennedy v. Solano, argues that these Plaintiffs cannot make this showing because they do not live on Sapelo Island and only visit. (Doc. 354, p. 51–52 (citing Kennedy v. Solano, 735 F. App'x 653, 655 (11th Cir. 2018) (per curiam)). Kennedy is distinguishable from the situation at hand, however. In that case, a disabled plaintiff brought an ADA claim seeking injunctive relief against a restaurant because it was not readily accessible by disabled individuals. Id. at 654. The district court said the plaintiff lacked standing and dismissed the case, and the Eleventh Circuit upheld the decision. Id. at pp. 655–56. The Eleventh Circuit reasoned that the plaintiff could not show that she would suffer an actual or imminent injury in the future because she did not live near the restaurant, she had only patronized the restaurant once, and she had no concrete plan for returning to the restaurant. Id. at p. 655. Here, unlike the Kennedy plaintiff, these Plaintiffs have a history of visiting Sapelo Island, including the property they own there, which strengthens their case for standing. See Houston, 733 F.3d at 1336 (finding that a plaintiff who had visited a supermarket twice before filing suit did have standing to seek injunctive relief). In addition, several of these Plaintiffs—including Dan Gardner, Mary Palmer, Richard Banks, Deborah Dixon, Jesse Jones, Delores Lewis, Verdie Walker, Valerie Williams, Marion Banks, Sr., Roberta Banks, Frances Mercer, Andrea Dixon, and Samuel Dixon—stated in their depositions

that they plan to visit Sapelo Island in the future or discussed how they consistently visit the Island a number of times every year, (see Background Section II n.6, supra), which further distinguishes them from the plaintiff in Kennedy who could not give a "definitive time [that she planned] to return to the" restaurant. Sloan, 735 F. App'x at 655. Finally, these Plaintiffs own Sapelo Island land, and thus have an interest that could be harmed even if they were not visiting the Island. For these reasons, the Court finds these Plaintiffs do face a real and immediate threat of future injury, for purposes of standing to seek injunctive relief.

In order to have standing, these Plaintiffs also must show a causal connection between the challenged action and the injury, and that a favorable judgment will redress the injury. See Gardner v. Mutz, 962 F.3d 1329, 1338 (11th Cir. 2020). Evidence in the record shows that the County Board of Commissioners annually sets the budget that determines funding for municipal resources. (See doc. 343-41; doc. 343-42; doc. 343-43; doc. 343-44; doc. 343-45; doc. 343-46.) Accordingly, these Plaintiffs have made a sufficient showing that the County's actions are traceable to their injuries. See Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1273 (11th Cir. 2003) ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action for standing purposes."); Bennett v. Spear, 520 U.S. 154, 169 (1997) (plaintiffs do not need to show that "the defendant's actions are the very last step in the chain of causation."). Likewise, Plaintiffs can show redressability because, if they win their case on the merits, the County will have to increase municipal services to Hogg Hummock where they own property. As such, Plaintiffs would no longer be paying property taxes in exchange for unequal and inadequate municipal services. See Harrell v. The Florida Bar, 608 F.3d 1241, 1260 n.7 (11th Cir. 2010) ("Redressability is established . . . when a favorable decision 'would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses

the injury suffered.'") (quoting Utah v. Evans, 536 U.S. 452, 464 (2002)).  Accordingly, the Court

finds that these Plaintiffs have standing to sue.

McIntosh County also asserts that Ceaser Banks, Nancy Banks, and Melvin Banks, Sr.,

have not experienced an injury in fact and thus do not have standing to assert their claims.  (Doc.

274-1, pp. 27, 34–36.)  All three of these Plaintiffs conveyed their Sapelo Island property in 2019,

during the pendency of this suit.  (Doc. 282, p. 8; doc. 305, pp. 6–10.)  The fact that these three

Plaintiffs no longer have property on the Island does not affect the past injuries they allegedly

experienced.  See, e.g., Kennedy, 505 F. Supp. 2d at 488 ("[T]he fact that some of the [p]laintiffs

have since moved from the [area affected by disparate treatment] does not affect their standing to

sue for past injury, which can be redressed through monetary and declaratory relief.").  However,

as they no longer have a property interest, Ceaser Banks, Nancy Banks, and Melvin Banks, Sr.,

cannot show that they are likely to experience a future injury and as such do not have standing to

seek injunctive relief.  See, e.g., Wooden, 247 F.3d at 1285–86 (student did not have standing to

seek injunctive relief against a discriminatory admittance policy after he was admitted by the

university).

For these reasons, the Court **GRANTS** the County's Motion for Summary Judgment on

the claims for injunctive relief asserted by Ceaser Banks, Nancy Banks, and Melvin Banks, Sr.

The Court **DENIES** Plaintiff's motion for summary judgment due to lack of standing as to all

other claims asserted by Plaintiffs who own (or owned) property on Sapelo but are not full-time

residents.

### B.   Plaintiffs Who Pay Taxes on—But Do Not Own—Property on Sapelo

There are also several Plaintiffs who have paid taxes on Sapelo property, but do not own

property on the Island.  The record shows that siblings Harry Jordan and Brenda Jackson inherited

Sapelo property from their mother, (doc. 294-1, p. 12; doc. 281-1, pp. 10–11), but then transferred

this property to their brother Charles Jordan, (doc. 281, pp. 8–9; doc. 294, pp. 9–13). While Charles Jordan died intestate, (doc. 346-13, p. 2), neither Harry Jordan nor Brenda Jackson state in their respective depositions that they have inherited the Sapelo Island property from Charles Jordan. In addition, the record does not show that any property has been transferred to either Harry Jordan or Brenda Jackson since Charles Jordan's death. The record does show that they pay taxes on the land. (Id.) Lisa Marie Scott says that she inherited an interest in the same land that Brenda Jackson and Harry Jordan transferred, but she admits that title to this land is not in her name. (Doc. 299-1, pp. 13, 19). Lisa Marie Scott also says she pays taxes on this land. (Doc. 346-19, p. 2.) Similarly, Aaron Walker pays taxes on Sapelo Island property even though his grandmother never transferred the deed conferring title to him. (Doc. 275-1, pp. 10–11.)

Plaintiffs cite no case law indicating that paying taxes on land alone—without some legal interest—creates a property right that could be injured for standing purposes. Both the Supreme Court and the Eleventh Circuit have stated that a court should look to state law to determine whether a party has a property interest. See Logan v. Zimmerman Brush Co., 455 U.S. 422, 430 (1982) ("The hallmark of property, the Court has emphasized, is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'"); Save Our Dunes v. Ala. Dep't of Env't Mgmt., 834 F.2d 984, 989 (11th Cir. 1987) ("Under the fourteenth amendment, plaintiffs' claim to a constitutionally cognizable 'property' interest must be grounded in state law."). Georgia courts have never specifically examined whether paying property taxes creates a property interest sufficient for standing, but in other contexts, Georgia courts have held that parties needed to hold some type of title to real property for standing purposes. See Stuttering Found., Inc. v. Glynn Cty., 801 S.E.2d 793, 798 (Ga. 2017) ("Those cases in which the Georgia appellate courts have found a zoning decision challenger to have a substantial interest in the zoning decision,

28

which satisfies the first prong of the standing test, have all involved holders of vested or inchoate title to real property.").  Based upon this and Plaintiffs' lack of legal support for the contrary conclusion, the Court finds that Harry Jordan, Brenda Jackson, Lisa Marie Scott, and Aaron Walker's history of paying taxes on Sapelo property for which they have no legal interest does not give them standing in this suit.

Like Harry Jordan and Brenda Jackson, Angela Hall and Marcia Hall Wells also have no property interest on Sapelo Island but help pay taxes on land there.  (Doc. 278-1, pp. 11, 39; doc. 301-1, pp. 30–31.)  Thus, these two Plaintiffs also do not have standing simply because they help pay these taxes.  While they both testified that they desire for their parents (Plaintiffs Benjamin and Florence Hall, who do own and reside on property on Sapelo) to have better medical services on Sapelo, (doc. 301-11, p. 10–11; doc. 278-1, pp. 20–21), this concern is premised upon an alleged denial of services to Benjamin and Florence Hall—the property owners and residents—and does not provide a basis for finding that Angela Hall and Marcia Hall Wells have standing.  See U.S. v. Hays, 515 U.S. 737, 743–44 (1995) ("[E]ven if a governmental actor is discriminating on the basis of race, the resulting injury accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct.") (internal citations and quotations omitted).  Thus, Angela Hall and Marcia Hall Wells have failed to produce evidence of an injury in fact and, therefore, have failed to show that they have standing.  For all these reasons, the Court **GRANTS** McIntosh County's Motion for Summary Judgment for lack of standing as to Harry Jordan, Brenda Jackson, Lisa Marie Scott, Aaron Walker, Angela Hall, and Marcia Hall Wells as to all claims asserted by them against the County.  (Doc. 274.)

### C.    Plaintiffs Who Have Not Shown an Ownership Interest in Any Property on Sapelo

Next, McIntosh County argues that several other Plaintiffs cannot establish the first and third elements for standing.  (Doc. 274-1, p. 35.)  These Plaintiffs include Lorie Banks (on her own behalf), David Grovner, Sr. (on his own behalf and on behalf of the estate of Vernell Grovner), David Grovner, Jr., Celia Grovner, Sylvia Williams, Victoria Hall, Bobby Grovner, Rosemary Harris, Tia Legree, Temperance Jones, Iregene Grovner, Jr., Richard Banks (on behalf of the estate of Carolyn Banks), and Margaret Hall, all of whom claim some connection to Sapelo Island property either through marriage, purported inheritance, expected inheritance, or as an owner of an LLC.  (See Background Section II, supra.)  The County asserts that because the alleged injury in this case is the provision of unequal municipal services to Sapelo Island, then "Plaintiffs with no property interest cannot establish that they have experienced a concrete and particularized injury in fact."  (Doc. 274-1, p. 35.)  The County also argues that, because these specific Plaintiffs have not experienced an injury, a favorable judicial decision would not affect them.  (Id.)

In response, Plaintiffs first argue that, regardless of whether they have an ownership interest in property on Sapelo, all of the Plaintiffs in this group have "neighborhood standing."  As the name suggests, under the theory of neighborhood standing, a plaintiff should be permitted to challenge "an adverse impact on the neighborhood in which the plaintiff resides."  Havens Realty Corp. v. Coleman, 455 U.S. 363, 375 (1982).  Plaintiffs argue that under neighborhood standing the "Supreme Court and [the] Eleventh Circuit have recognized that a plaintiff may challenge discriminatory conduct directed at a racially identifiable neighborhood rather than solely on conduct directed at the plaintiff."  (Doc. 341, p. 19.)  While "[t]he Supreme Court has held that 'the loss of important benefits from interracial associations' is an injury in fact sufficient for standing under § 804[] (42 U.S.C. § 3604) of the Fair Housing Act," Jackson v. Okaloosa Cty., 21

F.3d 1531, 1539 (11th Cir. 1994) (quoting <u>Trafficante v. Metro. Life Ins. Co.</u>, 409 U.S. 205, 210 (1972)), the Eleventh Circuit has only made clear that neighborhood standing applies to claims brought under the Fair Housing Act and it has made no mention of its applicability to claims brought pursuant to Section 1982, the Fourteenth Amendment, or Title VI.  <u>See id.</u> ("[A] plaintiff may have 'neighborhood' standing to challenge violations of the Fair Housing Act even if the discriminatory acts are not directed at that person.").  Plaintiffs cite no Eleventh Circuit authority indicating that neighborhood standing applies outside the context of the Fair Housing Act. Because neighborhood standing has never been extended beyond the statutory confines of the Fair Housing Act, and Plaintiffs provide no cognizable grounds for expanding the underpinnings of the doctrine to this context, the Court declines to interpret the doctrine broadly here.  <u>See Sierra Club v. Morton</u>, 405 U.S. 727, 732 (1972) ("Where the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged such a personal stake in the outcome of the controversy[.]") (citation and internal quotations omitted).  Furthermore, "[i]n order to establish neighborhood standing, the plaintiff must show that the racially discriminatory practice at issue affected the neighborhood where the plaintiff resides."  <u>Jackson</u>, 21 F.3d at 1539 (citing <u>Havens Realty Corp.</u>, 455 U.S. at 377).  The record is clear that Lorie Banks, David Grovner, Sr., David Grovner, Jr., Celia Grovner, Sylvia Williams, Iregene Grovner, Jr., Victoria Hall, Rosemary Harris, Temperance Jones, Margaret Hall, and Tia Legree do not reside on Sapelo Island.  (<u>See</u> Background Section II, <u>infra</u>.)  Additionally, before their deaths, Carolyn Banks and Vernell Grovner did not reside on Sapelo Island.  (Doc. 305-1, pp. 7, 12; doc. 288-1, p. 13.)  Thus, even if neighborhood standing was applicable to claims other than those premised upon the Fair Housing Act, it would still not be applicable here because all these particular Plaintiffs (besides Bobby Grovner) do not reside on Sapelo Island.  Moreover,

as to all of this group of Plaintiffs who do not own property on Sapelo, including Bobby Grovner, Plaintiffs have alleged merely speculative injuries, as opposed to a concrete and particularized injury and, have not demonstrated that a favorable decision would afford them relief.

Several of these Plaintiffs—David Grovner, Sr. (who brings claims on behalf of himself and the estate of his late wife Vernell Grovner), David Grovner, Jr., Bobby Grovner, Iregene Grovner, Jr., Celia Grovner, Victoria Hall, Sylvia Williams, Rosemary Harris, Tia Legree, and Lorie Banks—also argue that they actually do own (or co-own) property on Sapelo Island and as such have standing to sue.[20]  (Doc. 341, pp. 101–03, 106–08.)  First, David Grovner, Sr., and David

---

[20]  Many of these Plaintiffs rely upon their own testimony that they own Sapelo property by way of inheritance or that they are due to inherit property on the Island.  As explained herein, these claims are speculative, and though the County has produced evidence including title searches to refute these claims, Plaintiffs have produced no documentary evidence of ownership to support their claims.  Thus, even if the jury were to consider these Plaintiff's testimony that they own property, that testimony is too speculative for a rational juror to find that they have a legally recognized interest in any property on the Island.  Moreover, Plaintiffs have failed to establish that these statements regarding property ownership and inheritance can be presented in an admissible form at trial.  See, Smith v. Marcus & Millichap, Inc., ___ F.3d ___, n.2, No. 18-14797, 2021 WL 939184, at *7 (11th Cir. Mar. 12, 2021) ("evidence does not have to be authenticated or otherwise presented in an admissible form to be considered at the summary judgment stage, 'as long as the evidence could ultimately be presented in an admissible form.'") (quoting Lossia v. Flagstar Bancorp, Inc., 895 F.3d 423, 429 (6th Cir. 2018)).  These Plaintiffs assert that they own property by way of inheritance, and many of their claims assume not only that they inherited property on the Island but that their parents, grandparents, or other ancestors previously inherited or otherwise owned that property.  Thus, on the facts of this case, these Plaintiffs' statements regarding their property ownership and past or expected inheritance constitute legal opinions that must be based on technical or specialized knowledge of the principles of real property law and inheritance law.  Such opinions fall within the ambit of Federal Rule of Evidence 702, and Plaintiffs have not demonstrated that they are qualified to offer such opinions or that they could meet the other requirements of Rule 702, much less the disclosure requirements for such opinion testimony.  Moreover, Plaintiffs have not argued that they could testify regarding their alleged property ownership as lay witnesses.  Even if they had, Federal Rule of Evidence 701 only allows lay opinion testimony that is "rationally based on the witness's perception," "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Plaintiffs have failed to explain how their statements of property ownership are rationally based on their own perception, and, again, these statements amount to opinions requiring technical or specialized knowledge.  On similar facts, courts have refused to consider similar statements.  See, e.g., Arnold v. United States, 137 Fed. Cl. 524, 558 (2018) (court would not consider affiant's statements regarding land ownership at summary judgment because statements contained unsupported legal conclusions and affiant did not explain how his statements were rationally based on events he perceived);  Alcarmen v. J.P. Morgan Chase Bank, No. 13-CV-1575 YGR, 2014 WL 3368647, at *1 (N.D. Cal. July 8, 2014) (court refused to consider "Mortgage Loan Chain of Title Report" at summary judgment because, among other reasons, document was "replete with speculation" and

Grovner, Jr., argue that they inherited Sapelo Island property from Vernell Grovner who had inherited the land from her mother.  (Doc. 341, pp. 101–02.)  In her will, Vernell Grovner devised her "real and personal" estate to David Grovner, Sr., "for the remainder of his natural life" and then to David Grovner, Jr., to share equally with his brother.  (Doc. 346-10, p. 2.)  However, even when viewing the record in the light most favorable to Plaintiffs, nothing in that record demonstrates that Vernell Grovner actually owned Sapelo Island property, and David Grovner, Sr., even admitted that he did not know if his wife's name "is on the deed of the Sapelo property." (Doc. 288-1, p. 15.)  Furthermore, a title search shows no record of a conveyance of any Sapelo Island property from Vernell Grovner's estate.  (Doc. 283, p. 9.)  As David Grovner, Sr., and David Grovner, Jr., provide no evidence that Vernell Grovner's estate transferred title of Sapelo Island property to them or even that she possessed title to such property at all, there is no genuine dispute of fact concerning their lack of land ownership.  See, e.g., Villas of Lake Jackson, Ltd. v. Leon Cty., 884 F. Supp. 1544, 1556 (N.D. Fla. 1995) (no genuine dispute of material fact where one defendant provided evidence that plaintiff was "not in the chain of title as to" certain property and the plaintiff provided "no concrete evidence" to rebut it).

Similarly, there is no genuine dispute of fact concerning whether Celia Grovner owns land on Sapelo Island.  While Celia Grovner states that she inherited land from her parents, (doc. 283-

---

"document is inadmissible to the extent it contains legal arguments and lay opinions, of which it contains many"); Donovan v. Flamingo Palms Villas, LLC, No. 2:08-CV-01675-RCJ-RJJ, 2010 WL 11579451, at *6 n.2 (D. Nev. May 6, 2010) (striking declarant's statements regarding conveyance of legal interest and possession of interest in property because statements "are indeed opinions offered by a lay witness, [the declarant], and the opinions do not involve non-technical observations within the scope of lay opinion. Furthermore, conclusions of domestic law are not generally appropriate for admission as evidence, even when offered by experts.") (citing Burkhart v. Wash. Metro. Area Transit Auth., 112 F.3d 1207, 1212–13 (D.C. Cir. 1997)).  This is not to say that an alleged property owner could never testify as to her legal interest in real property.  However, on the facts of this case, these Plaintiffs have failed to demonstrate that they could present their statements of real property ownership and inheritance in admissible form at trial.

1, pp. 8–9), a title search provides no evidence of this conveyance, (doc. 283, p. 9), and she has not provided any other evidence to support her conclusory claim of land ownership.  Likewise, Victoria Hall brings suit on behalf of the estate of Joseph Hall.  (Doc. 202.)  Victoria Hall states that Joseph Hall inherited property, (doc. 320-1, p. 11), but Plaintiffs have not produced any property record or other documentary evidence of any devise, conveyance, or intestate passing of Sapelo Island property to Joseph Hall.  In addition, a title search provides no evidence of the conveyance of any Sapelo Island property to Joseph Hall.  (Doc. 283, p. 9).  Finally, Bobby Grovner says he inherited Sapelo Island property from his parents, (doc. 280-1, p. 14), but records show that he transferred his ownership stake to his mother after his father's death, (doc. 280, pp. 7–8).  Bobby Grovner has not produced any testamentary documents, property records, or other evidence indicating that the property was ever transferred back to Bobby Grovner after his mother's death.  Indeed, Plaintiffs' own statement of facts states that Bobby Grovner lives "on a parcel that is under his mother's name."  (Doc. 341-1, p. 55.)  Accordingly, the Court finds that Celia Grovner and Bobby Grovner have not provided any evidence from which the jury could find that they owned property on Sapelo Island, and, thus, they have failed to carry their burden on the issue of standing.  City of Miami Gardens, 956 F.3d at 1320.  The Court also finds that Victoria Hall has not produced evidence that Joseph Hall owned property on Sapelo Island before his death, and, therefore, Victoria Hall has not demonstrated that she has standing on behalf of his estate to sue the County in this matter.

Next, Victoria Hall, Sylvia Williams,[21] and Rosemary Harris state that they expect to inherit Sapelo Island property from family members who have died, (doc. 320-1, p. 8–10; doc.

---

[21] Celia Grovner and Sylvia Williams all stated that they paid taxes for property on Sapelo Island.  (Doc. 283-1, p. 98; doc. 316-1, p. 31.)  However, as the Court has already explained, paying property taxes is insufficient to create a property interest which can be injured to establish standing.  (See Discussion Section I.B., supra.)

316-1, pp. 29–30; doc. 346-21, p. 2), and Tia Legree was substituted in this action for Earlene

Davis (after her death) based on her status as the beneficiary of Davis's estate, (doc. 234, p. 1).  A

title record search does not indicate that any Sapelo Island property has been conveyed to Victoria

Hall, (doc. 283, p. 9), and the record is silent as to proof of conveyances to Rosemary Harris,

Sylvia Williams, and Tia Legree.  In addition, none of these Plaintiffs provide any sort of

testamentary evidence, such as a will, or other evidence showing that they have received or will

receive Sapelo Island property.  At best, the record shows that these four Plaintiffs expect at some

point in the future to have property on Sapelo Island, but this is insufficient to establish an injury

for standing purposes.  See 31 Foster Children v. Bush, 329 F.3d 1255, 1267 (11th Cir. 2003)

("[O]ne cannot merely allege that an injury will be suffered at 'some time' in the future.").  Finally,

Tia Legree's claim to Sapelo Island property is even less tenable because a title record search did

not show that Earlene Davis (from whom she claims have inherited or expects to inherit) owned

property on Sapelo Island. (Doc. 283, p. 10.)  As such, these Plaintiffs have not produced evidence

to support their claims that they own property on Sapelo, and the Court finds that Victoria Hall,

Sylvia Williams, Rosemary Harris, and Tia Legree have failed to produce "actual evidence [of

standing] required to withstand summary judgment." City of Miami Gardens, 956 F.3d at 1320.

Lorie Banks (who brings suit on behalf of both herself and the estate of Melvin Banks, Jr.)

claims that she "holds a life estate in her husband's property."  (Doc. 341, p. 103.)  Her husband,

Melvin Banks, Jr., owned Sapelo Island property before his death.[22]  (Doc. 300-1, p. 23.)  In her

deposition, Banks stated that her deceased husband left her "access to the property for the rest of"

---

[22] Melvin Banks, Jr., purchased this property before he married Lorie Banks.  (Doc. 300-1, p. 24.)  Under
Georgia law, "[a] property interest brought to the marriage by one of the marriage partners is a non-marital
asset . . . ." Payson v. Payson, 552 S.E.2d 839, 841 (Ga. 2001).  Thus, Lorie Banks does not and did not
have ownership of the property simply by virtue of her marriage to Melvin Banks, Jr.  She does, however,
have standing to bring claims on behalf of the estate of Melvin Banks, Jr., premised upon his ownership of
Sapelo property prior to his death.

her life.  (Doc. 300-1, p. 29.)  However, she also stated that she does "not legally" have an interest in her husband's property and that "legally [her] stepson owns the property now."  (Id.)  The record does not contain Banks' late husband's will or any sort of record deed to indicate that she has some sort of life estate on the property.  Accordingly, Banks has not put forth sufficient evidence to create a genuine dispute of material fact as to her claimed ownership of land on Sapelo Island, and, therefore, her claims cannot survive summary judgment on the issue of standing.

Next, McIntosh County argues that Temperance Jones, Richard Banks (on behalf of the estate of Carolyn Banks), and Margaret Hall do not own Sapelo Island property and thus do not have standing to sue.  (Doc. 274-1, pp. 27–28.)  These Plaintiffs argue that they acquired interests in property on Sapelo Island over the course of their respective marriages.  (Doc. 341, pp. 104–05.)  Under Georgia law, "[m]arital property includes real property, personal property, and assets acquired as a direct result of the labor and investment of the parties during the marriage."  Flesch v. Flesch, 804 S.E.2d 67, 68 (Ga. 2017).  However, "property interest[s] brought to the marriage by one of the marriage partners [are] non-marital asset[s]" and are not considered marital property.  Johnston v. Johnston, 641 S.E.2d 538, 541 (Ga. 2007) (internal quotation and citation omitted).

In her deposition, Temperance Jones stated that she married her husband, Plaintiff Jesse Jones, in 1972, (doc. 317-1, p. 40), but her husband could only remember that he purchased his property on Sapelo Island sometime in the 1970s, (doc. 297-1, p. 13).  Plaintiffs have not provided any record of this purchase or other documentary evidence that would support Temperance Jones' claims of property ownership by way of marriage.  Thus, Temperance Jones has not provided sufficient evidence that the property was purchased after her marriage in 1972, and thus she cannot create a genuine dispute of material fact concerning whether she acquired marital property on Sapelo Island.  Similarly, there is no evidence in the record concerning when Carolyn Banks

36

married Melvin Banks, Sr., or that Carolyn Banks inherited property from Melvin Banks, Sr. Thus, Richard Banks (on her behalf) has failed to produce evidence that she acquired an interest in the Sapelo Island property during her marriage.

Margaret Hall does provide evidence that she married Charles Hall on July 21, 1979, and that Charles Hall inherited land on Sapelo Island sometime in the 1980s. (Doc. 302-1, pp. 8, 28–29.) "However, property acquired during the marriage by one spouse by gift, inheritance, bequest or devise remains the separate property of the recipient spouse . . . ." Avera v. Avera, 485 S.E.2d 731, 732 (Ga. 1997). Inherited property "may be converted into a marital asset if a spouse takes action manifesting an intent to transform that separate asset into marital property." Flory v. Flory, 783 S.E.2d 122, 123 (Ga. 2016). Margaret Hall, however, provides no evidence that her husband ever took action to convert his inherited Sapelo Island property into marital property. In fact, the record shows that on February 26, 2007, Charles Hall signed a quit claim deed creating a life estate in the Sapelo Island property for only himself and vesting the remainder interest in Reginald Hall. (Doc. 302, p. 7.) Therefore, Margaret Hall has also failed to show that she owned property on Sapelo Island.

Finally, the record is clear that Iregene Grovner, Jr., does not own any property on Sapelo Island. (Doc. 295-1, p. 20.) Plaintiffs argue that Iregene Grovner, Jr., has standing because he has an ownership interest in Stay Sapelo, LLC, which owns property in Hogg Hummock. (Doc. 341, p. 96.) However, Stay Sapelo, LLC, is organized under Georgia law which is clear that "a member of a limited liability company . . . is considered separate from the company and 'is not a proper party to a proceeding by or against a limited liability company, solely by reason of being a member of the limited liability company.'" Yukon Partners, Inc. v. Lodge Keeper Grp, Inc., 572 S.E.2d 647, 651 (Ga. Ct. App. 2002) (quoting O.C.G.A. §14-11-1107(j)). In addition, "[a] member has

no interest in specific limited liability company property." O.C.G.A. § 14-11-501.  Thus, the mere fact that Iregene Grovner, Jr., has an ownership interest in Stay Sapelo, LLC, does not mean he has an ownership interest in Sapelo Island property or standing in this case.

For all of the above reasons, the Court finds that David Grovner, Sr. (on his own behalf and on behalf of Vernell Grovner's estate), David Grovner, Jr., Victoria Hall (on her own behalf and on behalf of Joseph Hall's estate), Celia Grovner, Bobby Grovner, Rosemary Harris, Sylvia Williams, Tia Legree, Lorie Banks (on her own behalf), Temperance Jones, Richard Banks (on behalf of the estate of Carolyn Banks), Iregene Grovner, Jr., and Margaret Hall (on her own behalf) have failed to produce evidence that they have an interest in real property on Sapelo Island that has been or is receiving inferior municipal services from McIntosh County or that they otherwise have suffered an injury in fact.  Consequently, even viewing the facts in the light most favorable to them, these Plaintiffs have failed to carry their burden of producing "actual evidence" necessary to survive summary judgment on the issue of standing.  See City of Miami Gardens, 956 F.3d at 1320.  Accordingly, the Court **GRANTS** McIntosh County's Motion for Summary Judgment for lack of standing as to all claims brought by David Grovner, Sr. (on his own behalf and on behalf of Vernell Grovner's estate), David Grovner, Jr., Victoria Hall (on her own behalf and on behalf of Joseph Hall's estate), Celia Grovner, Bobby Grovner, Rosemary Harris, Sylvia Williams, Tia Legree, Lorie Banks (on her own behalf), Temperance Jones, Richard Banks (on behalf of the estate of Carolyn Banks), Iregene Grovner, Jr., and Margaret Hall (on her own behalf).  (Doc. 274.)

## III.    Plaintiffs' Claims

In their Second Amended Complaint, Plaintiffs assert an Equal Protection claim under the Fourteenth Amendment brought by and through Section 1983, a Section 1982 claim, and a Title VI claim, all of which are based on allegations that the County provided disparate municipal

services to them because of their race.  (Doc. 206, pp. 88–95.)  Plaintiffs and the County disagree over the applicable legal framework that should be applied to analyze these claims.  (Doc. 274-1, pp. 37–38; doc. 341, pp. 25–26.)  Both sides also disagree on whether Plaintiffs have put forth sufficient evidence to survive summary judgment on any of their claims.  (Doc. 341, pp. 31–92; doc. 354, pp. 36–41.)

### A.    Applicable Legal Framework

As an initial matter, all of Plaintiffs' claims are based on disparate treatment, which requires essentially the same showing.  First, "[t]he Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of the laws, which is essentially a direction that all persons similarly situated should be treated alike."  Watson v. Div. of Child Support Servs., 560 F. App'x 911, 913 (11th Cir. 2014) (per curiam) (quoting City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985)).  To prove an Equal Protection claim, a plaintiff must show that the County's "decision or act had a discriminatory purpose and effect."  Burton v. City of Belle Glade, 178 F.3d 1175, 1189 (11th Cir. 1999).  If a plaintiff can make this showing, then "the burden shifts to [the defendant] to prove that, at the time of the discriminatory act, the same decision would have been made for a legitimate reason."  Id.  A Title VI claim requires the same analysis.  See Elston v. Talladega Cty. Bd. of Educ., 997 F.2d 1394, 1405 n.11 (11th Cir. 1993) ("Since Title VI itself provides no more protection than the equal protection clause—both provisions bar only intentional discrimination— we will not engage in a separate discussion of the Title VI statutory claims, as such an inquiry would duplicate exactly our equal protection analysis.") (internal citation omitted).  The only key analytical difference between an Equal Protection claim and a Title VI claim is that Title VI only "prohibits discrimination on the basis of race, color, or national origin in programs and activities

receiving federal financial assistance." <u>Sheely v. MRI Radiology Network, P.A.</u>, 505 F.3d 1173, 1191 (11th Cir. 2007). Finally, Section 1982 states that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. Under Section 1982, a plaintiff must show that (1) he or she is a member of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination concerned "interference with the rights or benefits connected with the ownership of property." <u>Long v. Aronov Realty Mgmt., Inc.</u>, 645 F. Supp. 2d 1008, 1016–17 (M.D. Ala. 2009) (quoting <u>Daniels v. Dillard's, Inc.</u>, 373 F.3d 885, 887 (8th Cir. 2004)). With regard to the third element, the Supreme Court has stated that Section 1982 "would support a challenge to municipal action benefiting white property owners that would be refused to similarly situated black property owners." <u>City of Memphis v. Greene</u>, 451 U.S. 100, 123 (1981).

The County argues that all of Plaintiffs' claims should be analyzed under the burden-shifting framework established in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). (Doc. 274-1, p. 37.) In <u>McDonnell Douglas</u>, the Supreme Court addressed "the order and allocation of proof in a private, non-class action challenging employment discrimination" under Title VII of 1964 Civil Rights Act. 411 U.S. at 800. The Supreme Court created a test requiring plaintiffs to "carry the initial burden under the statute of establishing a prima facie case of racial discrimination." <u>Id.</u> at 802. If a plaintiff can make this showing, "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." <u>Id.</u> The inquiry does not end there, however, as the plaintiff must "be afforded a fair opportunity to show that petitioner's stated reason for respondent's rejection was in fact pretext." <u>Id.</u> at 804. Although initially designed for Title VII claims, the Eleventh Circuit has extended the

McDonnell Douglas framework to claims brought under the Fourteenth Amendment and under Title VI.  See Lee v. Russell Cty. Bd. of Educ., 684 F.2d 769, 773 (11th Cir. 1982) ("Focusing first on the race discrimination charge, it is well established that [a Fourteenth Amendment claim] may be analyzed under the McDonnell Douglas structure developed in Title VII suits."); see also Elston, 997 F.2d at 1405 n.11.  In addition, while the Eleventh Circuit has never examined whether to apply McDonnell Douglas to Section 1982 claims, several district courts from within this circuit have applied it.  See, e.g., Farrior v. H.J. Russell & Co., 45 F. Supp. 2d 1358, 1367 (N.D. Ga. 1999) ("The Court finds the McDonnell Douglas analysis to be a workable solution in Section 1982 claims."); Bell v. Mike Ford Realty Co., 857 F. Supp. 1550, 1557 (S.D. Ala. 1994) ("As discussed under the McDonnell Douglas framework, in order to establish a § 1982 claim, the plaintiff must make out a prima facie case of discrimination by a preponderance of the evidence."); LeFlore v. Sea Breeze Nursing Home & Rehab. Ctr., No. Civ. 98–1136–AH–S, 2000 WL 726215, at *3 (S. D. Ala. May 8, 2000) ("The McDonnell Douglas burden-shifting analysis is also applied in a Section 1982 claim.").  Under the McDonnell Douglas framework, plaintiffs must show, "among other things, that [they were] treated differently from another similarly situated individual[s]—in court-speak, a comparator." Lewis v. City of Union City, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc) (citation and internal quotations omitted).  The County argues that Plaintiffs cannot make this showing because there is not another similarly situated barrier island that receives better municipal services than Sapelo Island.  (Doc. 274-1, pp. 38–40.)

In response, Plaintiffs argue that the McDonnell Douglas framework is not the exclusive means of analyzing their claims, and that there are "multiple frameworks" available to them.  (Doc. 341, p. 25.)  In support of this contention, Plaintiffs cite Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011).  (Id.)  In Lockheed-Martin Corp., the Eleventh Circuit stated

that "establishing the elements of the <u>McDonnell Douglas</u> framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion." <u>Lockheed-Martin Corp.</u>, 644 F.3d at 1328. The Eleventh Circuit went on to say that summary judgment was not appropriate "if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." <u>Id.</u> (internal citation and quotation omitted). Plaintiffs argue that the flexibility countenanced in <u>Lockheed-Martin Corp.</u> allows them to establish their claims under a test created in <u>Village of Arlington Heights v. Metropolitan Housing Development Corp.</u>, 429 U.S. 252 (1977). (Doc. 341, p. 25–26.)

In <u>Arlington Heights</u>, the Supreme Court fashioned a multi-factor test for race discrimination cases. 429 U.S. at 266–68. The County objects to the use of this test, calling it "incomplete and outdated." (Doc. 354, p. 16.) The Court, however, finds no credence in the County's objection concerning the test's continued relevance, particularly because the Eleventh Circuit has cited and applied this test to a Fourteenth Amendment claim as recently as last year. <u>See</u> <u>Greater Birmingham Ministries v. Sec'y of State for Ala.</u>, 966 F.3d 1202, 1225 (11th Cir. 2020). The County also argues that the <u>Arlington Heights</u> multi-factor test is inapplicable because it only examines discriminatory intent and not discriminatory effect, and both of these are needed for a successful Fourteenth Amendment Equal Protection claim. (Doc. 354, p. 13.) However, the Eleventh Circuit has been clear that <u>Arlington Heights</u> is a correct test to determine both discriminatory intent and effect. <u>See</u> <u>Greater Birmingham Ministries</u>, 966 F.3d at 1225 ("As we turn to the first prong of the equal protection analysis to determine whether the [challenged Alabama law] has both a discriminatory intent and effect, we are further guided by the multiple factor approach articulated by the Supreme Court in [<u>Arlington Heights</u>]."). A footnote in <u>Greater</u>

Birmingham Ministries provides further support for applying the Arlington Heights factors to this case. Id. at 1225 n.33. There, the Eleventh Circuit noted that the plaintiffs had "attempt[ed] to provide a convincing mosaic of circumstantial evidence" and the Court said it had "parsed [the plaintiffs'] arguments as neatly as possible within the Arlington Heights . . . framework." Id. (internal quotations omitted). By referencing the specific "convincing mosaic" language from Lockheed-Martin Corp., the Eleventh Circuit at least strongly suggested that the Arlington Heights framework is appropriate in this context.

Finally, the County points to Steele v. City of Port Wentworth, where this Court applied the McDonnell Douglas framework to a case involving allegations that the defendant city "provided African-American residents with inferior municipal services on the basis of race," No. CV405-135, 2008 WL 717813, at *13–14 (S.D. Ga. Mar. 17, 2008) (Moore, Jr., J.). (Doc. 354, pp. 14–15.) As an initial matter, "[i]t is black-letter law that the decision of one federal district court is not binding on another federal district court, or even on the same judge in another case." Pears v. Mobile Cty., 645 F. Supp. 2d 1062, 1076 n.18 (S.D. Ala. Aug. 7, 2009); see also McGinley v. Houston, 361 F.3d 1328, 1331 (11th Cir. 2004) ("a district judge's decision neither binds another district judge nor binds him"). Secondly, the Steele decision predates Lockheed-Martin Corp., and the Court is cognizant that Eleventh Circuit precedent set forth in that case dictates that "no matter its form, so long as the circumstantial evidence raises a reasonable inference [of discrimination] against the plaintiff, summary judgment is improper." Lockheed-Martin Corp., 644 F.3d at 1328. For all of these reasons, the Court finds that Plaintiffs may attempt to establish their claims using the test set forth in Arlington Heights.

### B.      Application of <u>Arlington Heights</u>

"[I]n <u>Arlington Heights</u> the Supreme Court provided some examples of 'circumstantial and direct evidence' that courts might properly consider in judging whether invidious discrimination permeated official action." <u>Jean v. Nelson</u>, 711 F.2d 1455, 1485 (11th Cir. 1983).  The Eleventh Circuit has summarized the <u>Arlington Heights</u> factors as follows:

> (1) the impact of the challenged [government action]; (2) the historical background; (3) the specific sequence of events leading up to [the government action]; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators[;] . . . (6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives.

<u>Greater Birmingham Ministries</u>, 966 F.3d at 1225.  Plaintiffs argue that they have evidence in their favor as to several of these factors.  (<u>See generally</u> doc. 341.)  The Court will begin by examining the first factor (the impact of the challenged government action), followed by the second and third factors (the historical background and the specific sequence of events leading up to the government action).  Finally, the Court will examine the sixth and seventh factors, concerning the foreseeability and knowledge of the disparate impact.

### (1)      The Impact of the Challenged Government Action

Both the Supreme Court and the Eleventh Circuit have advised that considering the "impact of the official action—that is, whether it bears more heavily on one race than another—may provide an important starting point" in examining Plaintiffs' racial discrimination claims.  <u>Young Apartments, Inc. v. Town of Jupiter</u>, 529 F.3d 1027, 1045 (11th Cir. 2008) (citing <u>Vill. of Arlington Heights</u>, 429 U.S. at 266.)  However, this factor alone "is not determinative." <u>Id.</u>  To establish this factor, Plaintiffs have, as an initial matter, introduced evidence showing that the overwhelming majority of individuals living in the Hogg Hummock Community on Sapelo Island are African-American and Gullah-Geechee, (doc. 343-6, p. 4; doc. 343-3, p. 18; doc. 343-4, pp. 4–7), and that

the McIntosh County mainland is predominately made up of white residents, (doc. 343-6, p. 8; doc. 324, p. 1).  Plaintiffs also argue that there is evidence that actions by the County have impacted the quality of municipal services provided to the Hogg Hummock Community.  The Court will first address the types of municipal services for which Plaintiffs have provided evidence of a disparate impact and then it will discuss the areas for which they have not.

### a.    Evidence of Disparate Impact

Plaintiffs argue that there is evidence of a disparate impact with regard to fire services. (Doc. 341, p. 68.)  First, the County placed its oldest fire truck on Sapelo Island.  (Doc. 345-13, pp. 18–19.)  This truck stopped working, and the County did not replace it for two to three months, leaving Hogg Hummock without a fire truck during that time.  (Doc. 274-2, p. 15; doc. 345-4, pp. 17–18.)  In addition, while McIntosh County houses its mainland fire trucks in enclosed buildings, (doc. 345-4, pp. 24–25), the Sapelo Island pumper truck sits on a concrete pad that is covered by a metal roof supported by six poles, with no walls, (see doc. 345-17, p. 2).  Because the fire truck is not housed in an enclosed building (and could potentially freeze), Sapelo Island has received an ISO Class rating of 10, signifying that Sapelo Island "is basically unprotected" from fires.[23]  (Doc. 345-13, p. 23.)  In contrast, the mainland's ISO Class rating is 5, indicating that this portion of McIntosh County receives better protection from fires.  (Id. at 24.)

---

[23] McIntosh County argues that the Court should not consider Sapelo Island's ISO Class rating because "[n]o Plaintiff has produced evidence that he or she has actually been harmed by the island's ISO rating." (Doc. 354, p. 27.)  First, the evidence shows that an ISO rating is "a protection class that's used by the insurance companies to set . . . rates [for homeowners'] insurance," (doc. 345-13, p. 23), and Lorie Banks (who brings suit on behalf of the estate of Melvin Banks, Jr.) states that her husband "attempted to get fire insurance on his property on Sapelo Island" but could not because "there were no fire services there[,]" (doc. 345-18, p. 2).  While Banks does not specifically mention the ISO rating, she does discuss insurance, which is affected by the ISO rating.  More importantly, even if Plaintiffs have not been specifically harmed by the ISO rating with regards to insurance, they can still use the rating as circumstantial evidence to show that the County is providing them fire services that are inferior to those provided to the mainland.  See, e.g., Tanner v. McCall, 625 F.2d 1183, 1192 (5th Cir. 1980) ("Circumstantial evidence can be used to supply inferences of an intent to infringe constitutional rights.").

Next, with regard to EMS, evidence in the record shows that the County provides "two [EMS] stations on the mainland," which each have two ALS trucks.  (Doc. 343-19, p. 40.)  EMS services are able to reach anyone on the McIntosh County mainland in fifteen minutes or less.  (Doc. 345-2, pp. 8–9.)  Normally, an individual on Sapelo Island has to travel to the dock on the McIntosh County mainland and meet EMS there, (doc. 343-14, p. 72), which results in it taking EMS thirty to thirty-five minutes to administer care, (doc. 344-50, p. 30).  While the County's EMS has boats that it can use to travel to Sapelo Island, (doc. 345-2, p. 14–17), the response time by boat is approximately forty-one to forty-five minutes.  (Id.)  In addition, the EMS stations on the mainland have provided services such as "[b]lood pressure checks and blood sugar checks" to the public and have provided outreach to the community on the mainland about these services.  (Doc. 345-5, pp. 4–5.)  However, EMS has never provided these services or outreach about the availability of these services to Sapelo Island.  (Id. at p. 6.)

Plaintiffs also provide evidence that the County only worked on the roads in Hogg Hummock two or three times within a three-year timespan, while it performs weekly maintenance on the County-owned dirt roads on the mainland.  (Doc. 343-19, pp. 29–30.)  In addition, to address "muddy conditions" on the mainland dirt roads, the County has mixed rocks or clay into the roadways.  (Doc. 344-14, pp. 20–21.)  The County has not done this for the dirt roads in Hogg Hummock.  (Id.)  District courts in this circuit have previously found that unequal maintenance of roads that are predominately used by African Americans can violate the Fourteenth Amendment.  See, e.g., Johnson v. City of Arcadia, 450 F. Supp. 1363, 1370–77 (M.D. Fla. 1978) (finding violation where City paved a higher proportion of streets in predominately white neighborhoods than those in predominately black neighborhoods).  In addition, multiple witnesses have described the poor quality of Hogg Hummock roads.  (Doc. 345-20, p. 14; doc. 343-14, p. 55.)

Plaintiffs also argue that the County provides "substantially inferior" trash services to Hogg Hummock. (Doc. 341, p. 83.) The record provides that the County contracted with Waste Management to provide for trash disposal. (Doc. 345-34.) The contract shows that the County agreed that Waste Management would provide once per week curbside pickup of trash to the mainland but would not provide this service to Sapelo Island. (Id. at p. 5.) Instead, the parties agreed that Waste Management would "provide one (1) 34-yard self contained compactor" per month for Sapelo Island. (Id. at p. 6.) Plaintiffs provide evidence that the compactor sometimes overflows, resulting in trash being left on the ground. (Doc. 329-1, p. 55; doc. 297-1, p. 33.)

Next, Plaintiffs assert that the County provides no funding for leisure services on the Island but provides these services for the mainland. (Doc. 341, pp. 91.) Plaintiffs point to evidence that the County annually sets aside money to provide for leisure services. (Doc. 343-42, p. 27; doc. 343-43, p. 28.) In addition, Plaintiffs point to County Manager Zoucks' acknowledgment that he was unaware of the County spending any of its leisure services funds on "activities or structures" on Sapelo Island. (Doc. 343-40, p. 13.)

Finally, Plaintiffs argue that they experience a disparate impact because the County provides mosquito control on the mainland and not for them. (Doc. 341, pp. 91–92.) Like with leisure services, Plaintiffs present evidence that the County budgeted money for mosquito control. (Doc. 343-41, p. 29; doc. 343-12, p. 25; doc. 343-43, p. 26.) Plaintiffs also point to testimony from Zoucks stating that the County responds to complaints about mosquitos from individuals on the mainland by sending out a "spraying machine in the back of a pickup truck" but does not do this for complaints about mosquitos on Sapelo Island. (Doc. 343-40, p. 17.) However, evidence in the record also shows that at one point the County paid $50,000.00 dollars for an "aerial spraying" to prevent mosquitoes, and that this spraying took place in "the populated areas of the

county [which] did include [Hogg Hummock]." (Doc. 343-40, p 18.) Thus, while not stark, there is some evidence in the record that a disparate impact exists as to mosquito control services.

Accordingly, the Court finds that a reasonable jury could conclude that there is evidence of disparate impact with regards to fire services, trash services, EMS, road maintenance, leisure services, and mosquito control services, and that this could support an inference of discriminatory purpose and effect.

### b. No Evidence of Disparate Impact

In their Brief, Plaintiffs contend that they experience a disparate impact due to the County's failure to expend resources to improve water services on the Island. (Doc. 341, pp. 88–89.) Evidence from the record reveals that Hogg Hummock receives its water from a system installed by the State of Georgia and does not receive water from McIntosh County's water system. (Doc. 345-41, pp. 5–6.) According to Plaintiffs' own expert witness, "the State of Georgia, Department of Natural Resources (DNR) [is] the party responsible for the water utility on the Island." (Id. at p. 6.) Thus, while it is true that McIntosh County has used federal grants to improve its water system on the mainland, (doc. 344-11, pp. 2–8; doc. 344-7, p. 2), this does not evince some special treatment or preference by the County for the mainland because the State DNR and not the County provides the water services to Sapelo Island. Plaintiffs cite no case law indicating that a disparate impact can be attributed to one governmental authority where the at-issue service is provided to the plaintiffs by another governmental authority, and Eleventh Circuit authority suggests that a defendant government has no "power or duty to service areas owned by other governmental authorities." Ammons v. Dade City, 783 F.2d 982, 986 (11th Cir. 1986).

Plaintiffs additionally argue that the County's actions have disparately impacted them because the County has not enforced certain zoning rules and restrictions for white property

owners in Hogg Hummock.  (Doc. 341, p. 54.)  Unlike the above analyzed claims, this claim is premised not on disparate treatment between property owners on Sapelo and the mainland but rather disparate treatment between white Sapelo property owners and black Sapelo property owners.  Plaintiffs point to creation of the Hogg Hummock District which was designed to preserve "low intensity and residential and cottage industry uses . . .  [that would] not contribute to land value increases" in Hogg Hummock.  (Doc. 343-12, p. 3.)  Plaintiffs assert that the County has not equally enforced the 1,400 square feet maximum dwelling size requirement that is applicable to the Hogg Hummock District.  (Doc. 341, p. 54.)  The record does show the County has interpreted this requirement to only include heated space, (doc. 344-16, p. 21), and that this exception was eventually codified into the text of the regulation by the Board of Commissioners, (doc. 274-2, p. 22; doc. 341-2, p. 48).  Plaintiffs also point to evidence that the County has approved building plans that exceed 1,400 square feet, and it is impossible to tell from these building plans which portions of the space are heated and which are not.  (See, e.g., doc. 344-37, p. 2; doc. 344-33, p. 2; doc. 344-38, p. 2; doc. 344-49, p. 2.; doc. 344-40, p. 2; doc. 344-41, p. 2; doc. 344-35, p. 2.)  Importantly, however, Plaintiffs are not able to show that the County enforced this regulation more stringently with them than with white individuals.  In his deposition, Ceaser Banks testified that the building inspector did not allow him to build a large wrap-around porch on his house because it would violate the 1,400 square feet requirement.  (Doc. 282-1, p. 81.)  However, a layout of his home shows that it contains 1,368 square feet on the "main level," but also has two porches that bring the square footage total above 1,400 square feet.  (Doc. 282, p. 37.)  Thus, this evidence demonstrates that Ceaser Banks was allowed to build a home with a total square footage that exceeds the 1,400 square foot maximum.  Plaintiffs simply have not pointed to evidence showing that this zoning ordinance is being unequally enforced.  In a similar fashion, Plaintiffs argue that

the County discriminated against them by enforcing a FEMA regulation which prevents them from erecting mobile homes in flood zones on Sapelo Island.  (Doc. 341, p. 62.)  However, like with the zoning regulation, Plaintiffs have not provided evidence showing that the County enforced this provision differently with them than white people.[24]

In addition, Plaintiffs assert that they have been impacted because the County's creation of the "heated space" exception has led to increased property values which has "threatened the Gullah Geechee community's ability to remain on the Island."  (Doc. 341, p. 59.)  However, Plaintiffs have not shown how the structures built under the "heated space" exception have caused their property values to go up.  Indeed, the evidence shows that the County and Plaintiffs have reached an agreement to prevent the assessed values of their property from dramatically increasing.[25]  (Doc. 274-2, p. 6; doc. 341-2, pp. 8–9.)  Moreover, they have not explained, much less produced evidence, that the heated space exception impacts black residents differently than white residents.

---

[24] When asked about whether he knew of an occasion where a white person placed a mobile home on Sapelo Island, Reginald Hall responded that he did not know.  (Doc. 344-47, p. 42.)  He then stated that he had heard "Fred Hay [say that] he brought one over."  (Id. at p. 43.)  This fits the classic definition of hearsay evidence and as such is inadmissible.  See Fed. R. Evid. 801(c) ("'Hearsay' means a statement that the declarant does not make while testifying at the current trial or hearing; and a party offers in evidence to prove the truth of the matter asserted in the statement.").  Plaintiffs have failed to demonstrate that they would be able to introduce this hearsay in an admissible form at trial. Likewise, Harry Jordan testified that he heard "[b]y mouth" that white landowners had been permitted to bring mobile homes to Sapelo Island. (Doc. 294-1, p. 34.)  This testimony is also hearsay that is not within Harry Jordan's personal perception, and Plaintiffs have again failed to demonstrate that they will be able to introduce this testimony in an admissible form.  Finally, Melvin Amerson stated that the McIntosh County Rod & Gun Club placed a mobile home in an area on Sapelo that might be a flood zone. (Doc. 344-16, p. 40.)  However, this statement constitutes speculation regarding whether the area is actually in a flood zone, and the Plaintiffs have provided nothing further on that issue.  Moreover, the Court has not been provided any evidence regarding the racial make-up of the club.  Accordingly, none of these statements creates an issue of fact concerning whether the County favored white individuals in enforcing the FEMA regulation.

[25] Plaintiffs argue that they were not all parties to this agreement.  (Doc. 341-2, p. 8.)  However, the only Plaintiff they point to who was not part of the agreement is Celia Grovner, (id.), and the Court has already determined that Celia Grovner does not have standing in this case, (see Discussion Section I.C., supra).  In addition, Celia Grovner has stated that her property taxes were also "reduced."  (Doc. 283-1, p. 83.)

For these reasons, the Court finds that Plaintiffs have not submitted evidence that could lead a reasonable trier of fact to find a disparate impact with regards to water services and zoning.

### (2)    Historical Background

The Court next turns to the historical background factor.  The Eleventh Circuit has noted that "the historical context of a challenged activity may constitute relevant evidence of intentional discrimination."  Ammons, 783 F.2d at 988; see also Baker v. City of Kissimmee, 645 F. Supp. 571, 588 (M.D. Fla. 1986) ("[T]hese historical facts are probative of a racially discriminatory purpose in analyzing present disparities between the black and white residential communities in the distribution of the challenged municipal services.").  Plaintiffs point to several pieces of evidence in support of this factor.  First, Plaintiffs cite a 1979 case from the former Fifth Circuit where the McIntosh County Branch of the NAACP sued the City of Darien (a city in McIntosh County) for violating the Fourteenth Amendment.  (Doc. 341, p. 37 (citing McIntosh Cty. Branch of the NAACP v. City of Darien, 605 F.2d 753 (5th 1979)).)  In that case, the court found that the plaintiffs had "introduced evidence pertaining to private discrimination (such as the existence of segregated barber shops and private schools) and discrimination by the McIntosh County government." City of Darien, 605 F.2d at 760.  The Eleventh Circuit has considered prior litigation as evidence when examining the historical background factor.  See Jean, 711 F.2d at 1490 ("Under the 'historical background' factor, plaintiffs introduced evidence of numerous lawsuits initiated in the past to challenge disparate treatment of Haitian immigrants.").  In addition, Plaintiffs provide evidence that the McIntosh County Board of Commissioners is made up of five members, (doc. 343-20, p. 2), and Commissioner Jordan was the only African American commissioner in 24 of the 28 years between 1990 and 2018.  (Doc. 343-14 pp. 4–5; doc. 343-23, p. 3; doc. 343-17, p. 2.) This level of African American representation is lower than the percentage of African Americans living in the County.  (Doc. 343-6, p. 8; doc. 343-4, pp. 3–7.)  Plaintiffs also point to minutes from

a Board of Commissioners meeting during which Commissioner Jordan voiced his concerns about "the Commission not appointing African American citizens to various McIntosh County boards." (Doc. 343-20, p. 5.)   This lack of representation also can be considered as circumstantial evidence.[26]   See Dowdell v. City of Apopka, 698 F.2d 1181, 1186 (11th Cir. 1983) (taking into consideration the fact that "Blacks continue to be significantly under-represented in administrative and elective positions").   In sum, the evidence, taken in the light most favorable to Plaintiffs, tends to show a historical background of discrimination by the County against African Americans.

### (3)   The Specific Sequence of Events Leading  up to Challenged Action

Plaintiffs also provide evidence of recent, specific sequences of action by the County related to administering municipal services.   The record shows that the McIntosh County Board of Commissioners unanimously voted to use 2010 SPLOST funds "for construction of [a] fire station" on Sapelo Island, (doc. 344-1, p. 5), but this project was ultimately not included as one of the 2010 SPLOST projects, (see generally doc. 343-50).   It is "not usual" for the Board of Commissioners to vote for SPLOST funding for a project and then not have that project go forward.   (Doc. 343-3, p. 42.)   The evidence also shows that the fire station was not "very high on the priority list" for the 2010 SPLOST funds.   (Doc. 343-14, p. 38.)   The 2016 SPLOST did include funding for the Sapelo Island fire station.   (Doc. 343-48, p. 4.)   However, three years later, in 2019, the County officials had not even gotten "cost estimates to build the fire station" and stated they were "just [beginning] the process."   (Doc. 343-40, p. 41.)   A reasonable trier of fact could view the County's inaction as

---

[26] In their Brief, Plaintiffs also cite books and a newspaper article in support of their argument that McIntosh County has a long history of supporting racial discrimination.   (Doc. 341, pp. 37–39.)   Such material is hearsay and inadmissible.   See, e.g., Cooper v. McDermott Int'l, 62 F.3d 395, 1995 WL 450209, at *5 (5th Cir. 1995) ("[The] facts in newspapers, magazines, and books are inadmissible hearsay.").   Plaintiffs have not demonstrated that these materials could ultimately be presented in an admissible form.   Accordingly, the Court will not consider this material on this Motion.

"shed[ding] some light on the decisionmaker's purposes."  Vill. of Arlington Heights, 429 U.S. at 267.

In addition, Plaintiffs point to Jane Garbisch's affidavit describing how McIntosh County "resist[ed] [her] efforts" to implement first responder training courses on Sapelo Island during the early 2000s.  (Doc. 344-49, p. 4.)  Garbisch stated that she believed "that McIntosh County's backlash against [her] efforts to establish a first-responder system on Sapelo Island resulted from the fact that most permanent residents of Hogg Hummock are African-American and Gullah Geechee."  (Id. at p. 5.)  Finally, with regard to trash services, Plaintiffs provide evidence that the County did not explore the possibility of providing curbside trash collection on Sapelo Island during its initial contract negotiations with Waste Management.  (Doc. 343-15, pp. 41–42; doc. 343-19, p. 51.)

The Court finds that a reasonable jury could determine that Plaintiffs have provided compelling evidence in their favor regarding the specific sequences of events leading to the County's actions and decisions with regards to fire, EMS, and trash services provided to Plaintiffs.

### (4)   Foreseeability and Knowledge of the Disparate Impact

"Another highly relevant factor is whether the defendant adhered to a policy with full knowledge" of the policy's disparate impact.  Hallmark Devs., Inc. v. Fulton Cty., No. 1:02–cv–01862–ODE, 2004 WL 5492706, at *13 (N.D. Ga. Sept. 27, 2004) (citing Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 465 (1979)).  Likewise, "[t]he Court has subsequently noted that 'actions having foreseeable and anticipated disparate impact are relevant evidence to prove the ultimate fact, forbidden purpose.'"  Williams v. City of Dothan, 745 F.2d 1406, 1415 (11th Cir. 1984) (quoting Columbus Bd. of Educ., 443 U.S. at 464.)  These factors may involve many of the same

facts, and the Eleventh Circuit has analyzed them together in the past. <u>See</u> <u>Greater Birmingham</u> <u>Ministries</u>, 966 F.3d at 1230.

Plaintiffs argue that "[t]he County has long been aware of the racial impact of taking adverse actions in Hogg Hummock." (Doc. 341, p. 35.) First, as Plaintiffs point out, the County was unquestionably aware of Hogg Hummock's Gullah-Geechee population, as evidenced by the creation of the Hogg Hummock District. (Doc. 343-12, p. 3.) Plaintiffs also argue that the County ignored requests for municipal services on the Island. (Doc. 341, pp. 42–43.) In Response, the County asserts that "Plaintiffs do no present evidence of a significant history of requests for service by the . . . Gullah-Geechee community." (Doc. 354, p. 39.) However, the record does show that the County received requests for services. First, Commissioner William Joel Williams states that he has received complaints about road maintenance. (Doc. 344-13, p. 4.) Commissioner Williams also says that the County responded to these requests. (<u>Id.</u>) However, Plaintiffs submit evidence disputing this testimony. According to Benjamin Hall, there has been no "improvement in [road] maintenance" and "the problem just is not being addressed." (Doc. 343-27, p. 30.) Likewise, as the Court has already discussed, the County received requests to help with first responder training on Sapelo Island. (Doc. 344-49, pp. 3–4.) In addition to these requests, Plaintiffs have submitted evidence showing that County officials are aware of Sapelo Island's current fire station situation and its ISO Class rating, (doc. 345-13, pp. 23–25), as well as the fact that it has no curbside garbage pickup, (doc. 345-34, p. 5). From this, the Court finds that a trier of fact could determine that the County could foresee—and had knowledge of—the disparate impact of these municipal services.

**(5)    Outcome of <u>Arlington Heights</u> Factors Analysis**

In light of all the foregoing, the Court finds that Plaintiffs have presented sufficient evidence to allow a reasonable trier of fact to find that the County acted with discriminatory

purpose and effect with regard to the provision of fire services, trash services, EMS, and road maintenance.  See Jean, 711 F.2d at 1490 (finding that plaintiffs had presented sufficient evidence by providing evidence of disparate impact along with evidence satisfying a few other Arlington Heights factors).  However, the Court finds that Plaintiffs have not made this showing as to water services, leisure services, mosquito control, and zoning.  Plaintiffs are unable to show evidence of a disparate impact as to water services or the County's enforcement of the zoning ordinance, and they provide no other evidence applicable to the other Arlington Heights factors to support their claims premised on these specific services other than the general evidence of racism in McIntosh County's past.  The Court is aware of no case law allowing a plaintiff to survive summary judgment based on such a showing, and the Plaintiffs cite no such authority from either the Eleventh Circuit or other circuit courts.  Finally, with regard to leisure services and mosquito control, while Plaintiffs do provide some evidence of disparate impact, the only other support for these claims is the general evidence of past racism in McIntosh County (pertaining to the "historical background" factor).  (Doc. 341, pp. 38–39, 91.)  However, the Supreme Court and Eleventh Circuit have cautioned against placing too much weight on these factors alone.  See Vill. of Arlington Heights, 429 U.S. at 266 ("Absent a [stark pattern,] impact alone is not determinative, and the Court must look to other evidence."); see also Greater Birmingham Ministries, 966 F.3d at 1228 ("We are mindful of the danger of allowing the old, outdated intentions of previous generations to taint [governmental] action forevermore on certain topics.").  Accordingly, the Court finds that Plaintiffs have also not provided enough evidence to permit a reasonable trier of fact to find discriminatory intent and effect as to the County's provision of funds for leisure services and mosquito control.

For these reasons, the Court **GRANTS** summary judgment in favor of the County as to

Counts II and III to the extent they are based on discriminatory water services, mosquito control

services, leisure services, and enactment and enforcement of zoning ordinances.  (Doc. 274.)  In

addition, water service was the only municipal service for which the County received federal

funds.[27]  (Doc. 344-3, p. 2; doc. 344-4, pp. 2–4; doc. 344-7, p. 2.)  As previously explained, "Title

VI prohibits discrimination on account of race, color, or national origin in all programs and

activities receiving federal financial assistance."   Humphrey v. United Parcel Service, 200 F.

App'x 950, 952 (11th Cir. 2006) (per curiam) (quoting Robinson v. Vollert, 602 F.2d 87, 89 (5th

1979)).  Because Plaintiffs are unable to show discrimination a to water services and that was the

only service at issue for which the County received federal funds, the Court **GRANTS** summary

judgment as to Count IV in its entirety.

### C.    McIntosh County's Legitimate, Nondiscriminatory Reasons

Once a plaintiff has provided evidence of discriminatory intent and effect under the

Arlington Heights factors, "the burden shifts to [the defendant] to prove that, at the time of the

discriminatory act, the same decision would have been made for a legitimate reason."  Burton, 178

F.3d at 1189.  McIntosh County argues that it had a non-discriminatory reason for each of its

"service-related decisions."[28]  (Doc. 354, p. 41.)  Accordingly, the Court will examine whether the

---

[27] Plaintiffs provide evidence that the County also received federal funds through the Georgia Community
Development Block Grant Program, none of which were used on Sapelo Island.  (Doc. 341, p. 50; doc. 344-
2; doc. 344-3; doc. 344-4; doc. 344-5; doc. 344-6; doc. 344-7; doc. 344-8.)  Plaintiffs provide no evidence,
however, regarding how the County decided where to dedicate the funds nor do they provide evidence that
the funds were used for projects or developments in predominantly white areas or for buildings owned by
white individuals, so they have failed to provide a basis for finding that the allocation of this money to areas
other than Sapelo Island was done with discriminatory intent and effect.

[28] McIntosh County asserts this argument in its Reply Brief.  (Doc. 354, pp. 40–41.)  Plaintiffs argue
McIntosh County waived this argument by not making it in their main brief.  (Doc. 355, p. 11.)  It is true
that, "[i]n general, a court should not consider arguments raised for the first time in a reply brief."  Reliance
Ins. Co. of Ill., Inc. v. Richfield Hosp. Servs., Inc., 92 F. Supp. 2d 1329, 1332 (N.D. Ga. 2000).  Here,
however, McIntosh County is responding to Plaintiffs' argument that their claims should be examined under

County can show that it had a legitimate reason to make each of the at-issue decisions concerning its road maintenance, EMS, trash, and fire services.

### (1)  Road Maintenance

The County argues that it does not own the roads on Sapelo Island, and thus does not have an obligation to maintain them as it does for the roads on the mainland.  (Doc. 354, p. 29.)  The County believes that the road maintenance it performed on Sapelo Island was for state roads, and, it asserts, this belief was reinforced by the fact that the State paid the County for this service.  (Doc. 274-1, p. 20.)  However, McIntosh County provides no evidence that the State of Georgia owns the roads in Hogg Hummock.[29]  In support of its argument that it lacks ownership of the roads, the County cites the minutes from a 1925 McIntosh County Board of Commissioners meeting.  (Doc. 345-21.)  The minutes state that "[o]n petition, from the citizens, and after duly advertising the same[,] the public Roads on Sapelo Island were discontinued, and made private roads."  (Id. at p. 2.)  In response, Plaintiffs point to a 2010 resolution passed by the McIntosh County Board titled "Sapelo Island Roadway Resolution," which provides, in part, that "the McIntosh County Board of Commissioners has never declared any of [the public] roads [on Sapelo Island] to be abandoned, nor has such Board transferred ownership of them to any other entity or person, and currently maintains some roads on Sapelo Island."  (Doc. 344-24, p. 7.)  Plaintiffs argue that this 2010

---

the Arlington Heights framework.  As McIntosh County did not use this framework in its main brief, it had no reason to assert this argument initially.

[29]  The invoices McIntosh County would send for services to the State cannot support the contention that the State of Georgia owns the roads in Hogg Hummock because they only mention state road maintenance work on Sapelo Island.  (Doc. 324, pp. 10–11.)  There is no way for the Court to determine if these services were for work on Hogg Hummock roads or roads on the 97% of Sapelo Island that the State owns.  Finally, while County Manager Zoucks testified that he thought the County provided services for State-owned roads in Hogg Hummock, he admitted that he did not know which roads therein were owned by the State.  (Doc. 343-19, p. 28.)

resolution shows that the County does in fact own the roads on Sapelo Island.  (Doc. 341, pp. 73–74.)

Under Georgia law, "[u]nless the governing authority has acquired fee-simple title to the roadway . . .[,] upon abandonment of the road by the governing authorities or by the public, the abutting landowners are presumed to own the fee to the middle of the road, free of the former rights of the general public."  Glass v. Carnes, 398 S.E.2d 7, 11 (Ga. 1990) (internal citations omitted).  Thus, for example, a county (and its successor in interest) maintained ownership of land even after it abandoned and barricaded the road because it owned the land in fee simple.  See Swanberg v. City of Tybee Island, 518 S.E.2d 114, 117 (Ga. 1999) ("Since we have determined that a fee simple estate was created by the 1919 conveyance, plaintiffs had no entitlement to the fee, even assuming an abandonment.").  However, a city government could not rescind its abandonment of a city street when it "no longer had any interest in such street."  Campbell v. City of Columbus, 161 S.E.2d 299, 301 (Ga. 1968).

Here, there is nothing in the record to indicate whether McIntosh County owned the land in fee simple in 1925 when it "discontinued" the public roads on Sapelo.  Thus, based on the present record (and viewing the record, as the Court must, in the light most favorable to Plaintiffs), the Court cannot say as a matter of law that McIntosh County abandoned all its interests in the roadway land on Sapelo Island in 1925 and thus did not effectively make those roads public (or confirm their ongoing status as public) through its 2010 Sapelo Island Roadway Resolution.  Accordingly, the Court cannot find that the County has proved it had a legitimate reason for providing insufficient road maintenance services to Plaintiffs.

### (2)   EMS

Plaintiffs' EMS disparate treatment claims are based on the longer emergency response time to Sapelo Island by EMS, the lack of funding for a first responder training program on Sapelo Island, and the provision of routine medical services at mainland EMS stations.  (Doc. 341, pp. 63–64.)  The County asserts that "[g]eographical constraints pose certain immutable challenges with respect to emergency response to isolated barrier islands." (Doc. 274-1, p. 14.)  Geographical barriers can serve as a legitimate, nondiscriminatory reason for a party's actions.  Cf. England v. United Ins. Co. of Am., 97 F. Supp. 2d 1090, 1099 (M.D. Ala. 2000) (finding that geographical considerations were a legitimate, nondiscriminatory reason in the employment context); Lara v. Kempthorne, 673 F. Supp. 2d 504, 516 (S.D. Tex. 2009) (finding that the employer's decision to interview plaintiff by phone was not discriminatory because it "was based on geography"). However, the report by Plaintiffs' expert witness Dr. William Fales states that the challenges posed by Sapelo Island's geography "are not at all insurmountable, nor are they substantively different than those facing other rural communities throughout the United States." (Doc. 344-50, p. 7.)  His report goes on to state that "it is reasonable for island residents to have expectations for an effective EMS system that affords comparable opportunities for surviving a time-critical emergency as is available to other rural communities in Georgia" and explains how the County could help train individuals on the Island to be qualified medical first responders.  (Id. at pp. 7, 38.)  The evidence also shows that the County has been aware of the attempts to establish first responder services on the Island, (doc. 344-49, p. 4), but the County provides no reason to explain why it has not tried to provide more equal EMS to Plaintiffs through this avenue.  This evidence creates a question of fact as to what extent (if any) geographical barriers play in McIntosh County providing disparate EMS to Sapelo Island.  For this reason, the Court finds that the County has not met its burden of

providing a legitimate, nondiscriminatory reason for the disparity of EMS that it provides to Plaintiffs as compared to the owners of property on the mainland.

### (3)   Trash Services

The County also argues that it could not provide curbside trash pickup to Sapelo Island because the County could not "incur even greater costs to add curbside pickup on the island" when every habitable structure in McIntosh County pays the same trash fee.  (Doc. 274-1, p. 19.) Plaintiffs argue that this reason does not explain the County's actions because there is no evidence that the County even considered it when making its decision.  (Doc. 341, p. 84.)  There is no evidence in the record indicating that the County inquired or discussed with Waste Management the option of providing curbside collection to Sapelo Island, much less how much this service would cost; indeed, Plaintiffs point to testimony from individuals who were involved in the negotiations and who deny knowing of any such discussions.  (Doc. 343-15, pp. 41–42; doc. 343-19, p. 51.)  In addition, nothing in the record shows that the County considered the cost of curbside pickup on Sapelo Island before it started negotiating with Waste Management[30] or when it signed a new contract with the company (which it must have done, as the evidence shows that Waste Management still provides trash services in the County even though the initial contract expired, at the latest, in 2017).  The County does provide the affidavit of Waste Management employee Russ

---

[30] In its Reply Brief, the County includes what seems to be a quoted section from Adam Poppell's deposition which appears to show that the County had considered the cost of providing curbside trash collection on Sapelo Island.  (Doc. 354, p. 33.)  However, this evidence is not in the present record before the Court. Plaintiffs have submitted portions of an Adam Poppell's deposition, but the pages of testimony cited by the County are not included in these sections.  (See generally doc. 343-3.)  The Eleventh Circuit precedent is clear that "[s]ummary judgment is proper only if the *record* before the district court shows that there is no genuine issue as to any material fact."  Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007) (emphasis added).  Thus, the Court cannot say that the County has provided evidence that it considered the financial practicality of supplying curbside trash pickup to Sapelo Island based on the current evidence in the record.  Even if Poppell's quoted testimony were a part of the record it would simply create a dispute of material fact on this issue.

Hightower who states that the approximate annual cost for supplying and servicing the trash compactors on Sapelo Island is $23,475.  (Doc. 322, p. 2.)  Notably, Hightower does not provide any information about the annual cost of supplying curbside pickup.  Additionally, Hightower signed this affidavit on July 31, 2020.  (Id.)  In 2016, however, when the County was asked in an interrogatory to identify the total funds expended on trash services for Sapelo Island versus the mainland, it responded that it "does not track that information in that manner."  (Doc. 345-37, pp. 18–19.)  This demonstrates that the County was not even aware of how much money it was spending for trash removal on Sapelo Island until Hightower furnished that information during this litigation.  The Eleventh Circuit has stated that obtaining evidence to show support for a proffered reason after the fact could suggest that the reason is pretextual.  See Rosenfield v. Wellington Leisure Prods., Inc., 827 F.2d 1493, 1496 (11th Cir. 1987) (defendant only obtained information about plaintiff's poor job performance after firing him, so this reason was deemed pretextual).  For all of these reasons, the Court finds that the County has not met its burden of showing, for purposes of summary judgment, that its decision to not provide curbside trash pickup to Sapelo Island was based on cost.

### (4)    Fire Services

Finally, the County argues that it spends more proportionally for fire services on Sapelo Island than it does for fire services on the mainland.  (Doc. 274-1, pp. 42–44.)  In support, it explains that the mainland has more than 6,500 residences while Sapelo has only 103, and that it provides "run stipends, worker's compensation, insurance and pagers" for eight volunteer firefighters on Sapelo Island and for approximately seventy volunteer firefighters on the mainland; as such, the County reasons, "the proportion of those annual expenses incurred by the island firefighters unquestionably exceeds the proportion of the County's population living on the

island." (Id. at pp. 43–44.)  The County does not provide or point to sufficient record support for this argument.[31]  There is no evidence regarding worker's compensation expenses, insurance costs, or pager costs.  And while the Court's own review of the record reveals that there are eight volunteer firefighters on Sapelo Island, and they receive a fifteen-dollar run stipend, (doc. 345-13, pp. 3, 25), the Court finds no information in the record showing there are approximately seventy volunteer firefighters on the mainland.  Moreover, even assuming there was evidence showing there are seventy firefighters on the mainland, there is no evidence concerning the average number of runs each group of firefighters (Island and mainland) makes during a given time period to permit the Court to evaluate whether the total amount spent on stipends for each group correlates with the respective portion of the County population they serve.  Accordingly, the County does not provide adequate factual support for its argument that the pro rata share of money it provides for fire services on Sapelo Island exceeds the pro rata share expended for the mainland.

In addition, even if the County made this showing, it would still not explain why it took the County three months to replace a fire truck on the Island after it stopped working.  It would also not explain why the County has not constructed an enclosed fire station on Sapelo Island.  For these reasons, the Court finds that the County has not met its burden of providing a legitimate reason for the disparity of fire services that it provides to Plaintiffs as compared to the owners of property on the mainland.

## CONCLUSION

In light of the foregoing, the Court **GRANTS IN PART** and **DENIES IN PART** McIntosh County's Motion for Summary Judgment.  (Doc. 274.)  For all Plaintiffs, the Court **DISMISSES**

---

[31] The County's Brief cites page seventeen of County Manager Zouck's deposition in support of its argument, (doc. 274-1, p. 43), but this page is not included in the copy of the deposition in the record, (see doc. 343-19).  The Court's review of the rest of the portion of Zouck's deposition in the record also provides no support for this argument.

Counts II and III to the extent they are based on claims of discriminatory water services, mosquito control services, leisure services, and zoning enforcement.  The Court also **DISMISSES** Count IV in its entirety.   Next, the Court **DISMISSES** all claims asserted against the County by David Grovner, Sr. (on his own behalf or on behalf of Vernell Grovner's estate), David Grovner, Jr., Victoria Hall (on her own behalf or on behalf of Joseph Hall's estate), Lisa Marie Scott, Celia Grovner, Bobby Grovner, Iregene Grovner, Jr., Aaron Walker, Rosemary Harris, Sylvia Williams, Tia Legree, Lorie Banks (on her own behalf), Temperance Jones, Richard Banks (on behalf of the estate of Carolyn Banks), Margaret Hall (on her own behalf), Angela Hall, Harry Jordan, Brenda Jackson, and Marcia Hall Wells for lack of standing.  The Court also **DISMISSES** HELP Org, Inc. and Raccoon Hogg, CDC, from this suit as they no longer have any claims in this case.  The remaining Plaintiffs may proceed on Counts II and III to the extent those claims are based on discriminatory road maintenance, trash services, EMS, and fire services.   However, the Court **DISMISSES** the claims for injunctive relief asserted by Ceaser Banks, Nancy Banks, and Melvin Banks, Sr.  The Court **DENIES** Plaintiffs' Notice Requesting Oral Argument on Defendant's Motion for Summary Judgment. (Doc. 356.)  Finally, McIntosh County may, if it so desires, file a new motion for summary judgment specifically addressing the applicability of the statute of limitations to any of Plaintiffs' remaining claims within **twenty-one (21) days of this Order**.

  **SO ORDERED**, this 30th day of March, 2021.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA