**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

MELVIN BANKS, SR. et al.,

        Plaintiffs,

   v.

MCINSTOSH COUNTY, GEORGIA,

       Defendant.

CIVIL ACTION NO.: 2:16-cv-53

## O R D E R

In a recent Order granting in part and denying in part Defendant McIntosh County's (hereinafter the "County") Motion for Summary Judgment, the Court permitted the County to file a second motion for summary judgment addressing the timeliness of Plaintiffs' claims and other related issues which the parties had not fully addressed in their original briefing.  (See doc. 359.) Presently before the Court is the County's Second Motion for Summary Judgment.  (Doc. 360.) For the following reasons, the Court **DENIES** Defendant's Second Motion for Summary Judgment.  (Id.)

### BACKGROUND[1]

This civil action arises from the provision of various municipal services by McIntosh County to Hogg Hummock, a Gullah-Geechee community on Sapelo Island, Georgia (hereinafter "the Island" or "Sapelo").  Plaintiffs, who are African American individuals who each claim some connection to the Island, allege that the County discriminated against them on account of their race

---

[1]  The Court recited the facts underlying this litigation more comprehensively in its March 30, 2021, Order granting in part and denying in part the First Motion for Summary Judgment.  (Doc. 359, pp. 2–18.)

in violation of 42 U.S.C. § 1982, the Fourteenth Amendment of the United States Constitution, and Title VI of the Civil Rights Act of 1964 by providing inferior services to the Island, including specifically Hogg Hummock, relative to predominately white areas on the mainland.[2]  (See doc. 206.)  In its First Motion for Summary Judgment, the County argued, *inter alia*, that Plaintiffs' claims were time-barred by the applicable two-year statute of limitations.  (Doc. 274-1, pp. 36–37.)  The Court denied the County's request for summary judgment on that basis because the County failed to specify which of Plaintiffs' claims it believed were untimely, as required by Federal Rule of Civil Procedure 56.  (Doc. 359, p. 21.)  However, in the interest of justice, the Court granted the County additional time to file a second motion for summary judgment addressing the following issues related to the statute of limitations defense: (1) "whether and to what extent [the] statute of limitations defense applies to each remaining Plaintiff"; (2) "whether the County contends that all Plaintiffs' requested remedies (damages, declaratory relief, and injunctive relief) are time-barred or only a portion of those remedies"; (3) "the timeliness of Plaintiffs' remaining substantive claims"; and (4) "the application of the continuing violations doctrine."  (Id. at pp. 21–22.)

---

[2]  Plaintiffs' Second Amended Complaint, which is the operative pleading in this case, asserts a Section 1981 Claim brought by and through Section 1983 (Count I), a Section 1982 claim (Count II), a Fourteenth Amendment claim (Count III) brought by and through Section 1983, and a Title VI claim (Count IV).  (Doc. 206, pp. 88–93; see doc. 374, p. 2.)  The Court previously dismissed all of Plaintiffs' claims to the extent they were based on allegations that the County conducted unequal and discriminatory tax appraisals.  (Doc. 240, pp. 7–12; see doc. 359, p. 20 n.17.)  Also, the Court merged Plaintiffs' Section 1981 claim into their Fourteenth Amendment claim, indicating that it would "treat them as a single claim under [Section] 1983."  (Doc. 359, p. 20 n.17 (quoting doc. 158, p. 21).)  Furthermore, in its March 30, 2021, Order, the Court dismissed Plaintiffs' claims under Sections 1982 and 1983 (Counts II–III) "to the extent they are based on claims of discriminatory water services, mosquito control services, leisure services, and zoning enforcement."  (Doc. 359, pp. 62–63.)  The Court also dismissed Plaintiffs' Title VI claim (Count IV) in its entirety.  (Id. at p. 63.)  However, on Plaintiffs' Motion for Reconsideration, (doc. 363), the Court reinstated the Title VI claim to the extent that it is based on discriminatory road maintenance, trash services, emergency medical services ("EMS"), and fire services, (doc. 374, p. 16).  Thus, Plaintiffs' pending claims are for the discriminatory provision of fire, trash, EMS, and road maintenance services under Section 1982, Section 1983, and Title VI.  (See docs. 359, 374.)

On April 20, 2021, the County filed the at-issue Second Motion for Summary Judgment, arguing that all of Plaintiffs' surviving claims are time-barred with respect to all Plaintiffs and all requested remedies.[3]  (See docs. 360, 360-1.)  Plaintiffs filed a Response, generally arguing that their claims are timely because the continuing violation doctrine extends the applicable limitations period.  (See doc. 369.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if it 'might affect the outcome of the suit under the governing law.'"  FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011). When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.

---

[3] The County argues that because Plaintiffs' claims for legal relief are time-barred, their claims for equitable and declaratory relief fail under the "concurrent remedy doctrine."  (Doc. 360-1, p. 14.)  Since the Court concludes that Plaintiffs' claims are not time-barred, see Discussion Section II.A–E, infra, it need not address this argument.  See Nat'l Parks & Conservation Ass'n v. Tenn. Valley Auth., 502 F.3d 1316, 1322 (11th Cir. 2007) ("[T]he concurrent remedy doctrine . . . arises only if the legal claims are time-barred.").

See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).   If the moving party

discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present

affirmative evidence to show that a genuine issue of fact does exist.  Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view

the record and all reasonable inferences that can be drawn from the record in a light most favorable

to the nonmoving party.  Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., Fla., 630 F.3d

1346, 1353 (11th Cir. 2011).   However, "facts must be viewed in the light most favorable to the

non-moving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S.

372, 380 (2007).   "[T]he mere existence of some alleged factual dispute between the parties will

not defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no genuine issue of material fact."  Id. (citation and emphasis omitted).

## DISCUSSION

### I.   Overview of Applicable Legal Authority in the Context of the Parties' Arguments

Plaintiffs' surviving claims are brought pursuant to Section 1982, Section 1983, and Title

VI, all of which are subject to Georgia's two-year statute of limitations.[4]  See Rozar v. Mullis, 85

F.3d 556, 561 (11th Cir. 1996) ("[A]s to section 2000d [of Title VI], we hold that Georgia's two-

year personal injury limitations period applies. . . . .");  Mullinax v. McElhenney, 817 F.2d 711,

716 n.2 (11th Cir. 1987) ("[T]he proper limitations period for all Section 1983 actions in Georgia

is the two-year limitations period set forth in O.C.G.A. § 9-3-33.");  Moore v. Liberty Nat'l Life

---

[4]  Plaintiffs argue that their Section 1981 claim is subject to a four-year statute of limitations period because the claim involves "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  (Doc. 369, pp. 8–9 (quoting Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 383 (2004)).) This argument is meritless.  As stated above, the Court previously merged Plaintiffs' Section 1981 claim into their Fourteenth Amendment claim, which is brought by and through Section 1983.  (Doc. 158, p. 21; see doc. 359, p. 20 n.17.)  The Court indicated that it would "treat them as a single claim under [Section] 1983."  (Id.)  Therefore, Georgia's two-year statute of limitations applicable to Section 1983 claims—not the four-year limitations period for certain Section 1981 claims—applies.

Ins. Co., 267 F.3d 1209, 1216–17 (11th Cir. 2001) (statute of limitations for personal injury torts

of state in which suit is filed applicable to Section 1982 claims); see also O.C.G.A. § 9-3-33

("[A]ctions for injuries to the person shall be brought within two years after the right of action

accrues . . . .").  "Federal law determines when the statute of limitations begins to run."  Lovett v.

Ray, 327 F.3d 1181, 1182 (11th Cir. 2003).  Under federal law, a claim accrues when "the facts

which would support a cause of action are apparent or should be apparent to a person with a

reasonably prudent regard for his rights."  Rozar, 85 F.3d at 561–62.

The parties agree that the applicable limitations period for Plaintiffs' claims is December

9, 2013, to December 9, 2015, which represents the two-year period up to the date Plaintiffs filed

the original Complaint.[5]  (See doc. 369, p. 9; doc. 360-1, pp. 7, 11, 12, 14; see also doc. 1); see

Rozar, 85 F.3d at 561 ("We turn next to whether plaintiffs' causes of action against each group of

defendants accrued before or after August 15, 1992, this being the date two years before the present

complaint was filed on August 15, 1994."); Mullinax, 817 F.2d at 716 ("Mullinax commenced this

[Section 1983] action [on] August 9, 1984.  Consequently, . . . those claims are barred if they

accrued prior to August 10, 1982."); see also Davis v. Chapman, No. 3:19-CV-24 (CAR), 2021

WL 4442358, at *2 (M.D. Ga. Sept. 28, 2021) ("Plaintiff filed his Complaint on February 28,

2019, so any [Section 1983] claims that accrued prior to February 28, 2017, are time-barred under

Georgia's two-year personal injury statute of limitations.").

The County argues that Plaintiffs' substantive claims are time-barred because "Plaintiffs

could have brought suit on all of the[m] . . . many years before the Complaint in this case was

filed."  (Doc. 360-1, p. 2.)  Since Plaintiffs allege that the County has provided inferior municipal

---

[5]  Plaintiffs argue that the limitations period for their Section 1981 claim extends back to December 9, 2011,
because the statute of limitations for that claim is four years.  (Doc. 369, p. 9.)  The Court rejects this
argument because, as described in footnote 4, supra, Georgia's two-year statute of limitations is applicable
to all of Plaintiffs' remaining claims.

services to the Island—and, in some instances, specifically to the Hogg Hummock community—for decades, the Court presumes that they knew or should have known "facts which would support [their] cause[s] of action" well before December 9, 2013.  Rozar, 85 F.3d at 561–62; (see generally docs. 206, 341, 369.)  Plaintiffs do not appear to dispute that their claims first accrued more than two years before the Complaint was filed on December 9, 2015.   (See generally doc. 369.) Nonetheless, Plaintiffs contend that their claims are actionable pursuant to the "continuing violation" doctrine because the County has maintained a long-standing pattern and practice of discrimination in the funding and provision of municipal services to Sapelo Island *during* the limitations period (and into the present day).  (See id.)  "Under the continuing violations doctrine, the statute of limitations is tolled for a claim that otherwise would be time-barred where the violation giving rise to the claim continues to occur within the limitations period."  Nat'l Parks & Conservation Ass'n, 502 F.3d at 1322 (citing Havens Realty Corp. v. Coleman, 455 U.S. 363, 380-81 (1982); see Robinson v. United States, 327 F. App'x 816, 818 (11th Cir. 2007) ("The continuing violation doctrine permits a plaintiff to sue on an otherwise time-barred claim when additional violations of the law occur within the statutory period.").  If the defendant's conduct constitutes a continuing violation, "the cause of action accrues, and the limitation period begins to run, at the time the unlawful conduct ceases."  Robinson, 327 F. App'x at 818; see Watkins v. Haynes, No. 2:12-cv-050, 2013 WL 1289312, at *4 (S.D. Ga. Mar. 27, 2013).

"The critical distinction in the continuing violation analysis is whether the [plaintiff] complains of the present consequence of a one[-]time violation, which does not extend the limitations period, or the continuation of that violation into the present, which does."  Baker v. Sanford, 484 F. App'x 291, 293 (11th Cir. 2012) (internal quotation omitted).  In making this determination, courts look to the text of the relevant statute or constitutional provision that forms

the basis of the plaintiff's claims, as well as the nature of the unlawful conduct alleged.  See Ctr. for Biological Diversity v. Hamilton, 453 F.3d 1331, 1334 (11th Cir. 2006) ("To determine whether the continuing violation doctrine applies, we must consider the text of the relevant statute . . . .") (citing Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108–09 (2002)); see also Motley v. Taylor, 451 F. Supp. 3d 1251, 1271–72 (M.D. Ala. 2020) ("[D]etermining whether a particular [Section] 1983 claim presents a continuing violation depends, in significant part, on the court's determining what constitutes the defendant's wrongful conduct.") (internal quotations omitted).  As the Court stated in its Order on the County's First Motion for Summary Judgment, all of Plaintiffs' discrimination claims are based on disparate treatment.  (Doc. 359, p. 39.) Therefore, although Plaintiffs bring the claims under different statutes, each claim requires essentially the same showing—that the County acted with discriminatory purpose and effect with regard to the provision of fire, trash, EMS, and road maintenance services to their community on Sapelo Island.  (Id. at pp. 39–43); see also Steele v. City of Port Wentworth, No. 4:05-cv-135, 2008 WL 717813, at *13 (S.D. Ga. Mar. 17, 2008) ("[P]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause.  Intentional discrimination is also required for claims brought pursuant to [Section] 1982. . . .  [B]ecause there is no substantial difference between Plaintiffs' claims under [Sections] 1982 and . . . 1983, the Court will consider these claims together.") (internal citations omitted) (citing Jackson v. Okaloosa County, 21 F.3d 1531, 1543 (11th Cir. 1994)).

In its Order on the First Motion for Summary Judgment, the Court held that Plaintiffs have "presented sufficient evidence to allow a reasonable trier of fact to find that the County acted with discriminatory purpose and effect with regard to the provision of fire services, trash services, EMS, and road maintenance."  (Doc. 359, pp. 54–55.)  This Court has previously stated that the

continuing violation doctrine may be applied to a "systemic violation, that is, a longstanding and demonstrable policy of discrimination." Steele, 2008 WL 717813, at *15 (internal quotations omitted) (quoting LRL Props. v. Portage Metro Hous. Auth., 55 F.3d 1097, 1106 (6th Cir. 1995)); see also Beasley v. Ala. State Univ., 966 F. Supp. 1117, 1129–30 (M.D. Ala. 1997). "A systemic violation has its roots in a discriminatory policy or practice; so long as the policy or practice itself continues into the limitations period, a challenger may be deemed to have filed a timely complaint." Steele, 2008 WL 717813, at *15 (citing Provencher v. CVS Pharm., Div. of Melville Corp., 145 F.3d 5, 14 (1st Cir. 1998)). Indeed, numerous courts, including the Supreme Court of the United States, have held that a "pattern, practice, and policy" of discrimination that is maintained into the limitations period is a continuing violation. Havens Realty Corp., 455 U.S. at 380–81; see id. (applying the continuing violations doctrine to claims filed after the statutory period because they were "based not solely on isolated incidents involving the [defendants], but a continuing violation manifested in a number of incidents—including at least one . . . that is asserted to have occurred within the [statutory] period."); see also Kennedy v. City of Zanesville, 505 F. Supp. 2d 456, 490–92 (S.D. Ohio 2007) (finding a continuing violation where the plaintiffs alleged that a county's long-standing policy of denying municipal water services to residents based on their race was manifested during the limitations period); see also Perez v. Laredo Junior Coll., 706 F.2d 731, 734 (5th Cir. 1983) ("[I]f the statutory violation occurs as a result of a continuing policy, itself illegal, then the statute does not foreclose an action aimed at the . . . enforcement of the policy within the limitations period."); Katz v. Vill. of Beverly Hills, 677 F. App'x 232, 236 (6th Cir. 2017) ("A plaintiff can establish a continuing violation if he or she shows a longstanding and demonstrable policy of discrimination.") (internal quotations omitted). Thus, a plaintiff "can survive summary judgment by creating a genuine issue of material fact with respect to [an] alleged

systemic continuing violation." <u>Steele</u>, 2008 WL 717813, at *16 (citing <u>Rural Water Sys. No. 1 v. City of Sioux Ctr.</u>, 967 F. Supp. 1483, 1508 (N.D. Iowa 1997)).

Relying on a systemic violation theory, Plaintiffs argue that they have "presented sufficient evidence to establish that the County has maintained ongoing patterns, practices, or policies of discriminatory provision of EMS, fire, roads, and trash services to Plaintiffs that continued into the applicable statute of limitations periods" and up to the present.  (Doc. 369, p. 8; <u>see also</u> <u>id.</u> at pp. 1–2, 9.)  The County disagrees, arguing that Plaintiffs have failed to identify discrete acts of discrimination by the County during the limitations period.[6]  (<u>See</u> doc. 360-1, pp. 7–13.)  The County contends that Plaintiffs have only presented evidence of "inaction" or "non-action" during the limitations period, which, according to the County, cannot form the basis of a continuing violation.[7]  (<u>Id.</u> at pp. 1–2, 7–8, 10–11, 13.)  For the reasons stated below, the Court finds that

---

[6]  The County apparently fails to appreciate that the continuing violation doctrine applies to claims of systemic, ongoing discrimination *regardless* of whether there were discrete violations during the limitations period.  For a claim involving systemic discrimination to be timely, a plaintiff need only demonstrate that the alleged discriminatory policy or practice was *maintained* during the limitations period.  <u>See</u> <u>Steele</u>, 2008 WL 717813, at *15 (stating in a parenthetical that a "systemic violation requires no identifiable act of discrimination within the limitations period") (citing <u>Provencher</u>, 145 F. 3d at 14); <u>see id.</u> at *16–20 (noting that, "[f]or the claims to be timely, Plaintiffs must show either discrete claims within the limitations period *or a systemic continuing violation*[,]" and analyzing these issues separately) (emphasis added); <u>see also</u> <u>Short v. Immokalee Water & Sewer Dist.</u>, 165 F. Supp. 3d 1129, 1142 (M.D. Fla. 2016) ("Continuing violations, on the other hand, are exceptions to this general rule regarding discrete discriminatory acts [during the applicable limitations period].").  Thus, to the extent the County argues that the continuing violation doctrine is inapplicable because Plaintiffs have failed to allege that the County committed any discrete acts during the limitations period, the Court disagrees.  Moreover, as discussed in Discussion Section II.A–D, <u>infra</u>, Plaintiffs have adequately alleged that the County maintained a policy and practice of providing inferior municipal services to them because of their race.

[7]  For support, the County cites <u>Watkins v. Haynes</u>, in which this Court stated, in dicta, "Typically, 'non-action' should not be construed as a continuing violation."  2013 WL 1289312, at *4 (citing <u>Hamilton</u>, 453 F.3d at 1336).  The County overstates the significance of this purported "non-action" principle, which this Court referred to in passing, qualified with the word "typically," and did not invoke to reach its decision.  Furthermore, the case this Court cited for support, <u>Center for Biological Diversity v. Hamilton</u>, did not categorically hold that "inaction" during the limitations period *never* constitutes a continuing violation.  Rather, in that case, the Eleventh Circuit Court of Appeals merely stated that it disagreed with an out-of-circuit district court's holding that the Secretary of the Department of the Interior's alleged "non-action"—failing to designate a critical habitat as required by the Endangered Species Act—was a continuing violation.  <u>See</u> <u>Hamilton</u>, 453 F.3d at 1334–36 (citing <u>S. Appalachian Biodiversity Project v. U.S. Fish &</u>

summary judgment is improper because a reasonable jury could conclude that the County's alleged discriminatory funding and provision of the respective municipal services constitute systemic continuing violations.

## II.   Application of the Continuing Violation Doctrine to Plaintiffs' Claims

### A.   Plaintiffs have adequately alleged a continuing violation with respect to EMS services.

Plaintiffs contend that the County has maintained a "pattern, practice, and policy of differential treatment . . . in the context of EMS services."  (Doc. 369, p. 11.)  Specifically, Plaintiffs allege that the County refused to "transport[] emergency personnel to victims on the Island," "abdicat[ed] to the State any responsibility for getting Island patients to the mainland[,]" failed to "formulate[] a plan for EMS responses to the [I]sland," and "fail[ed] to fund Island EMS services" both before and during the limitations period.  (Id. at pp. 11–12.)

The record adequately supports Plaintiffs' contentions.  Plaintiffs furnished an expert report from Dr. William Fales that stated that the County's EMS department "has historically not served, or underserved, Sapelo Island."  (Doc. 344-50, p. 7.)  Additionally, according to the sworn affidavit of Jane Garbisch, a resident of the island from the late 1990s to 2009, the County "would not dispatch emergency medical technicians to the Island" during the first few years of her residence and continued to refuse to do so "up through the time when [she] left . . . in 2009."  (Doc.

---

Wildlife Servs., 181 F. Supp. 2d 883, 887 (E.D. Tenn. 2001)).  Moreover, Hamilton expressed no opinion on the applicability of the doctrine to an alleged long-standing and enduring policy of discrimination, as the defendant's alleged misconduct in that case was a discrete act.  Id. at 1333–34.  Lastly, to the extent that the County more broadly argues that discrimination claims based on "inaction" are not viable, the Court disagrees.  It is well established that inaction by a government entity is actionable where the government's failure to act is accompanied by the requisite discriminatory intent.  See, e.g., Johnson v. City of Arcadia, 450 F. Supp. 1363, 1378 (M.D. Fla. 1978) ("Municipal inaction in response to discrimination in public institutions is violative of the Equal Protection Clause.").

344-49, pp. 2, 4; see id. at p. 2 ("Anyone on the Island who was in need of emergency medical care had to find his or her own means of traveling to the mainland in order to receive care.").) Although there is evidence that EMS now travels to the Island, Warnie Nettles, the Director of the County's EMS, estimates that paramedics did so only "three or four times [from around 2014 or 2015 to 2017]." (Doc. 345-2, pp. 4, 19.)  As such, according to Dr. Fales, the primary way for patients located on the Island to receive aid is to boat or ferry to the dock on the mainland.  (Doc. 344-50, p. 27.)  Yet, according to County Commissioner Charles Jordan, "[t]he county doesn't have a plan for how . . . patient[s] . . . get from Sapelo to [the dock]" because "the [C]ounty feel[s] that it should be the state['s] responsibility." (Doc. 343-14, p. 72).[8]  Indeed, Nettles testified that he has "no idea" how Sapelo's residents are "told what to do" when there is a medical emergency, as there are no "community meetings or trainings" for people living on the Island.  (Doc. 345-2, pp. 15–16.)

Furthermore, Plaintiffs supplied evidence that patients on the mainland receive EMS aid significantly quicker than patients on the Island.  While it takes less than fifteen minutes for EMS to respond to mainland emergencies, (id. at pp. 8–9), Dr. Fales estimates that it can take up to

---

[8] Plaintiffs also allege that the County does not have a plan for "responding to a medical emergency on Sapelo island," citing Rule 30(b)(6) deposition testimony from Adam Poppell. (Doc. 369, p. 12 (citing doc. 343-3, p. 7).) The portion of Poppell's testimony cited by Plaintiffs does not support this allegation because it does not discuss EMS services. (See doc. 343-3, p. 7.) Furthermore, a significant chunk of the transcript which follows soon after the portion Plaintiffs cite has been omitted. (See id.)  The absence or incompleteness of deposition testimony in the record has been a recurring issue in this litigation. (See doc. 325; doc. 359, p. 60 n.30.)  In a footnote in its Second Motion for Summary Judgment, the County has "renew[ed] its request for Plaintiffs to file the relevant original transcripts." (Doc. 360-1, p. 3 n.1.)  The Court rejects this request for two reasons.  First, in its Order granting in part and denying in part the County's Motion for Reconsideration, the Court warned the parties that when "original discovery materials upon which it wishes to rely have [not] been made a part of the record," the proper recourse is to alert the Court through a motion to compel. (Doc. 374, pp. 7–8.)  Second, the County's request is vague.  While it is likely that the County wishes to renew its Request for Filing of Original Discovery, (doc. 325), the Court will not waste time parsing through the County's request when it already instructed the parties how to proceed to resolve these issues.

forty-five minutes for a patient on Sapelo to receive aid, depending on whether paramedics travel

to the Island or the patient takes a boat to the dock on the mainland (in which case the time would

be somewhat shorter), (doc. 344-50, p. 30).

Lastly, Plaintiffs point out that although the County spent nearly $900,000 on EMS services

each year from 2013 to 2015, the County's budget-related documentation for those years does not

specifically show that there were any EMS-related expenditures specific to the Island.[9]  (Doc. 343-

43, p. 30 (showing actual expenses related to "Ambulance Service (EMS)" in 2013); doc. 343-44,

p. 31 (same, but for 2014); doc. 343-45, p. 30 (same, but for 2015); see also doc. 343-19, p. 61).)

The Eleventh Circuit has held that where there is significant disparity in the provision of municipal

services, the selection and reaffirmation of "a particular course of municipal services expenditures

. . . [can] evidence[] discriminatory intent."  Dowdell v. City of Apopka, 698 F.2d 1181, 1186

(11th Cir. 1983); see id. ("[T]he magnitude of the disparity, evidencing a systematic pattern of

municipal expenditures in all areas of town except the black community, is explicable only on

racial grounds. . . . [T]heir requests for improved municipal services continue to be ignored while

substantial funds are expended to annex and develop the new predominantly white sections of

town.").  Thus, these allegations and the supporting evidence suffice to create a genuine issue as

to whether the County maintained a pattern, practice, and policy of underfunding and providing

---

[9]  The line items under the heading "Ambulance Services (EMS)" for the years 2013 to 2015, while numerous, are very general, and do not delineate geographically where any money was spent (i.e., on the mainland, barrier islands, certain communities, or otherwise).  (Docs. 343-43, 343-44, 343-45.)  Rather, the line items show general categories of EMS-related expenditures, such as "Personnel Services & Employee Benefits," "Purchased/Contracted Services," and "Repairs & Maintenance."  (See e.g., doc. 343-44, p. 31.) However, in other portions of the budget-related documentation, there are line items for actual expenditures that were specific to the Island.  (See, e.g., id. at p. 17 (under the heading "Public Buildings," there is a line item for "Repairs/Maintenance Sapelo Center").)  Accordingly, the lack of a line-item expenditure specific to Sapelo Island for "Ambulance Services (EMS)" does not prove that no money was spent on ambulance services for Sapelo Island; rather, a dispute of fact exists as to whether the County failed to expend any (or a reasonable amount) of its budget on EMS services for the Island during the limitations period.

unequal EMS services to Sapelo Island into the limitations period, thereby constituting a systemic continuing violation.

**B.      Plaintiffs have adequately alleged a continuing violation with respect to fire services.**

Plaintiffs argue that "[t]he evidence of differential treatment regarding the provision and funding of fire services on the Island is part of a consistent, ongoing, continuing violation of the Constitution." (Doc. 369, p. 14.)  Specifically, Plaintiffs argue that the County has "maintained [an] overall practice of deprioritizing" fire services on the Island by providing inferior equipment and facilities for the Island's volunteer fire department relative to the mainland's volunteer fire department and failing to expend monies to improve them.  (Id. at pp. 13–14.)

The record contains sufficient evidence to substantiate Plaintiffs' claims.  There is a significant disparity between the number and nature of the fire stations on the mainland relative to the Island.  While there are eight fire stations located on the mainland, each containing "a small office . . . or a training room and [room for] the housing of the trucks," (doc. 345-4, pp. 24–25; doc. 274-2, p. 13), the lone "fire station" on the Island consists of only a re-purposed concrete parking slab covered by an un-enclosed metal roof, (see doc. 345-17, p. 2; see also doc. 345-4, p. 28).  Due to the state of the fire station on the Island, a significantly higher "ISO" rating has been assigned to Sapelo Island relative to the mainland.  "ISO" ratings are "fire protection class[ifications]" used by insurance companies to set rates for homeowners' insurance.  (Doc. 345-13, pp. 23–24.)  Locations are ranked from Class 1 to Class 10, with "1 being the best you can get," and 10 signifying that a location "is basically unprotected."  (Id. at pp. 24–25.)  Sapelo Island's rating is a Class 10, whereas the mainland as a whole is designated Class 5.  (Id. at pp. 23–25.)  Evidence indicates that the Island's rating is so low because the single firetruck located

on the Island is not (and never has been) housed in an enclosed building, which "[t]he ISO requires" in order to avoid damage to the firetruck caused by freezing weather. (Id. at pp. 24–25.)

Additionally, Plaintiffs supplied evidence that the County has been aware of the need to construct a new fire station on the Island for at least a decade; on August 11, 2009, the Board of Commissioners voted "to include Sapelo on SPLOST 2010 for construction of [a] fire station." (Doc. 344-1, p. 5.)   However, the project ultimately was not included in the 2010 SPLOST referendum, and no monies were expended to construct a fire station throughout the SPLOST's "six-year timeframe" because, according to Commissioner Jordan, the Board did not consider it "very high on the priority list."   (Doc. 343-14, pp. 37–38; see doc. 343-50.)   According to one county official, it is unusual for the Board to vote to include a project in a SPLOST funding cycle and, thereafter, exclude it from the referendum.   (Doc. 343-3, p. 42.)   Furthermore, although the Island's fire station project is included in the ongoing 2016 SPLOST, as of August 2019, construction had yet to commence, and the process of obtaining cost estimates had "just beg[u]n." (Doc. 343-40, p. 41.)   Lastly, the only firetruck operating on the Island from 2010 until 2019 (which encompasses the limitations period) was 17 years older than the next-oldest fire truck used in the County.   (Doc. 345-13, pp. 18–19.)   Viewing this evidence collectively, a reasonable juror could find a continuing violation because the County maintained a pattern and practice of de-prioritizing fire services on the island during the limitations period.

### C.   Plaintiffs have adequately alleged a continuing violation with respect to road services.

Plaintiffs argue that the County has maintained a "decades-long practice of failing to maintain, pave, and invest in the roads in Hogg Hummock . . . while regularly maintaining, paving, and investing in the roads on the mainland" which continues into the present. (Doc. 369, pp. 15–16.)

14

The record is replete with evidence that supports Plaintiffs' claims.  First, there is a significant disparity between the frequency with which the County grades roads on the mainland relative to those on the Island.  According to Plaintiffs' expert witness Michael Tuttman, the County's failure to "maintain the roads in the Hogg [Hummock] community on an adequate, and frequent, basis has created an unreasonably dangerous condition that presents a danger to the residents of, and the traveling public on, Sapelo Island." (Doc. 345-20, p. 14.)  The County has been aware of the condition of the roads in Hogg Hummock since at least February 8, 2011, when Commissioner Jordan stated during a monthly Board of Commissioners meeting that "the roads on Sapelo are in poor shape[,] and the County [does] not want anything to do with them." (Doc. 345-25, p. 3.)  Nonetheless, pursuant to the County's "current road-maintenance schedule," the County grades the roads on the mainland once per week, but grades the roads in Hogg Hummock only once per year.  (See doc. 343-19, pp. 29–30 (Sapelo roads paved "two to three times" from 2016 to 2019); see also doc. 359, p. 46.)  The County acknowledges that this current schedule has been in place since "long before this suit was filed," which necessarily means it was in effect during the limitations period.  (Doc. 360-1, p. 13.)  Additionally, according to the County Assistant Director for Public Works, while the County has mixed clay or rocks into mainland roadways in order to address sandy or muddy conditions, the County has never done so on the Island.  (Doc. 344-14, pp. 20–21.)  Indeed, in contrast to the routine weekly grading of mainland roads, the County must ship grading and other road maintenance equipment to and from the Island when such road work is done because no such items are stored there.  (Id. at p. 25; see also doc. 344-13. p. 4.)

Second, the roads on the Island are disproportionately unpaved relative to the predominately white mainland, which the Eleventh Circuit has held may violate the Constitution.

See <u>Ammons v. Dade City</u>, 783 F.2d 982, 985 (11th Cir. 1986) (affirming district court's finding that the "significant disparity between the races in the provision of street paving . . . [and] street resurfacing in maintenance" violated the Fourteenth Amendment); <u>see also</u> <u>Johnson</u>, 450 F. Supp. at 1372 (finding that a city's "unwritten" policy of de-prioritizing paving dead-end streets had disparate impact on black residents where a "far higher percentage of streets in the black community [were] dead-end than in the white community").  As of 2011, more than 60% of mainland roads were paved, while none of the roads on the Island were paved.  (Doc. 345-26, p. 2 (60% figure calculated by dividing total number of "Paved Miles" by "County Road Miles Combined").)  Notwithstanding that disparity, the County repeatedly has spent monies allocated for road paving purposes on the mainland rather than the Island.  For example, although the 2010 and 2016 SPLOSTs each designated at least $1,000,000 for "road paving" in the County, no funds were spent (or had been spent as of May 10, 2017) to improve roads on the Island, purportedly because the commissioners did not "make it one of their top priorities."  (Doc. 343-22, pp. 2, 11–12; <u>see</u> doc. 343-48, pp. 3–4 (2016 SPLOST list); doc. 343-50, p. 5 (2010 SPLOST list).)  SPLOST funds are distributed to approved projects over a "six-year timeframe," which suggests that the County maintained a pattern or practice of failing to allocate funds to improve Sapelo roads during the statutory period.  Thus, Plaintiffs have offered enough evidence for a reasonable jury to conclude that the County has engaged in a systemic practice of underfunding and providing inferior road maintenance and paving services which began before and continued into the limitations period.

   **D.     Plaintiffs have adequately alleged a continuing violation with respect to trash services.**

   Plaintiffs argue that the County has maintained a "systemic pattern, policy, and practice of providing disparate and discriminatory trash services on Sapelo Island" that has continued "well

into the limitations period and up to the present." (Doc. 369, p. 14.) Specifically, Plaintiffs contend that the County offers certain services (namely, curbside pickup) exclusively on the mainland and fails to maintain the dump site on the Island. (Id. pp. 14–15.) The County argues that any disparity in services is merely the "present consequence" of the County's "one-time act" of selecting a private company to run the County's waste collection service in the agreed-upon manner." (Doc. 360-1, p. 12 (quoting McGroarty v. Swearingen, 977 F.3d 1302, 1307 (11th Cir. 2020).) Again, Plaintiffs have the better of the argument.

In the past, the County's waste-collection procedures on Sapelo Island consisted of dumpsters which were periodically emptied by dump trucks brought over from the mainland. (Doc. 343-15, p. 37.) In 2011, the County entered into a contract with Waste Management of Georgia, Inc. ("Waste Management") to handle its trash services. (See doc. 345-34.) While the contract provided for weekly curbside trash pick-up on the mainland, such service was excluded on "barrier-islands." (Id. at p. 5.) In fact, the County did not discuss or negotiate with Waste Management about providing curbside collection to Sapelo Island residents. (Doc. 343-15, p. 42; doc. 343-19, p. 51.) Instead, the contract provided for one "34-yard self-contained [trash] compactor" to be placed on the Island, which Waste Management agreed to "pull" once per month.[10] (Doc. 345-34, p. 6; doc. 322, pp. 1–2.) According to Commissioner David Stevens, the County sought to replace the prior dumpster system with the compactor because the dumpsters were a "nightmare" and a "mess." (Doc. 343-15, p. 37.) Yet, the compactor is often overflowing, and Hogg Hummock residents—who must transport their trash themselves to the compactor because curbside pickup is not provided to them—have said that the surrounding area is littered

---

[10] According to the affidavit of Russ Hightower, the Government Affairs and Public Sector Sales Manager for Waste Management, the compactor is, in practice, pulled approximately nine times per year. (Doc. 322, pp. 1–2.)

with trash, smells poorly, and is inhabited by buzzards and stray animals.  (Doc. 345-35, p. 10;
doc. 343-36, pp. 12–13.)  Moreover, the record indicates that dumpsters remained alongside the
compactor throughout the limitations period and until at least a year and a half after this case was
filed.  (Doc. 343-27, pp. 35–36 (testimony by one Plaintiff that dumpsters are still on Sapelo
Island); see also doc. 345-35, p. 9 (same testimony by another Plaintiff).)  Indeed, one part-time
resident, Cheryl Grant, said that the "nasty" state of the area surrounding the compactor is partially
due to the dumpsters, which she doubted were ever emptied because they are "always full" of
things like old appliances and furniture.  (Doc. 345-35, pp. 10–11.)

   The fact that the dumpsters remained on the Island for years after the County signed its
contract with Waste Management undercuts the County's contention that "the services in place
prior to the installation of the compactor were discontinued more than two years before this suit
was filed."  (Doc. 360-1, p. 12 n.5.)  Furthermore, although the County's contract with Waste
Management did not require Waste Management to empty the dumpsters (indeed, it did not refer
to the dumpsters at all), it explicitly relieved Waste Management of any obligation "to collect,
transport, dispose of or otherwise handle . . . White Goods . . . [and] large equipment."  (Doc. 345-
34, pp. 8–9.)  "White goods," per the contract, means "[r]efrigerators, stoves and ranges, water
heaters, freezers, . . . and other similar domestic and commercial large appliances."  (Id. at p. 4.)
Plainly, therefore, Waste Management was not obligated to remove appliances from the dumpsters
pursuant to the contract.  Thus, while expressing no opinion on whether the County was legally
responsible for emptying the dumpsters through the contract period, the fact that the dumpsters
were frequently overflowing with items excluded from the Waste Management contract suggests
that the County de-prioritized the dump site, and trash removal in general, on Sapelo Island.
Indeed, the County's pattern of ignorance for the condition of the dump site is bolstered by the fact

that in 2015 or 2016, the County began removing "white goods" placed curbside at a resident's property once per month, but only on the mainland. (See doc. 343-15, pp. 71–72.) Island residents, however, continued to have to find their own way to haul white goods to the landfill on the mainland. (Id. at p. 72.)

Lastly, the contract with Waste Management provided for a fixed four-year term, with an additional two-years tacked on "unless . . . one party advise[d] the other in writing off its desire to terminate the Agreement at the conclusion of the [four-year term]" within 120 days before the four-year term expired. (Doc. 345-34, p. 5.) Since the contract provided for a commencement date of November 1, 2011, the County's option existed until 120 days before November 1, 2015. That means that the County could have exercised the option throughout most of the limitations period. Yet, there is no evidence in the record that it did so. To the contrary, despite the evidence that the Island dump site was in a state of disarray during the contract period (which covers the statutory period), the County signed a new contract with Waste Management. (See doc. 359, p. 60 (stating that the County must have signed a new contract because "the evidence shows that Waste Management still provides trash services in the County even though the initial contract expired, at the latest, in 2017").) In light of the foregoing, the Court finds that Plaintiffs provided sufficient evidence that the County's unequal provision of trash services and failure to maintain the dump site on the Island are attributable to an ongoing policy of discrimination, not just the "one-time" act of entering into the 2011 contract with Waste Management.

**E.     Plaintiffs' knowledge or awareness of their claims does not render them ineligible for the continuing violation doctrine.**

The County argues that Plaintiffs cannot rely on the continuing violation doctrine because they reasonably should have been aware that a violation of their rights had occurred with respect to the provision of each municipal service challenged. (Doc. 360-1, pp. 8–14.) According to the

County, the continuing violation doctrine is limited "to situations in which a reasonably prudent plaintiff would have been unable to determine that a violation had occurred." (Id. at p. 7 (quoting Hamilton, 453 F.3d at 1335).) Plaintiffs disagree, arguing that where there is an ongoing pattern or practice of discrimination, a plaintiff's awareness of discrimination is irrelevant to determining whether there is a continuing violation. (Doc. 369, p. 20.) According to Plaintiffs, "[w]hile the *traditional* theory of statute of limitations incorporates principles regarding a plaintiff's awareness, it is inappropriate and unnecessary to consider a plaintiff's awareness" in circumstances involving ongoing, systemic discrimination because "[t]he continuing violation doctrine exists to provide an *exception* to the traditional rules governing the statute of limitations when the violation happens in a single instance." (Id. at p. 21.)

The Eleventh Circuit has repeatedly stated that the "[t]he *critical distinction* in continuing violation analysis . . . is whether the plaintiff[] complain[s] of the present consequence of a one time violation . . . or the continuation of a violation into the present . . . ." Robinson, 327 F. App'x at 818 (emphasis added); see, e.g., Lovett v. Ray, 327 F.3d 1181, 1183 (11th Cir. 2003); City of Hialeah v. Rojas, 311 F.3d 1096, 1101–02 (11th Cir. 2002); Baker, 484 F. App'x at 293. While it is true that "the Eleventh Circuit gives considerable weight to [a] plaintiff's awareness of his rights and his duty to bring a timely claim," it has never categorically held that the continuing violation doctrine is inapplicable to claims of ongoing discrimination if the plaintiff reasonably should have been aware the alleged violation. Watkins, 2013 WL 1289312 at *5. In general, courts have considered the plaintiff's awareness of his rights and duty to assert a claim in the continuing violation context only in cases where the plaintiff has sought (unsuccessfully) to apply the doctrine to discrete acts of misconduct that occurred prior to the limitations period. See, e.g., McGroarty, 977 F.3d at 1308–09 (concluding that the continuing violation doctrine did not apply because

plaintiff was merely experiencing present consequences of defendant's "one time" act before adding that the plaintiff was "ineligible for the . . . doctrine" because he "knew or should have known of his claimed injury"); Hamilton, 453 F.3d. at 1335 (no continuing violation because the plaintiff "complain[ed] of the continuing effects of . . . a one-time violation under the Act" and because "a reasonably prudent plaintiff would have been aware of the failure of the Secretary to act on the day following the deadline"); E.E.O.C. v. Joe's Stone Crabs, Inc., 296 F.3d 1265, 1272 (11th Cir. 2002) ("The alleged acts at issue—the failure to hire the claimants because they were women—were discrete, one-time employment events that should have put the claimants on notice that a cause of action had accrued."); Steele, 2008 WL 717813, at *16 (finding that a city's failure to reopen a road that had been blocked by a private citizen was not a continuing violation because (1) "the closure of the road and the City's failure to reopen it constitute[d] discrete acts that should have triggered Plaintiffs' awareness of their rights," and (2) "a single event—the erection of the gate and closing of the road—ha[d] given rise to continuing injuries").

For example, in Watkins v. Haynes, this Court held that the defendants' denial of the plaintiff's requests for a diet consistent with his religious beliefs while he was incarcerated was not a continuing violation because (1) the defendants' respective responses to the requests were "single act[s]" and each defendant acted "once," and (2) "[i]t [could not] be said that a reasonable person in Plaintiff's position would be unaware of the injury resulting from the three . . . administrative denials of his request for relief." 2013 WL 1289312, at *5. Additionally, in USA Entertainment Group Inc. v. Tony, the Eleventh Circuit found the continuing violation doctrine did not extend the limitations period for a Section 1983 claim brought by a nightclub against local law enforcement for excessively policing their events. 847 F. App'x 642, 646–47 (11th Cir. 2021). The Eleventh Circuit reasoned that the plaintiff could have filed within the statutory period because

the club had filed cease-and-desist letters complaining of the police's conduct at its events long before they filed suit.  See id. at pp. 646–47 (quoting Ledbetter v. Goodyear Tire & Rubber Co., Inc., 421 F.3d 1169, 1178 (11th Cir. 2005)) ("[T]he timely-filing requirement erects an absolute bar on recovery for *discrete discriminatory or retaliatory acts* occurring outside the limitations periods[.]") (emphasis added) (internal quotations omitted).

However, neither the Eleventh Circuit nor any district court in this circuit has meaningfully inquired into the impact of a plaintiff's awareness of their claims in cases where the plaintiff adequately alleged they were subjected to an ongoing policy or practice of discrimination.  See, e.g., Beavers v. Am. Cast Iron Pipe Co., 975 F.2d 792, 797–98 (11th Cir. 1992); Mitchell v. Jefferson Cnty. Bd. of Educ., 936 F.2d 539, 548 (11th Cir. 1991); Robinson, 327 F. App'x at 818–19; see also Carter v. City of Montgomery, 473 F. Supp. 3d 1273, 1307 (M.D. Ala. 2020).   This makes sense because the continuing violation doctrine serves as an *exception* to the general rule that federal civil rights claims accrue when the "facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights."  Rozar, 85 F.3d at 561–62; see Baker, 484 F. App'x at 293 (contrasting the accrual rule for Section 1983 claims based on discrete acts and those alleging a continuing violation); Robinson, 327 F. App'x at 818 ("When the violation alleged involves continuing injury, the cause of action accrues, and the limitation period begins to run, at the time the unlawful conduct ceases.").   In practice, the doctrine allows claims of ongoing discrimination to proceed *even though* the plaintiff sued too long after their claims accrued—i.e., when they knew or should have known their rights were violated.  Thus, it is difficult to see why a plaintiff whose systemic discrimination claim is untimely precisely because they knew or should have known they could file it before the expiration of the statutory period should be ineligible for the continuing violation exception on that same basis.

Indeed, treating "plaintiff unawareness" as a rigid eligibility requirement in systemic discrimination cases would undermine the doctrine's purpose of "permit[ting] a plaintiff to sue on an otherwise time-barred claim." Hamilton, 453 F.3d at 1334.

The incongruence in probing into a plaintiff's awareness when the defendant has engaged in a pattern or practice of discrimination becomes clear when considering how the continuing violation doctrine developed. Courts first began evaluating plaintiff awareness for purposes of the continuing violation doctrine in employment discrimination cases brought under Title VII and other statutes, such as the Americans with Disabilities Act.[11] The accrual rules for employment

---

[11] Indeed, Hipp v. Liberty National Life Insurance Company, a case cited by the County to support its plaintiff awareness theory, is an employment discrimination case. 252 F.3d 1208 (11th Cir. 2001); (see generally doc. 360-1.) However, the plaintiff's knowledge of his claims was not the primary basis for the Eleventh Circuit's decision not to apply the continuing violation doctrine in that case. Hipp involved an opt-in collective action brought by various employees under the Age Discrimination in Employment Act of 1967. 252 F.3d at 1214–16. The plaintiffs argued that the continuing violation revived the stale claims of a class member, Plaintiff Lee, because "the [defendant's] allegedly discriminatory policy still exist[ed] and [was] being enforced against others." Id. at 1221. The Eleventh Circuit rejected this argument, stating that the doctrine "could [not] be read broadly enough to preserve otherwise stale claims of all class members as long as the illegal policy [was] being enforced against some members of the class." Id. at 1221-22 (citing Miller v. Int'l Tel. & Tel. Corp., 755 F.2d 20, 25 (2d Cir. 1985) ("[S]everal courts have held that an employee who has been discharged pursuant to a discriminatory policy may not take advantage of later discriminatory acts against other employees for the purpose of postponing the running of the statutory period as to him on a continuing violation theory."). Only after holding that acts against others cannot form the basis of a continuing violation did the Eleventh Circuit address the fact that Plaintiff Lee should have known to file a timely charge with the EEOC. Id. at 1222. The Eleventh Circuit stated that applying the continuing violation doctrine to save Lee's claims would "contravene the doctrine's purpose" because Lee suspected he was being harassed because of his age when he retired. See id. (citing Roberts v. Gadsden Mem. Hosp., 850 F.2d 1549, 1550 (11th Cir. 1988)) ("A claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180–day limitation period."). Notably, however, unlike in this case, in Hipp there was no evidence that the defendant had maintained its discriminatory policy against Lee—the relevant plaintiff for purposes of the continuing violation analysis—during the statutory period. Id. at 1222 ("[N]o action was taken against Lee during the charge-filing period."); see Discussion Section II.A–D, supra. Indeed, Lee could not have been discriminated against during the statutory period because he retired more than a year before the representative charge was filed. 252 F.3d at 1222. Moreover, the Eleventh Circuit relied on existing circuit court case law which provided that "once an employee leaves the company, he must comply with the charge-filing period, and the continuing violation doctrine will no longer save a late claim." Id. at 1222 n.12 (citing Gray v. Phillips Petrol. Co., 858 F.2d 610, 614 (10th Cir. 1988)). No such limitation on finding a continuing violation exists in the context of providing municipal services. Thus, Hipp does not control the outcome in this case.

discrimination claims are unique in that they depend on the filing of a timely charge with the Equal Employment Opportunity Commission ("EEOC").   Unlike federal civil rights claims, which accrue at the time when the plaintiff knew or should have known their rights were violated, the filing period for an EEOC charge begins "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e–5(e)(1); Morgan, 536 U.S. at 109–10 ("The requirement . . . that the charge be filed 'after' the practice 'occurred' tells us that a litigant has up to 180 or 300 days *after* the unlawful practice happened to file a charge with the EEOC.").   Since it can be difficult to "defin[e] precisely *when* the act or acts of discrimination occurred," the United States Court of Appeals for the Fifth Circuit, in Berry v. Board of Supervisors of L.S.U., 715 F.2d 971, 981 (5th Cir. 1983), developed a three-factor test to aid courts in this determination.  Alldread v. City of Grenada, 988 F.2d 1425, 1432 (5th Cir. 1993) (emphasis added); see Bell v. Chesapeake & Ohio Ry. Co., 929 F.2d 220, 223 (6th Cir. 1991) (similarly noting the difficulties of pinpointing when certain employment discrimination claims occur).   One of the factors, which Berry termed the "degree of permanence," considers whether the alleged misconduct is the type which "should trigger an employee's *awareness* of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate[.]"  Berry, 715 F.2d at 981 (emphasis added).  This factor derives from "the equitable notion that the statute of limitations ought not to begin to run until facts supportive of the cause of action are or should be apparent to a reasonably prudent person similarly situated."  Alldread, 988 F.2d at 1432 (internal quotations omitted).  However, the Fifth Circuit has never explicitly held that if a defendant's conduct would have alerted a reasonably prudent person to assert his rights, then it is *not* a continuing violation. To the contrary, it has emphasized—as the Eleventh Circuit repeatedly has—that the distinction

between "whether a complaint alleges a true continuing violation . . . turns on whether the practice at issue is part of, or a repetition of, a past discriminatory act, in which case there is a continuing violation, or whether it is facially neutral, simply giving effect to prior discrimination, in which case there is no continuing violation." Id. at p. 1431 (internal quotations omitted).

Moreover, in National R.R. Passenger Corp. v. Morgan, the Supreme Court "expressly held that the date on which a plaintiff becomes aware that she has an actionable Title VII claim is of no regard in the context of determining the timeliness of a hostile work environment claim," Davidson v. Am. Online, Inc., 337 F.3d 1179, 1185 (10th Cir. 2003) (citing Morgan, 536 U.S. at 117 n.11). See also Morgan, 536 U.S. at 117–18 ("We do not hold, as have some of the Circuits, that the plaintiff may not base a suit on individual acts that occurred outside the statute of limitations unless it would have been unreasonable to expect the plaintiff to sue before the statute ran on such conduct."). The Supreme Court reasoned that hostile work environment claims are "different in kind from discrete acts" because "the incidents constituting a hostile work environment are part of one unlawful employment practice." Morgan, 536 U.S. at 115–18. In so holding, the Supreme Court "implicitly overruled . . . cases to the extent [they] held that recovery on a Title VII hostile work environment claim is not available for acts taken outside the statutory time period where the plaintiff knew or should have known the conduct was discriminatory when the acts occurred."[12] Boyer v. Cordant Techs., Inc., 316 F.3d 1137, 1140 (10th Cir. 2003). Although Morgan specifically addressed hostile work environment claims, the Court sees no reason not to apply its reasoning to analogous claims of systemic discrimination which, unlike discrete acts, "occur[] over

---

[12] Notably, this overruling covered Martin v. Nannie & the Newborns, Inc., 3 F.3d 1410 (10th Cir. 1993), which is the origin of the oft-repeated statement by courts in this circuit that, "[i]f an event or series of events should have alerted a reasonable person to act to assert his or her rights at the time of the violation, the victim cannot later rely on the continuing violation doctrine." Hipp, 252 F.3d at 1222 (quoting Martin, 3 F.3d at 1415 n.6); see, e.g., Hamilton, 453 F.3d at 1335; Doe 1 v. Swearingen, No. 18-24145-CIV-Williams, 2020 WL 8225625, at *2 (S.D. Fla. Nov. 23, 2020).

a series of days or perhaps years" and "are based on the cumulative effect of individual acts." Morgan, 536 U.S. at 115.  Accordingly, the Court declines the County's request to impose an absolute "plaintiff unawareness" requirement into the systemic continuing violation analysis. Since Plaintiffs have adequately pled (and provided support for) their claim that the County engaged in systemic discrimination which continued into the statutory period, see Discussion Sections II.A–D, supra, the continuing violation doctrine renders their claims timely notwithstanding their knowledge or awareness of the County's conduct prior to the limitations period.

### CONCLUSION

For the foregoing reasons, the Court **DENIES** the County's Second Motion for Summary Judgment.  (Doc. 360.)

**SO ORDERED** this 9th day of February, 2022.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA