## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## BRUNSWICK DIVISION

CEASAR BANKS, et al.,

        Plaintiffs,

    v.

MCINTOSH COUNTY, GEORGIA,

        Defendant.

CIVIL ACTION NO.: 2:16-cv-53

## O R D E R

Plaintiffs are African American individuals claiming a connection to Sapelo Island, Georgia, (at times, the "Island"), seeking to hold Defendant McIntosh County, Georgia (the "County") liable for allegedly providing racially discriminatory municipal services to the Island, specifically their community known as Hogg Hummock.[1]  (See doc. 206.)  Presently before the Court are seven motions *in limine*: two filed by Plaintiffs, (docs. 396, 399), and five filed by the County, (docs. 419–23).   The background of this protracted, multi-year litigation is most comprehensively summarized in the Court's Order granting in part and denying in part the County's First Motion for Summary Judgment (the "Summary Judgment Order").  (Doc. 359, pp. 2–18.)  The sole claims remaining for adjudication at trial are Plaintiffs' claims that the County discriminated against them on account of their race by providing inferior fire, trash, EMS and road maintenance services to the Island relative to the predominately white mainland in violation of 42 U.S.C. § 1982, the Equal Protection Clause of the Fourteenth Amendment of the United States

---

[1]  Throughout this case, both sides frequently use varying spellings of the community's name (i.e., Hogg Hummock, Hog Hammock, Hogg Hammock).  Accordingly, while the Court will refer to the community as "Hogg Hummock," quotations from the parties' briefs may employ a different spelling.

Constitution,[2] and Title VI of the Civil Rights Act of 1964.  (See doc. 379, p. 2 n.2 (summarizing previously dismissed claims and clarifying the pending claims in this action); see also docs. 359, 374.)  The parties filed the at-issue motions *in limine* in anticipation of trial, which is set to begin on July 25, 2022, (doc. 384, p. 8), as well as other motions *in limine* which the Court referred to the Magistrate Judge, (docs. 394, 395, 398, 400).[3]  Both parties filed Responses to the other side's Motions, (docs. 427–30, 433, 436, 441), as well as Replies thereto, (docs. 442, 445, 452–456).

For the reasons set forth below, the Court rules as follows:

1.    Plaintiffs' Motion *in Limine* to Exclude Evidence and Argument Concerning Ownership of Roads in Hog Hammock is **DENIED**.  (Doc. 396.)

2.    Plaintiffs' Motion *in Limine* to Exclude Evidence Regarding Fair Market Values Set Through Settlement of Real Property Tax Appeals is **GRANTED**.  (Doc. 399.)

3.    The County's Motion to Exclude Evidence Concerning Services for which Claims Have Been Dismissed is **GRANTED**.  (Doc. 419.)

4.    The County's Motion to Exclude Evidence Concerning Zoning Enforcement is **GRANTED**.  (Doc. 420.)

5.    The County's Motion to Exclude Evidence Concerning Property Taxation is **GRANTED**.  (Doc. 421.)

6.    The County's Motion to Exclude Evidence Concerning Trash Services for Plaintiffs Who Do Not Pay Trash Fee is **DENIED**.  (Doc. 422.)

7.    The County's Motion to Exclude Evidence Concerning Alleged Historical Discrimination is **GRANTED in part and DENIED in part**.  (Doc. 423.)

---

[2]  Plaintiffs' Fourteenth Amendment claim is brought by and through 42 U.S.C. § 1983.  (Doc. 206, pp. 90–91.)

[3]  On July 6, 2022, the Court entered an Order granting in part and denying in part Plaintiffs' Motion to Exclude Testimony of Defendant's Undisclosed Witnesses, (doc. 394), granting Plaintiffs' Motion *in Limine* to Exclude Evidence of an Unrelated Administrative Investigation, (doc. 395), granting Plaintiffs' Motion *in Limine* to Exclude Irrelevant and Prejudicial Evidence Related to Plaintiff Reginald Hall, (doc. 398), and granting in part and denying in part Plaintiffs' Motion to Exclude Irrelevant Evidence of Non-Party Opinions and Media Coverage of the Case, (doc. 400).  (Doc. 465.)

**DISCUSSION**

I.     **Relevant Background Concerning Plaintiffs' Pending and Previously Dismissed Claims**

Throughout the course of this litigation, many parties and claims have been dismissed, both by the Court and voluntarily by Plaintiffs.  The Second Amended Complaint, which is the operative pleading in this case, alleges that the County discriminated against Plaintiffs on account of their race with respect to the provision of various municipal services in violation of Sections 1982 and 1983 and Title VI.  (See doc. 206.)  At summary judgment, the Court determined that Plaintiffs had only presented sufficient evidence to support a jury finding that the County acted with discriminatory purpose and effect regarding the provision of fire, trash, EMS, and road maintenance services (at times, collectively, the "Remaining Services").  (Doc. 359, pp. 54–56, 62–63.)  Accordingly, the Court dismissed Plaintiffs' claims to the extent they were based on the provision of water, leisure, and mosquito control services, as well as zoning enforcement.  (Id.)  The Court also determined that Plaintiffs could not pursue discrimination claims based on expenditures for the Sapelo Island library or community center.  (Id. at p. 18 n.6.)  Additionally, the Court found that Plaintiffs may establish that the County possessed the requisite discriminatory intent to prevail on their claims using the framework from Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252 (1977) ("Arlington Heights").  (Id. at pp. 39–43.)

The parties agree that, in 2012, the County's Board of Tax Assessors (the "Board") and Tax Assessor reassessed the fair market values of Sapelo Island property parcels, a number of which were owned by Plaintiffs in this case.  (See docs. 399, pp. 1–2; doc. 436, pp. 1–2.)  The reassessments, which set (and raised) the taxable values for each parcel and accompanying structures, led to significant increases in the owner's annual property taxes.  (See docs. 399, pp.

1–2; doc. 436, p. 1.)  These increased values were in place for the 2012–2014 tax years.  (See docs. 399, pp. 1–2; doc. 436, pp. 1–2; see also doc. 399-1, pp. 2–3.)  Many Sapelo Island property owners appealed their reassessments to the County Board of Equalization and, subsequently, to the superior court.  (See docs. 399, p. 2; doc. 436, p. 2; see also doc. 399-1, pp. 2–3.)  Approximately twenty Plaintiffs in this case reached settlements with the Board of Equalization in 2015 which significantly lowered the assessed values of the parcels through 2017 (the "Settlement Values") and provided for refunds.  (See docs. 399, p. 2; doc. 436, p. 2; see also doc. 399-1, pp. 2–3.) Around the time these settlements were reached, the County reduced the assessed value for *all* Sapelo Island properties—including those whose owners had not filed an appeal following the 2012 re-appraisal—until 2017.  (See docs. 399, p. 2; doc. 436, p. 2; see also doc. 399-1, pp. 2–3.) To date, the County has maintained these reduced assessed values, though the parties dispute whether these values accurately reflect the parcels' true fair market value.  (See docs. 399, p. 2; doc. 436, p. 2.)

The Second Amended Complaint alleges that the County conducted discriminatory property value appraisals—which form the basis for annual property tax assessments—resulting in Sapelo Island property owners paying significantly higher property taxes in 2012–2014.  (Doc. 206, pp. 69–74, 81, 86–91, 95.)  Plaintiffs also allege that they suffer from emotional distress due to fear of future discriminatory appraisals.  (Id. at p. 73.)  The County successfully moved to have the Board of Tax Assessors removed as a defendant in this case on the grounds that the claims against it were barred by the Tax Injunction Act, 28 U.S.C. § 1341.  (Doc. 158, pp. 38–40.) Subsequently, for the same reasons, the Court dismissed Plaintiffs' claims to the extent they sought relief based on the appraisal process and the resulting higher property taxes for Sapelo Island property owners.  (Doc. 240, pp. 8–12.)

Finally, Plaintiffs' earlier pleadings named as a defendant Stephen Jessup, the County's Sheriff, and alleged that he failed to provide police protection on the Island.  (See docs. 1, 29.) However, Plaintiffs voluntarily dismissed Jessup from the case, (docs 181, 182), and, per order of the Court, (doc. 205), removed all allegations and claims against him from the Second Amended Complaint, (doc. 206).

## II.     The Parties' Motions to Exclude Evidence Related to Previously Dismissed Claims

Many of the parties' motions seek to preclude the other side from introducing evidence concerning claims that have been dismissed by the Court.  (Docs. 399, 419–21.)  Specifically, the County broadly moves pursuant to Federal Rules of Evidence 401, 402 and 403 to exclude evidence related to: municipal services for which Plaintiffs' claims have been dismissed, (doc. 419), zoning enforcement, (doc. 420), and property taxes paid by Sapelo Island property owners prior to 2016, (doc. 421).[4]  The crux of these Motions is that evidence related to previously dismissed claims is irrelevant and its introduction would be unfairly prejudicial, would confuse and mislead the jury, and would waste time.  (See generally docs. 419–21.)  Plaintiffs' Responses to the County's Motions generally contend that the mere fact that the evidence the County seeks to exclude pertains to dismissed claims does not automatically render it inadmissible, and, contrary to the County's position, such evidence is relevant to establishing that the County intentionally discriminated against Plaintiffs with respect to the Remaining Services.  (See generally docs. 427, 429, 433.)  Additionally, Plaintiffs filed a Motion preclude the County from introducing "evidence of the settlement of Sapelo Island property owners' *ad valorem* tax assessment appeals, which set

---

[4]  Rule 401 provides that, to be relevant, evidence must have a "tendency" to make a fact which is "of consequence in determining the action" "more or less probable than it would be without the evidence." Fed. R. Evid. 401. "Irrelevant evidence is not admissible."  Fed. R. Evid. 402.  Additionally, Rule 403 permits the exclusion of relevant evidence if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

new, negotiated fair market values for Sapelo Island real property parcels." (Doc. 399.) Plaintiffs contend, *inter alia*, that the tax appeals and the Settlement Values set pursuant to the settlements are not relevant "to any issue that must be determined by the jury" at trial. (Id. at p. 4.)

In general, evidence related to previously dismissed claims is not relevant and, therefore, is inadmissible under Rule 402. See Anderson v. Brown Indus., No. 4:11-CV-0225-HLM, 2014 WL 12521732, at *4 (N.D. Ga. Mar. 14, 2014) (collecting cases). "District courts routinely exclude evidence and argument related to previously dismissed claims as irrelevant and prejudicial." DeBose v. Univ. of S. Fla. Bd. of Trustees, No. 8:15-CV-2787-EAK-AEP, 2018 WL 8919981, at *2 (M.D. Fla. Sept. 9, 2018) (collecting cases). However, evidence pertaining to a previously dismissed claim is not *necessarily* inadmissible; "[t]here could be evidence related to claims that were dismissed on summary judgment that are also relevant to [pending] claims." McDaniel v. Smith, No. 5:07-cv-079, 2011 WL 13238726, at *1 (S.D. Ga. June 15, 2011). Indeed, the "mere fact that a claim has been dismissed does not automatically render all evidence pertaining to that claim irrelevant and inadmissible." Holmes-Martin v. Sebelius, No. 07-2128, 2011 WL 13244746, at *1 (D.D.C. Mar. 3, 2011) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002)). "Rather, the admissibility of evidence pertaining to extinguished claims is governed by the same principles that govern the admissibility of evidence, such as relevance, unfair prejudice and confusion to the jury." Id. (citing Lyons v. England, 307 F.3d 1092, 1110 (9th Cir. 2002) (concluding that "background evidence" of time-barred prior discriminatory acts is admissible if relevant and not unfairly prejudicial). Thus, the Court will not automatically exclude any evidence pertaining to dismissed claims, and, instead, will evaluate the relevance and potential prejudicial effect of the evidence the parties seek to exclude under Rules 401, 402, and 403.

### A.   The County's Motion to Exclude Evidence Concerning Services for Which Claims Have Been Dismissed (Doc. 419)

The County's Motion to Exclude Evidence Concerning Services for Which Claims Have Been Dismissed seeks slightly different relief depending on the services at issue.  (See generally docs. 419, 452.)  Thus, the Court will address them in sections.

### (1)   Law Enforcement, Leisure, Mosquito Control, and Library Services, and the Sapelo Island Senior Center

The County argues that the Court should exclude "[a]ny evidence Plaintiffs may seek to present regarding" law enforcement, leisure, mosquito control, and library services, and the Sapelo Island Senior Center (at times, collectively, the "Dismissed Services") because it "is irrelevant to [the] evaluation of Plaintiffs' remaining claims." (Doc. 419, p. 3.)  The County bases its relevancy argument solely on the fact that, as noted above, Plaintiffs' claims for recovery pertaining to these services have been dismissed.  (See id. at pp. 1–4; see docs. 181, 182 (law enforcement); doc. 359, pp. 18 n.6, 54–56, 62–63 (leisure, mosquito control, library, community center).)  The County also contends that, to the extent that this evidence has any probative value, it should be excluded under Rule 403 because it "could easily confuse and mislead the jury, which is tasked with determining whether the County has discriminated only with respect to [fire, EMS, trash, and road maintenance services]." (Doc. 419, pp. 3–4.)

To be relevant, evidence must have a "tendency" to make a fact which is "of consequence in determining the action" "more or less probable than it would be without the evidence." Fed. R. Evid. 401.  "The relevance bar is quite low." Travelers Indem. Co. of Conn. v. Paschal, No. 4:17-CV-00066-HLM, 2018 WL 6422716, at *2 (N.D. Ga. July 27, 2018).  "To determine whether a fact is of consequence, [the Court] looks to the elements of the cause of action." Johnson v. Jennings, 772 F. App'x 822, 825 (11th Cir. 2019); see also S. Grande View Dev. Co. Inc. v. City

7

of Alabaster, 1 F. 4th 1299, 1309 (11th Cir. 2021).  All of Plaintiffs' remaining claims are based

on disparate treatment, which requires them to prove that the County acted with discriminatory

intent.  (See doc. 359, pp. 39–43.)  Thus, the central issue for the jury to determine will be whether

the County provided inferior trash, fire, EMS, and road maintenance services on the Island relative

to the predominately white mainland due to discriminatory animus.  See Steele v. City of Port

Wentworth, No. 4:05-cv-135, 2008 WL 717813, at *13 (S.D. Ga. Mar. 17, 2008) ("The Complaint

alleges that the City has provided African-American residents with inferior municipal services on

the basis of race. . . .  To prevail on these claims, Plaintiffs must show that the disparity in services

is caused by 'discriminatory intent.'").  "Determining whether invidious discriminatory purpose

was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence

of intent as may be available."  Arlington Heights, 429 U.S. at 266.  In Arlington Heights, the

Supreme Court set forth numerous factors courts "might properly consider in judging whether

invidious discrimination permeated official action."  Jean v. Nelson, 711 F.2d 1455, 1485 (11th

Cir. 1983).  The Eleventh Circuit has summarized these factors as follows:

> (1) the impact of the challenged [government action]; (2) the historical background;
> (3) the specific sequence of events leading up to [the government action]; (4)
> procedural and substantive departures; and (5) the contemporary statements and
> actions of key legislators[;] . . . (6) the foreseeability of the disparate impact; (7)
> knowledge of that impact, and (8) the availability of less discriminatory
> alternatives.

Greater Birmingham Ministries v. Sec'y of State of Ala., 992 F.3d 1299, 1322–32 (11th Cir. 2021).

Additionally, "[t]he Eleventh Circuit has identified a non-exhaustive list of circumstantial factors

that may be probative of discriminatory intent, including (1) 'the magnitude of the disparity;' (2)

'the legislative and administrative pattern of decision-making;' and (3) that a 'continued and

systematic relative deprivation of the black community was the obviously foreseeable outcome'

of the policies or decisions."  Steele, 2008 WL 717813, at *14 (quoting Dowdell v. City of Apopka,

698 F.2d 1181, 1186 (11th Cir. 1983)).  No factor is dispositive, and courts should consider the "totality of the relevant facts."  <u>Dowdell</u>, 698 F.2d at 1186 (citing <u>Washington v. Davis</u>, 426 U.S. 229, 242 (1976)).

Evidence pertaining to these Dismissed Services on the Island is, at best, only minimally relevant to the County's discriminatory intent.  While the evidence admittedly could shed some light on the alleged general disparity between the quality or availability of the governmental services offered on the Island relative to the mainland and perhaps also on the County's "legislative and administrative pattern of decision-making" as it pertains to the Remaining Services, <u>see, e.g.</u>, <u>Ammons v. Dade City</u>, 594 F. Supp. 1274, 1277, 1281 (M.D. Fla. 1984) (citing the city's deficient response to requests for additional fire hydrants, despite the fact that the only municipal services which remained subject to challenge were "street paving, street resurfacing and maintenance, and storm water drainage facilities"), this evidence should nonetheless be excluded under Rule 403. Rule 403 allows for the exclusion of relevant evidence if "its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.  Here, the probative value of evidence pertaining to the Dismissed Services is substantially outweighed by the risk of confusing the issues, misleading the jury, and wasting time. The Court already determined at summary judgment that Plaintiffs failed to identify sufficient evidence that the County acted with discriminatory purpose and effect with respect to the provision of the Dismissed Services on the Island.  (Doc. 359, pp. 54–56.)  Therefore, permitting Plaintiffs to introduce evidence pertaining to the Dismissed Services likely would influence jurors to believe that they are tasked with evaluating whether the County acted with discriminatory intent with respect to *both* the Dismissed and the Remaining Services—not just the Remaining Services.  <u>See</u>

Purdee v. Pilot Travel Centers, LLC, No. 4:07-cv-028, 2010 WL 11537542, at *1 (S.D. Ga. Jan. 11, 2010) ("[T]he evidence will refer to events not the subject of the case, creating a risk that it will confuse the jury."). The admission of this evidence could permit Plaintiffs to wage an improper "campaign" against the County for conduct for which it is not on trial, Sebelius, 2011 WL 13244746, at *2, thereby "distracting the jury from [its] central obligation to decide" whether the County intentionally discriminated against Plaintiffs *solely* with respect to the Remaining Services, Tracy v. Fla. Atl. Univ. Bd. of Trustees, 980 F.3d 799, 813 (11th Cir. 2020). Furthermore, allowing Plaintiffs to introduce this evidence would waste precious time in a case that the parties already anticipate will take weeks to try. Anderson, 2014 WL 12521732, at *4 ("At a minimum, evidence concerning . . . previous claims would waste the Court's time and likely confuse the jury."). Indeed, excluding this evidence will help to avoid bogging the Court and the jury down with ancillary issues related to these Dismissed Services, such as disputes over how those services were provided and their quality relative to those provided in other areas of the County. McDaniel, 2011 WL 13238727, at *2 ("The Court will not waste time on a series of mini-trials of Defendant's past conduct that does not directly relate to the case at bar. Such evidence will only serve to confuse the jury on the present issues and unduly prejudices Defendant.").

Based on the forgoing, the Court **GRANTS** the County's Motion to the extent it seeks to exclude evidence concerning the provision of law enforcement, leisure, mosquito control, and library services, and the Sapelo Island Senior Center. (Doc. 419.)

### (2)   Water Services

The County also moves to exclude certain evidence concerning water services. (Doc. 419, p. 4; see also doc. 452, pp. 3–5.) The County concedes that "[b]asic factual information about the manner in which [water] services currently operate on Sapelo [Island] may be relevant to a jury's

understanding of the operation of some of the [Remaining Services]," particularly fire services. (Doc. 419, p. 4.)  However, the County contends that "any evidence or argument about water . . . services that suggests that [the] County does, could, or should play a role in the operation of [water] services on Sapelo [Island], is inaccurate and prejudicial."  (<u>Id.</u> at p. 4.)  Thus, the County solely moves to exclude evidence and argument "suggesting that [the] County is responsible for, or has any obligation or ability to change, the current operation of the water . . . services on Sapelo Island."  (<u>Id.</u>)  For the reasons and per the limitations set forth below, the Court grants the Motion with respect to water services.  (Doc. 419.)

The parties agree that the State—and not the County—provides water services to Hogg Hummock.  (<u>See</u> <u>id.</u> at p. 4; <u>see also</u> doc. 427, p. 4.)  In fact, the Court has found that "[e]vidence from the record reveals that Hogg Hummock receives its water from a system installed by the State of Georgia and does not receive water from [the] County's water system."  (Doc. 359, p. 48 (citing doc. 345-41, pp. 5–6).)  Plaintiffs contend that "the County's choice not to provide water to Hog Hammock is probative of the County's treatment of Hog Hammock in general," along with evidence that the County has not allocated to Hogg Hummock the "millions of dollars in federal funding [it received] to expand County residents' access to water."  (Doc. 427, p. 4.)  Yet, the Court has already determined that the County's use of "federal grants to improve its water system on the mainland . . . does not evince some special treatment or preference by the County for the mainland because the State [of Georgia's] [Department of Natural Resources] and not the County provides the water services to Sapelo Island."  (Doc. 359, p. 48.)  In dismissing Plaintiffs' water-services-based claims, the Court noted that Plaintiffs failed to identify case law "indicating that a disparate impact can be attributed to one governmental authority where the at-issue service is provided to the plaintiffs by another governmental authority."  (<u>Id.</u>)  Indeed, as the Court

recognized, Eleventh Circuit precedent suggests that a governmental entity owes "no duty to service areas owned by other governmental authorities." (Id. (quoting Ammons, 783 F.2d 982 at 1986).)  Therefore, the fact that the County does not provide water services to Hogg Hummock or did not expend federal grant money to improve the Island's water systems is irrelevant.

Furthermore, allowing Plaintiffs to introduce such evidence would be unfairly prejudicial, as it would mislead the jury into assessing the County's discriminatory animus with respect to a service which the County does not provide to Hogg Hummock and which is no longer at issue in this case.  See Finney v. Bibb Cnty. Pub. Schs., No. 5:02-CV-468 (DF), 2005 WL 8165543, at *2 (M.D. Ga. Oct. 5, 2005) ("[Because] these allegations are no longer part of the lawsuit[,] any mention of them would . . . serve to mislead and confuse the jury and to waste time[.]").  Accordingly, pursuant to Rules 402 and 403, the Court prohibits the parties from introducing evidence pertaining to the County's expenditure of the aforementioned federal grant money. However, because the parties agree that evidence concerning the *operation* of water services on the Island may be relevant to understanding how the Remaining Services are provided, the Court will allow the parties to present evidence—including the fact that the State (and not the County) is responsible for Hogg Hummock's water—for this purpose.  (See doc. 419, p. 4; doc. 427, pp. 3–4.)  To avoid any potential prejudice or confusion, the Court will consider providing—if necessary based on the evidence presented during trial—a limiting instruction to the jury that it cannot consider the State's provision of water services to Hogg Hummock (or the quality of those services) as evidence that the County intentionally discriminated against Plaintiffs with respect to the Remaining Services.

Based on the forgoing, and subject to the limitations just described, the Court **GRANTS** the County's Motion to the extent that it seeks to limit evidence related to water services to

background evidence concerning the operation of the Island's water systems, which may be relevant to Plaintiffs' remaining claims.

### (3)   Ferry Services

The County moves to exclude certain evidence concerning ferry services.  (Doc. 419, p. 4.)  As with water services, the County acknowledges that evidence related to the ferry may be relevant to the operation of other Remaining Services, particularly EMS.  (Id.)  Thus, the County only seeks to preclude testimony or argument that the County is responsible for providing ferry services to the Island; it does not challenge evidence regarding the ferry being offered to provide background information pertinent to the Remaining Services.  (Id.)  Plaintiffs do not appear to oppose the County's Motion to the extent it is based upon ferry services.  (Doc. 427, p. 3.)  Specifically, Plaintiffs' Response states that they "have not identified exhibits related to ferry service and do not intend to introduce evidence or elicit testimony on the subject of the County's responsibility related to ferry service."  (Id.)  As such, the County's Motion is **GRANTED** as it pertains to evidence or argument that the County is responsible for providing ferry services.  However, the Court will allow background information about the ferry to the extent that it is relevant to explain the operation of any of the Remaining Services, subject to a limiting instruction that the jury shall not consider it when evaluating whether the County acted with discriminatory intent with respect to Plaintiffs' remaining claims.

### B.   The County's Motion to Exclude Evidence Concerning Zoning Enforcement (Doc. 420)

The County's Board of Commissioners drafts the County's zoning ordinances, (see doc. 344-16, p. 42), one of which sets Hogg Hammock's "[m]aximum dwelling size" at 1,400 square feet, (doc. 343-12, pp. 3–4).  The ordinance also contains a statement of intent "to reserve [the Hogg Hummock District] for low intensity residential and cottage industry uses which . . . will not

contribute to land value increases which could force removal of the indigenous population." (Doc. 343-12, p. 3.)  The County acknowledges that "the ordinance may be relevant to Plaintiffs' remaining claims" (though it does not clearly explain how) but objects to Plaintiffs pointing to the ordinance and raising the issue of whether the County has "met the intent" of the ordinance.  (Doc. 453, p. 1; see also doc. 420, p. 4.)  The County argues that "evidence about zoning enforcement is subject to exclusion for the same reasons as evidence about the [Dismissed Services]"; namely, that it is irrelevant because the Court has dismissed Plaintiff's zoning enforcement-based claims and because its admission would be prejudicial, confuse the jury, and waste time.  (Doc. 420, p. 1; see also id. at pp. 2–5.)  Plaintiffs, on the other hand, argue that the County's failure to enforce the zoning ordinance is relevant "historical background" evidence of the County's discriminatory intent under Arlington Heights.  (Doc. 429, pp. 3–4.)  Plaintiffs also contend that the ordinance's statement of intent is "probative of the foreseeability of the impact of the [County's] treatment of Hog Hammock residents."[5]   (Id. at p. 2 (citing Jean, 711 F.2d at 1486 (noting that the "foreseeability of discriminatory impact" is relevant to evaluating whether a defendant had discriminatory intent).)  According to Plaintiffs, "the County's recognition of the vulnerability of the Hog Hammock community makes the negative impact of failing to provide services to that community foreseeable, such that it is relevant."  (Id. at p. 3.)  The County replies that questioning

---

[5]  Additionally, Plaintiffs argue that they must be permitted to introduce evidence of the County's zoning enforcement decisions if the County is allowed to introduce "evidence of property values."  (Doc. 429, pp. 5–6.)  Specifically, Plaintiffs argue that the County "has proposed considerable evidence that appears to relate solely to property values and development on Sapelo Island" which cannot be responded to "without discussing enforcement of the zoning ordinance."  (Id. at p. 5.)  However, it is unclear to what extent the "evidence of property values" Plaintiffs refer to qualifies as evidence of pre-2016 property taxes or Settlement Values, which the Court is excluding, see Discussion Sections II.C–D, infra, or something else.  Therefore, the Court denies Plaintiffs' ambiguous request since it "cannot fully determine whether the evidence should be excluded prior to trial."  DeJesus v. Wal-Mart Stores E., LP, No. 2:19-cv-142, 2021 WL 5501816, at *2 (S.D. Ga. July 12, 2021).  Plaintiffs may make objections related to this issue at trial as argument is made and evidence presented.  Id.

whether the County fulfilled the ordinance's statement of intent "go[es] directly to the matter of zoning enforcement, and [is] entirely unrelated to the County's provision of [the Remaining Services]." (Doc. 452, pp. 1–2.) Additionally, the County reiterates that evidence concerning zoning enforcement should be excluded under Rule 403, regardless of its relevance. (Id. at p. 3.)

The County has the better of the argument. First, Plaintiffs' "foreseeability of discriminatory impact" argument fails. The statement of intent language, at most, indicates that the County could foresee that, absent certain zoning restrictions, land value increases could occur which could, in turn, force removal of the indigenous population. (See doc. 343-12, p. 3.) Moreover, the "foreseeability of discriminatory impact" analysis is only relevant where there has been a showing that the at-issue action or decision (here, the County's enforcement of the zoning ordinance) actually had a discriminatory effect. (See doc. 429, pp. 2–3.) Here, however, the Court dismissed Plaintiffs' zoning enforcement claims because there was no evidence of a disparate impact with respect to the County's enactment and enforcement of its zoning ordinance. (Doc. 359, pp. 48–49, 54–55.) Specifically, the Court determined that Plaintiffs failed to "point[] to evidence showing that [the County's] zoning ordinance is being unequally enforced" or to "show that the County enforced [it] more stringently with them than with white individuals." (Id. at p. 49.) Nonetheless, Plaintiffs maintain that the County's *failure* to enforce the ordinance remains relevant because the Court "explicitly recognized that the record contained evidence that the County had failed to enforce the 1,400 square foot maximum dwelling size requirement." (Doc. 429, p. 3 (citing doc. 359, p. 49).) It is true that the Court alluded to evidence in the record indicating that the County has approved building permits which exceed 1,400 square feet. (Doc. 359, p. 49 (citing doc. 344-37, p. 2).) However, the Court fails to see—and Plaintiffs have not satisfactorily explained—how the County's non-enforcement of this provision is probative of the

County's discriminatory intent with respect to the *Remaining Services*, when the Court already determined that there was not even evidence that the County's *zoning enforcement* decisions had a discriminatory purpose or effect.  (See doc. 359, pp. 54–55.)

Next, although Plaintiffs contend that courts in this circuit "have made clear that evidence of a municipality's enforcement of laws not directly governing the services at issue is relevant historic information," the lone case it cites for that proposition, Dowdell v. City of Apopka, 511 F. Supp. 1375 (M.D. Fla. 1981), is distinguishable on its facts.  (Doc. 429, p. 4.)  The ordinance in Dowdell explicitly segregated black residents and prohibited them from living in certain areas of town.  511 F. Supp at 1378.  A segregation ordinance is clearly more probative of discriminatory intent than the County's benign zoning ordinance, which regulates square footage and expressly states that its purpose is to accommodate the "unique needs" of the Hogg Hummock community. (Doc. 343-12, p. 3.)  Furthermore, more importantly, the district court in Dowdell determined that although the segregation ordinance had not been enforced, there was "evidence that its existence persuaded blacks to dispose of real property owned by them," 511 F. Supp. at 1378, and the Eleventh Circuit ruled on appeal that the ordinance had "contributed to the ghetto-like qualities of the black residential area," Dowdell, 698 F.2d 1181,1186 (11th Cir. 1983).  In this case, however, the Court held that Plaintiffs had failed to point to any evidence that the County's zoning decisions had a disparate impact on Hogg Hammock residents.  (Doc. 359, pp. 48–49, 54–55).  Thus, Dowdell does not convince the Court that the County's zoning ordinance, or its failure to enforce the ordinance, is relevant to Plaintiffs' remaining claims.

Additionally, the Court doubts—though it does not conclusively decide—that the County's prior enforcement decisions are proper "historical background" evidence under Arlington Heights. In Greater Birmingham Ministries, the Eleventh Circuit noted that the Supreme Court's "historical

background" analysis in <u>Arlington Heights</u> focused on the "specific sequence of events leading up to the challenged decision," and did not provide "an unlimited look-back to past discrimination." 992 F.3d at 1325 (citing <u>Arlington Heights</u>, 429 U.S. at 267).  Just a few months ago, the Eleventh Circuit confirmed that this is the proper approach.  <u>See</u> <u>League of Women Voters of Fla, Inc. v. Fla. Sec'y of State</u>, 32 F.4th 1363, 1373 (11th Cir. 2022) ("<u>Arlington Heights</u>'s 'historical background' factor should be 'focus[ed] . . . on the specific sequence of events leading up to the challenged decision' rather than 'providing an unlimited lookback to past discrimination.'") (internal quotations omitted) (quoting <u>Greater Birmingham Ministries</u>, 992 F.3d at 1325). Accordingly, consistent with the Court's analysis in the Summary Judgment Order, background evidence offered by the parties should be limited to "the specific sequences of events leading to the County's actions and decisions with regards to [the Remaining Services]."  (<u>See</u> doc. 359, pp. 52–53.)  Because the Court dismissed Plaintiffs' zoning-enforcement claims, the County's decisions not to enforce the zoning ordinance are no longer "challenged decision[s]."  <u>League of Women Voters of Fla, Inc.</u>, 32 F.4th at 1373.  Nor is there any indication that the County's zoning decisions are part of the "specific sequence of events leading up to" its decisions concerning the Remaining Services, or that they influenced or somehow are representative of those decisions in any material respect.  <u>Id.</u>

Regardless, even if zoning enforcement evidence were relevant to the County's intent and proper under <u>Arlington Heights</u>, it should—like other evidence related to previously dismissed claims—be excluded under Rule 403 because its probative value is substantially outweighed by the danger of confusing and misleading the jury to consider whether the County intentionally discriminated against Plaintiffs with respect to conduct which is no longer at issue.  <u>See</u> Discussion Sections II.A.1 & 2.  Additionally, it likely would waste time because, as the County aptly states,

"the matter of zoning enforcement encompasses multiple sub-topics, including [the] application for and issuance of building permits[,] enforcement of local, state, and federal building regulations[,] and construction oversight." (Doc. 420, p. 4.) Indeed, Plaintiffs' Amended Exhibit List includes a "Compilation of McIntosh County Building Permits," the various provisions of which would have to be broken down and explained to the jury. (Doc. 466, p. 5 (Exhibit No. 117); see doc. 392-57.) Furthermore, Plaintiffs' Witness List indicates that Archie Davis, the County's current Special Projects Manager and Rule 30(b)(6) deponent with respect to zoning issues, may testify. (Doc. 389, p. 2; see doc. 344-96, pp. 1–2.) During his deposition, Davis testified about the process of issuing building permits for new constructions in Hogg Hummock, including the role of the historic preservation committee and the mathematical process of determining the minimum height for structures in flood plains. (See doc. 344-36, pp. 10–11, 16–17.) There is a great chance that subjecting the jury to this (or similar) minuity, which does not bear on the County's provision of the Remaining Services, would consume significant time and cause unfair prejudice to the County.

Based on the foregoing, the Court **GRANTS** the Motion, thereby prohibiting the parties from introducing evidence related to the County's enforcement of its zoning ordinance. (Doc. 420.)

### C. The County's Motion to Exclude Evidence Concerning Property Taxation (Doc. 421)

The County argues that the Court should exclude "testimony and evidence concerning *ad valorem* taxes on Sapelo Island prior to the comprehensive downward adjustment of Sapelo Island properties in 2016, which inured to the benefit of all Sapelo Island taxpayers." (Doc. 421, p. 3.) Specifically, the County moves to preclude any evidence or "testimony concerning property appraisal and assessments, assessed values, value increases, payment of property taxes, or

associated emotional distress for any pre-2016 taxation."[6]  (Id.)  According to the County, evidence of pre-2016 property taxes is irrelevant and has no "impact on the claims and parties remaining in this case" because the Court has already determined that "any relief stemming from . . . Plaintiffs' allegations concerning the pre-2016 property tax assessments on Sapelo Island" are barred by the Tax Injection Act.  (Id. at pp. 3–4.)  Plaintiffs respond that "evidence regarding the County's property tax assessments prior to the tax appeal settlements is relevant to Plaintiffs' remaining claims regarding [the County's] discriminatory failure to provide municipal services to Hog Hammock."  (Doc. 433, p. 2.)  According to Plaintiffs, the "County's taxation of Plaintiffs as property owners in Hog Hammock is inextricably intertwined with [its] responsibility to provide municipal services in an equitable manner," and the jury cannot resolve Plaintiff's remaining claims without "the context of how those services are funded and Plaintiffs' contributions to those funds through property taxes."  (Id.)  The County replies that "Plaintiffs do not need to introduce evidence of the amount of taxes that they have paid to demonstrate their claimed entitlement to services," and the introduction of such evidence would be prejudicial, confusing, and time-wasting.  (Doc. 454, p. 3.)  As set forth below, evidence concerning pre-settlement property taxes is, at best, minimally relevant to the Plaintiffs' remaining claims and, regardless, it should be excluded under Rule 403.

---

[6] It is unclear whether the County seeks to preclude Plaintiffs from introducing evidence of the Settlement Values, despite its objection to Plaintiff's Motion to exclude the same. (See doc. 436.)  Specifically, the Court is uncertain whether the Settlement Values qualify as "property appraisal and assessments" or "assessed values . . . for any pre-2016 taxation" which the County contends are inadmissible. (Doc. 421, p. 3.)  On the one hand, it seems like the Settlement Values qualify as a pre-2016 "assessed value" because, according to the County, the 2015 settlements "re-valued" Sapelo Island properties "at only slightly higher values than those reflected in 2011 assessments."  (Id. at pp. 1–2.)  On the other hand, the parties appear to agree that, pursuant to the terms of the settlement, the Settlement Values were used to calculate property taxes during the 2016–2017 tax year.  (Id.; see also doc. 399, p. 2.)  Indeed, Plaintiffs appear to interpret the County as seeking to exclude "evidence regarding the County's property tax assessments *prior to the tax appeal settlements*."  (Doc. 433, p. 2 (emphasis added).)  In any event, to the extent that the County argues that the Settlement Values should not be admitted, the Court agrees for the reasons set forth in Discussion Section II.D, infra.

At the motion to dismiss stage, the Court dismissed Plaintiffs' claims to the extent they were "based on [the] County allegedly having conducted unequal and discriminatory tax appraisals" and the ensuing spike in property taxes paid by Sapelo Island property owners from 2012–2014.  (Doc. 240, pp. 8–12 (incorporating the Court's reasoning in its Order dismissing the Board of Tax Assessors as a defendant, doc. 158, pp. 38–40).)  Notwithstanding, Plaintiffs insist that "evidence regarding the nature, amount, and collection of . . . property taxes[] and how they are (or are not) used in Hog Hammock is directly relevant to Plaintiffs' claims that the County inequitably provided the [Remaining Services]."  (Doc. 433, p. 3.)  Evidence that taxpaying Island residents received inferior municipal services despite paying much higher property taxes is, at best, minimally relevant to Plaintiffs' remaining claims.  The Court recognized in the Summary Judgment Order that "property owners have an expectation of receiving municipal services in exchange for property taxes."  (Doc. 359, p. 24.)  Additionally, as Plaintiffs point out, there is evidence in the record that "[p]roperty taxes account for a significant portion of the county's revenue," (doc. 433, p. 2 (citing doc. 433-1, p. 4)), and evidence of how the County allocates the revenue it receives from property taxes towards providing the Remaining Services arguably relates to the "specific sequence of events leading up to the challenged action[s]." Arlington Heights, 429 U.S. at 267.  Indeed, a juror could find evidence that the County did not provide fire, EMS, trash, or road maintenance services that were commensurate with the significantly higher taxes the Island residents paid following the 2012 re-appraisal to be probative of the County's discriminatory animus.  Additionally, the way the County used (or failed to use) property taxes to fund the Remaining Services on the Island could reveal a "legislative and administrative pattern of decision making" indicative of unlawful discrimination. Dowdell, 698 F.2d at 1186.

Notwithstanding this potential probative value of the at-issue tax-related evidence, such value is substantially outweighed by the risk of unfair prejudice, confusing the issues, misleading the jury, and wasting time.  It is undisputed that the amount of property taxes paid by Sapelo Island property owners is based upon their parcels' appraised value.  (See doc. 421, pp. 1–2, doc. 399, pp. 1–2; see also doc. 206, p. 73 ("McIntosh County Board of Tax Assessors' appraisals of real property in the County form the basis for annual tax assessments that the County collects from its residents.").)  Thus, in order to present property tax evidence to the jury, the parties likely would have to go into detail about the Board's appraisal process.  In fact, Plaintiffs concede that they intend to call an expert witness, Steve Fentriss, and to present other evidence to establish that the County "failed to collect property tax dollars in Hog Hammock pursuant to an accurate and consistent process."  (Doc. 433, p. 3.)  Fentriss's expert report summarizes Georgia's revaluation and tax appraisal process and describes in detail its components, which include creating "land value schedules, replacement cost schedules[,] . . . and depreciation schedules," producing "Preliminary Sale Ratio Studies" to "measure assessments compiled from said schedules against prices of recently sold parcels," and the use of various valuation techniques "[p]ertinent to schedule development."  (Doc. 343-39, pp. 4–5.)  Fentriss's testimony at trial presumably would delve into these intricacies, as well as describe the "sales-ratio analysis based on recent Sapelo Island land sales" that Plaintiffs allege was improperly used by the Board in 2012 and which contributed to the pre-settlement tax increases.  (Doc. 206, p. 69; see 399-1, pp. 2–3.)  Given the detailed nature of the appraisal process, allowing the parties to present evidence pertaining to it, and, inevitably, offer evidence to clarify or rebut each other's evidence or bicker over the details, would waste time in a case that is already complex.  See LeBlanc v. Nortel Networks Corp., No. 3:03-CV-65 (CAR), 2006 WL 8445961, at *9 (M.D. Ga. June 30, 2006) (excluding exhibits because they would "serve

only to introduce unnecessary complexity into an already complicated case").  Furthermore, in order to show whether the Plaintiffs received services commensurate with their higher property taxes in 2012–2014, the parties would have to present detailed evidence to the jury about the amount of taxes they paid, the County's budget, and the process by which the County allocates revenue generated from property taxes to fund the services it provides to taxpayers.  This would create the incorrect and prejudicial impression to the jury that it must decide whether the Board— which was dismissed from this action in 2017, (doc. 158, pp. 38–40)—engaged in a purportedly discriminatory appraisal process, despite the Court's dismissal of claims based thereon.  Therefore, this evidence should be excluded under Rule 403.

Based on the foregoing, the Court **GRANTS** the County's Motion, thereby prohibiting either party from introducing any evidence concerning the amount of pre-settlement property taxes paid by Plaintiffs or other Island residents, as well as the appraisal process by which those taxes were assessed.  However, as property ownership and payment of property taxes is foundational to most if not all of the Plaintiffs' standing, the Court clarifies that it will allow Plaintiffs to offer evidence that any of them *paid* property taxes, and, as taxpayers, were entitled to municipal services from the County.  (See doc. 359, pp. 23–24.)

### D.  Plaintiffs' Motion to Exclude Evidence Regarding Fair Market Values Set Through Settlement of Real Property Tax Appeals (Doc. 399)

Plaintiffs move to preclude the County "from offering evidence of the settlement of Sapelo Island property owners' *ad valorem* tax assessment appeals, which set new, negotiated fair market values for Sapelo Island real property parcels."  (Doc. 399, p. 1.)  Plaintiffs argue, *inter alia*,[7] that

---

[7]  Plaintiffs also seek to exclude the Settlement Values and related evidence as improper evidence of a settlement under Rule 408, which prohibits the admission of evidence of "accepting, promising to accept, or offering to accept . . . a valuable consideration in compromising or attempting to compromise the claim." Fed R. Evid. 408(a)(1); (see doc. 399, pp. 3–4).  The Court need not address this argument because it finds that this evidence is excludable under Rules 402 and 403.  See Discussion Section II.D, infra.

this evidence should be excluded because it is irrelevant and prejudicial.  (Id. at pp. 4–6.)
Specifically, Plaintiff argues that the "resolution of the Sapelo Island property owner tax appeals
and the Settlement Values set pursuant to those settlements are not relevant to any issue that must
be determined by the jury in this matter."  (Id. at p. 4.)

      The Court agrees.  The Settlement Values do not appear to have any tendency to make it
more or less probable that the County provided the Remaining Services with discriminatory
purpose and effect.  Fed. R. Evid. 401.  Indeed, the County concedes that "the claims that were
settled by [the] tax appeal settlements at issue and the claims at issue in the present case are
unequivocally not the same claims."  (Doc. 436, p. 4.)  Nonetheless, the County insists that "[t]he
evidence that Plaintiffs benefit from favorable property taxes [after the settlements] is relevant to
counter Plaintiffs' claims of historical and current discrimination by [the County] under" Arlington
Heights.  (Doc. 436, p. 6.)  According to the County, it "would offer evidence of the artificially
low property taxes on Sapelo Island to counter the Plaintiffs' purported evidence of historical
discrimination by local government entities."  (Doc. 436, p. 5.)  However, the Court already
decided—on the County's motion—to exclude any evidence concerning the 2012 appraisal process
and the pre-settlement property taxes paid by Sapelo Island property owners because of the
significant risk of unfair prejudice, confusion to the jury, and wasting time.  See Discussion Section
II.C, supra.  Indeed, notably, in its Reply in support of its Motion to exclude that evidence, the
County argued that the introduction of "pre-2016 fair market values" would be "confusing and
misleading to jurors" and would "be an inefficient use of time at trial."  (Doc. 454, p. 3.)  This
argument flies in the face of the County's Response to Plaintiffs' at-issue Motion, which contends
that "the jury will be able to understand the import of ad valorem taxes and that the introduction
of evidence with regard to [the] same will not amount to a waste of time."  (Doc. 436, p. 6.)

Indeed, even if evidence of the tax appeals and the Settlement Values were relevant, its probative value would be substantially outweighed by the risk of confusing the issues and misleading the jury to consider claims that are no longer part of this case. It would also waste time given the complex evidence that would be needed to contextualize and understand the appeals process and the Settlement Values, such as testimony to explain the County's re-appraisal and property valuation processes. See Discussion Section II.C, supra (finding that the complexity of the evidence that would likely be presented to the jury to explain property re-appraisal and tax assessments weighs in favor of excluding such evidence under Rule 403).

Based on the forgoing, the Court **GRANTS** Plaintiff's Motion and, accordingly, will exclude evidence related to the settlement of Sapelo Island property owners' *ad valorem* tax assessment appeals and the resulting Settlement Values pursuant to Rules 402 and 403. (Doc. 399.)

## III. The County's Motion to Exclude Evidence Concerning Alleged Historical Discrimination (Doc. 423)

The County seeks to exclude the following evidence that it anticipates Plaintiffs will use to show an alleged history of racial discrimination by the County: (1) portions of the deposition of former County Commissioner Charles Jordan; (2) the case, McIntosh County Branch of the NAACP v. City of Darien, 605 F.2d 753 (5th Cir. 1979) (the "City of Darien Case"); (3) the book Praying for Sheetrock; and (4) any "vague or general references to historical discrimination" by the County. (Doc. 423, pp. 1–8.) The County generally argues this evidence is improper "historical background" evidence under Arlington Heights. (Id. at pp. 2–8.) The County also contends, *inter alia*, that certain of the evidence it challenges is inadmissible under Rule 403 due to the risks of unfair prejudice and misleading the jury. (Id. at pp. 2, 4–5.)

### A.        The City of Darien Case

Plaintiffs concede that they do not seek to introduce the City of Darien Case as an exhibit or to illicit any testimony related thereto, and, therefore, they do not appear to oppose the Motion with respect to this evidence.  (Doc. 428, pp. 1–2.)  Therefore, the Court **GRANTS** the County's Motion to the extent it seeks to preclude Plaintiffs from introducing evidence related to the City of Darien Case.

### B.        <u>Praying for Sheetrock</u> and "Vague or General References to Historical Discrimination"

In the Summary Judgment Order, the Court declined to consider the book <u>Praying for Sheetrock</u> as evidence of a history of race discrimination by the County, as Plaintiffs had not demonstrated that it was anything other than inadmissible hearsay.  (<u>See</u> doc. 359, p. 52 n. 26.)  In its Motion, the County moves to exclude "any references to the book in argument and any testimony, or questions seeking to elicit testimony, *related to the book or the events described therein*."  (Doc. 423, p. 8 (emphasis added).)  The County reasons that such evidence is "beyond the scope of information relevant to an analysis of the historical background of the provisions of services on Sapelo Island."  (<u>Id.</u> at p. 7.)  The County also moves to prevent "any vague or general references by Plaintiffs or their experts[] to historical discrimination by the County" on the same basis.  (<u>Id.</u> at p. 8.)  Plaintiffs respond that the Court should refuse to exclude this evidence because the County's request is too vague and ambiguous.  (Doc. 428, pp. 8–9.)

The Court agrees with Plaintiffs.  "A court has the power to exclude evidence *in limine* only when evidence is clearly inadmissible on all potential grounds."  <u>Stewart v. Hooters of Am., Inc.</u>, No. 8:04-cv-40-T-17-MAP, 2007 WL 1752873, at *1 (M.D. Fla. June 18, 2007) (citing <u>Luce v. United States</u>, 469 U.S. 38, 41 (1984)).  Therefore, district courts "should deny a motion *in limine* if it cannot fully determine whether the evidence should be excluded prior to trial."  <u>DeJesus,</u>

2021 WL 5501816, at *2; see also Powers v. Target Corp., No. 19-CV-60922-BLOOM/Valle, 2020 WL 1986968, at *7 (S.D. Fla. Apr. 27, 2020) ("[A] district court may deny a motion *in limine* when it 'lacks the necessary specificity with respect to the evidence to be excluded.'") (quoting Bowden ex rel. Bowden v. Wal-Mart Stores, Inc., No. CIV. A. 99-D-880-E, 2001 WL 617521, at *1 (M.D. Ala. Feb. 20, 2001)).  That is the case here.  The County has not identified which portions of Praying for Sheetrock, or which of the events or persons described therein, it wishes to exclude,[8] nor has it articulated with any specificity the sort of "vague or general references" it seeks to preclude Plaintiffs from offering.  (See doc. 423, pp. 7–8.)  "Granting the Motion . . . at this stage would be premature due to these ambiguities."  Atwater v. Schwartz, No. 2:18-cv-146, 2020 WL 7249626, at *5 (S.D. Ga. Dec. 9, 2020).  Accordingly, the Court **DENIES**, without prejudice, the County's Motion to the extent it seeks to preclude Plaintiffs from introducing this evidence. However, the Court will entertain timely, more concrete objections with respect thereto at trial. Id.

### C.      Portions of the Deposition of Commissioner Jordan

The parties have designated portions of the deposition testimony of former County Commissioner Charles Jordan, who is now deceased, for admission at trial.   (Doc. 426.) Pertinently, Plaintiffs designate (and the County has opposed) Jordan's responses to questions concerning the County's failure to hire African Americans to County positions and the effects of those decisions.  (Doc. 426, pp. 1–2 (corresponding with doc. 426-1, pp. 34–36).)  Specifically, Plaintiffs designate Jordan's testimony that he "remember[ed] . . . specific examples . . . where [he] saw African-American candidates who were qualified [and] that [sic] [he] thought should be hired but weren't hired by the [C]ounty."  (Doc. 426-1, p. 34; see doc. 40 at p. 2 (Excerpt No. 9).)

---

[8]  The Court, however, reminds Plaintiffs of its prior assessment of the admissibility of books such as Praying for Sheetrock.  (Doc. 359, p. 52 n.26.)

The County designates Jordan's testimony that he could not remember any examples or recall "any of the positions that were at issue where [he] thought African-Americans were qualified and should have been hired." (Doc. 426-1, p. 34; <u>see</u> doc. 426, p. 2 (Excerpt No. 10).) Plaintiffs also designate an exchange in which Jordan indicated that he believed other commissioners made hiring decisions outside of board meetings and without his involvement, and the County's hiring decisions had harmed the black community. (Doc. 426-1, pp. 35–36; <u>see</u> doc. 426, p. 2 (Excerpt No. 11).)

The County moves to exclude "[a]ny references to Charles Jordan's deposition testimony regarding his belief that [the] County failed to hire qualified African-American candidates in County roles." (Doc. 421, p. 4.) The County argues that Plaintiffs' designated testimony is irrelevant because it has nothing to do with the Remaining Services and its introduction would be unfairly prejudicial and confusing to the jury. (<u>Id.</u> at pp. 4–5.) The Court agrees. Jordan's testimony is very general, indicating only that he recalled examples of qualified black candidates not being "hired by the [C]ounty" and that he suspected other commissioners were making hiring decisions without his input. (Doc. 426-1, p. 34.) This testimony lacks the necessary specificity to render it probative of the County's intent with respect to the provision of the Remaining Services. As stated in Discussion Section II.B, <u>supra</u>, historical background evidence must be sufficiently related to the "specific sequence of events *leading up to the challenged decision*." <u>League of Women Voters of Fla., Inc.</u>, 32 F.4th at 1373 (emphasis added). Jordan did not testify that the jobs the black candidates applied for had anything to do with the provision of the Remaining Services, or that the alleged hiring decisions had any impact whatsoever on the quality of these services on the Island. (<u>See</u> doc. 426-1, pp. 34–36.) Additionally, allowing Plaintiffs to introduce Jordan's designated testimony likely would create the (erroneous) impression that Plaintiffs have brought employment claims against the County, and confuse the jury into thinking

that they must decide whether the county commissioners, in fact, refused to hire black candidates based on their race.  As such, Jordan's non-specific testimony about prior hiring decisions, which sheds no light as to the Remaining Services and likely would be misleading, is excludable under Rules 402 and 403.

Nonetheless, Plaintiffs insist that Jordan's testimony is relevant historical evidence because the Court held that the racial composition of the County's Board of Commissioners was circumstantial evidence of the County's discriminatory intent.  (Doc. 428, p. 5 (citing doc. 359, p. 52).)  Plaintiffs are correct that, in the Summary Judgment Order, the Court considered that Jordan was the only black commissioner in all but four of the years between 1990 and 2018 as evidence of historical discrimination by the County.  (Doc. 359, p. 52 (citing doc. 343-14 pp. 4–5; doc. 343-23, p. 3; doc. 343-17, p. 2).)  The Board of Commissioners' predominately white composition is relevant to the County's intent because that group annually sets the County's budget, which includes expenditures on municipal services.  (See doc. 343-41; doc. 343-42; doc. 343-43; doc. 343-44; doc. 343-45; doc. 343-46.)  As such, a jury reasonably could find that the under-representation of African Americans on the very board which is responsible for making decisions that affect the Remaining Services is relevant to the County's intent.  To the contrary, Jordan's generalized testimony that he recalled examples of qualified black candidates not being hired is not probative of the Board of Commissioners' composition, nor is it probative as stated as to the racial composition of County employees who have oversight as to the provision of municipal services.  Indeed, Jordan did not testify that the black candidates were applying for Board positions or other jobs involving budgetary or other decisions pertaining to the County's provision of the Remaining Services.  (See doc. 426-1, pp. 34–35.)  Therefore, the Court is not persuaded that it

must admit Jordan's testimony merely because it considered the far more probative evidence of the Board of Commissioners' composition at summary judgment.

Based on the forgoing, the Court **GRANTS** the County's Motion as it pertains to the designated portions of Jordan's testimony which concern the Board of Commissioner's hiring decisions.

## IV.   Plaintiffs' Motion to Exclude Evidence and Argument Concerning Ownership of Roads in Hog Hammock (Doc. 396)

Plaintiffs argues that evidence concerning ownership of roads on Sapelo Island should be excluded because it is irrelevant and will confuse the jury and waste time due to its complexity. (Doc. 396, pp. 1, 3–6.)  Issues of road ownership and whether the County has a duty to maintain the Island's roads arose at the summary judgment stage.  The County sought summary judgment with respect to Plaintiffs' inferior road maintenance claims on the grounds that the State of Georgia (and not the County) owned the roads, and, therefore, the County was not obligated to maintain them.  (See doc. 359, pp. 57–58; see also doc. 274-1, pp. 45–46; doc. 354, p. 29–32.)  Plaintiffs opposed summary judgment on this basis, arguing that the County did, in fact, own the roads, and, therefore, had to maintain them in a non-discriminatory manner.  (Doc. 341, pp. 73–74.)  The Court determined that there was a genuine dispute of fact as to who owned the roads on Sapelo Island, and, therefore, denied summary judgment with respect to Plaintiffs' road-maintenance claims. (Doc. 359, pp. 57–58.)  The County filed a Motion for Reconsideration, contending that Plaintiff failed to include certain evidence in the record that, according to the County, "would have answered the lingering questions that prevented the Court from accepting the County's position that it does not own the roads on Sapelo Island." (Doc. 361, p. 2.) The Court denied the County's Motion for Reconsideration because, even after considering the deposition testimony that was

absent from the summary judgment record, factual questions remained concerning the ownership of roads on Sapelo Island.  (Doc. 374, p. 10; see id. at pp. 5–9.)

Plaintiffs now contend, in a motion *in limine*, that the issue of "[w]ho owns the roads" is irrelevant because the County "has maintained the roads in Hog Hammock for decades, and that course of conduct independently gives rise to the County's responsibility to maintain the roads in an equitable way."  (Doc. 396, pp. 1, 3–4.)  Specifically, Plaintiffs ask the Court to preclude the County from eliciting testimony concerning road ownership or from introducing the numerous exhibits devoted to this issue included in the County's Amended Proposed Exhibit List.  (Id.; see doc. 468, pp. 1–2 (Exhibit Nos. 17–29, 38).)  The County responds that "the question of road ownership remains to be resolved," and "simply proceeding with trial as though this unanswered question has been conclusively resolved in Plaintiffs' favor . . . is clearly improper."  (Doc. 441, p. 2.)  The County is correct.  As Plaintiffs concede, "a party may not use a motion *in limine* as a backdoor means to seek summary judgment."  (Doc. 430, p. 5.)  "Motions *in limine* address evidentiary questions and are inappropriate devices for resolving substantive issues."  Witness Sys., Inc. v. Nice Sys., Inc., No. 1:06-cv-126-TCB, 2008 WL 2047633, at *1 (N.D. Ga. May 10, 2008).  Indeed, they are not a "substitute for summary judgment."  Ruiz v. Safeco Ins. Co. of Ill., No. 18-21036-CV-WILLIAMS/TORRES, 2019 WL 2568013, at *2 (S.D. Fla. Apr. 23, 2019); see also Gold Cross Ems, Inc. v. Children's Hosp. of Ala., 309 F.R.D. 699, 700–01 (S.D. Ga. 2015) (siding with majority of circuits which hold that a motion *in limine* should not be used to dispose of claims and defenses).

The acceptance of Plaintiffs' argument that evidence of road ownership is irrelevant because of the County's prior road maintenance would require a legal determination that a duty to equitably conduct road maintenance services arises whenever a municipality maintains roads

within its jurisdiction, regardless of who owns the roads.  (See generally doc. 396, pp. 1, 3–4.)
The County has reiterated its position that the County could not "assume independent
responsibility for maintenance of the roads in Hog Hammock as a result of its performance of
maintenance on those roads." (See doc. 442, pp. 2–3.)  Now is not the proper time to resolve this
hotly contested issue of whether the County has a duty to maintain the Island's roads in a non-
discriminatory manner.[9]  See Mavrinac v. Emergency Med. Ass'n of Pittsburgh, No. 04-1880,
2007 WL 2908007, at *1 (W.D. Pa. Oct. 2, 2007) ("Motions in limine are inappropriate vehicles
to seek a final determination with respect to a substantive cause of action.").  Additionally, while
the Court is cognizant that allowing the parties to introduce evidence pertaining to road ownership
(which may be complex) will take time, it will not be unfairly prejudicial because it relates directly
to Plaintiffs' road-maintenance claim.  Cf. Goodwin v. Crawford Cnty., 454 F. Supp. 3d 1301,
1306 (M.D. Ga. 2020) (excluding exhibits given the "substantial likelihood they will unfairly
prejudice the jury against the Defendants and/or mislead the jury into considering [the plaintiff's]
dismissed substantive due process claim").  This contrasts sharply with the evidence concerning
prior dismissed claims which the Court excluded due to the risk that it would influence the jury to
contemplate issues no longer pertinent to this case.  See Discussion Sections II.A–D, supra.
Furthermore, it is worth noting that the road ownership evidence is not overwhelming prejudicial
to one side or the other; if construed by the jury in Plaintiffs' favor, the evidence would *benefit*

---

[9]  Plaintiffs appear to have argued in passing at summary judgment that road ownership is irrelevant to the
County's duty to maintain the roads.  (See doc. 341, p. 74.)  However, they raised this argument in a section
of their brief titled, "The Evidence Demonstrates That the County Is Responsible for Maintaining All Dirt
Roads in Hogg Hummock but Has Failed to Do So," under the subsection, "The County Owns All Roads
in Hogg Hummock." (Id. at p. 73.)  The Court did not address this argument, and, instead, denied summary
judgment with respect to Plaintiffs' road maintenance claims due to conflicting evidence as to who owned
the roads.  (Doc. 359, pp. 57–58.)

Plaintiffs because it would support a finding that the County had a duty to maintain the roads, and, therefore, had to do so in a non-discriminatory manner.

Based on the forgoing, the Court **DENIES** Plaintiff's Motion, (doc. 396), and, accordingly, will permit the introduction of evidence that is relevant to the issue of whether the County owns the roads on Sapelo Island.

**V.     The County's Motion to Exclude Evidence Concerning Trash Services for Plaintiffs Who Do Not Pay the Trash Removal Fee (Doc. 422)**

The Second Amended Complaint alleges that the County "charges all Plaintiffs who have developed properties on the Island for trash collection services. The trash fee . . . is the same for mainland and Island property owners. The services are not." (Doc. 206, p. 54.) The County moves to prohibit Plaintiffs who do not have a habitable structure on the Island, and, therefore, do not pay the trash fee or receive trash services, from "testifying about their personal experiences and grievances with the quality of trash removal services that exist on Sapelo Island." (Doc. 422, pp. 1–2 & n.1.) The crux of the County's argument is that these Plaintiffs' testimonies will be irrelevant and prejudicial because those Plaintiffs lack standing to bring a claim about the disparate trash services. (See id. at pp. 2–4.) Plaintiffs respond that the County "conflates Plaintiffs' standing with the relevance of their testimony" and they contend that, regardless of their standing, their personal observations and experiences regarding the County's provision of trash services is relevant to Plaintiffs' claims based on those services. (Doc. 430, pp. 1–3.)

The Court agrees. In the Summary Judgment Order, the Court rejected the County's argument that the following Plaintiffs lacked standing and thus should be dismissed from the case: Marion Banks, Valerie Williams, Stacey White, Andrea Sparrock, David Sparrock, Verdie Walker, Mary Palmer, Johnny Matthews, Sonnie Jones, Jesse Jones, and Dena Mae Harrison, the representative Harold and Johnnie Hillery's estate. (Doc. 359, pp. 23–27.) Notably, these are the

very Plaintiffs whom the County "anticipates . . . will testify that they do not have a habitable structure on the property in which they claim an interest, meaning they do not pay the trash fee." (Doc. 422, pp. 1–2 n.1.)   These Plaintiffs' standing to bring a claim concerning the County's provision of trash services has no bearing on whether they are competent to testify at trial about their personal knowledge regarding the trash services, nor does it mean that their testimony is necessarily irrelevant.   Standing is a jurisdictional doctrine used to determine whether there is a case or controversy for purposes of Article III, not a basis for evaluating the admissibility of testimony.   See Am. C.L. Union of Fla., Inc. v. Dixie Cnty., 690 F.3d 1244, 1247 (11th Cir. 2012) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 559 (1992)).   Indeed, the Federal Rules of Evidence allow any lay person to testify so long as they are competent, have personal knowledge of the subject matter of their testimony, and give an oath or affirmation before testifying.   Fed. R. Evid. 601–03.   Notably, "*every person* is competent to be a witness unless the [Federal Rules of Evidence] provide otherwise."   Fed. R. Evid. 601 (emphasis added).   Additionally, Rule 401 provides that evidence is relevant so long as it tends to make a fact "which is of consequence in determining the action" "more or less probable than it would be without the evidence."   Fed. R. Evid. 401.   None of the foregoing Rules requires witnesses to have standing or suggests that testimony by someone who lacks standing is irrelevant or prejudicial, and the County fails to cite to any authority suggesting otherwise.   (See docs. 422, 455.)   In fact, if that were the case, the vast majority of witnesses would be prohibited from testifying.   The County has not pointed to any other reason for the Court to conclude, at this time, that their testimony related to trash services on the Island would necessarily be inadmissible.

Accordingly, regardless of their standing, assuming they are competent and have personal knowledge on the topic, Plaintiffs who do not pay the trash removal fee may testify as witnesses

concerning the quality of the County's trash removal services on the Island.  Of course, their specific testimony must be relevant under Rule 401 and may be subject to exclusion at trial for reasons *other than* their purported lack of standing.

Based on the forgoing, the Court **DENIES** the County's Motion.  (Doc. 422.)

## CONCLUSION

For the reasons explained above, the Court **DENIES** Plaintiffs' Motion *in Limine* to Exclude Evidence and Argument Concerning Ownership of Roads in Hog Hammock, (doc. 396), and **GRANTS** their Motion *in Limine* to Exclude Evidence Regarding Fair Market Values Set Through Settlement of Real Property Tax Appeals, (doc. 399).  Additionally, the Court **GRANTS** the County's Motion to Exclude Evidence Concerning Services for which Claims Have Been Dismissed, (doc. 419), Motion to Exclude Evidence Concerning Zoning Enforcement, (doc. 420), and Motion to Exclude Evidence Concerning Property Taxation, (doc. 421).  The Court **DENIES** the County's Motion to Exclude Evidence Concerning Trash Services for Plaintiffs Who Do Not Pay Trash Fee, (doc. 422).  Finally, the County's Motion to Exclude Evidence Concerning Alleged Historical Discrimination is **GRANTED in part and DENIED in part**.  (Doc. 423.)

**SO ORDERED**, this 14th day of July, 2022.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA